## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE 2002 LAWRENCE R. BUCHALTER ALASKA TRUST and ALASKA TRUST COMPANY and STEPHEN C. HARRIS, TRUSTEES<br><br>　　　Plaintiffs<br><br>　　　vs.<br><br>PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY f/k/a AGL LIFE ASSURANCE COMPANY<br><br>　　　Defendant | Civil Action No.  12 cv 6808 (KMK)<br>ECF Case<br><br>**COMPLAINT** |

## I.    THE PARTIES

1.    Plaintiff, the 2002 Lawrence R. Buchalter Alaska Trust ("the Trust" or "Plaintiff Trust") is an irrevocable trust created on or about November 1, 2002.

2.    Plaintiff, the Alaska Trust Company is a co-Trustee of the Trust, having an address at Resolution Plaza, 1029 W. Third Ave., Ste 400, Anchorage, AK 99501-1981 ("Plaintiff co-Trustee" or "Plaintiff Alaska Trust Co." ).

3.    Plaintiff, Stephen C. Harris is a co-Trustee of the Trust, having an address at [_____]  New Rochelle, New York. ("Plaintiff co-Trustee" or "Plaintiff Harris").   Mr. Harris, an honors graduate of the University of Pennsylvania Wharton School of Business, has ten years' hedge fund experience.

4.    Defendant, Philadelphia Financial Life Assurance Company, f/k/a AGL Life Assurance Company ("Philadelphia Financial") was renamed Philadelphia Financial

Company on or about December 10, 2010.  Philadelphia Financial is an insurance and financial

services organization having a principal office at 1650 Market Street, 54th Floor, Philadelphia,

Pennsylvania 19103.

5.      Lawrence R. Buchalter ("Grantor" and/or "Appointer") is the grantor and

appointer of the Trust.   The Grantor resides at ____ _____ Short Hills, New Jersey

07078.   The Grantor is also an experienced hedge fund manager, serving since 2007 as

president of a large New York hedge fund.    As the Appointer of the Trust, Mr. Buchalter has

the power to appoint trustees and co-trustees of the Trust, and the investment advisor of the

Trust.

6.      Jeffrey J. Brown ("Investment Advisor"), was appointed by Mr. Buchalter as the

investment advisor to the Trust.  Mr. Brown is an investment professional with more than twenty

years' experience in evaluating investments.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C.

§1332 as complete diversity exists between Plaintiffs and Defendant, the amount in controversy

exceeds the jurisdictional minimum of this Court, and the Plaintiff co-trustees are citizens of

Alaska and New York, respectively, and are real parties to the controversy for purposes of

diversity jurisdiction because they possesses certain customary powers to hold, manage, and

dispose of assets for the benefit of another.  Plaintiff Alaska Trust Company, as co-Trustee, is

also a real party in interest as it holds the Policy pursuant to which this matter is brought, and is a

beneficiary thereof.

8.      According to the statements contained in the Policy at issue herein, Philadelphia

Financial at all times relevant herein was "principally engaged in the sale of life insurance and [ ]

licensed in 47 states and the District of Columbia." Philadelphia Financial does business in New York, and at all times relevant herein, had substantial contacts with New York in connection with the events giving rise to the claims herein.

9.      Venue is proper in this district because Defendant does substantial business in New York, and had substantial contacts with New York at all times relevant herein.

## III.      NATURE OF THE ACTION

10.      This action arises out of Defendant's actions in connection with the investment fund portion of a variable universal life policy purchased through Plaintiff Alaska Trust Company, a co-Trustee, at the direction of Grantor and held by Plaintiff Trust.  By the express terms of the Policy and associated documents, Plaintiff Trust, Plaintiff Alaska Trust Co. and Grantor were prohibited from contact with the general partner of the investment fund for any reason, and at all times relevant herein, Defendant, as limited partner, was to provide all information concerning the investment fund to Plaintiffs and Grantor so that Grantor could determine whether to redeem (withdraw) the funds, and Plaintiff Alaska Trust Co. could execute said redemption.  In addition, the terms created an obligation on the part of Defendant to timely and accurately process any withdrawal requests.

11.      As a sophisticated investor and experienced hedge fund manager, Grantor undertook the investment at issue because of the expected investment merits, as well as the ability to redeem upon 45 days notice.  However, he and the Plaintiff Trust were completely dependent upon Defendant to provide information from which Grantor could determine whether to direct the Plaintiff Alaska Trust Co. to redeem the investment on behalf of Plaintiff Trust.  In consideration for Defendant's services under the investment portion of the Policy, including, but not limited to, the timely provision of full and accurate information and the provision of prompt

3

and correct processing of redemption requests, the Plaintiff Trust paid more than $345,000 in fees to Defendant, and relied upon Defendant to promptly and competently perform its duties under the Policy.

12.     Defendant, as limited partner and a major investor in the investment fund, had access to regular and material information concerning the fund, but failed to provide said information to Grantor and the Plaintiff Trust so that redemption decisions could be made. Rather, the information provided was misleading in that it was both incomplete and also misrepresented the facts, both by reporting only positive information and by misrepresenting other facts.

13.     Despite the positive reports concerning the investment fund, Grantor had a redemption request made on behalf of the Plaintiff Trust in July, 2008, for monies in the fund to be immediately withdrawn.   Defendant failed to timely and correctly process the redemption request, and before the request could take effect, some three months later, all monies in the fund were frozen.  As of the date of this Complaint, all of the Plaintiff Trust's $3.9 million investment in the fund at the time of redemption request has been lost.

14.     As a direct consequence of Defendant's breach of its duties to provide information and to promptly and accurately process the redemption request, Plaintiff Trust has suffered direct investment losses of $3.5 to $3.9 million.

### IV.     THE TRUST AND THE POLICY

15.     On or about November 1, 2002, Grantor created the Trust which was established pursuant to the laws of the State of Alaska for the benefit of Grantor and his family.  (see **Exhibit A**).

4

16.     The Trust is a beneficiary and contract holder under a variable universal life insurance policy known as the Flexible Premium Survivorship Variable Life Insurance Contract, policy number VL300397, issued in or about December, 2002 by Defendant Philadelphia Financial (the "Policy") (see **Exhibit B**).

17.     The Trust was funded by the Grantor, and became the applicant investor under the Policy.  The Trust is identified therein as "Contract Holder" and "Beneficiary."  The Policy was delivered to the Trust in the State of Alaska.

18.     The Trust provides for Grantor to appoint one or more Independent Trustees. (See **Exhibit B** at II-29). On or about November 1, 2002, the Grantor appointed the Alaska Trust Company as an Independent Trustee.  Thereafter, on or about June 25, 2012, based on the events giving rise to the claims hereunder, as well as the need for closer oversight of the Trust, the Grantor appointed as an additional Independent Trustee, Stephen C. Harris, who is a citizen of New York, with a principal address at .                           New Rochelle, New York, and who is an experienced hedge fund manager and investment professional.

19.     The Trust provides to the co-Trustees the powers to hold, manage and dispose of assets for the benefit of the Trust, including, but not limited to, the power to retain counsel to act on behalf of the Trust.  (See **Exhibit A** II-1 through 5)

20.     The Trust holds the Policy, a variable universal life insurance policy, with an initial face amount death benefit of $55,000,000.00.  Grantor funded the Trust upon an initial premium payment to Philadelphia Financial of $1,500,000.00, with an initial net premium of $1,465,900.00, on or about December 31, 2002.  Thereafter, Grantor paid premiums through the Trust of $1,500,000.00 on December 31, 2003 and $1,500,000.00 on December 31, 2004 for a

total of $4,500,000.00. The Policy provides that its "Governing Jurisdiction" is the state of Alaska and that its "State of Issuance" is the state of Alaska.

21.    The Policy provides that it "will be sold by individuals who, in addition to being licensed as life insurance agents for the Company, will be National Association of Securities Dealers, Inc. ("NASD") registered representatives." (**Exhibit B** at 30). As such, Defendant had expertise in connection with both the life insurance portion and the investment portion of the Policy.

## V.    PHILADELPHIA FINANCIAL AND THE POLICY INVESTMENTS

22.    At all times material and relevant herein, Philadelphia Financial offered variable universal life insurance policies.  Variable universal life insurance policies are designed to allow policy holders to invest a portion of their premiums in optional investment accounts which are offered under the policy.  Because the investments are held under a policy, gains inside the policy are shielded from income taxes, as is the payout upon death.  Policy holders are able to access their money during their lifetime by withdrawing or borrowing funds, tax free, from the policies.  The policies are generally considered an element of personal estate planning and are essentially a combination of life insurance, and a tax-advantaged investment vehicle.

23.    The Grantor selected Philadelphia Financial from a field of four to six leading carriers in 2003 to: (1) underwrite, syndicate and maintain the "tax integrity" of the underlying insurance coverage, and, (2) comprehensively maintain and administer the policy's optional investment accounts on behalf of the Trust.  For these services, Philadelphia Financial would be paid by the Trust both upfront fees as well as annual fees for the life of the policy.  The annual fees to be paid by the Trust were based on these two services:  one was calculated and charged in

relation to the life insurance in force, and the other was calculated and charged in relation to the reported amounts in the investment accounts.

24.     In connection with the selection of investment alternatives under the Policy, Philadelphia Financial provided to Plaintiff Trust and Grantor, on behalf of Plaintiff Trust, for their consideration and review, its Private Placement Memorandum ("Philadelphia Financial PPM"). The Philadelphia Financial PPM described the offering of limited partnership interests in various funds, which interests are designated to be an investment option under the insurance contract.   The pre-approved list presented by Philadelphia Financial to Plaintiff Trust and Grantor was a group of private hedge fund partnerships and fund-of-hedge-fund partnerships that created investment vehicles designed specifically for insurance company investment, and designed to be in compliance with relevant tax and insurance regulations.

25.     However, while Plaintiff Trust, and Grantor, on behalf of Plaintiff Trust, had a choice of the managers (investment advisors) of its investment accounts, which had been pre-approved by Philadelphia Financial, they had neither control nor discretion with respect to the funds in which these accounts were invested, and no ownership interest in the accounts.  Rather, Philadelphia Financial, as the actual owner of the investment interest in the investment accounts, and serving as limited partner investing on behalf of and as agent for the Trust, had exclusive control.

26.     Specifically, the Policy provides that Philadelphia Financial will maintain ownership over the investments, providing that: "[t]he Company owns all of the shares held by each Investment Account.  Currently, the Company, in its discretion, may exercise the voting rights in such shares." Id at 30.  Specifically:

> **The assets in the Investment Accounts and the Policy are owned by the Company, and Policy Owners have no legal, equitable, direct, indirect or**

**other interest in any specific investment item held in the Investment Accounts or the Policy.**

Id at 33. (Emphasis in text)

27.     In addition, pursuant to both the Policy and the Philadelphia Financial PPM, Plaintiffs, and Grantor are prohibited from direct contact with the hedge fund manager. Specifically, the Policy states that: "Policy owner will not directly or indirectly influence or attempt to influence the Manager's selection, purchase, retention or sale of any investment within the Fund." See Philadelphia Financial letter dated December 20, 2002 at ¶9, attached to Policy at **Exhibit A** hereto.

28.     The reason for the foregoing prohibition was further explained by way of the Philadelphia Financial PPM: "If there is any pre-arrangement or understanding that an Investment Account will invest in a particular security or other investment, there would be a material risk that the Policy Owner would be treated as owning the assets underlying the Investment Accounts, in which case the Policy would not be treated as a life insurance contract for federal tax purposes. **For this reason, no Policy Owner should ever attempt to contact an investment advisor. Rather, any and all questions, comments, or instructions regarding the Policy should be addressed to the Company."** See Philadelphia Financial PPM at 33, ¶2, attached hereto as **Exhibit C.** (Emphasis in original.).

29.     Despite the lack of ownership and control over the investments as described above, the Policy provides that the Policy holder is permitted to change the direction of the investments, depending on the investment, as well as gain access to the funds in the event that the investments prove to be unattractive to the Grantor and the Plaintiff Trust.

30.     In or about 2003, approximately $1,500,000.00 of the Trust's funds were invested by Philadelphia Financial in Millenium Global, LP.  In or about 2004, approximately

$1,500,000.00 of the Trust's funds was invested by Philadelphia Financial in Arden Investment Partners, LP; and approximately $1,500,000.00 of the Trust's funds was invested by Philadelphia Financial in Silver Creek Insurance Dedicated Fund, LP. Through appreciation of these investment choices, the Trust had Philadelphia Financial-reported balances of more than $6 million by January 1, 2006.

31.     Upon investing, Plaintiffs and the Grantor were completely dependent upon Philadelphia Financial for information concerning the investments. Specifically, in addition to being barred from direct contact with the funds in which the Trust monies were invested, Grantor and the Plaintiffs also had no way to obtain public information concerning the investments because the investments were limited partnership interests of private investment partnerships. Accordingly, it was critically important that Philadelphia Financial, as the limited partner of the investments, provided all relevant information concerning the investments to Plaintiffs.

32.     In acknowledgement of Philadelphia Financial's role as disseminator of information, the Policy states that "[a]ll records and accounts relating to the Investment Accounts will be maintained by the Company. The Company will mail an annual policy statement to the Policy Owner." Id. at 30.

33.     In addition to Plaintiff Trust's and Grantor's need for information, and their reliance upon Philadelphia Financial for same, Philadelphia Financial also advised Grantor and Plaintiffs that Philadelphia Financial provided oversight of "platform funds," such as the ones noted in paragraph 30 above, as they related to compliance with certain regulatory requirements. The "platform," as presented to Philadelphia Financial policy holders, including the Trust, was essentially the list of partnerships with which Philadelphia Financial had reached agreements and which had been deemed to be suitable for investment by Philadelphia Financial policy holders.

Such agreements with the partnerships presumably included the commissions to be earned by

Philadelphia Financial.

34.     Consistent with the foregoing, and by way of example of the type of detailed

oversight Philadelphia Financial agreed to provide, Philadelphia Financial informed Plaintiffs

and Grantor via email in or about September, 2003, as follows:

> We require all insurance-dedicated funds in which our policy assets are invested
> to assume continuing responsibility for compliance with applicable diversification
> requirements.  Put another way, we do not (and will not) ask policy holders to
> figure this out on their own.
>
> The insurance-dedicated funds in which we are currently invested, and all
> insurance-dedicated funds in which we contemplate future investment, are aware
> of the proposed changes to the diversification regulation.  It is our understanding
> that they either have structured or are preparing to structure their operations to
> deal with a regulatory environment in which investments in non insurance-
> dedicated hedge funds cease to qualify for "look through" treatment.
>
> From a purely practical standpoint, this makes perfect business sense.  No
> insurance-dedicated hedge fund will be able to remain in business or attract new
> investments unless it is willing to make a commitment to adhere to the
> diversification requirements (whatever they may be).

See Email from Philadelphia Financial to Grantor and Trust dated September, 2003, attached

hereto as **Exhibit D.**

35.     In addition to diversification requirements, however, Philadelphia Financial further

acted in accordance with the foregoing obligation to provide oversight and information, when, in

or about September, 2005, upon learning of a possible fraud involving a fund in which the Trust

had a very small, indirect investment, Philadelphia Financial contacted counsel for the Grantor to

advise Grantor of the fraud and to inform the Grantor and the Plaintiffs so that steps could be

taken to protect the Trust's and the Grantor's investment.

36.     Specifically, Philadelphia Financial informed the Grantor that the Trust's

investment in an investment fund known as Silver Creek "is in turn invested at least in part in

Silver Creek's Long Short Fund.  Three Silver Creek Long Short Funds in turn had a 4%

exposure to … a hedge fund which is currently under investigation for fraud. . . . ."  See

Transcript of Voicemail message from September, 2005, attached hereto as **Exhibit E.**

Philadelphia Financial also advised the Grantor's counsel, William Lipkind, Esq. to contact

Philadelphia Financial so that Philadelphia Financial's Director of Research, Mr. Sandy Geyelin,

could provide further details.   The losses to the Trust of this "bad news" were less than 0.3% of

the then-value of the Trust investment account.  The Grantor and Plaintiff Trust gained

considerable comfort from the attentiveness and awareness of Philadelphia Financial as to what

was a relatively small adverse development within the investment account.

     37.    The Plaintiff Trust and Grantor further took comfort from the fact that

Philadelphia Financial had designated a "Director of Research" to engage in and to conduct

oversight of the policy investment activity.

     38.    In consideration for Philadelphia Financial's services to the Plaintiffs and

Grantor in connection with the Policy, the Trust has paid more than $345,000.00 in fees to

Philadelphia Financial since the inception of the Policy.

## VI.   INVESTMENT IN STRATEGIC STABLE RETURN FUND (ID), LP

     39.    Later in September, 2005, in an email to the Grantor from Philadelphia

Financial's Director of Research, Philadelphia Financial provided information to Grantor

concerning the Strategic Stable Return Fund ("SSR"), a hedge fund managed by SSR Capital

Partners, LP, identifying SSR as an approved investment choice that had been "vetted" by

Philadelphia Financial.  See September, 2005 email attached hereto as **Exhibit F.**

     40.    At the time Philadelphia Financial presented SSR as an approved investment

choice, there were an estimated 75 to 100 insurance-dedicated hedge funds.  Philadelphia

Financial presented just 27 insurance-dedicated funds to Plaintiff Trust and Grantor, clearly indicating that Philadelphia Financial had utilized specific criteria to select said funds, and conversely found that the majority of available funds were not appropriate for its policyholders, such as the Trust. As such, SSR was affirmatively pre-selected by Philadelphia Financial as suitable for policyholders such as Plaintiff Trust and Grantor, based upon Philadelphia Financial's review and determination, utilizing specific criteria.

41.      SSR is an insurance-dedicated fund-of-funds launched in September, 2003 that invested in credit-based hedge fund managers. In or about October, 2003, Philadelphia Financial had approved SSR as one of its "platform funds." Thus, at the time it presented SSR to Plaintiff Trust and the Grantor in September 2005, Philadelphia Financial and SSR had had approximately two years of a business relationship during which time Philadelphia Financial presumably drew conclusions concerning SSR's suitability for Philadelphia Financial's policy holders, including the Trust. For the reasons hereafter discussed, Grantor, on behalf of Plaintiff Trust, decided to invest through the Policy in SSR.

42.      At the time of the Trust's first association with SSR, SSR was less than two years old, had a relatively small disclosed investor base, totaling about $22 million, but offered the risk protection of a diversified fund-of-hedge funds. Its investment strategy was to invest the investment funds with multiple hedge fund managers, thus reducing the risk taken with an investment in a single hedge fund manager controlled by one or a few individuals.

43.      One of the important investment terms of the SSR fund was that it allowed for investors' redemptions every quarter, with only 45 days' advance notice, any time after the first full year of investment. As such, policy investors had the flexibility to withdraw their

investment in the fund, in whole or in part, four times per year, for a variety of reasons, including reasons related to changes, developments or performance of the SSR fund.

44.     Given the fact that factors change throughout the life of any investment, these factors must be reviewed and reconsidered frequently to consider and reaffirm the commitment to the investment, and therefore, the right to redeem (i.e. withdraw) was an essential feature in favor of this fund.  Among the factors at issue are changes in assets under management, personnel, investment returns, market conditions for the particular strategy, legal actions, investment concentration, and changes in service providers, including the fund's independent auditor and third party administrator.

45.     In essence, this fund was particularly attractive because it could be monitored by the investor and Philadelphia Financial, and if any issues affecting the performance or investment risk should arise, a full withdrawal could be made each and every quarter, as directed by Grantor, and executed by Plaintiff co-Trustee on behalf of the Plaintiff Trust.  Older, larger, and more established funds often typically only allow redemptions annually, or with much longer notice periods.

46.     The foregoing was important because Philadelphia Financial indicated that this "product" was intended for affluent, sophisticated investors who were comfortable with self-directed investment decisions.  Grantor was such an investor.

A.     **Philadelphia Financial's Obligation to Provide Information**

47.     Philadelphia Financial also made it clear that it did not verify information about or presented by SSR for evaluation for a possible investment. On both its investment "tearsheets" as well as in its own policy PPM, Philadelphia Financial indicated that the investor should determine on its own whether the information provided was material for an investor to consider

as to the investment merits. A decision on withdrawal or other action was clearly left to the Grantor to decide, on behalf of the Plaintiff Trust, and executed by the Plaintiff co-Trustee.

48.     Specifically, on December 16, 2005, Philadelphia Financial, in Part II of the Private Placement Memorandum Supplement delivered to the Trust (in connection with the Trust's investment beginning on December 31, 2005), made the following two statements, each in boldface type:

> **For a fuller understanding of the SSR Fund, its investment objectives, policies, management, strategies, risks, fees and expenses, Policy Owners must carefully read the attached Confidential Private Placement Memorandum and Limited Partnership Agreement of the SSR Fund.**
>
> **The information provided herein regarding the SSR Fund was extracted from the attached Confidential Private Placement Memorandum and Limited Partnership Agreement of the SSR Fund. The Company has not confirmed the completeness, genuineness, or accuracy of such information or data.**

See Philadelphia Financial Private Placement Memorandum Supplement, attached hereto as **Exhibit G.**

49.     However, by informing Plaintiffs and Grantor that Plaintiff Trust, and Grantor, on behalf of Plaintiff Trust, had to rely solely on SSR-provided information to evaluate all investment considerations and risks (which Plaintiffs and Grantor could only obtain from Philadelphia Financial), Philadelphia Financial agreed to assume a duty to collect and pass forward directly to Plaintiffs and Grantor whatever information that was made available by SSR, as well as information uncovered through Philadelphia Financial's research department in monitoring the accounts for the benefit of the Trust, so that Grantor could continually or periodically consider and evaluate said information in making decisions with respect to whether to stay with the investment in SSR, on behalf of the Trust.

50.     Philadelphia Financial's agreement and duty was further evidenced by the fact that, although Grantor and Plaintiff Co-Trustee, and the Trust, as policyholder, were prohibited from contact with SSR at any time, for any reason, Philadelphia Financial, as limited partner, investing in SSR as agent for and on behalf of the Trust, did have broad access and regular contact with SSR, and SSR regularly provided information to Philadelphia Financial.

51.     Specifically, the manager of SSR, in its AIMA Questionnaire (an industry-standardized disclosure statement provided to prospective investors), sets forth the information it provided to limited partners, such as Philadelphia Financial:

We provide for our clients:

| | |
|---|---|
| Monthly Estimate: | On or before 15th of the following month |
| Account Statement: | On or before the 25th of the following month |
| Investor Letter: | Quarterly |
| Audited Financials: | Within 180 days of year end |
| ADV Part II: | Offered on a yearly basis |

We also have a portfolio breakdown that is available upon request.

See SSR's Disclosure Statement, at Section 17.1, attached hereto as **Exhibit H.**

52.     SSR's marketing presentation further lists seven "Primary Responsibilities" of its role as manager of the fund. Number one on the list is to "communicate effectively with, and be responsive to our investors." See SSR's Marketing Presentation, attached hereto as **Exhibit I** at 13. In fact, it is known from documents provided by SSR that, in late 2007, at the time the Trust was invested in SSR, Philadelphia Financial was SSR's third largest investor. Thus, there was every reason for Grantor to believe that SSR would provide more than sufficient information about its activities to Philadelphia Financial to allow an investor such as Grantor to frequently evaluate its continuing commitment to the fund on behalf of the Plaintiff Trust.

53.     Significantly, Philadelphia Financial's "Director of Research," Mr. Sandy Geyelin, was solely dedicated to monitoring and evaluating Philadelphia Financial's investment managers and interfacing with Philadelphia Financial policyholders with respect to these managers.  Thus, Grantor knew that Philadelphia Financial would have the ability to pass through meaningful information to Plaintiffs and the Grantor, upon which Grantor could make both initial and ongoing investment decisions.  The Grantor was well-positioned to evaluate such information, based upon more than twenty years of investment experience with investments of all types, and as a former partner in the credit businesses of Goldman Sachs & Co.  Further, Grantor was the founder and president of a billion-dollar credit-based hedge fund, and personally reported to hundreds of that fund's investors.

54.     At all times material and relevant, it was understood between the parties that Philadelphia Financial, acting as a conduit, would pass on any and all information received by Philadelphia Financial with respect to SSR to Grantor and Plaintiffs so that the Grantor could make timely and informed decisions each quarter to take one of three possible actions:  remain invested, reduce or increase the investment, or exit the investment entirely.

## B.     Information To Be Provided by Philadelphia Financial

55.     Given the opaque nature of hedge funds ("HFs") and fund-of-hedge funds ("FOFs") (as compared to a holding in a mutual fund, a public stock or bond, or an exchange-traded fund), an investor has limited tools with which to monitor or critically evaluate an HF or FOF investment.  These information tools are, in order of importance:  a review of the audited financial statements as presented by the Independent Auditor of the fund, periodic direct communications from the manager itself (eg., via letters, conference calls, website access),

observation of reported changes in service providers, or, for sophisticated investors only,

periodic access to the investment manager.

56.     Among the types of information that were important in determining whether an

investor should withdraw, reduce, or exit the investment entirely were the following:

(a)     Information provided in audited financial statements;
(b)     Changes in key service providers—auditor, counsel, administrator;
(c)     Ownership of the General Partner;
(d)     Changes in the investment in the fund by principals of the General Partner;
(e)     Related party transactions;
(f)     Concentration of the portfolio holdings;
(g)     Major portfolio holdings;
(h)     Legal action that the general partner of the fund is a party to;
(i)     Regulatory actions or investigation;
(j)     Change in investment strategy, leverage, portfolio risks.
(k)     Changes to total assets under management.

Accordingly, Grantor and Plaintiffs reasonably expected that any and all information

received by Philadelphia Financial as to the foregoing would be provided to Plaintiffs and

Grantor.  As more fully set forth herein, the importance of this information to Plaintiffs' and

Grantor's investment could not be overemphasized.

57.     **Audited Financial Statements.**  Any possible irregularities reported in the

audited financial statements were critical information in considering the ongoing commitment to

a fund investment.  For example, the SSR Fund limited partnership agreement provided that the

partnership would provide annual audited financial statements to limited partners.  Not only was

it critical that Philadelphia Financial then forward this information to Plaintiffs and Grantor, but

a failure by SSR to provide audited statements to Philadelphia Financial was even more critical

adverse information.  Specifically, the absence of an audited statement where, as here,

Philadelphia Financial knew that an audited statement was critically important, was, itself,

important information which Philadelphia Financial and its Director of Research should have provided to Plaintiffs and Grantor.

58.    In addition to the importance of the existence of audited statements, it is essential that investors in HFs and FOFs have the ability to consider the strength and continuity of the fund's "service providers."

59.    **Service Providers.**   Specifically, hedge funds and fund-of-hedge funds have only three or four external service providers that provide the only outside, objective observations of the manager and serve as critically important inputs for an investor as to the business, accounting, and investment practices of the fund.    Hedge funds and fund-of-hedge funds have no true independent boards of directors, no regulator, no federal or state reporting responsibilities and no other similar mechanism to allow investors to gain confidence that the manager of the fund is acting responsibly with investor capital and is reporting profits in accordance with accounting standards.  These four service providers for HFs and FOFs are, in order of importance:  the independent auditor, the administrator, the prime broker, and the outside counsel.

60.    Each of the service providers risk impairing its reputation if a fund for which it serves as a paid service provider has questionable practices that the service provider did not seek to remedy or, in the alternative, if the service provider did not resign if no remedy was achievable.  Therefore, a change in service provider is widely viewed as a material event for a hedge fund or a fund-of-hedge fund and is reported promptly to limited partners as such.

61.    **The Independent Financial Auditor.**   SSR's independent financial auditor at the time of investment and indicated in the SSR Private Placement Memorandum was the prominent accounting firm of Ernst & Young.  Thereafter, the firm of Rothstein, Kass & Co.

("RKCO"), also a noted firm with experience in reviewing and opining on accounting practices, valuation methodology and various other operating measures of HFs and FOFs, was indicated on the SSR "tearsheets" as the fund's auditor. This, too, was an important consideration by the Grantor in selecting SSR for the Trust's investment.

62.    Accordingly, the SSR Private Placement Memorandum indicated that a credible hedge fund accounting firm had agreed to serve as independent auditor, bringing its experience base and business standards to bear each year in reviewing the funds' accounts and profit and loss calculations. Financial statements that bear the report and approval of an independent auditor attest to the financial statements' fairness and compliance with generally accepted accounting principles. HFs and FOFs are essentially unregulated, and as such, do not have independent governance oversight and do not make regular reports to the Securities and Exchange Commission or other public agencies that are available for investors to review and compare. Therefore, evaluation and approval of the independent auditor is critically important — much more important, for example, than a typical corporate audit of a publicly-traded company.

63.    The independent auditor is hired to comply with any legal requirements, to challenge and to corroborate the valuation and financial reporting provided by the third party administrator and/or investment manager and to provide informed comment on the application of new and existing accounting standards.   The auditor is appointed by the fund's directors.

64.    Another important function of an independent auditor is to consider fraud controls and issue appropriate audit recommendations. In short, the auditor is viewed as keeping the investment manager "honest" as it relates to reporting to investors the value of their respective investment accounts, particularly at year-end, when the investment manager is

permitted to allocate fund capital to itself in the form of annual Incentive Fees. It was

determined, in the aftermath of the Madoff fraud, that the fraud was enabled by a lack of a

rigorous review of the investment accounts by the fund's auditor. In the case of SSR, which

invested in other partnerships that specialized in "asset-based lending," the oversight of valuation

practices and the oversight of the financial statements of the underlying funds were essential for

the Policy holder (the Trust), and the Grantor, (in consultation with its investment advisors), to

make decisions about whether to leave monies in the fund, increase or decrease the amount

invested, or withdraw them. As such, the lack of any independent audit would raise a red flag

indicating a problem with the fund, leading to withdrawing, or redemption, of monies.

65.    **The Administrator.**   The administrator is responsible for calculating the

monthly account balance, generating investor statements and delivering statements directly to

investors, as well as preparing the annual accounting statements that are then reviewed by the

Independent Auditor. A change in administrator is very rare and is viewed by any sophisticated

investor as a possible sign of trouble for any HF or FOF partnership. Disclosure of this

information, without an accompanying reasonable explanation, would lead most sophisticated

investors to withdraw their monies from the fund.

66.    **Other Types of Information.**   Of additional critical importance, an indictment,

SEC investigation or the equivalent, or other regulatory action taken against a fund manager, or

anyone affiliated with the fund, would be an immediate catalyst for an investor to evaluate the

status of an investment in the partnership, and in all likelihood, redeem at the first opportunity.

67.    In addition, to providing information to Plaintiffs and Grantor, Philadelphia

Financial had previously led the Grantor to believe that Philadelphia Financial would play a

consultative and informative role with the Grantor with respect to the Trust's investments.

68.     Based upon the provisions of the PPMs and Policy, and Philadelphia Financial's own internal corporate policy, Plaintiff Trust and Grantor were completely dependent upon Philadelphia Financial for all of the foregoing information, including, the absence of such information.

69.     Moreover, based upon Philadelphia Financial's prior representations as to researching, monitoring and oversight of the investments, and past reporting of investment warnings related to a comparatively minor investment of Plaintiffs', Plaintiff Trust and Grantor reasonably relied upon Philadelphia Financial's duty under the contract and as a matter of law, to provide all material information to Plaintiffs.

**C.      The Decision to Invest in SSR Was Based On Defendant's Representations**

70.     In or about December, 2005, in reliance upon all of the foregoing, including the assurances by Philadelphia Financial to the Plaintiff Trust and the Grantor that it would continue to keep the Plaintiffs and Grantor informed, Grantor, on behalf of Plaintiff Trust, elected to invest half of the monies in the Trust investment account in SSR.

71.     An initial payment to SSR in the amount of $88,000.00 was made on or about December 30, 2005.  On or about January 31, 2006, the Trust invested a second payment, in the amount of $2,781,000.00.  The third, and final installment, was made on or about February 28, 2006 in the amount of $317,722.64.  Thus, the total invested in SSR by the Trust was $3,186,722.64.  In consideration for Philadelphia Financial's services to the Trust and Grantor, the Trust has paid more than $345,000.00 in fees to Philadelphia Financial since the inception of the Policy.  Of these fees, approximately $250,000.00 was paid to Philadelphia Financial by the Trust since investing in SSR.

72.     Thereafter, Philadelphia Financial communicated directly by email with the Grantor of the Trust on a monthly basis with timely information concerning only the reported investment performance of the SSR fund. Such information should have included any and all data that Philadelphia Financial had received from SSR or to which it had access by virtue of its status as a limited partner acting on behalf of the policy owners, as well as based on information received by way of its Research Department, which was directed by Mr. Geyelin.

73.     Based upon Philadelphia Financial's previous communications (September, 2005) with the Grantor and the Trust, information concerning fraudulent activities and details with respect to individual investors and owners of the funds was knowledge and information to which Philadelphia Financial was privy and which it was obligated to disclose to Plaintiffs and the Grantor.

74.     Philadelphia Financial's presentation of SSRs' documents to the Trust and Grantor, under the representation that the financials had been independently audited, as well as the fact that Philadelphia Financial had agreed to provide all relevant information to investors, caused the Grantor and the Trust to reasonably rely upon Philadelphia Financial to provide accurate and complete information.

75.     Beginning in the second quarter of 2007, a full year after the initial investment, the Plaintiffs and Grantor had earned the right to demand a partial or full redemption at any quarter-end, provided 45 days' notice was given to SSR. In or about May, 2007, Philadelphia Financial provided fund balances for the month ending April, 2007. In response, the Grantor noted that he and the Trust had not received a report in approximately one year and requested a copy of it. Philadelphia Financial later sent a similar current report, which was a one page marketing sheet that purported to summarize the fund and its performance. Based upon the

information Philadelphia Financial provided to Plaintiffs and Grantor, the Fund was performing

extremely well, still having not lost money in any month since inception of the fund.

**D.**   **Request to Redeem; Denial of Request; Loss of Monies**

76.   Despite the foregoing, in or about July, 2008, Grantor grew suspicious after

Philadelphia Financial had –again--reported to the Grantor and to Plaintiffs what were

surprisingly consistent positive monthly returns, despite extreme market conditions in the

previous months and the beginning quarters of the global financial crisis of 2008.

77.   Specifically, SSR had reported sixty-one straight positive months (ninety-two, if

their pro-forma marketing figures are considered), averaging about 12% profits annually with no

down months and remarkably small volatility of returns (the most commonly used measures for

hedge fund risk are monthly volatility of returns and magnitude of "down" months).  In the

opinion of the Grantor, the performance was so aberrational and unreasonably good that it

materially informed his suspicion of wrongdoing at SSR and he elected to redeem before even a

single month of investment loss was ever reported.

78.   Based on his extensive experience in the financial markets and investment

partnerships, and without any other information about the fund provided to him by Philadelphia

Financial, including the absence of any commentary or business information from the manager

that could explain the foregoing aberration, and without the ability to speak to the manager, the

Grantor suspected, at the minimum, valuation irregularities and decided to make a request of a

full redemption/withdrawal from the fund.  He contacted counsel for the Grantor to effectuate the

Trust's redemption of its investment from SSR.

79.   On or about July 30, 2008, at the instruction of the Grantor, William Lipkind,

Esq., attorney for the Grantor, sent an email to John Hillman, Chief Executive Officer of

Philadelphia Financial, <u>requesting that he prepare the documentation such that the Trust could</u> <u>redeem investment positions for cash "ASAP."</u>  The request, made via email, stated as follows:

> I need the applicable person at your shop to send me the applicable documents
> and describe the applicable procedures whereby the Buchalter policy can sell out
> all of its positions and reduce everything to cash ASAP.

<u>See</u> July 30, 2008 email, attached hereto as **Exhibit J**.

As of the June 30, 2008 Philadelphia Financial statement sent to the Grantor and the Trust the reported value of the SSR investment account was $3,877,135.00.

80.     The SSR redemption terms allowed the Trust to make a complete withdrawal at the end of each quarter, with at least 45 days' notice. Lipkind's request to Hillman was 61 days prior to the end of the third quarter, September 30, 2008.

81.     On or about August 5, 2008, Philadelphia Financial sent to Lipkind the "applicable documents" that had been requested by Lipkind five days earlier.

82.     On or about August 7, 2008, William Lipkind, Esq. forwarded the "applicable documents" to the Plaintiff Alaska Trust Company, then sole Trustee of the Trust, together with a letter from Mr. Jeff Brown, the Grantor's appointed Investment Advisor to effect the SSR redemption.  At this time, there were 55 days before the next available redemption date, September 30, 2008.  <u>See</u> Letter dated August 7, 2008 to Alaska Trust Company, enclosing letter from Mr. Brown, attached hereto as **Exhibit K.**

83.     The "applicable documents" were prepared by Philadelphia Financial, as directed by Mr. Hillman himself, on Philadelphia Financial letterhead.  However, for reasons that are known only to Philadelphia Financial, and discovered by Grantor only months later, the "applicable documents" were completed by Philadelphia Financial with specific instruction to redeem all funds on <u>December 30, 2008</u>, not September 30, 2008.   Thus, while Philadelphia

Financial had been directed by counsel for the Grantor to effect the redemption "ASAP,"
Philadelphia Financial constructed the document to effect the redemption in 145 days. See Forms
prepared by Defendant, attached hereto as **Exhibit L.**

84.       By October 2008, at the nadir of the financial crisis of 2008-2009, SSR had
received so many requests for redemptions that it exercised its right to suspend all redemption
requests until such time it felt it could accommodate the return of capital.

85.       While the Trust (through Lipkind) requested Philadelphia Financial to effect a
redemption well before SSR reported a down month and before essentially all other redemption
requests, Philadelphia Financial's professional negligence in preparing the redemption
documents contrary to that specifically requested by Grantor, and those acting on Grantor's
behalf, caused Plaintiff Trust, co-Trustee and Grantor to have their request for redemption
suspended along with all similar requests made to SSR through November 15, 2008.

86.       In response to a request for information and for an explanation and a demand for
compliance with the redemption request, Philadelphia Financial continued to assure those acting
on behalf of the Trust that Philadelphia Financial was in contact with SSR "on at least a weekly
basis to monitor their activities regarding SSR's underlying investments", that they would
"remain actively engaged" and that they would "report back on new developments as we learn of
them." See Email from Philadelphia Financial dated November 20, 2008, attached hereto as
**Exhibit M.** Again, Philadelphia Financial provided assurances to the Grantor from senior
Philadelphia Financial officers regarding Philadelphia Financial's attentiveness and oversight of
the investments it made on behalf of, and as agent for, the Trust.

87.       Despite Philadelphia Financial's prior representations and assurances, and despite
Plaintiffs' and the Grantor's request to Philadelphia Financial in July, 2008, seeking redemption

immediately, no capital has been returned to the Trust.  Rather, as of June 30, 2012, the Trust has

been informed via a letter from SSR dated July 31, 2012 (forwarded to the Grantor from

Philadelphia Financial on August 7, 2012), that the Trust has a stated balance of $492,900 in the

SSR investment account, but faces the likelihood that the account may be valued at zero in the

very near future, possibly within weeks.  Specifically, after initially reaching a peak value in

September, 2008 of $3.904 million, the reported SSR investment account balance has dropped

every single month thereafter.  Following sixty-two consecutive positive return months (in fact,

SSR's first sixty-two months of operations), SSR has now reported forty-six consecutive

unprofitable months, with the Trust's account balance showing a stated decline of about 88%,

with losses rising monthly.

## VII.   PHILADELPHIA FINANCIAL'S OMISSIONS AND MISREPRESENTATIONS

88.    Philadelphia Financial indicated in its Policy PPM that it was investing as a

limited partner in the relevant investment fund "on behalf of" the Trust's separate account.   See

**Exhibit C** at 38.  The language chosen, "on behalf of," directly implied their actions would be

consistent with the definition of the word 'behalf': "in the interest of," "for the benefit of," "as a

representative of,", or "as agent of, on the part of."

89.    Philadelphia Financial's regular access to SSR information, which it was duty-

bound to pass on to Plaintiffs and Grantor, was even more critical because Philadelphia Financial

expressly prohibited Plaintiffs and Grantor from speaking directly to SSR.

90.    There can be no question that Philadelphia Financial received regular

communications from SSR.  Specifically, of the five insurance carriers that constituted more than

90% of SSR's assets under management ("AUM") in SSR, based on the AIMA report dated

August 22, 2007, Philadelphia Financial was one of the top three limited partners. Clearly,

Philadelphia Financial received all updates made by SSR given Philadelphia Financial's importance to SSR's business and SSR's obligations under the Limited Partnership Agreement and other written commitments to investors, including the items listed in paragraph 17.1 of that same document.

91.     Of further evidence that Philadelphia Financial received regular communications from SSR is the following:   on multiple occasions between 2005 and 2008, Philadelphia Financial emailed to the Grantor documents that required a signature to agree to a fund document change for which SSR needed investor consent.  These communications occurred in 2006 and then again after the redemption request was denied in 2008.

92.     In fact, other insurance companies received such recurring information from SSR and passed all such information directly through to their policyholders, for their investors' own evaluation of their continuing investment decision.  One illustrative example of this is attached as **Exhibit N**, one of the regular SSR quarterly letters that AIG, an unrelated insurance company, received from SSR and forwarded to its policyholders.   See SSR Letter dated March, 2007, attached hereto as **Exhibit N.**

93.     In or about June, 2012, Grantor learned that Philadelphia Financial also had access to information through SSR's investor website, of which Philadelphia Financial never advised Grantor and Plaintiffs, and to which Philadelphia Financial never provided access for Grantor and Plaintiffs, apparently based on Philadelphia Financial's own internal company policy that strictly prohibited the Grantor and Plaintiffs from any contact with the manager of the funds it invested in on behalf of the Trust.  Accordingly, Philadelphia Financial had continual access to SSR information, while the Grantor and Plaintiffs did not, giving further rise to an

obligation on the part of Philadelphia Financial to review such information on behalf of the Grantor and Plaintiffs and to report same to Grantor and Plaintiffs.

94.     However, other than account value summaries, from the time of the Trust's investment until the time of the written redemption request, Philadelphia Financial did not provide any of the information that it was provided to it, or to which it had access from SSR, including material adverse developments essential to any investor, including Grantor and Plaintiff Trust.  Philadelphia Financial was thus selective and deliberate as to which SSR documents and communications it chose to deliver to the Grantor and Plaintiffs.

95.     Moreover, Philadelphia Financial provided only infrequent updates after some of the adverse matters became visible in the industry.  Whatever Philadelphia Financial learned, as one of the largest few investors in the SSR ID Fund and with a relationship that was later described to the Grantor as "weekly" contact, it did not share with Plaintiffs or the Grantor.

96.     Philadelphia Financial never provided the foregoing information to Plaintiffs or Grantor, even though there can be no question that Philadelphia Financial received such information from SSR.  Specifically, in or about May 2012, the Grantor obtained a five page quarterly update letter published by SSR to fund investors in March 2007 that had been provided to an unrelated investor by his insurance company, which, like Philadelphia Financial, was a limited partner in SSR.  No such quarterly updates were ever received by Plaintiffs or the Grantor.  See SSR Letter dated March, 2007, attached hereto as **Exhibit N.**

97.     Of particular note in the aforementioned letter are two lines at the conclusion of the letter. SSR advised its investors to "look for quarterly updates from us from this point forward" and offered to its investors' additional transparency and information: "please be aware

that you can request a quarterly report that gives detail on the portfolios of the Funds." **Exhibit N.**

98.     Further, for those investors that desired, specific portfolio detail was available for review.  Philadelphia Financial, as investor on behalf of, and as agent for, the Trust, never forwarded this letter or any future quarterly letters before the redemption request, and never informed Plaintiffs or the Grantor that all SSR investors could get additional information upon request.

99.     In addition to failing to provide the foregoing information, Philadelphia Financial never disclosed to Plaintiffs and Grantor that other investors did have access to such information through their insurance companies, including that noted above and the SSR website.

100.    This lack of access, while others who were similarly situated did have access, placed Plaintiff Trust and Grantor at a considerable disadvantage in that not only did they not have equal access to the same information as other investors did, based solely on Philadelphia Financial's internal company "policy", but Philadelphia Financial repeatedly and materially failed to provide this information to the Plaintiffs and Grantor.  Philadelphia Financial never advised Plaintiffs or Grantor, either at the initial stages of the investment or during the period of the investment, of this significant investment risk (i.e., that they would not have available to them the same critical investment information that other SSR investors would have and were given).  Specifically, Philadelphia Financial never made such updates and letters available to Plaintiffs and Grantor.  In short, Philadelphia Financial failed to provide critical information in virtually all of the noted categories described supra. at ¶56.

A.      **No Audited Financial Statements.**

101.    In or about February, 2012, Grantor learned that SSR either could not, or would

not, produce audited financial statements after the year 2006.  Philadelphia Financial never

disclosed this critically important fact to the Grantor and the Trust.

B.      **Unexplained Changes in Key Service Providers.**

102.    **Independent Auditor.**  In addition, also in February, 2012, Grantor learned that

Ernst & Young ("E & Y"), had been "dismissed" by SSR "prior to any audit work beginning."

No further explanation was provided by SSR.

103.    **Fund Administrator.**  In or about March, 2012, Grantor learned that on January

1, 2007, the Administrator for the SSR Fund was changed from Hedgemetrix LLC to

Hedgeworks LLC.  Either Hedgemetrix LLC resigned over accounting and valuation

irregularities, or it was dismissed by SSR.  Either way, this was significant information that

should have been disclosed by Philadelphia Financial to Grantor and Plaintiffs.  Specifically,

administrators are very rarely changed, given the integral knowledge they have of the books and

records, investor accounts, and accounting infrastructure of the fund. Knowledge of this change

was material as it would have served to provide investors reason for heightened concern, and was

typically one of the signs of serious trouble in a fund.  Further, the change came at the worst

possible time:  at the close of the books for the year, and when the financial reports for the

auditors to approve are prepared.

104.    Philadelphia Financial never passed on the foregoing critical information to

Plaintiffs and Grantor.   In fact, when Philadelphia Financial responded to the Grantor's request

for additional information on SSR in June, 2007, Philadelphia Financial provided information

dated May 2007 that reflected Hedgemetrix as fund administrator, even though it had been replaced <u>months earlier</u>.

105.    Information that was also never fully disclosed by Philadelphia Financial to Plaintiffs and Grantor included information concerning ownership of SSR and the fund, including the extent of the association of SSR with William Gunlicks and his "Founding Partners" family of hedge funds.  As more fully discussed herein, the Gunlicks connection further implicated other critical facts, never fully disclosed by Philadelphia Financial to Plaintiffs and Grantor.  In fact, as more fully discussed below, Philadelphia Financial not only failed to make full and material disclosure of critical information, but also misled Plaintiffs and Grantor by providing incomplete information, or no information at all.  At the core of Philadelphia Financial's misrepresentations and omissions was the very nature of SSR and its management and ownership.

## C.    <u>Ownership of the General Partnership</u>

### *1.    Formation of SSR Capital Partners, LP*

106.    In or about May, 2003, Steven Helland and Tim Law formed a hedge fund-of-funds entitled SSR Capital Partners, LP, ("SSR") in Dallas, TX.   SSR's basic commercial purpose and business model was to attract capital that it would then allocate to other hedge fund managers, and thereby charge multiple fees to those investors.  SSR's fees were both:  (a) a fixed percentage of assets and (b) a percentage of the reported and audited annual partnership profits.  SSR began managing capital in September 2003.  Helland and Law both served as Managing Partners of the firm.

107.    Helland and Law were employees of Scottish Re Group, an international insurance company during the period 2001-2003, and 1999-2003 respectively.

Helland's experience, as a retail stockbroker with Barings, Prudential and Salomon Brothers in New York, and then as a high-net-worth retail broker with Scottish Re Group, gave rise to no material experience whatsoever in the arcane and complex world of structured finance, corporate receivables financing and asset-based lending; he was a successful asset gatherer for his banking employers. Law was an attorney by education and also claimed no experience in these complex markets or asset management in any SSR materials provided to the Grantor. In fact, Law had no credit or lending experience, and no hedge fund management experience, indicating just four years of any business experience whatsoever, beginning in 1999 when he joined Scottish Re Group to structure its private placement business.

108.    SSR intended to attract fee-paying capital to manage and create firm revenues principally through appealing to: (a) insurance carriers, including Philadelphia Financial Life, which presented the ID Fund to its policyholders, including the Trust, and, (b) Registered Investment Advisors ("RIAs"), who are investment brokers and financial planners that registered and met the reporting requirements of their respective state securities agency, or the SEC, generally depending on the amount of assets they advise on.

109.    RIAs are individuals or firms that receive compensation for giving advice on investing in securities such as stocks, bonds, mutual funds, or exchange traded funds. An RIA must adhere to a fiduciary standard of care set forth in the Investment Advisors Act of 1940, which requires RIAs to act and serve a client's best interests with the intent to eliminate, or at least to expose, all potential conflicts of interest which might incline an investment adviser— consciously or unconsciously—to render advice which was not in the best interest of the RIA's clients.

2.      *William L. Gunlicks:  Owner, Investor, RIA*

110.    It was not until February 2012, that Grantor learned of the depth of the business and economic relationship between SSR and William L. Gunlicks ("Gunlicks"), and critical facts concerning William Gunlicks that were never disclosed to Grantor and Plaintiff Trust.

111.    The fact that William Gunlicks was so closely and significantly involved with SSR was critical information, for reasons that are set forth below.  As more fully discussed herein, Gunlicks provided the necessary capital to establish SSR in 2003, owned one-third of the fund's investment manager (SSR Capital Partners, LP) and also managed at times what was approximately one half of the capital that SSR had responsibility for investing on behalf of investors, including the Trust.  SSR had its most significant investment in Gunlicks' Founding Partners Stable Value Fund.  That information was known to Philadelphia Financial, and was never disclosed to Grantor and Plaintiff Trust.

112.    In addition, Gunlicks was on the board of directors of SSR and was once listed on at least one public website (www.investorpoint.com ) as a Registered Investment Advisor for SSR.  Plaintiffs and Grantor were never informed of any of that information by either SSR or by Philadelphia Financial.  In addition, as a director, Gunlicks had input into the selection of the fund's independent auditor and initially selected Founding Partners' auditor, Ernst & Young ("E & Y") as SSR's auditor.  Although E & Y was presented to the Grantor as SSR's auditor, Grantor learned only in February, 2012 that E & Y never actually performed any audit services for SSR.  As set forth below, more material information about Gunlicks was also known to Philadelphia Financial, both before the Trust's investment in SSR and thereafter.

113.    Specifically, Philadelphia Financial had a relationship with SSR's Helland and Law that dates back to the inception of SSR or before its formation. Joe Fillip, General Counsel

of Philadelphia Financial sent an email to William Lipkind, Esq., attorney to the Grantor, in
October 2003, the month after SSR commenced operations, indicating that he was "in the
process of adding" SSR to its platform.

114.    Though the founders Helland and Law had no previous experience in the field,
Philadelphia Financial had already determined that this fund would be suitable for its
policyholders before Helland and Law had even two months of operating experience in the
management of their first investment partnership.

115.    In addition, Helland and Law were business partners with Gunlicks, who had been
under investigation by the Securities and Exchange Commission ("the SEC") since 2000, a fact
that was known by Philadelphia Financial, or which could have been known with even a
modicum of due diligence.

116.    Just months earlier, Helland and Law were competitors of Philadelphia Financial,
with no experience in managing investment partnerships.  Now, in October 2003, with six weeks
of operations and a small amount of capital, Philadelphia Financial had determined at senior
levels to present SSR to its policyholders "in the very near future." See Email from Joseph Fillip,
Philadelphia Financial General Counsel dated October, 2003, attached hereto as **Exhibit O.**

117.    The very basic level of even "search engine due diligence" duty owed to
policyholders in recommending managers suitable for their investment was ignored or was
subordinated to a possible financial arrangement that Philadelphia Financial may have had in
place with SSR, though Philadelphia Financial denied that any such arrangement  was a
consideration to "making SSR an available investment option..."  Aside from all of his other
responsibilities as General Counsel of an insurance company, Fillip was personally trying to add
new managers for immediate investment by Philadelphia Financial policyholders.

118.    Although Philadelphia Financial was effectively there at "Day One" of SSR and chose SSR instead of many other investment partnerships for its policyholders, it did not disclose the Gunlicks relationship to Grantor and Plaintiff Trust.  The particulars of that relationship are set forth below.

119.    Gunlicks had been operating his Founding Partners Capital Management Company, LP ("Founding Partners") group of investment partnerships ("funds") in Naples, Florida since 1994.  Gunlicks was 100% owner, chief executive officer and chief investment officer of Founding Partners, which was a Registered Investment Advisor and the investment manager of multiple funds, the largest of which was Founding Partners Stable-Value Fund, LP ("Stable-Value").   The Offering Memorandum for Stable-Value described Gunlicks' investment program as designed to have *"no correlation to the equity and bond markets."*

120.    In 2003, Gunlicks provided seed capital to Steven Helland and Tim Law, launching SSR Capital Partners, LP in September 2003 to invest in hedge funds that specialized in "asset-based lending."  Founding Partners Hybrid Value Fund, LP took a 33% interest in SSR in exchange for providing initial capital and other commercial guidance to Helland and Law. Gunlicks' Founding Partners Hybrid-Equity Fund, LP ("Hybrid-Equity") owned one-third of SSR, with the remaining two-thirds owed by Helland and Law.

121.    Although Gunlicks owned a significant portion of SSR (through Hybrid-Equity), he was receiving the largest percentage of SSR's assets to manage himself, charging SSR his full "hedge fund" fee structure.  In fact, his Stable-Value fund was the biggest determinant of SSR's performance.  This, too, was never disclosed to the Grantor and the Trust.

122.    SSR's investment management program, described by SSR using the same language as Gunlicks used in describing the Stable-Value management program, was intended to

deliver "consistent positive monthly returns in the Strategic Stable Return Fund (ID), LP" (the

"Fund") with "……*no correlation to the bond and equity markets.*"   See SSR tear sheet dated

May, 2007, attached hereto as **Exhibit P.**

123.    In or about March, 2011, Grantor first learned that SSR's portfolio was invested

with approximately half of its assets dedicated to the SSR investment partnerships allocated into

funds managed by Gunlicks. The Grantor received a letter from SSR dated March 11, 2011

which disclosed to him for the first time the size of the Founding Partners investment—at that

time it was reported to be 49.3% of SSR ID Fund assets.

124.    In addition, Gunlicks and his Founding Partners Capital Management Company

were registered investment advisors with the SEC from 1996-2009, and Gunlicks was directly

affiliated as RIA with SSR.

125.    At a minimum, Gunlicks' relationship with SSR was plagued with the conflicts of

interest that the Investment Advisors Act of 1940 law was designed to address; conflicts of

which Philadelphia Financial should have fully disclosed to Grantor and Plaintiff Trust.

However, the economic partnership that SSR and Gunlicks established, which, from an

investment perspective, made Gunlicks and SSR effectively indistinguishable from one another,

was even of greater concern, as set forth below.

    *3.    Lucrative Partnership for SSR and Gunlicks Never Disclosed*

126.    The economic relationship between SSR and Founding Partners was a lucrative

partnership, fraught with conflicts completely unknown to Grantor and Plaintiff Trust, though

well-known by Philadelphia Financial, as one of SSR's largest investors.

127.    In short, SSR was essentially a marketing and capital raising instrumentality of

Gunlicks, tapping for him a new source of capital for the first time: the insurance carrier private

placement variable life and variable annuity market, in which Philadelphia Financial was one of the market leaders. By establishing Helland and Law in business with his fund's capital and creating mutual incentives for the management of attracted capital, SSR and Gunlicks were in every sense of the phrase, business partners. Specifically:

      a.     SSR investors were paying fees to SSR that Gunlicks benefited from directly in two separate ways: a) Gunlicks earned, through his Hybrid-Equity fund, the economics of one-third of SSR's fees on investor capital, and, b) he earned the full hedge fund fees (management fee and incentive fee) on all of the capital that SSR invested in Stable-Value. Indeed, Gunlicks had a far greater economic interest in capital that was acquired by SSR than even the two managing partners of SSR, Helland and Law.

      b.     As SSR grew assets, SSR's value would typically be increased in some relative proportion to the assets under management. As this value grew, Gunlicks had further economic gain through his one-third stake in SSR held by Hybrid-Equity. Gunlicks effectively had a highly-leveraged financial interest in the performance of SSR, whereby the better the reported performance of SSR, the more investment management fees he accrued, the easier it was for SSR to raise additional capital, and the more that SSR itself was worth. At the same time, Gunlicks' own flagship fund, Stable-Value, was the largest holder of, and the largest contributor to reported "profits" to the SSR portfolio. As more fully discussed herein, it was ultimately learned by Plaintiffs – too late --- that as Gunlicks lied to his own investors in Founding Partners and misrepresented his investment program, he capitalized further on that lie through his economic interest in SSR, levered directly to his own reported (and later determined to be misleading) performance.

128.    Grantor and Plaintiff Trust were never informed of the depth of this relationship, or the closely intertwined relationship between Gunlick's Founding Partners Equity Fund, L.P. ("FPEF") and SSR. Instead, only one paragraph within the hundreds of pages of materials presented by Philadelphia Financial in connection with the SSR investment even mentioned any relationship at all, and that paragraph never referred to William Gunlicks or Founding Partners Funds by name. Specifically:

      FPEF is a limited partner of the SSR General Partner. The general partner of FPEF is also the general partner of one or more of the investment vehicles in which SSR had the availability to invest. Although FPEF has no control over the

management of the SSR General Partner, that affiliation gave the SSR General
Partner additional incentive to invest in FPEF investment vehicles. In addition, in
the event of an investment by SSR in investment vehicles, the general partner of
FPEF benefited from FPEF's share of the management fees and performance fees
payable to the SSR General Partner, as well as from management fees and
performance fees payable by SSR to the general partner of FPEF as a result of an
investment in such affiliated investment vehicles.

See SSR Private Placement Memorandum, attached hereto as **Exhibit Q**, at 15.

129.    The fee sharing between the two firms was an additional source of revenue for

Gunlicks.  By way of example, an investor that subscribed to a $1,000,000 partnership interest

with SSR ID Fund would pay a Management Fee of 1.0% and an "Incentive Fee" of 10.0% of

profits.  At the highly consistently stated SSR investment performance of roughly 12% annually,

the investor would pay SSR a $10,000 Management Fee annually and a $12,000 Incentive Fee

annually (10% of $120,000 reported profits) plus a pro-rata share of SSR expenses that were

chargeable to the fund.  Ignoring those expenses for purposes of illustration and conservatism,

SSR would earn about $22,000 for this $1 million investor. Gunlicks' Hybrid-Equity Fund

would earn roughly one-third of that amount, or, $7,333.

130.    Expounding upon this example, with SSR investing an assumed 50% ($500,000)

of all its capital in Stable- Value, Gunlicks' firm would then receive additional fees of $10,000

(2% management fee), and approximately $12,000 from incentive fees (12% reported Founding

Partners Fund return).  In total, while Helland and Law would earn $14,666 (two-thirds of

$22,000) between them on that $1 million investment (before considering the expenses of

funding their business), Gunlicks' entities earned approximately $29,333 ($7,333 via SSR fees

and $22,000 from Stable-Value Fund fees), or almost <u>double</u> what his SSR co-founders earned.

Illustration Summary

Hypothetical Investment:            $1,000,000

| Reported annual performance (est.) | | 12.0% |
|---|---|---|
| SSR's gross income | $ | 14,666 (33.3%) |
| Founding Partners' income | $ | 29,333 (66.6%) |
| Total Combined Fees | $ | 44,999 (100.0%) |

131.    As objectionable and transparent as this appears to be today, it was not apparent and not transparent to the Grantor, a sophisticated hedge fund investor, because neither the SSR portfolio nor the materiality of the Gunlicks' ownership was ever disclosed to him by Philadelphia Financial.  Further, SSR decided just months after the Grantor invested, in April 2006, to "turbocharge" this arrangement, by securing financing from KBC Worldwide ("KBC") to leverage each $1 million invested by an investor with a $1 million fund-level borrowing from KBC. Essentially, now for each $1 million investment by an individual or insurance policyholder investor, SSR and Gunlicks could each double the figures above: SSR would earn about 4.5% and Gunlicks almost 9% from all investment dollars, as long as they both kept producing (or, at least reporting) 12% annual returns.

### 4.    Failure to Provide Audited Statements

132.    In June, 2007, shortly after the issuance of its unqualified audit opinion on Stable-Value's 2006 financial statements, the independent auditors to the Founding Partners Funds, Ernst & Young ("E & Y"), resigned from those responsibilities, and therefore, did not provide audited statements.

133.    As much later learned by the Grantor, Stable-Value was SSR's biggest fund allocation/investment, and without audited financial statement from the manager of its biggest holding, SSR's auditors (Rothstein, Kass & Co.) could not provide the required audit of SSR.  In

fact, SSR's auditors never provided an audit for SSR beyond 2006, a critical fact that was also never disclosed to Plaintiffs or Grantor by Philadelphia Financial.

134.    Neither the Plaintiffs nor Grantor were ever informed of any of the foregoing events, despite the fact that there can be no question that: (a) such facts were critically important to the Trust's investment in SSR; and (b) Philadelphia Financial knew or should have known said facts, and the importance of said facts.

**D.      Adverse Legal, Investigatory and Regulatory Actions Not Disclosed.**

135.    As noted above, at or about the time that SSR was formed, and then quickly approved as a platform fund by Philadelphia Financial for the investment dollars of its policyholders, including the Trust, Founding Partners and William Gunlicks were already under SEC investigation, and had been since 2000.  In addition, and significantly, a "Wells Notice" had been issued by the SEC against them in December, 2003.

136.    A Wells Notice is a letter that the SEC sends to individuals or firms against whom it is planning to bring an enforcement action.  As such, investors generally view a Wells Notice as a very serious matter, at least as serious as an SEC investigation, and one that threatens the continuing existence of smaller investment management partnerships, such as Founding Partners. Any diligent inquiry by Philadelphia Financial and its Director of Research would have revealed this fact.

137.    In or about January, 2012, Grantor learned that on December 3, 2007, the SEC had issued a "Cease and Desist" Order against Founding Partners Capital Management Company and William L. Gunlicks, compelling Gunlicks to agree to a censure, a cease-and-desist order and certain financial sanctions.  Though SSR and Gunlicks were essentially one and the same, this development was not reported to the Grantor and the Trust by Philadelphia Financial.

138.    In that December, 2007 SEC Order, Stable-Value was described to have committed a lengthy list of inappropriate related-party transactions and certain securities law violations, including violation of Section 17(a) (2) of the Securities Act of 1933.   Unlike the Wells Notice, this was a matter of public record.

139.    In addition, SSR advised all investors, including Philadelphia Financial, of the foregoing order against Gunlicks in early 2008.  Philadelphia Financial never provided that information to Plaintiffs and Grantor.

140.    Founding Partners would grow to over $500 million before its assets were frozen by SEC Order in April 2009, as more fully discussed herein at ¶141.

141.    In or about April, 2009, the SEC charged Gunlicks and Founding Partners with misusing fund assets to pay personnel expenses, and misrepresenting that its funds had audited financial statements for 2007 when they did not. Additionally, the SEC alleged that Gunlicks and Founding Partners failed to disclose to all investors and to comply with a prior Commission order entered against them. The Court froze all Founding Partners assets with an emergency order and appointed a receiver.   Further supporting the close interrelationship between Gunlicks and SSR, the SEC opened an investigation into SSR later that year, which turned into a "formal investigation" in late 2010.

**E.      Change in Strategy**

142.    As discussed above in ¶131, shortly after the Trust initiated a $3.1 million investment in SSR, in May 2006, SSR announced a change in strategy and a change in the amount of financial risk it would seek to manage.  In addition to simply allocating the monies invested with the SSR partnerships, beginning in May 2006, the SSR ID Fund began employing what it phrased as 'modest' leverage, which SSR described as intended to "limit to no more than

41

one dollar of leverage per dollar of fund equity." See SSR Letter dated April 24, 2006, attached hereto as **Exhibit R.** Through this leverage, SSR could allocate to other hedge funds $2 for every $1 of capital entrusted to it to manage. The other dollar would be lent to the Fund by a Belgian bank to invest as it chose.

143.    The limited partner insurance companies, including Philadelphia Financial, encouraged SSR to make this change in strategy.   Philadelphia Financial was providing input and approvals to SSR which would serve to enhance SSR's and Gunlick's profits, enhance Philadelphia Financial's profits and concurrently compromise its responsibilities to the policyholders on whose behalf it invested, including the Trust.

**F.    Overstatement of Assets Under Management**

144.    It was further later learned by the Grantor that the May 2007 SSR update, provided by Philadelphia Financial after the request of the Grantor for more information about SSR, reported that SSR had $169 million in Fund Assets when, in fact, SSR had half that amount based on the August 2007 AIMA disclosure questionnaire containing information supplied by SSR. Thus, the report provided to the Grantor and the Trust upon the Grantor's request for information materially overstated committed investor assets.   Though the manager itself reported its assets accurately and in accordance with industry practice, Philadelphia Financial reported a number that would serve to show highly misstated investor acceptance of SSR, a misstatement of SSR's presence in the markets in which it invested, and, by far most importantly, a misstatement of the implied ability of SSR to meet potential redemption requests of the fund.

145.    Not only is asset growth an important proxy for broader investor acceptance, it is, more importantly, a key measure and proxy for a fund's near-term ability to meet all redemption

(i.e. withdrawal) requests, since redemption requests are funded by either sale of investment interests in the fund itself, income and profits from the underlying investments or, more typically, by the receipt of new investor capital. With the strong asset growth reported to the Grantor by Philadelphia Financial (nearly eight-fold growth, from $22 million as reported to the Grantor in January 2006 to $169 million as reported to the Grantor in May 2007), and in the absence of any other available information, the Grantor gained considerable comfort that any redemption request the Trustees might make at the direction of the Grantor in the coming quarters for the Trust's $4 million investment could be readily accommodated by SSR, the likelihood and ease of which increased with each month. This perception was created by Defendant's misrepresentations, which Grantor and Plaintiff Trust relied upon, to their detriment.

146.    Philadelphia Financial's misrepresentation of SSR's growth in assets under management suggested a vastly overstated ability on the part of SSR to meet redemption requests, which, as evidenced by its suspension of redemptions, was insufficient.

147.    Philadelphia Financial directly furthered the Gunlicks fraud by leading its policyholders into investments with SSR, which was essentially a fund-raising vehicle for Gunlicks and Founding Partners, and then not providing any information whatsoever (beyond a monthly reported return, later learned by the Grantor and Plaintiffs to be untrue) that could allow even an investor far less sophisticated than the Grantor to escape from this web of related party transactions, resigning auditors and administrators, and SEC investigations and charges. If Philadelphia Financial had disclosed even one of the preceding facts, Grantor would have elected, on behalf of the Plaintiff Trust, to exit the funds, based on the Grantor's extensive understanding of hedge fund investing, and well before other SSR investors asked for

43

withdrawals in the fall of 2008, which essentially collapsed the fund, wiping out nearly $4 million of capital in the Trust investment account.

148.    At no point prior to the withdrawal decision by Grantor on behalf of the Trust were the Plaintiffs and Grantor informed of: (a ) SSR's extraordinarily large investment with just one manager--Gunlicks,  (b) Gunlick's Founding Partners' 33% interest in SSR; (c) Gunlick's legal problems with the SEC including the Wells Notice, (d) Gunlicks' Founding Partners independent auditor (Ernst & Young)'s resignation in early 2007, (e)  the failure of the Founding Partners funds or the SSR ID Fund to produce an independent audited financial statement for 2007 or for 2008, or (f)  the SEC censure and cease-and-desist order against Gunlicks in early December 2007.

149.    If Philadelphia Financial had timely communicated to those acting on behalf of the Trust any of the foregoing facts, which, at all times relevant herein, were known to Philadelphia Financial or could have been known by Philadelphia Financial if it had acted in accordance with its duties under the Policy and as it represented, Grantor would have immediately directed Plaintiff Trustee Alaska Trust Co. to withdraw or redeemed the Trust's investment in SSR, thereby avoiding loss therein.  In addition to the Grantor, Defendant could have provided access to SRS to the Trustees, or the Investment Advisor to the Trust, Jeffrey J. Brown, without running afoul of investor control regulations.  Instead, Defendant did nothing, or in many respects, mislead and misrepresented the facts, resulting in the complete loss of Plaintiffs' investment.

## COUNT I

## Negligence and/or Negligent Misrepresentation

150.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 149 and incorporate the same herein by reference.

151.    Defendant owed Plaintiffs a duty to act with a reasonable care in connection with information provided to Defendant concerning Plaintiff Trust's assets.

152.    Defendant has breached its duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made not misleading.

153.    At the time of the misrepresentations and omissions of material facts by Defendant, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiff Trust, and Grantor, acting on behalf of Plaintiff Trust, relied upon the misrepresentations made by Defendant.   Had Grantor and Plaintiff Trust been aware of the true facts, Grantor and Plaintiff Trust either would not have invested in SSR, or would have immediately directed Plaintiff Trustee Alaska Trust Co. to withdraw the funds at the time such facts were learned by Grantor and Plaintiff Trust.

154.    Neither Plaintiff Trust nor its agents knew of any of the falsity and/or misleading nature of Defendant's statements and omissions and, therefore, relied upon the representations made by Defendant.

155.    Defendant's conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in the connection with statements that were made) under all applicable law.  As a direct and proximate result of the negligent misrepresentations/omissions, and in reliance thereon, Plaintiff Trust has suffered damages.

## COUNT II

### Breach of Contract

156.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 155 and incorporate the same herein by reference.

157.    By the express terms of the Policy, and associated documents, the Trust, and others acting on its behalf, were prohibited from contact with SSR for any reason, and all information was to be timely provided by Defendant to those acting on behalf of the Trust so that said individuals could determine whether to redeem or withdraw funds in the investment.  In addition, the terms created an obligation on the part of Defendant to promptly and accurately process Grantor and Plaintiff Alaska Trust Co.'s redemption request.

158.    Based on the nature of the investment, it was critical that Defendant provide relevant and timely information to those acting on behalf of the Trust as detailed herein.

159.    Defendant's failure to so provide full and non-misleading information, and failure to promptly and accurately process Grantor's and Plaintiff Trustee Alaska Trust Co.'s redemption request, constitute breaches of the provisions of the Policy and are further contrary to law.

160.    As a direct and proximate result of Philadelphia Financial's breach, Plaintiff Trust has suffered damages and are entitled to recover damages against Defendant, as well as the return of all fees paid to Defendant.

### COUNT III

### Common Law Duty of Good Faith and Fair Dealing

161.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 160 and incorporate the same herein by reference.

162.    There is implied in every contract a duty of good faith and fair dealing that neither party will do anything to deprive the other of the fruits of the contract.

163.    The Policy contained said implied duty of good faith and fair dealing, as a matter of law.

164.    By failing to act in accordance with the provisions of the Policy, and by withholding critical information from Plaintiffs and Grantor on behalf of Plaintiff Trust, Defendant has not only deprived Plaintiff Trust of the fruits of the contract, but has caused further losses to Plaintiff Trust.  Said actions constitute breaches of the implied covenant of good faith and fair dealing.

165.    Further, the fiduciary relationship inherent in every insurance contract gives rise to an implied covenant of good faith and fair dealing.

166.    Defendant's breaches of the implied covenant of good faith and fair dealing entitle Plaintiff Trust to damages caused by Defendant's breaches, as well as punitive damages.

### COUNT IV

**Professional Malpractice Resulting in Economic Loss Pursuant to A.S. 09.10.050**

167.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 166 and incorporate the same herein by reference.

168.    By virtue of the Policy, a professional service relationship was created between Defendant and the Trust.

169.    Arising out of said professional service relationship was the duty on the part of Defendant to provide oversight of the investment by performing regular research, and consistent monitoring of related investments, as well as by its regular and frequent contact with SSR.

170.    In addition, by virtue of said professional service relationship and the nature of the investment, Defendant had the duty to make full, fair and timely disclosure of all facts material to the interests of the Trust to Grantor and/or others acting on behalf of the Trust. Defendant further had the duty to promptly and accurately process redemption requests in accordance with the directions of the Trust and the Grantor.

171.    Defendant failed to exercise due diligence with respect to the foregoing duties and failed to timely provide facts material to the interests of the Trust.

172.    As a direct and proximate result of Defendant's breaches, Plaintiff Trust has suffered damages and is entitled to recover damages against Defendant, as well as the return of all fees paid to Defendant.

## COUNT V

### Unjust Enrichment

173.    Plaintiffs repeat and reiterate the allegations contained in paragraphs 1 through 172 of the Complaint and incorporate the same herein by reference.

174.    Defendant financially benefited from its unlawful acts as it collected improper management fees based upon the Policy's net asset values.  These unlawful acts caused Plaintiff Trust to suffer injury and monetary loss.

175.    As a result, it is unjust and inequitable for Defendant to have enriched itself in this manner.

176.    Plaintiff Trust is entitled to restitution of the revenue derived from Defendant's unjust enrichment and inequitable conduct.

**WHEREFORE**, Plaintiffs hereby demand judgment against Defendant on all Counts as follows:

48

A.  Awarding Plaintiff Trust compensatory damages suffered as a result of the wrong complained of herein, including, but not limited to, professional and legal fees, together with appropriate interest;

B.  Awarding them costs and expenses of this litigation, including reasonable attorneys' fees and costs of suit;

C.  Awarding punitive damages in accordance with applicable law; and

D.  Awarding them damages for unjust enrichment and for such other relief as the court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues.

### LAW OFFICES OF WILLIAM R. CONNELLY, LLC

By:  William R. Connelly, Esq.

### DESIGNATION OF TRIAL COUNSEL

William R. Connelly, Esq. is designated as trial counsel in this matter.

William R. Connelly, Esq.

Dated:  9-4-12