UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE 2002 LAWRENCE R. BUCHALTER ALASKA TRUST, ALASKA TRUST COMPANY and STEPHEN C. HARRIS, TRUSTEES, | Civil Action No. 12 cv 6808 (KMK) |
| Plaintiffs, | Jury Trial Demanded |
| - against – | |
| PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY f/k/a AGL LIFE ASSURANCE COMPANY, | **SECOND AMENDED COMPLAINT** |
| Defendant. | |

Plaintiffs the 2002 Lawrence R. Buchalter Alaska Trust (the "Trust"), Alaska Trust Company and Stephen C. Harris, Trustees (collectively, "Plaintiffs"), by their attorneys, Pryor Cashman LLP, as and for their Complaint against defendant Philadelphia Financial Life Assurance Company f/k/a AGL Life Assurance Company ("PFLAC"), allege as follows:

## NATURE OF THE ACTION

1.     This action arises from PFLAC's manifest negligence and breach of its duties in managing the investment fund portion of a variable universal life policy (the "Policy," as hereinafter defined). The Trust is the owner and beneficiary of the Policy, in which investment accounts are held for the Trust's benefit. As a direct consequence of PFLAC's actions and material omissions, the Trust ultimately suffered investment losses totaling approximately $3.9 million.

2.     The Trust and its advisors[1] were completely dependent on PFLAC for information concerning the ongoing status of the Policy's investments, and were solely responsible for analyzing the merit of such investments in terms of deciding whether to redeem, reduce or add to the investment, based on PFLAC's meeting its obligation.  In addition to the fact that the Policy invested in funds that do not release information to the public, the Trust was prohibited from direct contact with the managers of funds in the Policy's Investment Accounts in order to preserve tax benefits associated with the Policy.  PFLAC therefore was the only conduit through which the Trust could acquire material information concerning the Policy's investments in various funds that would enable its Advisors and the Trustee to make informed decisions regarding the Trust's investments.  The information concerning such investment funds that is critically important to investors such as the Trust, which PFLAC indisputably had a duty to provide, includes, among other things, information concerning the ownership of the general partnership, audited financial statements, changes in key service providers such as a fund's independent auditor or fund administrator, changes in investment strategy or metrics and any legal or regulatory actions.

3.     Given the Trustee's and Advisors' reliance on PFLAC to provide the relevant information that would allow them to make informed investment decisions on behalf of the Trust, it was entirely foreseeable that they would not make a decision (most notably, to redeem a given investment) if PFLAC failed to meet its obligation to provide such information.

---

[1] To the extent that the "Trust" is referred to herein, such use recognizes that the plaintiff Alaska Trust Company (the "Trustee") acted on behalf of, and was in receipt of information relevant to, the Trust.  In addition, the parties understood that Lawrence Buchalter ("Grantor" to the Trust and the "Insured" under the Policy whose children are the Trust's beneficiaries) and Jeffrey Brown, the Trust's appointed Investment Advisor (Buchalter and Brown are referred to collectively herein as the Trust's "Advisors") acted as advisors to the Trust in connection with the allocation of assets in the Policy's investment accounts.

4.      In or about December 2005, the Trust invested nearly $3.2 million of the investment account in the Strategic Stable Return Fund ID ("SSR"), a hedge fund-of-funds that PFLAC purportedly vetted and haphazardly placed on its "platform" as an investment choice for its policyholders, such as the Trust; one of only 27 chosen from the available pool of an estimated 75 to 100 insurance-dedicated hedge funds in existence.

5.      Incredibly, PFLAC had determined to present SSR as an investment option to its policy holders in 2003, despite the fact that SSR had just commenced operations *six weeks* prior and had only a very small amount of capital under management.  Over the years that followed, PFLAC provided the Trust with precious little material from SSR, even though it eventually became clear that PFLAC had access to (or had directly received from SSR) a significant amount of highly material information that it negligently failed to provide to the Trust.

6.      In or about July 2008, the Trust's Advisors and the Trustee elected to redeem the Trust's entire investment in SSR.  The redemption directive was sent to PFLAC's CEO in an email requesting that he prepare the necessary redemption documentation "ASAP."  Since the Trust could elect to withdraw its funds at the end of every calendar quarter, such request was indeed made in plenty of time (well outside the 45 days' notice period) to effect the redemption on the next possible redemption date, September 30, 2008.

7.      However, PFLAC negligently completed the documents with specific "special instructions" to redeem all funds on December 30, 2008, rather than three months prior as clearly directed in the "ASAP" email.

8.      PFLAC's material error proved to be critical.  At the time of the Trust's redemption request, the reported value of the Trust's SSR investment account approximated $3.9 million.  But shortly after the September 30, 2008 date passed, SSR exercised its right to suspend

all investor redemption requests. The Trust's capital was frozen, though SSR offered considerable and consistent optimism in the months and years that followed that the return of capital was imminently forthcoming. Despite this optimism, the Trust's SSR investment account steadily declined in stated value, and it is now highly likely that it will end with a zero or *de minimus* balance.

9.      A subsequent investigation conducted by Buchalter on the Trust's behalf in or around 2012 ultimately revealed that PFLAC was shockingly negligent throughout the process in terms of its failure to vet SSR in the first instance before placing it on the PFLAC platform, and its subsequent failure bring highly material information concerning the SSR investment to the Trust's attention.

10.      First, PFLAC appears not to have vetted SSR at all. Or more likely, it haphazardly ignored critical information in its rush to become a leading carrier of variable universal life policies, which involved signing up as many funds as possible, as quickly as possible, to the PFLAC platform without regard to issues and factors that would have caused other companies in a similar position of acting on behalf of investors to have rejected consideration of investment in SSR-managed funds.

11.      The information that PFLAC likely ignored included SSR's managers' stunning lack of relevant experience, as one manager had no material experience in the complex world of structured finance, corporate receivables financing and asset-based lending, while the other had no credit or lending experience and just four years of reported business experience.

12.      Second, PFLAC also likely ignored SSR's lucrative, overtly conflicted partnership with a fund manager named William Gunlicks who had been under investigation by the SEC since 2000. Specifically, Buchalter's investigation revealed that SSR's portfolio was

invested with approximately half of its assets dedicated to partnerships allocated into funds managed by Gunlicks, even though Gunlicks owned one-third of SSR's investment manager and was paid full hedge fund fees on all capital that SSR invested in his funds. PFLAC never informed the Trustee nor the Advisors of the depth of SSR's lucrative, highly-conflicted relationship with Gunlicks.

13.     In December 2007 the SEC issued a "Cease and Desist" Order against both Gunlicks and his management company, Founding Partners Capital Partners LP.  Upon information and belief, SSR advised all of its investors, including PFLAC, of the order against Gunlicks in early 2008, but PFLAC failed to provide that information to the Trust even though SSR and Gunlicks, as discussed further below, at that point essentially were alter egos of one another.

14.     Gunlicks' funds' assets were frozen by SEC Order in April 2009, severely impairing SSR's ability to return capital to investors, including the Trust. Because of PFLAC's negligence, however, the Trustee and the Advisors had no knowledge of these developments. Further supporting the intertwined interrelationship between Gunlicks and SSR, the SEC opened an investigation into SSR later that year, which turned into a "formal investigation" in late 2010.

15.     Third, Buchalter belatedly discovered that SSR's auditors did not provide required audited financial statements of SSR after 2006.  PFLAC incredibly again failed to inform the Trustee and the Advisors of this serious concern, despite the fact that audited financial statements are critically important to investors attempting to evaluate hedge funds and fund-of-hedge funds that do not publicly report financial results.  And the Trustee and the Advisors could not have learned of this information from any source other than PFLAC for the reasons set forth above.

16.    Fourth, yet another piece of critical information that PFLAC failed to pass on to the Trustee and the Advisors were changes to SSR's key service providers.  A change in a fund service provider is widely viewed by the industry as a material event and therefore is immediately reported to investors.  Here, SSR's administrator had been replaced in January 2007, tellingly when SSR was in the process of closing their books for the 2006 year.  Such changes to administrators generally means one of two things; either accounting and valuation irregularities or a dispute with the fund that led to dismissal.  In any event, this change should have been immediately reported to the Trust and PFLAC was grossly negligent in failing to do so.  Moreover, the Trustee and the Advisors were completely blind to the fact that SSR's administrator had been changed because PFLAC sent Buchalter a report in June 2007 erroneously indicating that the replaced SSR administrator still was in place.

17.    Fifth, in 2006, unbeknownst to the Trust, SSR made a significant change in strategy concerning the amount of financial risk that it would manage.  This change involved employing substantial leverage whereby SSR could "double down" on the investor capital it was entrusted to manage in an attempt to enhance its profits.  Upon information and belief, PFLAC encouraged SSR to employ this risky change in strategy despite the fact that it significantly compromised its responsibilities to the policyholders on whose behalf it invested, including the Trust, as PFLAC was charging it fees that increased with SSR profits.

18.    Finally, PFLAC recklessly (or worse, deliberately) overstated SSR's assets under management by approximately 100% in a report provided to the Buchalter (in his role as Advisor) in 2007.  PFLAC reported a grossly higher number that would misleadingly indicate increased investor acceptance of SSR, a misstatement of SSR's presence in the markets in which it invested, and, most importantly, a misstatement of SSR's implied ability to meet potential

redemption requests from investors. Indeed, what PFLAC misrepresented as strong asset growth gave Buchalter (and thereby the Trust) false comfort that any redemption request made in the coming quarters for the Trust's investment could be readily accommodated by SSR.

19.    If PFLAC had reported any single piece of the various items listed above to either the Trustee or Advisors, the Trust would have made a redemption request immediately. PFLAC's failure to provide such material information, especially where the Trust's representatives had no other way to obtain it due to being prohibited from having direct contact with fund managers, left them completely in the dark, and specifically misled them, until it was too late. After SSR suspended redemptions in October 2008, the Trust could do nothing as all of its investment in SSR was lost.

20.    In addition, the Trust has paid nearly $350,000 in fees to PFLAC since the inception of the Policy, which PFLAC certainly did not properly earn for the reasons set forth herein.

21.    By this action, the Trust seeks damages arising from PFLAC's:  (i) initial failure to reasonably vet SSR before pre-approving and endorsing it for the Trust's consideration and selection; (ii) failure to provide critical and readily available information that had the Trust known of would have led it to redeem its SSR investment prior to July 2008; and (iii) failure to follow the simple instruction to process the redemption request for third quarter 2008, which had it been processed properly indisputably would have forestalled the losses that the Trust subsequently suffered.

## THE PARTIES

22.    Plaintiff the 2002 Lawrence R. Buchalter Alaska Trust is an irrevocable trust created on or about November 1, 2002.

7

23.    Plaintiff the Alaska Trust Company is a co-Trustee of the Trust, with a place of business in Anchorage, Alaska.

24.    Plaintiff, Stephen C. Harris is a co-Trustee of the Trust, with a place of residence in New Rochelle, New York.

25.    Defendant Philadelphia Financial Life Assurance Company, f/k/a AGL Life Assurance Company is an insurance and financial services organization having a principal office in Philadelphia, Pennsylvania.  In December, 2011, PFLAC announced its agreement acquire all of the assets of Hartford Life Private Placement, LLC ("HLPP").  HLPP was a subsidiary of The Hartford and has its offices in Florham Park, New Jersey.  Former HLPP employees were transferred to PFLAC and continue to operate out of the New Jersey facility.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, as this action is between citizens of a state and a foreign state and the amount in controversy exceeds $75,000 exclusive of interest and costs.

27.    PFLAC also is subject to personal jurisdiction in this District under CPLR § 302 because it regularly transacts business in New York.

28.    Venue also is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

29.    Variable universal life insurance policies are designed to allow policy holders, such as the Trust, to invest a portion of their premiums in optional investment accounts that are offered under the policy.  Because the investments are held through a policy, gains are non-taxable, as is the death benefit payable upon death.  Policy holders are able to access account balances during their lifetime by borrowing funds, tax free, from the policies.  The policies

generally are considered an element of personal estate planning and essentially are a combination of life insurance and a tax-advantaged investment vehicle. In the case of the Trust, the Policy was (i) a vehicle to provide substantial tax-free wealth to Buchalter's children upon his and his (then) wife's passing, and additionally (ii) a way to have investment gains accumulate tax-free with the flexibility to have the Trust's capital returned in the form of loan or redemption at any time, as described by PFLAC at the time of his investment.

**The Trust And The Policy**

30.     On or about November 1, 2002, Buchalter created and funded the Trust for his and his family's benefit. (**Exhibit A**.)

31.     The Trust provides for Buchalter to appoint one or more Independent Trustees. On or about November 1, 2002, Buchalter appointed the Alaska Trust Co. Company as an Independent Trustee.[2]  Specifically, the Trust Instrument explicitly provides that Buchalter has transferred all of his "right, title and interest in and to the property described in Schedule A" to the Trustee. (Ex. A at I-1.)

32.     The Trust is the Owner and Beneficiary under a variable universal life insurance policy known as the Flexible Premium Survivorship Variable Life Insurance Contract, policy number VL300397, issued in or about December 2002 by Defendant PFLAC (the "Policy"). (**Exhibit B**.) The Policy had an initial face amount death benefit of $55,000,000.00.

33.     Pursuant to the terms of the the of the related Private Placement Memorandum ("the PPM") (**Exhibit C**), the Trust as Owner of the Policy "retains all rights and responsibilities of ownership pertaining to [its] interest in the Policy, included [sic], but not limited to, investment

---

[2] On or about June 25, 2012, Buchalter appointed Harris as an additional Independent Trustee.

allocation, payment of Premium, borrowing, taking partial withdrawals, and surrendering the Policy."

34.    The PPM further provides that the Trust as Beneficiary of the Policy "will receive all benefits payable upon the death of the Insured."

35.    On or about December 31, 2002, the Trust made an initial premium payment to PFLAC of $1,500,000.00.    The Trust made subsequent premium payments to PFLAC of $1,500,000.00 on December 31, 2003 and $1,500,000.00 on December 31, 2004, for a total of $4,500,000.00.

**PFLAC's Oversight Of Pre-Selected Funds**

36.    Buchalter, acting on the Trust's behalf, selected PFLAC from a field of four to six leading carriers in 2003 to: (1) underwrite, syndicate and maintain the "tax integrity" of the underlying insurance coverage, and; (2) comprehensively maintain and administer the Policy's optional investment accounts.    For these services, the Trust paid PFLAC both upfront fees as well as annual fees for the life of the Policy.    The annual fees were based on the aforementioned two services:    one was calculated and charged in relation to the life insurance in force, and the other was calculated and charged in relation to the reported amounts in the investment accounts.

37.    PFLAC provided Buchalter and the Trustee with the PPM in order to allow them to select investment alternatives under the Policy.    The PPM described the offering of limited partnership interests in various funds, which interests were designated to be an investment option under the insurance contract.    The pre-approved list that PFLAC presented was a group of private hedge fund partnerships and fund-of-hedge-fund partnerships that created investment vehicles designed specifically for insurance company investment, and designed to be in compliance with relevant tax and insurance regulations.

38.     PFLAC also advised Buchalter that it provided oversight of so-called "platform funds." The "platform," as presented to PFLAC policy holders, such as the Trust, essentially was the list of partnerships with which PFLAC had reached agreements and, based on PFLAC's due diligence, had been deemed suitable for investment by PFLAC policy holders.    Upon information and belief, PFLAC received commissions from the partnerships as part of such agreements.

**PFLAC's Essential Role As The Sole Provider Of Material Investment Information**

39.     In or about 2003, PFLAC invested approximately $1,500,000.00 of the Trust's funds in Millennium Global, LP.    In or about 2004, PFLAC invested approximately $1,500,000.00 of the Trust's funds in Arden Investment Partners, LP; and approximately another $1,500,000.00 in Silver Creek Insurance Dedicated Fund, LP.    Through appreciation of these investment choices, the Trust's PFLAC-reported balances were more than $6 million by January 1, 2006.

40.     Importantly, while the Trust had the ability to choose the managers (investment advisors) of the Policy's investment accounts, which again had been pre-approved and supposedly vetted by PFLAC, it had neither control of nor discretion with respect to the funds in which these investment accounts were invested, and indeed no ownership interest of the assets in the accounts.    Rather, PFLAC, as the actual owner of the investment interest in the investment accounts, and serving as limited partner investing on behalf of and as agent for the Trust, had exclusive control of such assets.    As explained in the PPM: "The assets in the Investment Accounts and the Policy are owned by [PFLAC], and [the Trust] ha[s] no legal, equitable, direct, indirect or other interest in any specific investment item held in the Investment Accounts or the Policy."  (PPM (Ex. C) at 37, ¶ 2.)

41.    Moreover, pursuant to both the Policy and the PPM, the Trust was prohibited from direct contact with the hedge fund manager (or fund-of-funds manager, as in the case of SSR). **Specifically, the Policy states that: "[The Trust] will not directly or indirectly influence or attempt to influence the Manager's selection, purchase, retention or sale of any investment within the Fund**." (Letter from PFLAC dated December 20, 2002, attached to Policy (Ex. B), at ¶ 9) (emphasis added.)

42.    The reason for the foregoing prohibition was explained in the PPM: "If there is any pre-arrangement or understanding that an Investment Account will invest in a particular security or other investment, there would be a material risk that the Policy Owner would be treated as owning the assets underlying the Investment Accounts, in which case the Policy would not be treated as a life insurance contract for federal tax purposes. **For this reason, [the Trust] should ever attempt to contact an investment advisor. Rather, any and all questions, comments, or instructions regarding the Policy should be addressed to [PFLAC].**" (PPM (Ex. C) at 33, ¶ 2 (emphasis in original).)

43.    Despite the its lack of ownership of and control over the investments as described above, and the prohibition on directly or indirectly contacting fund managers, the Policy provides that the Trust is permitted to change the direction of the investments. (Ex. B, December 20, 2002 letter from PFLAC to Trust, ¶ 12.) The Policy further allows the Trust to gain access to the funds in the event that the investments prove to be unattractive through loans or partial withdrawals. (*Id.* at p. 20–21; PPM (Ex. C) at 13.)

44.    In this regard, the Trust was structured so as to rely on the Trustee and the Advisors for decision-making concerning investments in the Policy's investment accounts. But

these decision-makers, and thereby the Trust, only could gauge the attractiveness of any particular investment if PFLAC provided it with appropriate information.

45.    Indeed, the Trust's representatives were wholly dependent upon PFLAC to provide information concerning the subject investments.  In addition to being completely barred from direct contact with the investment managers of the funds in which the its monies were invested, they also had no way to obtain public information concerning the investments because they were limited partnership interests of private investment partnerships.  All of this made it critically important that PFLAC, as the limited partner of the investments, provide the Trust with any and all information it had access to concerning SSR.  And while PFLAC was not obligated or expected to offer ongoing judgments as to the investment merits of SSR, the Trust (through its advisors) assumed sole responsibility for analyzing whether to redeem, reduce or add to his investment, based on PFLAC's meeting its obligation to provide or pass through complete and timely information concerning SSR that it acquired acting on behalf of the Trust.

46.    The PPM expressly acknowledges PFLAC's role as disseminator of information, stating that "[a]ll records and accounts relating to the Investment Accounts will be maintained by the Company."  (PPM (Ex. C) at 30.)

### Types Of Critical Information That PFLAC Was Obligated To Provide

47.    Given the opaque nature of hedge funds and fund-of-hedge funds (as compared to a mutual fund, a public stock or bond, or an exchange-traded fund), an investor such as the Trust has limited tools with which to monitor or critically evaluate an investment.  These information tools are, in order of importance: (i) a review of the audited financial statements as presented by the independent auditor of the fund; (ii) periodic direct communications from the manager itself (e.g., via letters, conference calls, website access); (iii) observation of reported changes in

service providers; and (iv) for sophisticated investors only, periodic access to the investment manager. These tools are all that investors have in determining whether to withdraw, reduce, or exit the investment.

48.    **Information provided in audited financial statements.**    Any possible irregularities reported in the audited financial statements were critical information in an investor's ongoing consideration of whether to remain committed to any particular fund investment. Moreover, a fund's *failure* to provide audited financial statements to PFLAC would be an even more critical, adverse indicator. PFLAC was well aware of this dynamic.

49.    **Service providers.**    It is also essential to hedge fund and fund-of-hedge fund investors to have the ability to consider the strength and continuity of the fund's "service providers," such as, in order of importance, auditors, administrators, prime brokers and outside counsel.

50.    The independent auditor is the most important service provider, and is hired to comply with any legal requirements, to challenge and to corroborate the valuation and financial reporting provided by the third party administrator and/or investment manager and to provide informed comment on the application of new and existing accounting standards. Another important function of an auditor is to consider fraud controls and issue appropriate audit recommendations. In short, the auditor is viewed as keeping the investment manager "honest" as it relates to reporting to investors the value of their respective investment accounts, particularly at year-end, when the investment manager is permitted to allocate fund capital to itself in the form of annual incentive fees.

51.    The fund administrator, also a vital service provider, is responsible for calculating the monthly account balance, generating investor statements and delivering statements directly to

investors, as well as preparing the annual accounting statements that are then reviewed by the independent auditor.

52.     Such service providers provide the only outside, objective observations of fund managers and serve as critically important inputs for an investor as to the business, accounting, and investment practices of a given fund.  This is because hedge funds and fund-of-hedge funds have no true independent boards of directors, no regulators, no federal or state reporting responsibilities and no other similar mechanisms to allow investors to gain confidence that the manager of the fund is acting responsibly with investor capital and is reporting profits in accordance with proper accounting standards.  Service providers risk impairing their reputation if a fund for which they serve has questionable practices that the provider did not seek to remedy or, in the alternative, if the provider did not resign if no remedy was achievable.

53.     This explains why a change in independent auditor or administrator is extremely rare and is viewed by any sophisticated investor as a serious adverse development for any hedge fund or fund-of-hedge fund partnership.  Disclosure of such a change to a key service provider, without an accompanying reasonable explanation, in and of itself would lead most sophisticated investors to withdraw their monies from the fund immediately.

54.     **Legal or regulatory action.**  Of additional critical importance, an indictment, SEC investigation, or any other regulatory action commenced against a fund manager, or anyone affiliated with the fund, would be an immediate catalyst for an investor to evaluate the status of an investment in the partnership, and in all likelihood, redeem at the first opportunity.

55.     **Material investment-related information.**  Hedge fund and fund-of-hedge investors also consider various other investment information, including: ownership of the general partner of the investment fund; changes in the investment in the fund by principals of the general

partner; related party transactions; concentration of portfolio holdings; major portfolio holdings; change in investment strategy; leverage; portfolio risks; and changes to total assets under management.   A material change in any one of these categories would lead an investor to immediately consider redeeming the subject investment and a combination of several of these factors would assuredly lead to an immediate withdrawal of such funds.

56.    Based upon the provisions of the PPMs and Policy, and PFLAC's own internal corporate policy, the Trust (through the Trustee and Advisors) was completely dependent upon PFLAC for all of the foregoing information, including, the absence of such information.  And based on PFLAC's prior representations as to researching and vetting of "platform" funds, and monitoring and oversight of the investments, the Trustee and the Advisors had every reason to believe that PFLAC would fulfill its duties to it by competently gathering and providing any material information concerning the subject investments without delay.

57.    As more fully set forth herein, the critical importance of such information to the Trust's investment, and the redemption thereof, cannot not be overemphasized.

### PFLAC Misrepresents SSR As A Vetted And Approved Investment

58.    In September, 2005, PFLAC's Director of Research sent Buchalter (in his capacity as advisor to the Trust) an email in which he provided information concerning the Strategic Stable Return Fund ("SSR"), managed by SSR Capital Partners, L.P.   PFLAC identified SSR as one of its vetted and approved investment choices.  (**Exhibit D.**)

59.    SSR was an insurance-dedicated fund-of-hedge fund that invested in credit-based hedge fund managers.   In or about October 2003, PFLAC had approved SSR as one of its "platform funds."  Thus, at the time PFLAC presented SSR in September 2005, PFLAC and SSR

already had had a two year business relationship during which time PFLAC presumably drew conclusions concerning SSR's suitability for its policy holders.

60.     At the time PFLAC presented SSR as an approved investment choice, there were an estimated 75 to 100 insurance-dedicated hedge funds in existence. PFLAC presented just 27 insurance-dedicated funds, clearly indicating that it had utilized specific criteria to select said funds, and conversely found that the majority of available funds were not appropriate for its policyholders. As such, PFLAC affirmatively preselected SSR from a much larger universe as especially suitable for policyholders such as the Trust, based on PFLAC's purported vetting and determination utilizing specific criteria.

61.     SSR had a relatively small disclosed investor base, but offered the risk protection of a diversified fund-of-hedge funds. Its stated investment strategy was to invest investor funds with multiple hedge fund managers, thus reducing the risk taken with an investment in a single hedge fund manager controlled by one or a few individuals.

62.     One of the important investment terms of the SSR fund was that it allowed for investors redemptions every quarter, with only 45 days' advance notice, any time after the first full year of investment. Given that material factors such as those described above can change throughout the life of any investment, these factors must be reviewed and reconsidered frequently to consider and reaffirm the commitment to the investment, and therefore, the right to redeem (i.e. withdraw) was an essential feature in favor of this fund. That SSR allowed for redemptions every quarter was particularly attractive because older, larger, and more established funds typically only allow redemptions annually, or with much longer notice periods.

63.     The terms of PFLAC's "tearsheets" and the PFLAC PPM made it such that the Trust would have to rely exclusively on SSR-provided information (as provided exclusively by

PFLAC) to evaluate all investment considerations and risks, including those related to the factors mentioned above. And because the Trust was specifically prohibited from direct contact with fund managers per PFLAC's express policy, it only would be able to obtain SSR-provided information from PFLAC acting as an intermediary.

64.     This dynamic indisputably created a duty on PFLAC's behalf to collect and pass on to the Trust whatever SSR information was available so that the Trustee and the Advisors could consider and evaluate such information in deciding whether to continue the its investment in SSR.

65.     Commensurate with this duty, PFLAC had broad access to and regular contact with SSR, and SSR regularly provided information to PFLAC concerning its various investments.

66.     Specifically, SSR's manager set forth the information that it provided to limited partners, such as PFLAC, in its AIMA Questionnaire (an industry-standardized disclosure statement provided to prospective investors):

We provide for our clients:

| | |
|---|---|
| Monthly Estimate: | On or before 15th of the following month |
| Account Statement: | On or before 25th of the following month |
| Investor Letter: | Quarterly |
| Audited Financials: | Within 180 days of year end |
| ADV Part II: | Offered on a yearly basis |

We also have a portfolio breakdown that is available upon request. (**Exhibit E**.)

67.     SSR's marketing presentation further lists seven "Primary Responsibilities" of its role as manager of the fund. Number one on the list is to "[c]ommunicate effectively with, and be responsive to our investors." (**Exhibit F**, at p. 13.)

68.     PFLAC was, acting on behalf of its policyholders, including the Trust, one of SSR's largest investors.

69.     And PFLAC had a "Director of Research" who supposedly was solely dedicated to monitoring and evaluating PFLAC's investment managers and interfacing with PFLAC policyholders with respect to these managers.

70.     For all of these reasons, the Trust (through the Trustee and Advisors) had every reason to believe that PFLAC had sufficiently vetted SSR.  In addition, the Trust had sufficient reason to believe that SSR would provide more than sufficient information to PFLAC about its activities, and in turn, that PFLAC would pass on any and all information that it received with respect to SSR to enable the Trust's advisors to make timely and informed decisions each quarter to take one of three possible actions:  remain invested, reduce or increase the investment, or exit the investment entirely.

71.     Alternatively, if PFLAC failed in its duty to pass along SSR-related information, the Trust through its advisors would be operating in the proverbial dark, and it was entirely foreseeable that they would fail to make an informed investment decision because they lacked the most basic underlying information.

**The Trust Invests In SSR Based On PFLAC's Misrepresentations**

72.     In or about December, 2005, in reliance upon all of the foregoing, the Trustee and the Advisors, acting on behalf of the Trust, elected to invest half of the Policy's investment account monies in SSR.

73.     An initial payment to SSR in the amount of $88,000.00 was made on or about December 30, 2005.  A second payment in the amount of $2,781,000.00 was made on or about

January 31, 2006. The third, and final installment, was made on or about February 28, 2006 in the amount of $317,722.64. Thus, the Trust invested a total of $3,186,722.64 in SSR.

74.    PFLAC thereafter emailed the Trustee and Buchalter on a monthly basis with information concerning only the reported investment performance of the SSR fund. Such information should have included any and all data that PFLAC had received from SSR or to which it had access by virtue of its status as a limited partner (and one of SSR's largest investors) acting on behalf of the policy owners, such as the Trust, as well as based on information received by way of its own Research Department.

75.    PFLAC's presentation of SSR's reported investment performance to the Trust, under the representation that the financials had been independently audited, as well as the fact that PFLAC had agreed to provide all relevant information to investors, caused the Trustee and the Advisors to reasonably rely upon PFLAC to provide accurate and complete information.

76.    In or about May, 2007, PFLAC provided fund balances for the month ending April, 2007. In response, Buchalter noted that he and the Trustee had not received a detailed investment report in approximately one year and requested a copy thereof. PFLAC thereafter sent a one page marketing sheet that purported to summarize the fund and its performance. Based upon the information PFLAC provided, the fund was performing extremely well.

**PFLAC's Negligent Handling Of The Trust's Instruction
To Redeem The SSR Investment Before Third Quarter 2008**

77.    The Trust had the right to demand a partial or full redemption from SSR at any quarter end (with 45 days' notice) as of the second quarter of 2007.

78.    The June 30, 2008 financial statement that PFLAC sent to the Trustee and Buchalter showed the value of the SSR investment account as $3,877,135.00.

79.     Shortly thereafter, the Trustee the Advisors elected to redeem the Trust's full investment.

80.     On or about July 30, 2008, Buchalter's attorney, William Lipkind, sent an email to John Hillman, Chief Executive Officer of PFLAC, requesting that he prepare the documentation such that the Trust could redeem its SSR investment positions for cash "ASAP." The request stated:

> I need the applicable person at your shop to send me the applicable documents and describe the applicable procedures whereby the Buchalter policy can sell out all of its positions and reduce everything to cash ASAP.

**(Exhibit G.)**

81.     Lipkind's request to Hillman was made 61 days prior to the end of the third quarter, September 30, 2008 (well within the 45 day notice period).

82.     On or about August 5, 2008, PFLAC sent Lipkind the "applicable documents" that he had requested five days earlier.

83.     PFLAC prepared the "applicable documents" on its company letterhead. However, PFLAC completed the documents in blatant error with specific "special instructions" to redeem all funds on *December 30, 2008*; not September 30, 2008 as had been specifically requested.    **(Exhibit H.)**  Thus, while being specifically directed to effect the redemption "ASAP," PFLAC negligently completed the document to effect the redemption one entire quarter later than it should have been effectuated.

84.     Assuming that PFLAC had followed his specific instruction, Lipkind subsequently forwarded the "applicable documents" to the Alaska Trust Company, then sole Trustee of the Trust, together with a letter from Jeff Brown (Buchalter's appointed Investment

Advisor) to effect the SSR redemption. (**Exhibit I**.) At this time, there were 55 days before the next available redemption date, September 30, 2008.

85.    The Trustee and the Advisors, expecting that PFLAC had followed Lipkind's explicit instruction to redeem "ASAP," reasonably expected that the Trust's SSR investment would be redeemed as of September 30, 2008 and that it would recoup the entire stated balance. But this inexplicably did not occur because of PFLAC's aforementioned gross negligence in connection with the most routine process of filling out the redemption forms.

86.    By October 2008, SSR had received so many redemption requests that it exercised its right to suspend all such requests until such time it felt it could accommodate the return of capital.

87.    The Trust's redemption would indisputably have been effected in September had PFLAC drafted the aforementioned redemption request document in accordance with Lipkind's instruction. Instead, PFLAC's unexplainable error in misdating the document caused the redemption request to be suspended along with all similar requests made to SSR through November 15, 2008.

88.    In response to a request for an explanation for this egregious error and a demand for compliance with the redemption request, PFLAC continued to assure Buchalter (acting as advisor to the Trust) that it was in contact with SSR "on at least a weekly basis to monitor their activities regarding SSR's underlying investments", that they would "remain actively engaged" and that they would "report back on new developments as we learn of them." (**Exhibit J**.)

89.    In fact, SSR sent out letters to investors after the September 2008 suspension of redemptions suggesting that the return of investor capital was imminent in each year 2008, 2009, 2010 and 2011.

90.    For example, on November 21, 2008, SSR wrote: "However, given the current market environment and liquidity constraints with our other underlying managers, *it could take 12-18 months or more to fully pay out the December 31 [2008] withdrawals*."

91.    Similarly, on August 7, 2009, SSR wrote: "Assuming the accuracy of those projections, and, most importantly, assuming a successful refinancing this year or next of the Promise facility, which would provide liquidity to Stable-Value Fund investors, *distributions to ID Fund investors could begin in the first part of 2011*."

92.    On June 2, 2010, SSR wrote: "While you may already appreciate our position, we want to reiterate that we have placed 100% redemption requests with ALL underlying manager positions and as such, as liquidity returns, we first pay down leverage and once leverage is paid in full, *we expect to being making full distributions to all investors*."

93.    And on March 18, 2011, SSR wrote: "While 2010 has been an extremely difficult year, we remain committed to seeking liquidity to pay down the leverage line and *return capital to investors as quickly as possible*."

94.    These communications from SSR offered Buchalter some comfort that the Trust's capital would be returned. And he did not have any notion that PFLAC had committed any wrongdoing in connection with SSR.

95.    Despite PFLAC's and SSR's prior representations and assurances, and despite the July 2008 request seeking immediate redemption, no capital has been returned to the Trust.

96.    After initially reaching a peak value in September 2008 of $3.904 million (when the redemption should have been effected), the reported SSR investment account balance has dropped every single month thereafter.

97.     A January 29, 2013 email from PFLAC to Buchalter states that the Trust's SSR investment account had a stated balance of $356,900 as of November 30, 2012, indicating a loss of over 90% of capital since the Trust's redemption request.  Moreover, upon information and belief, the SSR-reported capital balances are slowly and surely being managed toward zero, and there is only a negligible chance of even a token amount of capital being returned to the Trust.

### PFLAC'S Material Misrepresentations And Omissions

98.     In 2012, Buchalter, on behalf of the Trust, began investigating what went wrong with SSR.  During that process, he discovered a shocking amount of material information concerning SSR that PFLAC had immediate access to, but negligently failed to pass on pursuant to its indisputable duties to the Trust.

### PFLAC's Access To Material Information Concerning SSR

99.     Of the five insurance carriers that constituted more than 90% of SSR's assets under management, PFLAC was one of the top three limited partners based on the AIMA report dated August 22, 2007.  As a major investor, PFLAC clearly received all updates provided by SSR under the Limited Partnership Agreement and other written commitments to investors, including the items listed in paragraph 17.1 of that same document.

100.     Buchalter also eventually learned that other insurance companies received such recurring information from SSR and directly provided such information to their policyholders, for their investors' own evaluation of their continuing investment decision.

101.     Buchalter further learned that PFLAC had access to information through SSR's investor website, a fact of which PFLAC never advised the Trustee nor the Advisors, and to which PFLAC never provided access for the Trust, apparently based on PFLAC's own internal company policy that strictly prohibited the Trust from having any contact with the managers of

the funds PFLAC invested on behalf of the Trust.  Accordingly, PFLAC had continual access to SSR information, giving further rise to its obligation to review and report such information to the Trust and its representatives.

102.   However, other than supplying basic account value summaries, from the time of the Trust's investment until the time of the written redemption request, PFLAC did not provide the Trustee or the Advisors with any of the material information with which it was provided, or to which it had access from the SSR investor website, including material adverse developments that would be essential to any investor, including the Trust.

103.   Moreover, PFLAC only provided infrequent updates even after some of the adverse matters actually became known in the industry.  Whatever PFLAC learned, as one of the largest investors in the SSR ID Fund and with a relationship that was later described as "weekly" contact, it did not share with the Trustee or the Advisors.

104.   In or about May 2012, Buchalter obtained a five page quarterly update letter published by SSR to fund investors in March 2007 that had been provided to an unrelated investor by his insurance company, which, like PFLAC, was a limited partner in SSR.  (**Exhibit K**.) PFLAC failed to provide this quarterly update to the Trustee and the Advisors.

105.   Of particular note, SSR advised its investors in the aforementioned letter to "look for quarterly updates from us from this point forward" and offered to its investors additional transparency and information: "please be aware that you can request a quarterly report that gives detail on the portfolios of the Funds."  Further, for those investors that desired, specific portfolio detail was available for review.

106.   PFLAC, as investor on behalf of, and as agent for the Trust, never forwarded this letter or any future SSR quarterly letters before the Trust's redemption request, and never

informed the Trustee nor the Advisors that all SSR investors could receive additional information upon request.

107.    In addition to failing to provide the foregoing information, PFLAC never disclosed to the Trustee nor the Advisors that other investors *did* indeed have access to such information through their insurance companies, including that found on the SSR investor website.

108.    This lack of access, while similarly situated investors were granted same, placed the Trust at a considerable disadvantage in that the Trustee and the Advisors did not have equal access to the same information as did other investors, placing the Trust at PFLAC's mercy, and PFLAC in turn repeatedly and materially failed to provide crucial information.

109.    PFLAC never advised the Trustee nor the Advisors, either at the initial stages of the investment or during the period of the investment, of this significant investment risk (i.e., that they would not have available to them the same critical investment information that other SSR investors would have and were given).

110.    The various categories of material information with which PFLAC failed to provide the Trust are set forth below:

### SSR's Unqualified Management And Misrepresentation That SSR Was Vetted

111.    Steven Helland and Tim Law formed SSR in or about May, 2003.    PFLAC elected to place SSR on its approved platform of preferred investment choices despite the fact that neither man had the requisite material experience in the arcane and complex world of structured finance, corporate receivables financing and asset-based lending.

112.    In addition, as discussed in more detail below, Helland and Law were business partners with William Gunlicks and his "Founding Partners" family of funds.  Gunlicks had been

under investigation by the Securities and Exchange Commission ("the SEC") since 2000, a fact that was known by PFLAC, or which could have been discovered with even a modicum of due diligence.

113.    Nevertheless, by October 2003, with just six weeks of operations and a small amount of capital under its belt, PFLAC at senior levels had incredibly determined to present SSR to its policyholders, such as the Trust, "in the very near future." For instance, PFLAC's General Counsel emailed Lipkind in October 2003, a mere month after SSR commenced operations, indicating that he was "in the process of adding" SSR to its platform. (**Exhibit L.**)

114.    Upon information and belief, PFLAC had designs on becoming a leading carrier of variable universal life policies.  A shortcut to achieving this status was signing up as many funds as possible to its platform, as quickly as possible, without regard to quality.  This explains why PFLAC would ignore its indisputable duty to properly vet managers that it recommended to its investors, such as the Trust.  PFLAC either failed to carry out even minimal due diligence on SSR, or, more likely, did carry out diligence and recommended SSR to its investors notwithstanding Helland and Law's complete lack of experience because it furthered PFLAC's own self-interest to add a fund to its platform by which it could generate additional fees.  In any event, PFLAC breached its duty to investors, including the Trust.  It is also possible that PFLAC subordinated its investors' interests to a financial arrangement with SSR, which would have presented an unacceptable conflict of interest.

<u>SSR's Deep, Conflicted Relationship With William Gunlicks</u>

115.    It was not until February 2012 that Buchalter discovered the depth of the business and economic relationship between SSR and Gunlicks and his "Founding Partners" family of funds, and critical facts concerning Gunlicks that were never disclosed.

116.    Unbeknownst to Buchalter and the Trustee, Gunlicks provided the necessary capital to establish SSR in 2003, and owned one-third of the fund's investment manager (SSR Capital Partners, LP).  Gunlicks also was on SSR's Board and at one time was listed on a public website (www.investorpoint.com ) as a Registered Investment Advisor[3] for SSR.  Neither the Trustee nor the Advisors were informed of any of these facts by PFLAC.

117.    Gunlicks also managed approximately one half of the capital that SSR had responsibility for investing on behalf of investors.  SSR had its most significant investment in Gunlicks' Founding Partners Stable-Value Fund.  Thus, although Gunlicks owned a significant portion of SSR, he was receiving the largest percentage of SSR's assets to manage himself, charging SSR his full investment fund fee structure (i.e., management and performance fees) in a blatantly self-interested role.  PFLAC was aware of this fact, but again never disclosed it to the Trustee or the Advisors.

118.    SSR's investment management program, described by SSR utilizing the very same language Gunlicks employed in describing the Stable-Value management program, was intended to deliver "consistent positive monthly returns in the Strategic Stable Return Fund (ID), LP" (the "Fund") with "......*no correlation to the bond and equity markets*."  (**Exhibit M**.)

119.    In short, SSR essentially was a marketing and capital raising instrumentality of Gunlicks, tapping for him a new source of capital for the first time: the insurance carrier private placement variable life and variable annuity market.  By establishing Helland and Law in business with his fund's capital and creating mutual incentives for the management of attracted

---

[3] Registered Investment Advisers ("RIAs") are investment brokers and financial planners that registered with and met the reporting requirements of their respective state securities agency, or the SEC, depending on the amount of assets they advise on.  RIAs receive compensation for giving advice on investing in securities, and must adhere to a fiduciary standard of case set forth in the Investment Advisors Act of 1940, which requires them to serve a client's best interests with the intent to eliminate, or at least expose, all potential conflicts of interest that might incline an advisor to render advise not in the best interest of his clients.

capital, SSR and Gunlicks were in every sense of the phrase, alter egos of one another. Specifically:

(a) SSR investors were paying fees to SSR that directly benefited Gunlicks in two separate ways. He earned: (i) through his Hybrid-Equity fund, the economics of one-third of SSR's fees on investor capital; and (ii) the full hedge fund fees (management fee and incentive fee) on all of the capital that SSR invested in Stable-Value.

(b) As SSR grew assets, SSR's value would typically be increased in some relative proportion to the assets under management. As this value grew, Gunlicks would realize further economic gain through his one-third stake in SSR held by Hybrid-Equity. Gunlicks effectively had a highly-leveraged financial interest in the performance of SSR, whereby the better the reported performance of SSR, the more investment management fees he accrued, the easier it was for SSR to raise additional capital, and the more that SSR itself was worth. At the same time, Gunlicks' Stable-Value fund was the largest holder of, and the largest contributor to, reported "profits" of the SSR portfolio.

120.    The fee sharing between the two firms was an additional source of revenue for Gunlicks. By way of example, an investor that subscribed to a $1,000,000 partnership interest with the SSR ID Fund would pay a management fee of 1.0% and an "incentive fee" of 10.0% of profits. At the highly consistently stated SSR investment performance of roughly 12% annually, the investor would pay SSR a $10,000 management fee and a $12,000 incentive fee annually, plus a pro-rata share of SSR expenses that were chargeable to the fund. Ignoring those expenses for purposes of illustration and conservatism, SSR would earn about $22,000 for this $1 million investor. Gunlicks' Hybrid-Equity Fund would earn roughly one-third of that amount, or, $7,333.

121.    Further expounding upon this example, with SSR investing an assumed 50% ($500,000) of all its capital in Stable-Value, Gunlicks' firm would then receive additional fees of $10,000 (2% management fee), and approximately $12,000 from incentive fees (12% reported Founding Partners Fund return).  In total, while Helland and Law would earn $14,666 (two-thirds of $22,000) between them on that $1 million investment (before considering the expenses of funding their business), Gunlicks' entities earned approximately $29,333 ($7,333 via SSR fees and $22,000 from Stable-Value Fund fees), or almost <u>double</u> what his SSR co-founders earned.

122.    PFLAC never informed the Trust of the closely intertwined relationship between Gunlicks' Founding Partners Equity Fund, L.P. and SSR.  Instead, only one paragraph within the hundreds of pages of materials presented by PFLAC in connection with the SSR investment even mentioned this relationship, and that paragraph did not even refer to William Gunlicks or Founding Partners Funds by name.

123.    At a bare minimum, Gunlicks' relationship with SSR was plagued with the conflicts of interest that the Investment Advisors Act of 1940 law was designed to address; conflicts of which PFLAC indeed should have fully disclosed to the Trustee and the Advisors.

124.    As objectionable and transparent as the Gunlicks/SSR relationship appears today, it was not apparent to the Trustee nor the Advisors at the relevant time because PFLAC never disclosed the SSR portfolio or the materiality of the Gunlicks' ownership.

125.    Furthermore, SSR decided just months after the Trust invested, in April 2006, to "turbocharge" this arrangement, by securing financing from KBC Worldwide ("KBC") to leverage each $1 million invested by an investor with a $1 million fund-level borrowing from KBC.  Essentially, now for each $1 million investment by an individual or insurance policyholder investor, SSR and Gunlicks could each double their respective fees.  SSR would

earn about 4.5% and Gunlicks almost 9% from all investment dollars, as long as they both kept producing (or, at least reporting) 12% annual returns.

126.    In June, 2007, shortly after the issuance of its unqualified audit opinion on Stable-Value's 2006 financial statements, the independent auditors to the Founding Partners Funds, E&Y, resigned from those responsibilities, and therefore, did not provide audited statements.

127.    As noted above, at or about the time that SSR was formed, and then quickly approved as a platform fund by PFLAC for the investment dollars of its policyholders, Founding Partners and Gunlicks already were under SEC investigation, and had been since 2000.   In addition, and significantly, a "Wells Notice" had been issued by the SEC against Founding Partners and Gunlicks in December, 2003.

128.    Not surprisingly, investors generally view a Wells Notice as an extremely serious matter, and one that threatens the continuing existence of smaller investment management partnerships, such as Founding Partners.   Any diligent inquiry by PFLAC and its research department would surely have revealed this fact.

129.    In or about January, 2012, Buchalter learned that on December 3, 2007, the SEC had issued a "Cease and Desist" Order against Founding Partners Capital Management Company and Gunlicks, compelling Gunlicks to agree to a censure, a cease-and-desist order and certain financial sanctions.   The Order described Stable-Value as having committed a lengthy list of inappropriate related-party transactions and certain securities law violations, including violation of Section 17(a) (2) of the Securities Act of 1933.   Unlike the Wells Notice, this was a matter of public record.   Though SSR and Gunlicks were again essentially alter egos, this development shockingly was not reported to the Trustee nor the Advisors by PFLAC.

130.    In addition, upon information and belief, SSR advised all investors, including PFLAC, of the foregoing order against Gunlicks in *early 2008*.    Incredibly, PFLAC never provided that information to the Trustee nor the Advisors.

131.    In or about April, 2009, the SEC charged Gunlicks and Founding Partners with misusing fund assets to pay personnel expenses, and misrepresenting that its funds had audited financial statements for 2007 when they did not.    Additionally, the SEC alleged that Gunlicks and Founding Partners failed to disclose to all investors and to comply with a prior Commission order entered against them.    As a result, a court froze all Founding Partners assets with an emergency order and appointed a receiver.

132.    Further supporting the close interrelationship between Gunlicks and SSR, the SEC opened an investigation into SSR later that year, which turned into a "formal investigation" in late 2010.

> No Audited Financial Statements

133.    At the time of the Trust's investment, E&Y was SSR's independent financial auditor.    Thereafter, Rothstein, Kass & Co., also a highly regarded hedge fund accounting firm, was indicated on SSR "tearsheets" as the fund's auditor.    That SSR was being audited by such well respected firms in the industry was crucially important to the Trustee and the Advisors in selecting SSR for investment.

134.    But in or about February, 2012, Buchalter learned that did not produce audited financial statements after the year 2006.

135.    Upon information and belief, this was a direct result of E&Y's resigning from its responsibilities to audit Gunlicks' Founding Partners Funds.    As Buchalter eventually learned, Gunlicks' Founding Partners Funds was SSR's largest investment, and without audited financials

from the manager of its largest holding, SSR's auditors (at that point, Rothstein, Kass & Co.) could not provide the required audit of SSR.

136.    PFLAC was aware of, or should have been aware of, this critically important fact, but once again never disclosed it to the Trustee nor the Advisors.

<u>Unexplained Changes in Key Service Providers</u>

137.    **Independent Auditor.**  In February, 2012, Buchalter learned that E & Y had been "dismissed" by SSR "prior to any audit work beginning."  No further explanation was provided by SSR.  PFLAC was aware of, or should have been aware of, this critically important fact, but never disclosed it to the Trustee nor the Advisors.

138.    **Fund Administrator.**  In or about March, 2012, Buchalter learned that on January 1, 2007, the Administrator for the SSR Fund was changed from Hedgemetrix LLC to Hedgeworks LLC.  Upon information and belief, Hedgemetrix either resigned over accounting and valuation irregularities, or was dismissed by SSR.  The change was material because it would have provided investors reason for heightened concern, and was typically one of the signs of serious trouble in a fund.  PFLAC never passed on this critical information to the Trust.  In fact, when Buchalter requested additional information on SSR in June 2007, PFLAC provided information dated May 2007 that reflected Hedgemetrix as fund administrator, even though it had been replaced months earlier.

<u>Change in Strategy</u>

139.    Shortly after the Trust initiated its investment in SSR, in May 2006, SSR announced a change in strategy and a change in the amount of financial risk it would seek to manage.  In addition to simply allocating the monies invested with the SSR partnerships, beginning in May 2006, the SSR ID Fund began employing what it phrased as 'modest'

leverage, which SSR described as intended to "limit to no more than one dollar of leverage per dollar of fund equity." (**Exhibit N.**) Through this leverage, SSR could allocate to other hedge funds $2 for every $1 of capital it was entrusted with by investors, such as the Trust, to manage. The other dollar would be lent to the Fund by KBC to invest as it chose.

140.    The limited partner insurance companies, including PFLAC, encouraged SSR to make this change in strategy.   PFLAC was providing input and approvals to SSR which would serve to enhance SSR's and Gunlick's profits, enhance PFLAC's profits and concurrently compromise its responsibilities to the policyholders on whose behalf it invested, including the Trust.

<u>Overstatement of Assets Under Management</u>

141.    Buchalter also learned that the May 2007 SSR update that PFLAC provided after he, on behalf of the Trust, requested more information about SSR, which reported that SSR had $169 million in assets under management, in fact had only approximately half that amount based on the August 2007 AIMA disclosure questionnaire containing information supplied by SSR. Thus, the investment report PFLAC to the Trust provided materially overstated committed investor assets by approximately 100%.   Though SSR reported its assets to PFLAC accurately and in accordance with industry practice, PFLAC reported a grossly higher number to the Trust that would serve to show highly misstated investor acceptance of SSR, a misstatement of SSR's presence in the industries in which it invested, and, by far most importantly, a misstatement of the implied ability of SSR to meet potential redemption requests of the fund.

142.    Not only is asset growth an important proxy for broader investor acceptance, it is, more importantly, a key measure and proxy for a fund's near-term ability to meet all redemption (<u>i.e.</u> withdrawal) requests, since redemption requests are funded by either sale of investment

interests in the fund itself, income and profits from the underlying investments or, more typically, by the receipt of new investor capital. With the strong asset growth reported by PFLAC (nearly eight-fold growth, from $22 million as reported to the Trust in January 2006 to $169 million as reported in May 2007), and in the absence of any other available information, the Trust gained considerable comfort that any redemption request in the coming quarters for the $4 million investment could be readily accommodated by SSR. This perception was directly created by PFLAC's blatant misrepresentations and omissions, which the Trustee and the Advisors relied on to the Trust's ultimate detriment.

## The Effect Of PFLAC's Misrepresentations And Omissions

143. At no point before it was too late did PFLAC inform the Trustee or the Advisors of: (a) its failure to properly vet SSR, most notably with respect to its managers' shocking lack of experience, as misrepresented by placing SSR on the platform; (b) SSR's extraordinarily large investment with just one manager (Gunlicks); (c) Gunlicks' Founding Partners' 33% interest in SSR; (d) Gunlicks' legal problems with the SEC including the Wells Notice, (e) Gunlicks' Founding Partners' independent auditor's resignation in early 2007; (f) the failure of the Founding Partners funds or the SSR ID Fund to produce independent audited financial statements for 2007 or for 2008, or (g) the SEC censure and cease-and-desist order against Gunlicks in early December 2007.

144. PFLAC directly furthered the Gunlicks fraud by leading its policyholders, such as the Trust, into investments with SSR, which was essentially a fund-raising vehicle for Gunlicks and Founding Partners, and then not providing any information whatsoever (beyond a monthly reported return, later learned by the Buchalter to be untrue) that could allow an investor to escape from this web of related party transactions, resigning auditors and administrators, and SEC

investigations and charges. If PFLAC had disclosed even merely one of the preceding facts, the Trust would have indeed elected to exit the SSR investment, years before other SSR investors requested withdrawals in the fall of 2008, which essentially collapsed the fund, wiping out nearly $4 million of the Trust's capital in the SSR investment account.

145.    Finally, for its purported "services" to the Trust in connection with the Policy, the Trust has paid more than $345,000 in fees to PFLAC since the inception of the Policy.

## FIRST CAUSE OF ACTION
### (Negligence)

146.    Plaintiffs repeat and reallege paragraphs 1 through 145 as if fully set forth herein.

147.    PFLAC owed the Trust a duty of care with respect to its investments, and in particular, among other things, a duty to properly vet and approve the funds in which the Trust invested, to monitor material developments at such funds, to provide the Trust through the Trustee and the Advisors with any material information concerning such funds in timely and accurate fashion, and to process the Trust's redemption requests, again, in timely and accurate fashion.

148.    PFLAC was the sole conduit of information concerning the Trust's SSR investment due to the non-public nature of the investments and the Policy's express prohibition on the Trust contacting fund managers directly. PFLAC knew, or reasonably should have foreseen that, in the absence of the exercise of its duty of care, it would cause damage to the Trust.

149.    By virtue of PFLAC's wrongful acts and conduct, including but not limited to its misrepresentation that SSR was properly vetted and an approved investment choice, its failure to monitor material developments at SSR, its failure to provide the Trustee and the Advisors with material information concerning SSR, its failure to accurately process the Trust's request to

redeem the SSR investment, and its misrepresentations to Buchalter concerning SSR's asset base and change in fund administrator, PFLAC breached its duties to the Trust.

150.    But for PFLAC's wrongful acts and conduct, the Trust's investment in SSR would have been redeemed prior to SSR exercising its right to suspend all such redemption requests in October 2008.

151.    Whereas PFLAC passed along almost no information to the Trustee and the Advisors including the critical information referenced herein, it was foreseeable that they (and therefore the Trust) would remain unaware of critical information and thereby not elect to redeem the SSR investment before it was too late.

152.    As a direct and proximate result of PFLAC's wrongful acts and conduct, and the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)

153.    Plaintiffs repeat and reallege paragraphs 1 through 152 as if fully set forth herein.

154.    PFLAC, both an insurance and financial services organization, in the course of its business owed the Trust a duty of care with respect to its investments, and in particular, to provide accurate information concerning its vetting and approval of the funds in which the Trust invested, and SSR's assets under management and change in fund administrator.

155.    By virtue of its misrepresentation that SSR was thoroughly vetted and an approved investment choice and its misrepresentations concerning SSR's change in fund administrator and assets under management, PFLAC, in breach of its duty, supplied the Trust (through the Trustee and the Advisors) with false or misleading information.

156.    The Trust (through its Trustee and Advisors) justifiably relied on PFLAC's representations. PFLAC was the sole conduit of information concerning the Trust's SSR investment due to the non-public nature of the investments and the Policy's express prohibition on the Trust contacting fund managers directly. PFLAC knew, or reasonably should have foreseen that, its misrepresentations would cause damage to the Trust.

157.    Whereas PFLAC passed along almost no information to the Trust, it was foreseeable that the Trust would remain unaware of critical information (that SSR had not been properly vetted, that SSR's fund administrator had changed, and that SSR's accounts under management were half of what was represented by PFLAC) and thereby not elect to redeem the SSR investment before it was too late.

158.    But for PFLAC's misrepresentations in breach of its duty of care, the Trust's investment in SSR would have been redeemed prior to SSR exercising its right to suspend all such redemption requests in October 2008.

159.    Instead, as a direct and proximate result of PFLAC's misrepresentations, and the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

## THIRD CAUSE OF ACTION
### (Breach Of Fiduciary Duty)

160.    Plaintiffs repeat and reallege paragraphs 1 through 159 as if fully set forth herein.

161.    PFLAC owed the Trust a fiduciary duty by virtue of its relationship with the Trust. Specifically, the Trust is both the Owner and the Beneficiary of the Policy. And in addition to the duties owed by PFLAC in its role as insurer and the counter-party to the Policy, PFLAC further owed the Trust duties by virtue of the dynamic whereby the Trust (through its Trustee and Advisors) was wholly dependent on PFLAC providing information concerning the

SSR investment (due to its non-public nature and the Policy's express prohibition on the Trust contacting fund managers directly) so that it could make informed investment decisions.

162.    Whereas PFLAC was the sole conduit of information concerning the Trust's SSR investment due to the non-public nature of the investments and the Policy's express prohibition on the Trust contacting fund managers directly, it imposed on the Trust a special confidence in PFLAC to act in good faith and with due regard for the best interests of the Trust. PFLAC knew, or reasonably should have foreseen that, in the absence of the exercise of its fiduciary duty, it would cause damage to the Trust.

163.    By virtue of PFLAC's wrongful acts and conduct, including but not limited to its misrepresentation that SSR was properly vetted and an approved investment choice, its failure to monitor material developments at SSR, its failure to provide the Trustee and the Advisors with material information concerning SSR, its failure to accurately process the Trust's request to redeem the SSR investment, and its misrepresentations to Buchalter concerning SSR's asset base and change in fund administrator, PFLAC breached its fiduciary duty to the Trust.

164.    Whereas PFLAC passed along almost no information to the Trust, including the critical information referenced herein, it was foreseeable that the Trust would remain unaware of critical information and thereby not elect to redeem the SSR investment before it was too late.

165.    As a direct and proximate result of PFLAC's breach of its fiduciary duty,  the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

## FOURTH CAUSE OF ACTION
### (Professional Malpractice)

166.    Plaintiffs repeat and reallege paragraphs 1 through 165 as if fully set forth herein.

167. Insurance carriers and agents are expected to possess reasonable skills and knowledge in connection with policies that they offer, and to exercise diligence in their relations with clients.

168. By virtue of the Policy and as the Trust's insurer, PFLAC owed the Trust (the Owner and Beneficiary of the Policy) a duty of reasonable care in performing its duties in managing the Policy's investment accounts.

169. By virtue of PFLAC's wrongful acts and conduct, including but not limited to its misrepresentation that SSR was properly vetted and an approved investment choice, its failure to monitor material developments at SSR, its failure to provide the Trustee and the Advisors with material information concerning SSR, its failure to accurately process the Trust's request to redeem the SSR investment, and its misrepresentations to Buchalter concerning SSR's asset base and change in fund administrator, PFLAC breached its duties to the Trust.

170. As a direct and proximate result of PFLAC's malpractice, the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

## FIFTH CAUSE OF ACTION
### (Breach Of Contract)

171. Plaintiffs repeat and reallege paragraphs 1 through 170 as if fully set forth herein.

172. On one hand, by the express terms of the Policy, and associated documents, the Trust was specifically prohibited from contact with SSR for any reason. Specifically, the Policy states that: "[The Trust] will not directly or indirectly influence or attempt to influence the Manager's selection, purchase, retention or sale of any investment within the Fund."

173.    On the other hand, PPM expressly acknowledges PFLAC's role as keeper of information, stating that "[a]ll records and accounts relating to the Investment Accounts will be maintained by the Company."

174.    Thus, where the Trust had no access to SSR, and PFLAC had a duty to maintain all records relating to the Investment Accounts, PFLAC had an implied obligation to *pass on* any SSR records to the Trust in timely and accurate fashion, so that the Trustee and Advisors could determine whether to redeem or withdraw the Trust's funds in the SSR investment.

175.    PFLAC's failure to so provide full and non-misleading information to the Trust constituted a breach of the provisions of the Policy and is further contrary to law.

176.    As a direct and proximate result of PFLAC's breach of contract, the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

## SIXTH CAUSE OF ACTION
### (Breach Of The Covenant Of Good Faith And Fair Dealing)

177.    Plaintiffs repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.    The covenant of good faith and fair dealing is implied in the Policy just as it is in every contract.  In particular, PFLAC, both an insurance and financial services organization, in the course of its business and as party to the Policy, owed the Trust a duty of care with respect to its investments, and in particular, to provide fulsome and accurate information concerning those investments.

179.    As a direct and proximate result of PFLAC's wrongful acts and conduct, including but not limited to its misrepresentation that SSR was properly vetted and an approved investment, its failure to monitor material developments at SSR, its failure to provide the Trust with material information concerning SSR, and its misrepresentations concerning SSR's asset

base and change in fund administrator, PFLAC breached the covenant of good faith and fair dealing and unfairly frustrated the agreed common purpose of the Policy and thereby deprived the Trust of the benefits of the Policy.

180.    By virtue of its wrongful acts and conduct, PFLAC disappointed the Trust's reasonable expectations as Owner and Beneficiary of the Policy.

181.    As a direct and proximate result of PFLAC's breach of the covenant of good faith and fair dealing, the Trust has been damaged in an amount to be determined at trial, but in no event less than $3,900,000, plus interest.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment)**

182.    Plaintiffs repeat and reallege paragraphs 1 through 181 as if fully set forth herein.

183.    PFLAC financially benefited from its wrongful acts and conduct as it collected improper management fees based upon the Policy's net asset values.  These unlawful acts caused the Trust to suffer injury and monetary loss.

184.    PFLAC accepted and retained these benefits in spite of its wrongful acts and conduct.

185.    It is unjust and inequitable for PFLAC to have enriched itself in this manner.

186.    Accordingly, the Trust is entitled to restitution of the revenue derived from PFLAC's unjust enrichment and inequitable conduct.

**WHEREFORE**, Plaintiffs hereby demand that judgment be issued and entered against PFLAC as follows:

a)  On the first cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,0000, plus interest;

b)  On the second cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,000 plus interest;

c)  On the third cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,000, plus interest;

d)  On the fourth cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,000, plus interest;

e)  On the fifth cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,000, plus interest;

f)  On the sixth cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $3,900,000, plus interest;

g)  On the seventh cause of action, a money judgment against PFLAC in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $345,000.00, plus interest;

h)  Such other and further relief as this Court deems just and proper, including but not limited to attorneys' fees and costs.

Dated: New York, New York
        March 27, 2014

                                PRYOR CASHMAN LLP

                                By: _____
                                        Jonathan T. Shepard
                                        Eric D. Dowell
                                7 Times Square
                                New York, New York 10036-6569
                                (212) 421-4100

                                *Attorneys for Plaintiffs*