UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE 2002 LAWRENCE R. BUCHALTER ALASKA
TRUST, ALASKA TRUST COMPANY, and
STEPHEN C. HARRIS, trustees,

        Plaintiffs,

   -v-

PHILADELPHIA FINANCIAL LIFE ASSURANCE
COMPANY f/k/a AGL LIFE ASSURANCE
COMPANY,

        Defendant.

Case No. 12-CV-6808 (KMK)

OPINION & ORDER

Appearances:

Eric Donovan Dowell, Esq.
Jonathan Thomas Shepard, Esq.
Pryor Cashman LLP
New York, NY
*Counsel for Plaintiffs*

William Robert Connelly, Esq.
Law Offices of William R. Connelly, LLC
Mendham, NJ
*Counsel for Plaintiffs*

Kendall Johan Burr, Esq.
Thomas F.A. Hetherington, Esq.
Aaron Christopher Storm, Esq.
Hutson Brit Smelley, Esq.
Edison, McDowell & Hetherington, LLP
Houston, TX
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

       Plaintiffs The 2002 Lawrence R. Buchalter Alaska Trust ("the Trust"), Alaska Trust

Company, and Stephen C. Harris ("Harris") assert seven causes of action against Defendant

Philadelphia Financial Life Assurance Company ("PFLAC"), formerly known as AGL Life Assurance Company, from which the Trust purchased a variable universal life insurance policy. Defendant moves to dismiss all seven causes of action. For the following reasons, Defendant's Motion To Dismiss is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the allegations contained in Plaintiffs' Second Amended Complaint ("SAC"), as well as the exhibits attached thereto. Lawrence Buchalter ("Buchalter") "created and funded the Trust for his and his family's benefit" in November 2002. (SAC ¶ 30 (Dkt. No. 42).) The Trust is an asset protection trust, created under Alaska law. (*See* SAC Ex. A ("Trust Instrument"), at I-3, II-11.) Under the terms of the Trust Instrument, payments of the Trust's principal and income to the Trust's beneficiaries were to be made at the discretion of the Trustee. (*Id.* at I-11–12, II-12–13.) On or about November 1, 2002, Buchalter appointed the Alaska Trust Company as an Independent Trustee, meaning that, pursuant to the terms of the Trust Instrument, Buchalter "transferred all of his 'right, title and interest in and to the property' . . . to the Trustee." (SAC ¶ 31 (quoting Trust Instrument I-1).) The Alaska Trust Company has a "place of business in Anchorage, Alaska." (*Id.* ¶ 23.) "On or about June 25, 2012, Buchalter appointed Harris as an additional Independent Trustee." (*Id.* ¶ 31 n.2.) Harris has a place of residence in New Rochelle, New York. (*Id.* ¶ 24.) Plaintiffs assert that Jeffrey Brown ("Brown") was the Trust's appointed investment advisor, and that "the parties understood" that Buchalter was also an investment advisor, (*id.* ¶ 2 n.1), despite the fact that the Trust Instrument provided that the investment advisor was Brown, or anyone else later appointed pursuant to the appointer article, (Trust Instrument I-8).

2

"The Trust is the Owner and Beneficiary under a variable universal life insurance policy known as the Flexible Premium Survivorship Variable Life Insurance Contract, policy number VL300397, issued in or about December 2002" by Defendant (the "Policy"). (SAC ¶ 32.) The Policy issued to the Trust is not a widely available, off-the-shelf product. Rather, the "Policy is offered only to qualified investors, including individuals, trusts[,] and other entities that satisfy certain suitability standards." (SAC Ex. C (Private Placement Memorandum) ("PPM"), at 1.) Specifically, "PURCHASE OF THE POLICY IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL ECONOMIC MEANS AND FINANCIAL SOPHISTICATION," and a would-be policy owner is required to "REPRESENT THAT HE OR SHE MEETS CERTAIN MINIMUM FINANCIAL AND OTHER SUITABILITY STANDARDS." (*Id.* at 3.) The PPM issued in connection with the Policy provides that the "Policies will be offered for sale only to persons or entities who [Defendant] has reasonable grounds to believe are eligible investors under the securities laws applicable to private placements because the Policies are being sold in an offering that has not been registered with the SEC." (*Id.* at 10.) And a purchaser must represent in writing that he, she, or it is an "accredited investor" under Regulation D of the Securities Act of 1933, as amended, a "qualified purchaser" under Section 2(a)(51) of the Investment Company Act of 1940, as amended, and "has substantial experience in making investment decisions of this type," among other qualifications. (*Id.* (internal quotation marks omitted).) Thus, before issuing a policy, Defendant will "make inquiry of each potential Policy Owner to determine whether he, she, or it is an eligible investor with sufficient knowledge and experience in investments of this type to evaluate the advantages, as well of the risks involved in purchasing the Policy." (*Id.*) In particular, applicants had to fill out a detailed written questionnaire. (*See id.* 49–54.) Additionally, the PPM advised that "[t]he Variable Account is

3

not registered with the SEC under the 1940 Act as an investment company," and therefore the "SEC does not supervise the management or the investment practices or policies of the Variable Account or of the Company." (*Id.* at 16.)

In exchange for Defendant maintaining the tax integrity of the insurance coverage and maintaining and administering the Policy's optional investment accounts, the Trust paid Defendant upfront and annual fees for the life of the Policy. (*See* SAC ¶ 36.) In total, Plaintiffs allege that the Trust paid more than $345,000 in fees to Defendant in connection with the Policy. (*Id.* ¶ 145; *see also id.* ¶ 20.) Policies such as the one at issue in this case "are designed to allow policy holders, such as the Trust, to invest a portion of their premiums in optional investment accounts that are offered under the policy." (*Id.* ¶ 29.) Such policies have certain tax benefits, including that investment gains and the payout upon death are non-taxable and that policy holders "are able to access account balances during their lifetime by borrowing funds, tax free, from the policies." (*Id.*) As such, the policies are "essentially a combination of life insurance and a tax-advantaged investment vehicle." (*Id.*) Plaintiffs allege that the Trust has made a total of $4.5 million in premium payments for the Policy. (*Id.* ¶ 35.)

Defendant provided Buchalter and the Trustee with the PPM "in order to allow them to select investment alternatives under the Policy." (*Id.* ¶ 37.) "The pre-approved list that [Defendant] presented was a group of private hedge fund partnerships and fund-of-hedge-fund partnerships that created investment vehicles designed specifically for insurance company investment, and [were] designed to be in compliance with relevant tax and insurance regulations." (*Id.*) Furthermore, while the investments were held by the Policy, (*see id.* ¶ 40 (explaining that Defendant had exclusive control over and ownership of the invested assets)), the Trust had some degree of control over how the Policy invested the funds. In particular, "the

4

Policy provides that the Trust is permitted to change the direction of the investments." (*Id.* ¶ 43; *see also* SAC Ex. B ("Second Dec. 20, 2002 Letter Agreement"),[1] at 3 ("Insurer will permit Policyowner (subject to such restrictions as may be imposed by Insurer in the PPM or in the Policy) to allocate Assets between or among the Accounts."); PPM 13 ("As soon as practicable . . . , Premium will be allocated between or among the Investment Accounts according to the Policy Owner's instructions as specified in the Application, or as subsequently changed.").)

In September 2005, Defendant provided Plaintiffs with a list of insurance dedicated funds available on Defendant's platform.  (SAC Ex. D ("AGL Life Assurance Company – Insurance Dedicated Funds").)[2]  One such fund was the Strategic Stable Return Fund ID ("SSR"), a "hedge fund-of-funds."  (SAC ¶ 4.)  The document provided by Defendant regarding SSR states,

> BEFORE MAKING ANY INVESTMENT IN THE FUND OR BEFORE ALLOCATING ASSETS TO AN INSURANCE COMPANY SUB-ACCOUNT THAT INVESTS IN THE FUND, INVESTORS ARE ENCOURAGED TO

---

[1] Exhibit B to the SAC contains several documents.  Unnumbered page one is the Policy Receipt; unnumbered pages two to three constitute a letter to The 2002 Lawrence R. Buchalter Alaska Trust from Joseph A. Fillip, Jr., Senior Vice President and General Counsel for Defendant dated December 20, 2002 (the "First Dec. 20, 2002 Letter Agreement"); unnumbered pages four to nine constitute a letter to The 2002 Lawrence R. Buchalter Alaska Trust from Joseph A. Fillip, Jr., Senior Vice President and General Counsel for Defendant dated December 20, 2002 (the "Second Dec. 20, 2002 Letter Agreement"); unnumbered pages ten to twenty-two contain the Flexible Premium Survivorship Variable Life payout tables; unnumbered pages twenty-three to fifty-one constitute the Flexible Premium Survivorship Variable Life Insurance Contract (the "Policy"); and unnumbered pages fifty-two to sixty-four constitute the Buchalters' life insurance application.  For ease of reference, each of these documents will be cited separately.

[2] Exhibit D to the SAC contains correspondence between Buchalter and an employee of Defendant.  Unnumbered page one is an email from Sandy Geyelin to Larry Buchalter dated September 19, 2005; unnumbered page two is a list of AGL Life Assurance Company Insurance Dedicated Funds ("AGL Life Assurance Company – Insurance Dedicated Funds"); unnumbered page three is an email from Sandy Geyelin to Larry Buchalter dated September 21, 2005; and unnumbered pages four to nine are an information sheet about SSR dated August 2005 ("August 2005 SSR Tear Sheet").  For ease of reference, each of these documents will be cited separately.

CAREFULLY AND THOROUGHLY REVIEW THE FUND'S PRIVATE
PLACEMENT MEMORANDUM AND RELATED GOVERNING
DOCUMENTS WITH THEIR FINANCIAL, LEGAL[,] AND TAX ADVISORS
TO DETERMINE WHETHER THE INVESTMENT IS APPROPRIATE AND
SUITABLE FOR THEM.  INVESTMENT IN THE FUND AND ALLOCATION
OF ASSETS TO AN INSURANCE COMPANY SUB-ACCOUNT THAT
INVESTS IN THE FUND IS NOT APPROPRIATE OR SUITABLE FOR ALL
INVESTORS.

(SAC Ex. D ("August 2005 SSR Tear Sheet"), at 2.)[3]  In or about December 2005, "the Trust

invested nearly $3.2 million of the investment account" in SSR, (SAC ¶ 4; *see also id.* ¶ 73),

which investment reached a peak of $3.904 million in September 2008, (*id.* ¶ 96).  Plaintiffs

allege that in or about July 2008, they sought to redeem the Trust's entire investment in SSR and

requested that Defendant's CEO prepare the necessary redemption documentation ASAP.  (SAC

¶¶ 6, 80; *see also* SAC Ex. G (Email from William D. Lipkind, Esq. to John Hillman (July 30,

2008) ("July 30 Lipkind Email") ("I need the applicable person at your shop to send me the

applicable documents and describe the applicable procedures whereby the Buchalter policy can

sell out all of its positions and reduce everything to cash ASAP.").)  Plaintiffs allege that the

request was made with enough time for Defendant to effect the redemption request before the

quarter ended, as SSR required 45 days' notice to redeem, and the quarter ended on September

30, 2008.  (SAC ¶¶ 62, 81.)  However, instead of requesting redemption in September, as

Plaintiffs wished, Defendant included special instructions "to redeem all funds on December 30,

2008, rather than three months prior as clearly directed in the 'ASAP' email."  (*Id.* ¶ 7; *see also*

*id.* ¶ 83; SAC Ex. H ("Investment Account Transfer Requests"), at unnumbered 2 (listing as

special instructions, "Effective Date – December 31, 2008").)  Plaintiffs further allege that "[t]he

Trustee and the Advisors, expecting that [Defendant] had followed [Buchalter's counsel's]

---

[3] The document also lists the "SIGNIFICANT" risks associated with the investment
objective and strategy of SSR.  (August 2005 SSR Tear Sheet 2.)

explicit instruction to redeem 'ASAP,' reasonably expected that the Trust's SSR investment would be redeemed as of September 30, 2008 and that [the Trust] would recoup the entire stated balance." (SAC ¶ 85.)  However, Plaintiffs allege that this "inexplicably did not occur because of [Defendant's] . . . gross negligence in connection with the most routine process of filling out the redemption forms." (*Id.*)  And "[b]y October 2008, SSR had received so many redemption requests that it exercised its right to suspend all such requests until such time it felt it could accommodate the return of capital." (*Id.* ¶ 86.)  At that point, the "Trust's capital was frozen," and the "Trust's SSR investment account steadily declined in stated value[.]" (*Id.* ¶ 8.) Although "SSR sent out letters to investors after the September 2008 suspension of redemptions suggesting that the return of investor capital was imminent in . . . 2008, 2009, 2010[,] and 2011," (*id.* ¶ 89; *see also id.* ¶¶ 90–93 (describing these letters)), which letters "offered Buchalter some comfort that the Trust's capital would be returned," (*id.* ¶ 94), "no capital has been returned to the Trust," (*id.* ¶ 95).  Indeed, according to Plaintiffs, the "reported SSR investment account balance has dropped every single month" since its peak in September 2008, (*id.* ¶ 96), and as of November 30, 2012, the investment account had a stated balance of $356,900, "indicating a loss of over 90% of capital since the Trust's redemption request," (*id.* ¶ 97).  Further, Plaintiffs allege, "upon information and belief, . . . [that] there is only a negligible chance of even a token amount of capital being returned to the Trust." (*Id.*)  Finally, Plaintiffs allege that "[i]n response to a request for an explanation for this egregious error and a demand for compliance with the redemption request," Defendant sent an email dated November 20, 2008, explaining that Defendant was monitoring developments with SSR on a weekly basis and indicating that SSR

was exploring legal options.  (*Id.* ¶ 88; *see also* SAC Ex. J (Letter from Joseph A. Fillip, Jr. to William Lipkind (Nov. 20, 2008) ("Nov. 20 Fillip Letter").)[4]

Plaintiffs allege that Buchalter then conducted an investigation on the Trust's behalf in or around 2012 into Defendant's conduct with respect to the Trust's investment in SSR.  (SAC ¶ 9.) Plaintiffs allege that they discovered two categories of wrongdoing, in addition to the failure to effect the redemption request discussed above.  The first category relates to Defendant's vetting of SSR, and the second relates to Defendant's failure to alert Plaintiffs to certain negative information about SSR.

First, Plaintiffs allege that Defendant either failed to vet SSR at all, or "more likely, . . . haphazardly ignored critical information in its rush to become a leading carrier of variable universal life policies, which involved signing up as many funds as possible, as quickly as possible, to [Defendant's] platform[.]"  (SAC ¶ 10; *see also id.* ¶ 114.)  Plaintiffs allege that Defendant "likely ignored . . . SSR's managers' stunning lack of relevant experience," alleging that "one manager had no material experience in the complex world of structured finance, corporate receivables financing and asset-based lending, while the other had no credit or lending experience and just four years of reported business experience."  (*Id.* ¶ 11; *see also id.* ¶ 111 (alleging that neither Steven Helland nor Tim Law, who together formed SSR, "had the requisite material experience in the arcane and complex world of structured finance, corporate receivables financing[,] and asset-based lending").)  Second, Plaintiffs allege that Defendant "also likely

_____

[4] In particular, SSR was considering legal action against Thomas Petters.  (*See* Nov. 20 Fillip Letter ("We are in contact with the managers of SSR on at least a weekly basis to monitor their activities regarding SSR's underlying investments with exposure to Petters.").)  According to Defendant, Petters was a "Ponzi-schemer," and it had been discovered that "SSR had exposure to investment funds" he operated.  (Mem. of Law in Supp. of Def. Phila. Fin. Life Assurance Co.'s Mot. To Dismiss Pls.' Second Am. Compl. Under Rule 12(B)(6) ("Def.'s Mem.") 7 (Dkt. No. 45).)

ignored SSR's lucrative, overtly conflicted partnership with a fund manager named William

Gunlicks[,] who had been under investigation by the SEC since 2000." (*Id.* ¶ 12.)  In particular,

Plaintiffs allege that SSR's relationship with Gunlicks was conflicted because approximately

one-half of SSR's assets were "dedicated to partnerships allocated into funds managed by

Gunlicks," but his management company, Founding Partners, had a 33% interest in SSR and

Gunlicks "was paid full hedge fund fees on all capital that SSR invested in his funds." (*Id.* ¶ 12;

*see also id.* ¶¶ 112, 116, 118–22, 143.)  "Thus, although Gunlicks owned a significant portion of

SSR, he was receiving the largest percentage of SSR's assets to manage himself, [and] charging

SSR his full investment fund fee structure[.]" (*Id.* ¶ 117.)  Additionally, "Gunlicks . . . was on

SSR's Board and at one time was listed on a public website . . . as a Registered Investment

Advisor for SSR." (*Id.* ¶ 116 (footnote omitted).)

      Furthermore, Plaintiffs allege that Defendant misrepresented SSR as an approved and

vetted investment.  Plaintiffs allege that "[i]n September, 2005, [Defendant's] Director of

Research sent Buchalter (in his capacity as advisor to the Trust) an email in which he provided

information concerning" SSR and, in particular, "identified SSR as one of its vetted and

approved investment choices." (*Id.* ¶ 58.)  The email, contained in Exhibit D to the SAC, states

the following: "At your request, please find attached a list of the insurance dedicated funds

available through [Defendant's] platform.  If you would like additional information on any of the

funds, please do not hesitate to contact me." (SAC Ex. D (Email from Sandy Geyelin to Larry

Buchalter (Sept. 19, 2005).)  Attached to the email was a list of 27 insurance dedicated funds,

including SSR.  (AGL Life Assurance Company – Insurance Dedicated Funds.)  Plaintiffs allege

that "[a]t the time [Defendant] presented SSR as an approved investment choice, there were an

estimated 75 to 100 insurance-dedicated hedge funds in existence," and therefore conclude that

the fact that Defendant presented only 27 funds "clearly indicat[ed] that it had utilized specific criteria to select said funds, and . . . [had] found that the majority of available funds were not appropriate for its policyholders."  (SAC ¶ 60.)

Second, Plaintiffs allege that Defendant did not pass on certain material information about SSR.  The underlying theory behind this allegation is that Plaintiffs were unable to access information about SSR on their own, and therefore Defendant was required to pass on material information in its possession.  Plaintiffs allege that they were "completely dependent on [Defendant] for information concerning the ongoing status of the Policy's investments."  (*Id.* ¶ 2.)  According to Plaintiffs, the reasons for this dependence were twofold.  First, the Policy "invested in funds that [did] not release information to the public."  (*Id.*; *see also id.* ¶¶ 45, 156, 161–62.)  Second, "the Trust was prohibited from direct contact with the managers of funds in the Policy's Investment Accounts in order to preserve tax benefits associated with the Policy." (*Id.* ¶ 2; *see also id.* ¶¶ 19, 41–42, 45, 101, 148, 161, 172; Second Dec. 20, 2002 Letter Agreement 2 ("Policyowner will not directly or indirectly influence or attempt to influence the Manager's selection, purchase, retention or sale of any investment within the fund."); PPM 32 (explaining that one factor considered in determining whether a variable life insurance contract owner is an owner of the assets invested through the policy for tax purposes is "whether there is any contact between a variable contract owner and the investment advisor relating to the investment decisions made"); *id.* at 33 ("[N]o Policy Owner should ever attempt to contact an investment advisor.  Rather, any and all questions, comments, or instructions regarding the Policy should be addressed only to the Company." (emphasis omitted)).)  "Given the Trustee's and Advisors' reliance on [Defendant] to provide the relevant information that would allow them to make informed investment decisions on behalf of the Trust," Plaintiffs assert, "it was entirely

foreseeable that they would not make a decision (most notably, to redeem a given investment) if [Defendant] failed to meet its obligation to provide such information." (SAC ¶ 3.) Additionally, Plaintiffs allege that the "PPM expressly acknowledges [Defendant's] role as disseminator of information, stating that '[a]ll records and accounts relating to the Investment Accounts will be maintained by the Company.'" (*Id.* ¶ 46 (alteration in original) (quoting PPM 30).) However, the PPM provides only that "[t]he Company will mail an annual policy statement to the Policy Owner." (PPM 30.) Similarly, the Policy provides: "Each year . . . we will mail a report to you," which report will "show the Account Value," among other information. (Policy 22.)

Plaintiffs allege that the following categories of information are material to making investment decisions regarding hedge funds and fund-of-hedge funds: (1) "the audited financial statements as presented by the independent auditor of the fund;" (2) "periodic direct communications from the manager itself (e.g., via letters, conference calls, website access);" (3) "reported changes in service providers;" and (4) "for sophisticated investors only, periodic access to the investment manager." (SAC ¶ 47 (underlining omitted).) With regard to the financial statements provided by SSR, Plaintiffs allege that any information about any potential irregularities in the audited financial statement would be critical, as would the fact that SSR had not provided an audited financial statement, and that Defendant knew that this information was critical. (*Id.* ¶ 48.) Plaintiffs also allege that information regarding any changes in service providers, especially changes in independent auditor or administrator is critical because such a development would be "viewed by any sophisticated investor as a serious adverse development for a hedge fund or fund-of-hedge fund partnership." (*Id.* ¶ 53; *see also id.* ¶¶ 49–53 (explaining that a change in service provider without a reasonable explanation is viewed as a serious adverse development for this type of fund because "service providers provide the only outside, objective

observations of fund mangers," and because service providers "risk impairing their reputation if a fund for which they serve has questionable practices that the provider did not seek to remedy or, in the alternative, if the provider did not resign if no remedy was achievable").)   Plaintiffs further allege that information regarding any "indictment, SEC investigation, or any other regulatory action commenced against a fund manager, or anyone affiliated with the fund" would be critical as it "would be an immediate catalyst for an investor to evaluate the status of an investment in the partnership, and in all likelihood, redeem at the first opportunity."  (*Id.* ¶ 54.) Finally, Plaintiffs allege that "[h]edge fund and fund-of-hedge investors also consider various other investment information, including: ownership of the general partner of the investment fund; changes in the investment in the fund by principals of the general partners; related party transactions; concentration of portfolio holdings; major portfolio holdings; change in investment strategy; leverage; portfolio risk; and changes to total assets under management."  (*Id.* ¶ 55.) Plaintiffs allege that a "material change in any one of these categories would lead an investor to immediately consider redeeming the subject investment and a combination of several of these factors would assuredly lead to an immediate withdrawal of such funds."  (*Id.*)

Plaintiffs allege that the following information was not passed on to them by Defendant: that in December 2007, the SEC issued a "Cease and Desist" Order against Gunlicks when "SSR and Gunlicks . . . at that point essentially were alter egos of one another," (*id.* ¶ 13; *see also id.* ¶ 129); that Founding Partners and Gunlicks had been under investigation since 2000, (*id.* ¶ 127); that Gunlicks had a conflicted relationship with SSR, (*id.* ¶ 122); that SSR's auditors did not provide audited financial statements to SSR after 2006, (*id.* ¶¶ 15, 126, 134–36); that E&Y, the independent auditor at the time of the Trust's investment, was dismissed by SSR prior to any work beginning, (*id.* ¶¶ 133, 137); that SSR's fund administrator was replaced in January 2007,

12

(*id.* ¶¶ 16, 138); that SSR made a significant change in strategy, increasing its investment risks by "employing substantial leverage" in 2006, (*id.* ¶ 17; *see also id.* ¶¶ 125, 139);[5] and that SSR's assets were 100% lower than what was reported by Defendant in 2007, (*id.* ¶ 18).  Additionally, Plaintiffs allege that in or about May 2007, in response to Defendant's provision of fund balances for April 2007, Buchalter "noted that he and the Trustee had not received a detailed investment report in approximately one year and requested a copy thereof."  (*Id.* ¶ 76.) Defendant "thereafter sent a one page marketing sheet that purported to summarize the fund and its performance."  (*Id.* ¶ 76.)

Additionally, Plaintiffs allege that Defendant generally had "broad access to and regular contact with SSR, and SSR regularly provided information to [Defendant] concerning its various investments."  (*Id.* ¶ 65.)  Specifically, Plaintiffs allege that Defendant was provided with a monthly estimate, a monthly account statement, a quarterly investor letter, annual audited financials, and ADV Part II annually,[6] and that a portfolio breakdown was available upon request.  (*Id.* ¶ 66.)  Moreover, Plaintiffs allege that Defendant had a "'Director of Research' who supposedly was solely dedicated to monitoring and evaluating [Defendant's] investment managers and interfacing with [Defendant's] policyholders with respect to these managers."  (*Id.* ¶ 69.)  Additionally, Defendant had access to information "through SSR's investor website, a fact of which [Defendant] never advised the Trustee []or the Advisors, and to which [Defendant] never provided access for the Trust."  (*Id.* ¶ 101.)  However, while other insurance companies

---

[5] The Court notes that Plaintiffs allege that they received a summary of the fund in May 2007.  (SAC ¶¶ 76, 141.)  That summary, provided at Exhibit M, states, "Beginning in May 2006, the Fund began employing modest leverage, which the managers intend to limit to no more than one dollar of leverage per dollar of fund equity."  (SAC Ex. M ("May 2007 SSR Tear Sheet"), at 1.)  Thus, it appears that Plaintiffs were advised of this change in investment strategy.

[6] This term is not defined in the SAC.

passed on such information to their policyholders, (*id.* ¶¶ 100, 107), Defendant did not provide

any information to Plaintiffs other than basic account value summaries, (*id.* ¶ 102; *see also id.*

¶¶ 104, 106), nor did they inform Plaintiffs that other investors had access to such information,

(*id.* at ¶¶ 101–02, 107–09).

Finally, Plaintiffs allege that Defendant made two material misrepresentations, in

addition to the alleged vetting misrepresentation.  First, Plaintiffs allege that Defendant

"recklessly (or worse, deliberately) overstated SSR's assets under management by approximately

100% in a report provided to . . . Buchalter (in his role as Advisor) in 2007."  (*Id.* ¶ 18.)

Specifically, Plaintiffs allege that "[Buchalter], on behalf of the Trust, requested more

information about SSR, [and Defendant] reported that SSR had $169 million in assets under

management, [but SSR] in fact had only approximately half that amount based on the August

2007 [Alternative Investment Management Association Limited ('AIMA')] disclosure

questionnaire containing information supplied by SSR."  (*Id.* ¶ 141.)  Plaintiffs allege that the

"higher number . . . would misleadingly indicate increased investor acceptance of SSR, a

misstatement of SSR's presence in the markets in which it invested, and, most importantly, a

misstatement of SSR's implied ability to meet potential redemption requests from investors."

(*Id.* ¶ 18.)  Second, Plaintiffs allege that "SSR's administrator had been replaced in January

2007[,] tellingly when SSR was in the process of closing their books for the 2006 year."  (*Id.* ¶

16.)  Plaintiffs further allege that Defendant "sent Buchalter a report in June 2007 erroneously

indicating that the replaced SSR administrator still was in place."  (*Id.*; *see also* SAC. Ex. M

("May 2007 SSR Tear Sheet").)

Based on these allegations, Plaintiffs bring seven causes of action: negligence, negligent misrepresentation, breach of fiduciary duty, professional malpractice, breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.

### B.  Procedural Background

Plaintiffs filed the Complaint on September 7, 2012, and a Summons was issued as to Defendant on the same day.  (*See* Dkt. No. 1.)  With the Court's permission, Plaintiffs subsequently filed an Amended Complaint on February 15, 2013, (*see* Dkt. No. 20), and Defendant filed a Motion To Dismiss the Amended Complaint, (*see* Dkt. No. 26).  After oral argument on the issue of whether Buchalter had standing as a plaintiff, the Court denied without prejudice Defendant's Motion To Dismiss to allow Plaintiffs to further amend their Amended Complaint.  (*See* Dkt. No. 35.)  Pursuant to a scheduling order set by the Court, (*see* Dkt. No. 37), Plaintiffs filed the SAC on March 31, 2014, (*see* Dkt. No. 42), Defendant filed a Motion To Dismiss the SAC and accompanying papers on June 2, 2014, (*see* Dkt. Nos. 44–45), Plaintiffs filed a Memorandum of Law in Opposition to Defendant's Motion To Dismiss, (*see* Dkt. No. 46), and Defendant filed a Reply, (*see* Dkt. No. 47).  On February 13, 2015, the Court ordered supplemental briefing from the Parties on the issue of professional malpractice, (*see* Dkt. No. 49), which the Parties submitted on February 20, 2015, (*see* Dkt. Nos. 50–51).  The Court held oral argument on February 24, 2015.  (*See* Dkt. (minute entry for Feb. 24, 2015).)

## II.  Discussion

### A.  Standard of Review

Defendant moves to dismiss Plaintiff's SAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (brackets, citations, and internal quotation marks omitted). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and brackets omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id; see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a

complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted));

*Dixon v. United States*, No. 13-CV-2193, 2014 WL 23427, at *1 (S.D.N.Y. Jan. 2, 2014) ("For

the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's]

complaint are true.").  Further, "[f]or the purpose of resolving [a] motion to dismiss, the

Court . . . draw[s] all reasonable inferences in favor of the plaintiff."  *Daniel v. T&M Prot. Res.,

Inc.*, No. 13-CV-4384, 2014 WL 182341, at *1 n.1 (S.D.N.Y. Jan. 16, 2014) (citing *Koch v.

Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  However, "the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

*Iqbal*, 556 U.S. at 678.

  "In ruling on a 12(b)(6) motion, . . . a court may consider the complaint as well as any

instrument attached to the complaint as an exhibit or any statements or documents incorporated

in it by reference," as well as "matters of which judicial notice may be taken, and documents

either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing

suit."  *Kalvanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44

n.1 (2d Cir. 2014) (brackets and internal quotation marks omitted)); *see also Leonard F. v. Isr.

Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a

district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v.

City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Finally, where "a plaintiff alleges a claim based on a written instrument," if "the documents

contradict the allegations of a plaintiff's complaint, the documents control and the [c]ourt need

not accept as true the allegations in the complaint."  *Bill Diodato Photography LLC v. Avon*

*Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (internal quotation marks omitted); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (holding that, for the purposes of deciding a motion to dismiss, courts take allegations as true "unless contradicted by . . . documentary evidence . . . from the exhibits attached" to the complaint); *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (internal quotation marks omitted)); *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 329 (S.D.N.Y. 2008) ("The exhibits to the [a]mended [c]omplaint contradict the[] allegations [contained in the amended complaint] . . . . [S]uch allegations cannot survive a motion to dismiss when they are contradicted by plaintiffs' own exhibits.").

### B.  Analysis

#### 1.  General Choice-of-Law Considerations

The basis for subject matter jurisdiction in this case is diversity of citizenship pursuant to 28 U.S.C. § 1332.  (*See* SAC ¶ 26.)  "A federal court sitting in diversity jurisdiction must apply the choice-of-law principles of the forum state, in this case New York."  *Fargas v. Cincinnati Mach., LLC*, No. 13-CV-4443, 2013 WL 6508863, at *3 (S.D.N.Y. Dec. 12, 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)); *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state, which is New York in this instance."), *cert. denied*, 133 S. Ct. 952 (2013).

"In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws."

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (internal quotation marks omitted). "An actual conflict exists where the applicable law from each jurisdiction provides differing rules that have the potential to affect the outcome of the case significantly." *Horton v. Greenwich Hosp.*, No. 12-CV-4436, 2014 WL 956468, at *2 n.1 (S.D.N.Y. Mar. 10, 2014).

Under New York law, the choice of law analysis is generally done separately for each claim and defense, under a doctrine called dépeçage. *See Fed. Hous. Fin. Agency v. Ally Fin. Inc.*, No. 11-CV-7010, 2012 WL 6616061, at *5 (S.D.N.Y. Dec. 19, 2012) ("New York embraces a choice-of-law doctrine known as dépeçage . . . ."). Under that doctrine, "'the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues.'" *Golden v. Wyeth, Inc.*, No. 04-CV-2841, 2013 WL 4500879, at *3 (E.D.N.Y. Aug. 20, 2013) (quoting *Hutner v. Greene*, 734 F.2d 896, 901 (2d Cir. 1984)); *see also Bigio*, 675 F.3d at 169 (same). In other words, the "[d]epecage doctrine recognizes that in a single action different states may have different degrees of interests with respect to different operative facts and elements of a claim or defense." *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000). Here, Defendant argues that all of Plaintiffs' claims are procedurally governed by Alaska's statute of limitations, (*see* Mem. of Law in Supp. of Def. Phila. Fin. Life Assurance Co.'s Mot. To Dismiss Pls.' Second Am. Compl. Under Rule 12(B)(6) ("Def.'s Mem.") 11–12 (Dkt. No. 45)); that Plaintiffs' breach of contract claim is substantively governed by Alaska law, (*see id.* at 10); and that Plaintiffs' tort claims are covered by Alaska law if there is a conflict, or by New York law if there is not a conflict, (*see id.* at 10–11). For their part, Plaintiffs agree that all of their claims are procedurally governed by Alaska's statute of limitations, (*see* Pls.' Mem of Law in Opp'n to PFLAC's Mot. To Dismiss the Second Am. Compl. ("Pls.' Mem.") 10–11 (Dkt. No. 46)), and do not address

head-on the issue of whether substantive New York or Alaska law applies to their claims. Because New York courts apply the dépeçage doctrine, the Court will "conduct the choice-of-law analysis separately for each of . . . Plaintiffs' claims." *Bigio*, 675 F.3d at 169.

### 2.  Statute of Limitations

"A motion to dismiss on statute of limitations grounds generally is treated as a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6)[.]" *Nghiem v. U.S. Dep't of Veterans Affairs*, 451 F. Supp. 2d 599, 602–03 (S.D.N.Y. 2006), *aff'd*, 323 F. App'x 16 (2d Cir. 2009).  Statute of limitations defenses are affirmative defenses, and may be made at the motion to dismiss stage, without conversion to a motion for summary judgment, where the "plaintiff adequately states a claim, but [the] plaintiff's own allegations show that the defense exists." *Id.* at 603 (internal quotation marks omitted).  Motions to dismiss on statute of limitations grounds are treated as other motions to dismiss; courts merely are to "determine whether the complaint itself is legally sufficient" to survive the affirmative defense, "not to weigh the evidence that may be presented at a trial." *Adams v. Crystal City Marriott Hotel*, No. 02-CV-10258, 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004).

The first issue the Court must address in assessing Defendant's Motion To Dismiss on statute of limitations grounds is which state's statute of limitations to apply.  "Federal courts sitting in diversity apply the forum state's statutes of limitation." *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, No. 12-CV-198, 2012 WL 6186598, at *6 (S.D.N.Y. Dec. 12, 2012), *aff'd*, 560 F. App'x 52 (2d Cir. 2014); *see also Vincent v. Money Store*, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) (same).  "In diversity cases in New York, federal courts apply New York's borrowing statute, N.Y. C.P.L.R. § 202 . . . ." *Vincent*, 915 F. Supp. at 562 (citing *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998)); *see also Cantor Fitzgerald Inc. v.*

*Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (applying N.Y. C.P.L.R. § 202 in a diversity case

where the forum state is New York).  Section 202 provides the following guidance:

> An action based upon a cause of action accruing without the state cannot be
> commenced after the expiration of the time limited by the laws of either the state
> or the place without the state where the cause of action accrued, except that where
> the cause of action accrued in favor of a resident of the state the time limited by the
> laws of the state shall apply.

N.Y. C.P.L.R. § 202.  The practical import of § 202 is that it "requires non-resident plaintiffs to

file claims by the shorter of the statute of limitations of either (a) New York or (b) the

jurisdiction where the claim accrued (in order to prevent forum shopping by time-barred

claimants)."  *Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12-

CV-4025, 2013 WL 6667601, at *5 (S.D.N.Y. Dec. 17, 2013); *see also BPP Ill., LLC v. Royal*

*Bank of Scotland Grp., PLC*, No. 13-CV-638, 2013 WL 6003701, at *4 (S.D.N.Y. Nov. 13,

2013) ("Pursuant to [Section 202], when a nonresident plaintiff sues upon a cause of action that

arose outside of New York, the court must apply the shorter limitations period, including all

relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action

accrued." (internal quotation marks omitted)).

 "Under New York law, tort and contract claims are deemed to accrue at the time and

place of the injury," and "[i]n cases involving economic harm, that place is normally the state of

plaintiff's residence."  *Deutsche Zentral-Genossenschaftsbank A.G.*, 2013 WL 6667601, at *5

(internal quotation marks omitted); *see also Mohsen v. Morgan Stanley & Co.*, No. 11-CV-6751,

2013 WL 5312525, at *8 n.9 (S.D.N.Y. Sept. 23, 2013) ("New York law locates the cause of

action for breach of contract causing financial harm at the place of injury, which usually is where

the plaintiff resides and sustains the economic impact of the loss." (internal quotation marks

omitted)); *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 485 (N.Y. 1999) ("When an

alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.").

Here, Defendant argues that Alaska's statutes of limitations apply, (Def.'s Mem. 12), and Plaintiffs likewise "agree that Alaska's statutes of limitations apply to all of Plaintiffs' claims pursuant to New York's borrowing statute and there is no dispute concerning the statutes of limitations that Alaska applies to Plaintiffs' claims," (Pls.' Mem. 11).  The Court agrees that the injury to Plaintiffs occurred in Alaska.  First, the Trust is the purchaser, owner, and beneficiary under the Policy.  (SAC Ex. B ("Policy") 3.)  Second, the Trust itself was located in Alaska, and organized under Alaska law.  (Trust Instrument II-11.)  Third, the sole trustee at the time of the injuries was an Alaska party.  (SAC ¶¶ 23, 31 n.2.)  Finally, the trust beneficiaries were not entitled to any guaranteed distributions under the trust.  (Trust Instrument I-11–12, II-12–13.)[7] Here, the Court is "persuaded that it is the Trust itself that suffered the loss, and the loss was felt in [Alaska]. . . . The corpus of the Trust diminished as a result of the investment in this case." *Maiden v. Biehl*, 582 F. Supp. 1209, 1218 (S.D.N.Y. 1984); *cf. Freschi v. Grand Coal Venture*, 551 F. Supp. 1220, 1225–26 (S.D.N.Y. 1982) (considering the location of the trustee, under what laws the trust was organized, and where the grantor was located in assessing where an injury to the trust occurred).[8]

_____

[7] Moreover, it is not clear from the pleadings where the trust beneficiaries live or lived at the time that the Policy was issued.

[8] The Court notes as a final matter that the Alaska choice-of-law provision contained in the Policy does not impact the Court's analysis as to which state's statute of limitations applies to Buchalter's claims.  In *Portfolio Recovery Associates, LLC v. King*, 927 N.E.2d 1059 (N.Y. 2010), the New York Court of Appeals considered whether the question of the timeliness of a plaintiff's claims for breach of contract and account stated was to be answered by reference to the statute of limitations of Delaware, the law of which the parties to the contract at issue had selected to govern their agreement in the contract's choice-of-law provision.  *Id.* at 1061–62. The court described the choice-of-law provision as "standard," "stating that [the contract] would

As a result, the shorter of New York's or Alaska's statute of limitations applies to all claims asserted in this Action.  Because Alaska's statutes of limitations are shorter and therefore apply, the statute of limitations for each of the alleged claims will either be two or three years. In particular, the statute of limitations for tort actions is two years, *see* Alaska Stat. § 09.10.070, and the statute of limitations for contract actions is three years, *see* Alaska Stat. § 09.10.053.

Additionally, because Alaska's statutes of limitations apply, so do Alaska's rules regarding when causes of action accrue.  *See RA Global Servs., Inc. v. Avicenna Overseas Corp.*, 817 F. Supp. 2d 274, 282 (S.D.N.Y. 2011) ("[I]f a court borrows the statute of limitations of another state, it should also borrow that state's rules as to accrual and tolling.").  Alaska law applies the discovery rule to contract and tort claims, in the absence of a statute to the contrary, meaning that these claims accrue when a plaintiff knew or should have known through the exercise of reasonable diligence of the breach or the tort, rather than at the time the breach or tort

---

be governed by the laws of Delaware." *Id.* at 1060.  The court held that "[t]he Appellate Division [had] properly concluded that the Delaware choice of law clause did not require the application of the Delaware three-year statute of limitations to bar [the plaintiff's] claims," as "[c]hoice of law provisions typically apply to only substantive issues, and statutes of limitations are considered procedural because they are deemed as pertaining to the remedy rather than the right." *Id.* at 1061 (citations and internal quotation marks omitted).  "There being no express intention in the agreement that Delaware's statute of limitations was to apply to [the parties'] dispute, the choice of law provision cannot be read to encompass that limitations period." *Id.*; *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007) ("[C]hoice of law provisions generally implicate only the substantive law of the selected jurisdiction."); *Morson v. Kreindler & Kreindler, LLP*, 814 F. Supp. 2d 220, 225 (E.D.N.Y. 2011) ("'Choice of law provisions typically apply to only substantive issues and statutes of limitations are considered procedural because they are deemed as pertaining to the remedy rather than the right.'" (quoting *King*, 927 N.E.2d at 1061)).

Here, the Alaska choice-of-law provision contained in the Policy is similarly "standard," stating only, "Governing Jurisdiction: AK," (Policy 3), and defining "Governing Jurisdiction" as "[t]he state or jurisdiction in which [the Policy] is delivered and whose laws govern its terms," (*id.* at 10).  Just as was the case in *King*, there is no express intention in the Policy that Alaska's statute of limitations is to apply to the parties' dispute, and the choice-of-law provision cannot be read to encompass Alaska's limitations period.

occurred.  *See Bauman v. Day*, 892 P.2d 817, 827–29 (Alaska 1995) (extending the tort

discovery rule to contract claims); *see also Breck v. Moore*, 910 P.2d 599, 603–04 (Alaska 1996)

(noting that the Alaska courts have consistently applied the discovery rule to professional

malpractice claims and reiterating the Alaska Supreme Court's prior holding that the discovery

rule should be applied in some contract claims).  Specifically, the discovery rule provides that

"[w]here the plaintiff does not actually know of the existence of elements essential to her cause

of action, the limitations period does not begin to run until a reasonable person in like

circumstances would have enough information to alert that person that he or she has a potential

cause of action or should begin an inquiry to protect his or her rights."  *Bauman*, 892 P.2d at 825

(brackets, alterations, and internal quotation marks omitted) (quoting *Lee Houston & Assocs. v.

Racine,* 806 P.2d 848, 851 (Alaska 1991)).

 Because Plaintiffs allege multiple courses of conduct as bases for their claims, the Court

will address the statute of limitations issues by course of conduct rather than by claim.  The

categories of conduct the Court will assess are as follows: (1) Defendant's alleged failure to

effect Plaintiffs' redemption request on September 30, 2008; (2) Defendant's alleged failure to

adequately vet SSR before putting it on its platform; and (3) Defendant's alleged failure to pass

along material information regarding SSR.

 Any claims based on Defendant's failure to effect Plaintiffs' redemption request on

September 30, 2008 are time-barred under either a two or three year statute of limitations.

Plaintiffs allege that in or about July 2008, Plaintiffs sought to redeem the Trust's entire

investment in SSR and requested that Defendant's CEO prepare the necessary redemption

documentation ASAP.  (SAC ¶¶ 6, 80; July 30 Lipkind Email.)  Plaintiffs allege that the request

was made with enough time for Defendant to effect the redemption request before the quarter

24

ended in September.  (SAC ¶¶ 62, 81.)  However, instead of requesting redemption in

September, as Plaintiffs wished, Defendant included special instructions "to redeem all funds on

December 30, 2008, rather than three months prior as clearly directed in the 'ASAP' email."  (*Id.*

¶ 7; *see also id.* ¶ 83; Investment Account Transfer Requests at unnumbered 2.)  Plaintiffs further

allege that "[t]he Trustee and the Advisors, expecting that [Defendant] had followed [Plaintiffs'

counsel's] explicit instruction to redeem 'ASAP,' reasonably expected that the Trust's SSR

investment would be redeemed as of September 30, 2008 and that it would recoup the entire

stated balance.  But this inexplicably did not occur because of [Defendant's] aforementioned

gross negligence in connection with the most routine process of filling out the redemption

forms."  (SAC ¶ 85.)  Finally, Plaintiffs allege that "[i]n response to a request for an explanation

for this egregious error and a demand for compliance with the redemption request," Defendant

wrote back an email contained in Exhibit J to the SAC.  (*Id.* ¶ 88.)  That email, sent in response

to Plaintiff's request for an explanation, was sent on November 20, 2008.  (Nov. 20 Fillip

Letter.)

      Even under the longer Alaska statute of limitations, this claim is time-barred.  Not only

did the alleged tort or breach occur in July 2008, but Plaintiffs also discovered the wrongdoing

no later than November 2008 according to Plaintiffs' own pleadings.  The non-redemption itself

on September 30, 2008 put Plaintiffs on inquiry notice that something had gone wrong with

respect to Defendant's efforts to effect the redemption request.  Indeed, it is clear from Plaintiffs'

allegations that they discovered that they were damaged by Defendant's alleged error by October

2008, when SSR "exercised its right to suspend all investor redemption requests," at which point

the "Trust's capital was frozen," and its SSR investment account began to "steadily decline[] in

stated value."  (SAC ¶ 8; *see also id.* ¶ 86.)  This discovery prompted Plaintiffs to seek an

explanation for Defendant's failure to process the redemption request.  (*Id.* ¶ 88.)  Even if they did not learn the full extent of their damage due to this error until later, because "SSR sent out letters to investors after the September [sic] 2008 suspension of redemptions suggesting that the return of investor capital was imminent in . . . 2008, 2009, 2010 and 2011," (*id.* ¶ 89), Plaintiffs knew they were damaged in October 2008 and were put on inquiry notice with regard to this claim, (*id.* ¶ 19 ("After SSR suspended redemptions in October 2008, the Trust could do nothing as all of its investment in SSR was lost."); *id.* ¶ 96 ("After initially reaching a peak value in September 2008 of $3.904 million (when the redemption should have been effected), the reported SSR investment account balance has dropped every single month thereafter.").)  *See Beesley v. Van Doren*, 873 P.2d 1280, 1282 (Alaska 1994) (holding, in the professional malpractice context, that "[t]he guiding principle is that the statute of limitations commences to run when one is actually damaged as a result of the alleged malpractice, and that the commencement of the statute will not be put off until one learns the full extent of his damages" (internal quotation marks omitted)).  For the above reasons, any claim in the SAC based on the allegedly negligent failure to effect the redemption request in line with Plaintiffs' instructions is time-barred under either a two or three year statute of limitations.

Next, with regard to the claims arising from the allegations that Defendant failed to vet SSR before putting it on their platform or ignored warning signs about SSR, at this time the Court finds that the claims are not time-barred.  Plaintiffs allege that they learned in 2012 of Defendant's failure to vet SSR and, in particular, that they learned in 2012 that Defendant likely ignored SSR's relationship with Gunlicks.  (SAC ¶¶ 9, 12, 115.)  Plaintiffs' allegations that SSR suspended investor redemption requests in 2008 and that the Trust's SSR investment account "steadily declined in stated value" since that point, as well Plaintiff's attachment of an email

dated November 20, 2008 discussing the possibility of Defendant bringing legal action against SSR, raises the question of whether Plaintiffs were on inquiry notice as early as 2008 of Defendant's alleged failure to vet SSR.  (*See id.* ¶ 8; Nov. 20 Fillip Letter.)  Under Alaska law, the inquiry notice date is "the date when the plaintiff has information which is sufficient to alert a reasonable person to begin an inquiry to protect his rights."  *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1275 (Alaska 2013) (internal quotation marks omitted).  The statute of limitations generally starts to run on the inquiry notice date.  *Id.*  However, Alaska has recognized that this rule may yield unfair results, because "inquiry may be a time-consuming process, which may not produce knowledge of the elements of a cause of action within the statutory period, or it may produce knowledge of the elements of a cause of action only relatively late in the statutory period."  *Id.* (internal quotation marks omitted).  Therefore, when assessing whether a claim is time-barred based on the inquiry notice date, where no inquiry has been made, courts are to assess (1) on what date the plaintiff had information sufficient to alert a reasonable person to begin an inquiry to protect his rights, and (2) "whether a reasonable inquiry would have produced knowledge of the cause of action."  *Id.*  Taking as true the facts alleged in the SAC, the Court cannot conclude as a matter of law that Plaintiffs had inquiry notice and that a reasonable inquiry would have produced knowledge of the cause of action in 2008.  Thus, these claims are timely and should not be dismissed at this stage.

Finally, with regard to the claims based on the alleged failure to pass along material information to Plaintiffs, Plaintiffs sufficiently allege they did not discover or have a duty to inquire until 2012, thus falling within the two or three year statutes of limitations.  There are two types of information-related conduct Plaintiffs allege: (1) the allegations that there was certain negative information Defendant knew about, but was non-public, and that Defendant did not pass

on to Plaintiffs; and (2) that Defendant should have regularly passed on more information to Plaintiffs in the ordinary course of conduct.  Looking at the first category, Plaintiffs have pleaded these allegations in a way that survives the Motion To Dismiss on statute of limitations grounds, by alleging that Plaintiffs only learned that Defendant knew of this information and did not pass it on in 2012.  (*See, e.g.*, SAC ¶¶ 15–17, 47–57, 129–42.)  Plaintiffs also generally do the same for the allegations that Defendant should have regularly passed on more information to Plaintiff, by alleging that Defendant should have passed on all the information it had, and they only later learned to what information Defendant had access.  (*See, e.g.*, *id.* ¶¶ 99–109.)  However, what gives the Court pause is Plaintiffs' allegation that in or shortly after May 2007 "Buchalter noted that he and the Trustee had not received a detailed investment report in approximately one year and requested a copy thereof."  (*Id.* ¶ 76.)  It is possible that this apparent knowledge by Plaintiffs that Defendant was not providing all the information it had may have put Plaintiffs on inquiry notice.  However, even if this put Plaintiffs on inquiry notice, it is not clear from the allegations in the SAC at what point a reasonable inquiry by Plaintiffs would have led them to discover this claim and the Court therefore does not find a sufficient basis for finding this course of conduct to be time-barred.

Finally, Defendant asks the Court to take judicial notice of the fact that Plaintiffs allegedly "attempted in their latest amendment to remove allegations showing their claims are time-barred."  (Def.'s Mem. 12; *see also id.* at 12 n.6.)  Specifically, Defendant states that "the Court may take judicial notice of Plaintiffs' prior allegation[] that[,] by July 2008, Buchalter became suspicious of SSR's 'aberrational' returns 'despite extreme market conditions' that 'materially informed his suspicions of wrongdoing' and 'possible irregularities' at SSR, which prompted him to cause the Trustee to redeem."  (*Id.* at 14 (quoting Compl. ¶¶ 76–77 (Dkt. No.

1); First Am. Compl. ¶ 81 (Dkt. No. 20)).)  Defendant thus argues that Plaintiffs were put on notice in 2008 to investigate whether they had a claim, which triggered the running of the limitations period.  Plaintiffs respond that first, the Court should not consider prior complaints since they are legal nullities and second, concerns about *SSR's* wrongdoing did not put them on inquiry notice of *Defendant's* wrongdoing.  (Pls.' Mem. 2.)  Defendant responds that the Court may consider the prior pleadings, and argues that Plaintiffs' concerns about SSR put Plaintiffs on inquiry notice about any possible claims, and because Plaintiffs knew they could not bring claims directly against SSR, they were on notice of claims against Defendant.  (Def. Phila. Fin. Life Assurance Co.'s Reply in Supp. of its Mot. To Dismiss Pls.' Second Am. Compl.  ("Def.'s Reply") 2–4 (Dkt. No. 47).)  In particular, Defendant cites two cases for the proposition that the Court may consider the earlier iterations of Plaintiffs' complaint: *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), and *Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229 (S.D.N.Y. 2011).  (Def.'s Reply 3–4.)  However, the cases cited by Defendant do not warrant the result Defendant seeks.  First, *McKeon* notes in dicta that superseded pleadings in a civil case may be admitted in litigation since they are admissions of a party-opponent, but certainly does not hold they should be considered in deciding a Motion To Dismiss.  *See McKeon*, 738 F.2d at 31.  Second, the point set forth in *Eaves*, that a court may take notice of judicial documents such as prior pleadings, is not a controversial one.  *See Eaves*, 785 F. Supp. 2d at 245.  But when a court takes judicial notice of documents in the public record at the Motion To Dismiss stage, it considers them "only to establish their existence and legal effect, or to determine what statements they contained not for the truth of the matters asserted."  *Liang v. City of New York*, No. 10-CV-3089, 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (brackets and internal quotation marks omitted) (quoting *Twine v. Four Unknown N.Y. Police Officers,* No. 10–CV–

6622, 2012 WL 6184014, at *7 (S.D.N.Y. Dec. 12, 2012)); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine *what* statements [the document] contained—but . . . *not for the truth of the matters asserted.*" (internal quotation marks omitted)).

In rare circumstances, courts in the Second Circuit will consider prior pleadings. However, courts only do this when "the plaintiff directly contradicts the facts set forth in his original complaint," which is not the case here, as Plaintiffs merely removed certain allegations from their Complaint and First Amended Complaint instead of alleging directly contradictory facts. *Wallace v. N.Y.C. Dep't of Corr.*, No. 95-CV-4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996); *see also Colliton v. Cravath, Swaine & Moore LLP*, No. 09-CV-400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (accepting facts alleged in an original complaint as true for a motion to dismiss where the plaintiff made a "transparent attempt . . . to amend his pleading[s] in order to avoid a dispositive defense" raised by the defendant and the plaintiff's amended complaint directly contradicted his original complaint), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). "While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course." *Barris v. Hamilton*, No. 96-CV-9541, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999) (citation omitted) (citing *Wallace*, 1996 WL 586797, at *2); *see also Russell v. Hollister Corp.*, No. 13-CV-5273, 2014 WL 2723236, at *4–5 (S.D.N.Y. June 17, 2014) (holding, in a case where a pro se plaintiff changed the date on which she allegedly received a right to sue letter between her complaint and her amended complaint, that although her "modification of the crucial detail of the receipt date [was] problematic, to say the least, the proper response [was] not

to strike or dismiss an amended complaint based solely on contradictory statements or those inconsistent with prior pleadings"), *adopted by* 2014 WL 3928948 (S.D.N.Y. Aug. 8, 2014); *Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 WL 1655575, at *5 (E.D.N.Y. May 2, 2011) (describing approaches to this issue taken by courts in the Second Circuit), *aff'd*, 457 F. App'x 40 (2d Cir. 2012); *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 266–67 (S.D.N.Y. 2008) (declining to follow *Wallace*'s approach where "[t]he changes between the complaint and amended complaint [were], when taken as a whole, not blatant or directly contradictory, and [could] be described as clarifying but, at most, as inconsistent" (brackets and internal quotation marks omitted)).  Therefore, the Court will not take judicial notice of the previous pleadings in this case for the truth of the matters asserted in the previous pleadings, though Defendant may make use of these prior statements either at the summary judgment stage or at trial.

For the above reasons, the Court grants Defendant's Motion To Dismiss based on statute of limitations grounds for claims arising out of Defendant's alleged failure to effect Plaintiffs' redemption request according to their instructions, but denies Defendant's Motion To Dismiss on statute of limitations grounds for claims arising out of the other conduct alleged.  However, the Court's decision to deny Defendant's Motion To Dismiss on statute of limitations grounds for claims arising out of the inadequate vetting and failure to turn over information courses of conduct is without prejudice to the renewal of a statute of limitations defense in a motion for summary judgment.  *See, e.g.*, *Almasmary v. City of New York*, No. 07-CV-1868, 2009 WL 914693, at *9 (E.D.N.Y. Mar. 31, 2009) (denying the defendants' motion to dismiss "without prejudice to applying for permission to renew these motions upon summary judgment if defendants can develop proof to substantiate their statute-of-limitations defenses"); *Savage v.*

31

*Bonavitacola*, No. 03-CV-16, 2005 WL 1331079, at *2 (E.D. Pa. June 2, 2005) (considering

statute of limitations defense to a summary judgment motion after denying relief on such

grounds on a motion to dismiss), *aff'd,* 180 F. App'x 384 (3d Cir. 2006).

### 3.  Breach of Contract

#### a.  Choice of Law

As Defendant notes, the Policy contains an express Alaska choice-of-law provision,

which reads: "Governing Jurisdiction: AK." (Policy 3.)  The Policy defines "Governing

Jurisdiction" as "[t]he state or jurisdiction in which [the Policy] is delivered and whose laws

govern its terms."  (*Id.* at 10.)  "New York law provides that, 'as a general matter, the parties'

manifested intentions to have an agreement governed by the law of a particular jurisdiction are

honored.  It is as though the law of the selected jurisdiction were incorporated into the agreement

by reference.'"  *Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co.*, 979 F. Supp. 2d

385, 391 (S.D.N.Y. 2013) (brackets omitted) (quoting *Freedman v. Chem. Constr. Corp.*, 372

N.E.2d 12, 15 (N.Y. 1977)); *see also Boss v. Am. Exp. Fin. Advisors, Inc.*, 791 N.Y.S.2d 12, 14

(App. Div. 2005) ("It is the well-settled policy of courts of this State to enforce contractual

provisions for choice of law . . . ." (internal quotation marks omitted)), *aff'd*, 844 N.E.2d 1142

(N.Y. 2006).  However, "the 'choice of law principle that parties to a contract have a right to

choose the law to be applied to their contract . . . is not absolute.'"  *Estee Lauder Cos. v. Batra*,

430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (quoting *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*,

597 F. Supp. 1014, 1025 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 990 (2d Cir. 1985)).  The Second

Circuit has framed the inquiry that a district court sitting in diversity in New York must

undertake to determine whether it should give effect to a choice-of-law clause in the following

manner:

New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *see also Branham v. ISI Alarms, Inc.*, No. 12-CV-1012, 2013 WL 4710588, at *10 n.9 (E.D.N.Y. Aug. 30, 2013) (same); *Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 351 (E.D.N.Y. 2013) (same); *Discovery Ortho Partners, LLC v. Osseous Techs. of Am., Inc.*, No. 10-CV-1729, 2012 WL 6201204, at *1 (S.D.N.Y. Dec. 11, 2012) (same); *Boss*, 791 N.Y.S.2d at 14 (observing that a choice-of-law clause is "prima facie valid" and may only be invalidated upon a showing "that its enforcement would be unreasonable, unjust, or would contravene public policy, or that the clause is invalid because of fraud or overreaching" (internal quotation marks omitted)).

Alaska clearly has "sufficient contacts with the transaction," the Trust's purchase of the Policy from Defendant.  By its own terms, the Policy was delivered in Alaska, (*see* Policy 3, 10), and the Trust itself was created under, and continues to be governed by, Alaska law, (*see* Trust Instrument I-3).  Further, until 2012, the Trust's sole trustee was the Alaska Trust Company, (*see* SAC ¶ 31 & n.2), also an Alaskan entity, (*see id.* ¶ 23 ("Plaintiff the Alaska Trust Company is a co-Trustee of the Trust, with a place of business in Anchorage, Alaska.")).  What is more, Defendant notes that "[t]he Trust is an Alaska asset protection trust, created under ALASKA STAT. § 34-40.110 and permitting the interests of the grantor (Buchalter) and beneficiaries (Buchalter's children) to be shielded from their creditors because the Trustee cannot transfer the interests to a creditor."  (Def.'s Mem. 2–3 (footnote omitted).)  In other words, Buchalter specifically availed himself of Alaska law in order to derive financial benefit from the Trust's structuring.  Plaintiffs do not contest this characterization of the motivation behind the decision to establish the Trust in

Alaska, and nothing in their submissions is to the contrary.  In short, the parties' "sufficient

contacts" with Alaska are undeniable.  *See Champion Auto Sales*, 943 F. Supp. 2d at 352 n.3

(enforcing an agreement's Minnesota choice-of-law provision because, among other reasons, the

principal place of business of one of the parties to the agreement was in Minnesota); *Discovery

Ortho Partners*, 2012 WL 6201204, at *1 (enforcing an agreement's New York choice-of-law

provision for the sole reason that the parties did "not dispute that New York ha[d] sufficient

contacts with the" agreement, even though one of the parties to the agreement was located in

California).  For all of the foregoing reasons, it follows that the parties also had a reasonable

basis for choosing Alaska law.  Thus, the only basis on which the Court is permitted to not give

effect to the Policy's choice-of-law provision is if doing so would violate New York public

policy.

 "'The public policy doctrine is an exception to implementing an otherwise applicable

choice of law in which the forum refuses to apply a portion of foreign law because it is contrary

or repugnant to its State's own public policy.'"  *Galeotti v. Cianbro Corp.*, No. 12-CV-900, 2013

WL 3207312, at *16 (N.D.N.Y. June 24, 2013) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480

N.E.2d 679, 687 (N.Y. 1985)).  This exception "should only be used in instances in which the

laws of the foreign state are 'truly obnoxious'" to the public policy of the forum state.  *Id.*

(quoting *Edwards v. Erie Coach Lines Co.*, 952 N.E.2d 1033, 1041 (N.Y. 2011)); *see also

Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("The public policy of the forum thus

provides an exception to application of foreign law only for law 'truly obnoxious' to that

policy."); *cf. Boss*, 791 N.Y.S.2d at 14 (noting that a court should only refuse to enforce a

choice-of-law provision on public-policy grounds if its enforcement "would result in [the]

approval of [a] transaction that is inherently vicious, wicked or immoral, and shocking to prevailing moral senses").

The party seeking to invoke this doctrine bears the "heavy burden" of establishing that the foreign law is repugnant. *Galeotti*, 2013 WL 3207312, at *16 (internal quotation marks omitted). In order to determine whether the application of Alaska law would be "truly obnoxious" to New York public policy, the Court will compare the relevant Alaska law with its New York counterpart. Under Alaska law, "[i]n order to assert a claim for breach of contract, a plaintiff must generally allege: (1) the existence of a contract; (2) breach; (3) causation; and (4) damages." *Nicdao v. Chase Home Fin.*, 839 F. Supp. 2d 1051, 1068 (D. Alaska 2012) (citing *Great W. Sav. Bank v. George W. Easley Co.*, 778 P.2d 569, 577–78 (Alaska 1989); *Winn v. Mannhalter*, 708 P.2d 444, 450 (Alaska 1985)). Under New York law, the elements of a cause of action for breach of contract are "(1) the existence of a contract between [the plaintiff] and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages to the plaintiff caused by [the] defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The two standards are thus essentially the same, and neither Plaintiffs nor Defendant have directed the Court to any aspect of New York public policy that might render the application of the Alaska standard instead of the New York standard "truly obnoxious" to the latter state's interests. Therefore, if there is an actual conflict between Alaska and New York law, Alaska law will apply.

### b. Analysis

Having determined that Alaska law applies in the event of a conflict between Alaska and New York law, the Court will now assess Plaintiffs' breach of contract claim. Plaintiffs' claim

for breach of contract is set out as follows.  The Trust was forbidden from contacting SSR for

any reason.  (SAC ¶ 172.)  In support of this allegation, Plaintiffs quote the Policy as stating that

the Trust "will not directly or indirectly influence or attempt to influence the Manager's

selection, purchase, retention or sale of any investment within the Fund."  (*Id.*)  However, the

"PPM expressly acknowledges [Defendant's] role as keeper of information, stating that '[a]ll

records and accounts relating to the Investment Accounts will be maintained by the Company.'"

(*Id.* ¶ 173 (alteration in original).)  Therefore, according to Plaintiffs, "where the Trust had no

access to SSR, and [Defendant] had a duty to maintain <u>all</u> records relating to the Investment

Accounts, [Defendant] had an implied obligation to *pass on* any SSR records to the Trust in [a]

timely and accurate fashion, so that the Trustee and Advisors could determine whether to redeem

or withdraw the Trust's funds in the SSR investment."  (*Id.* ¶ 174 (emphases in original).)  Under

this theory, Plaintiffs allege that Defendant's failure to provide full and non-misleading

information to the Trust constituted a breach of the provisions of the Policy.  (*Id.* ¶ 175.)

    As Defendant points out, this is a claim for a breach of an implied contractual duty, rather

than an explicit contractual duty.  (*See* Def.'s Mem. 14–15.)  Indeed, Plaintiffs do not identify a

specific provision that was breached by this alleged failure to provide information, and, in fact,

the Policy and PPM require only that Defendant provide annual statements.  (*See* Policy 22

(discussing reporting requirements to the policyholder); PPM 30 (same).)  Defendant argues that

neither Alaska law nor New York law "permit[s] the Court to create obligations the parties did

not bargain for" where the contract was negotiated at arms-length by sophisticated business

people.  (Def.'s Mem. 15.)

    This claim cannot survive Defendant's Motion To Dismiss under the facts alleged.  Given

that the contract was extensively negotiated at arm's-length between sophisticated and counseled

parties, the Court will not read in a duty to provide information that could have been contracted

for but was not.  This conclusion is warranted by both Alaska law, *see Renaissance Alaska, LLC*

*v. Rutter & Wilbanks Corp.*, 263 P.3d 35, 41 (Alaska 2011) (noting, in holding that a term was

neither express nor implied in a contract, that both parties to the contract were "sophisticated,"

and that the "agreements between them were extensively negotiated," and therefore that had they

"wished to include an express term [providing for a particular requirement], they could have

done so"), and New York law, *see Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292,

297 (App. Div. 2012) ("According to well-established rules of contract interpretation, when

parties set down their agreement in a clear, complete document, their writing should as a rule be

enforced according to its terms.  We apply this rule with even greater force in commercial

contracts negotiated at arm's length by sophisticated, counseled businesspeople.  In such cases,

courts should be extremely reluctant to interpret an agreement as impliedly stating something

which the parties have neglected to specifically include." (citations and internal quotation marks

omitted)).  Here, the inclusion of specific terms regarding what information Defendant was

required to pass on to Plaintiffs indicates that the absence of a provision for broader information

sharing was not an oversight or a gap that was left for the Court to fill, but rather was an

intentional decision.  *See Young v. Kelly*, 334 P.3d 153, 157 (Alaska 2014) ("Courts will fill in

gaps where parties' reasonable expectations are clear, but they cannot impose performance

where it is not clear the parties had a meeting of the minds."), *reh'g denied* (Sept. 29, 2014);

*Renaissance Alaska*, 263 P.3d at 40 ("[T]he threshold inquiry in determining whether a case is an

appropriate one for gap-filling is whether, in fact, there is an essential term or circumstance for

which the parties failed to plan." (brackets and internal quotation marks omitted)); *Casey v.*

*Semco Energy, Inc.*, 92 P.3d 379, 386 (Alaska 2004) (rejecting an argument "that the superior

court should have read new terms into the agreement in order to fill contractual gaps because we find that there were no contractual gaps to fill"); *accord Davis v. Dykman*, 938 P.2d 1002, 1007 (Alaska 1997) (holding that courts may "fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are clear"); *cf. Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) ("In the absence of any ambiguity, we look solely to the language used by the parties to discern the contract's meaning."). And Plaintiffs do not plead the existence of any extrinsic evidence or anything else that could support an alternative holding that the Parties intended to include a contract term, express or implied, that required additional disclosure of information beyond what was explicitly provided for in the contract. *See Miller v. Handle Constr. Co.*, 255 P.3d 984, 988–89 (Alaska 2011) (holding that the "goal of contract interpretation is to give effect to the parties' reasonable expectations," which "must be gleaned not only from the contract language, but also from extrinsic evidence, including evidence of the parties' conduct, goals sought to be accomplished, and surrounding circumstances when the contract was negotiated" (citation and internal quotation marks omitted). Therefore, this claim is dismissed.

### 4.  Breach of Covenant of Good Faith and Fair Dealing

#### a.  Choice of Law

Although Alaska law governs Plaintiffs' breach-of-contract claim in case of a conflict, it is somewhat less clear whether the Policy's choice-of-law provision extends to Plaintiffs' claim that Defendant violated the implied covenant of good faith and fair dealing. A district court, "sitting in diversity [in New York], [is] bound to apply New York law to determine the scope of the contractual choice-of-law clause. New York courts decide the scope of such clauses under New York law, not under the law selected by the clause . . . ." *Fin. One Pub. Co. Ltd. v. Lehman*

*Bros. Special Fin., Inc.*, 414 F.3d 325, 333 (2d Cir. 2005); *see also Trade Wind Distribution,*

*LLC v. Unilux Ag.*, No. 10-CV-5716, 2011 WL 4382986, at *3 (E.D.N.Y. Sept. 20, 2011)

("The . . . scope of a choice-of-law provision is a threshold question that a federal court, sitting in

diversity, should decide based on the forum state's law rather than the law specified in the

clause."); *Commerce & Indus. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 07-CV-5731, 2008

WL4178474, at *4 (S.D.N.Y. Sept. 3, 2008) ("In determining the scope of the choice of law

provision, this Court must follow New York law.").

There is a "reluctance on the part of New York courts to construe contractual choice-of-

law clauses broadly to encompass extra-contractual causes of action." *Lehman Bros.*, 414 F.3d

at 334.  "Under New York law, in order for a choice-of-law provision to apply to claims for tort

arising incident to the contract, the express language of the provision must be sufficiently broad

as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97

F.3d 640, 645 (2d Cir. 1996) (internal quotation mark omitted).  Accordingly, "[u]nder New

York law, . . . tort claims are outside the scope of contractual choice-of-law provisions that

[merely] specify what law governs construction of the terms of the contract . . . ." *Lehman Bros.*,

414 F.3d at 335; *see also Ayco Co. v. Frisch*, 795 F. Supp. 2d 193, 203 (N.D.N.Y. 2011) (same).

A number of courts applying New York choice-of-law rules have determined that choice-of-law

provisions nearly identical to that contained in the Policy—which states only that Alaska is the

"Governing Jurisdiction," (*see* Policy 3), and defines "Governing Jurisdiction" as "[t]he state or

jurisdiction in which [the Policy] is delivered and whose laws govern its terms," (*id.* at 10)—are

insufficiently broad to encompass tort claims.  *See, e.g.*, *Lehman Bros.*, 414 F.3d at 335 (noting

that contractual language stating that "[t]his [a]greement will be governed by and construed in

accordance with the laws of the State of New York (without reference to choice of law doctrine)"

was "essentially the same" as the choice-of-law clause at issue a New York state choice-of-law case, "a clause found not broad enough to reach tort claims incident to the contractual relationship" (emphasis omitted)); *Krock*, 97 F.3d at 645 ("In the case at hand, the choice-of-law provision in the parties' mortgage document stated only that '[t]his [m]ortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.' We see no way such language can be read broadly enough to apply to fraudulent misrepresentation." (first alteration in original)); *Document Sec. Sys., Inc. v. Coupons.com, Inc.*, No. 11-CV-6528, 2012 WL 3597769, at *4 (W.D.N.Y. Aug. 20, 2012) ("In this case, the choice of law provision is narrow, since it only pertains to the [non-disclosure agreement]: 'This [a]greement shall be governed by the applicable laws of the State of New York, excluding its conflict of law provisions.' . . . Accordingly, the [c]ourt finds that the [non-disclosure agreement's] choice-of-law provision does not require the application of New York law to related tort claims."); *Ayco*, 795 F. Supp. 2d at 203 ("[T]he choice of law provision states only that '[t]his [a]greement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to any conflict of laws provisions.' New York courts in this [c]ircuit have refused to extend similarly worded clauses to govern tort claims . . . ." (citation omitted) (second alteration in original)). Therefore, the Court finds that the Policy's choice-of-law provision applies only to those of Plaintiffs' causes of action that sound in contract, and not to those that sound in tort.

But this conclusion does not resolve the issue. The Court must still identify which state's law it should apply to determine whether a cause of action alleging a violation of the implied covenant of good faith and fair dealing sounds in contract or in tort, and once that law has been so identified, what result follows. The first question is a particularly important one in the context

of this case, as under Alaska law, "an insured's action against its insurer for breach of the

implied covenant of good faith and fair dealing sound[s] in tort," *Ennen v. Integon Indem. Corp.*,

268 P.3d 277, 281 (Alaska 2012) (citing *State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d

1152, 1156–57 (Alaska 1989)), while "[u]nder New York law, parties to an express contract are

bound by an implied duty of good faith, but breach of that duty is merely a breach of the

underlying contract," *Funk v. Allstate Ins. Co.*, No. 13-CV-5933, 2013 WL 6537031, at *4

(E.D.N.Y. Dec. 13, 2013) (citing *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80

(2d Cir. 2002)); *see also Aeolus Down, Inc. v. Credit Suisse Int'l*, No. 10-CV-8293, 2011 WL

5570062, at *4 (S.D.N.Y. Nov. 16, 2011) ("New York law does not recognize a cause of action

for tortious breach of an insurance contract." (citing *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d

763, 770 (N.Y. 1995)); *Commerce & Indus. Ins. Co.*, 2008 WL 4178474, at *3 ("New York law

views various bad faith claims against insurance carriers as contractual in nature." (internal

quotation marks omitted) (quoting *New England Ins. Co. v. Healthcare Underwriters Mut. Ins.

Co.*, 352 F.3d 599, 606 (2d Cir. 2003)); *In Re Worldcom, Inc. Sec. Litig.*, 456 F. Supp. 2d 508,

519 (S.D.N.Y. 2006) ("To the extent that [the plaintiff] is attempting to plead a breach of the

duty of good faith and fair dealing, then under New York law, . . . [the plaintiff] is required to

plead as well a viable claim for breach of contract.  Without an adequate pleading of a breach of

a term of contract, [the] plaintiff[] may not plead a breach of the implied duty of good faith and

fair dealing.")).  Thus, if the Court were to find that Alaska law governs the characterization of

Plaintiffs' cause of action, then it would likely fall outside the scope of the Policy's choice-of-

law provision, while if the Court were to find that New York law governs the characterization of

Plaintiffs' cause of action, it would fall within the provision's scope—which, somewhat

curiously, would mean that Alaska law would then govern the question of whether Plaintiffs have sufficiently pleaded a cause of action for the implied covenant's breach.

While the answer is not perfectly clear, it appears as though the Court's obligation to "apply New York law to determine the scope of the contractual choice-of-law clause," *Lehman Bros.*, 414 F.3d at 333, encompasses an obligation to apply New York law to determine whether a cause of action is contractual or tortious in nature for the purpose of analyzing whether that cause of action falls within the clause's scope.  In *Commerce & Industry Insurance Company v. U.S. Bank National Association*, another court in this District was presented with a similar question, under similar facts.  There, the defendants counterclaimed against the plaintiffs, both of which were insurance companies, for breach of contract and "bad faith refusal to pay."  2008 WL 4178474, at *1.  One of the contracts in dispute contained a choice-of-law provision, which provided that "the law of the State of New York" would apply "[i]n the event that the [parties] dispute[d] the validity or formation of [the contract] or the meaning, interpretation[,] or operation of any term, condition, definition[,] or provision of [the contract] resulting in litigation, arbitration[,] or other form of dispute resolution . . . ."  *Id.* at *3.  The parties "dispute[d] whether this clause cover[ed] [defendants'] bad faith claim . . . ."  *Id.* at *4.  After noting that "New York courts are generally reluctant to construe choice of law provisions broadly," and that "extra-contractual claims, such as tort claims that arise only incidentally to the contract[,] [were] not covered by the choice of law clause," the court then looked to New York law to determine whether defendants' bad-faith claim was best characterized as contractual or tortious.  *Id.* at *4 (internal quotation marks omitted).  The court held that "New York law considers the duty to act in good faith as controlled by the implied covenant of good faith and fair dealing found in every contract," and that "[t]herefore, a bad faith claim is treated as a breach of the underlying contract

42

for the purposes of applying a choice of law provision." *Id.* (internal quotation marks omitted)
(collecting cases).  The Court further noted that "[t]he basic holding" of the cases to which it had
cited, "that the same state's law should govern both the contract and bad faith claims, applies
with equal force where the choice of law for the contract dispute is determined by a contractual
choice of law provision." *Id.* at *5.  "An . . . unnecessarily confusing situation would result if
different laws [were to] govern the contract and bad faith claims." *Id.* (internal quotation marks
omitted).  Reasoning that "the breach of contract and bad faith claims are inextricably
intertwined and should be governed by the laws of the same state," and noting that "New York
law governs the claim for breach of contract," the court concluded that "New York law should
also apply to the bad faith refusal to pay claim relating to these contracts." *Id.*

　　　　While apparently applying, though not always explicitly citing to, New York law, other
courts within this District have taken a similar approach, both before and after *Commerce*.  *See,*
*e.g., Torain v. Clear Channel Broad., Inc.*, 651 F. Supp. 2d 125, 138 (S.D.N.Y. 2009) ("[The]
[c]ourt will apply Texas substantive law to determine whether [the plaintiff] was discharged for
cause under the terms of the [e]mployment [a]greement, and whether [the defendant] is entitled
to indemnification for the [s]ettlement [p]ayment.  Moreover, because [the plaintiff's] claim for
breach of the implied covenant of good faith and fair dealing arises out of the [e]mployment
[a]greement, that claim is also governed by Texas law."); *Comprehensive Habilitation Servs.,*
*Inc. v. Commerce Funding Corp.*, No. 05-CV-9640, 2009 WL 935665, at *10 n.14 (S.D.N.Y.
Apr. 7, 2009) ("Because breach of the implied covenant of good faith and fair dealing is a
contractual cause of action, and the choice of law provision applies to the interpretation and
enforcement of the contract, Virginia law applies to [the plaintiff's] implied covenant claim
arising out of the terms of the [f]actoring [a]greement."); *Butvin v. DoubleClick, Inc.*, No. 99-

CV-4727, 2001 WL 228121, at *7 (S.D.N.Y. Mar. 7, 2001) ("[T]he [c]ourt notes that the parties

indicated in [their] agreement that it would be governed and construed according to Delaware

law . . . . Since the implied covenant of good faith is a rule of interpretation rather than a separate

obligation, the [c]ourt holds that a claim for breach of the covenant is a contractual cause of

action and therefore Delaware law applies to [the plaintiff's] claim regarding the . . .

[a]greement."), *aff'd*, 22 F. App'x 57 (2d Cir. 2001); *In re Lois/USA, Inc.*, 264 B.R. 69, 97–98

(Bankr. S.D.N.Y. 2001) ("[O]ne of the [plaintiff's] claims . . . , which alleges violation of an

implied covenant of good faith and fair dealing . . . seeks to enforce [a] covenant; if it is to be

done, it must be done as an additional term of the [a]greement.  The choice-of-law issue with

respect to that claim is not a difficult one; this [c]ourt has little doubt that if . . . Illinois law

governs the contract . . . , it is no jump at all to find that any efforts to engraft implied terms into

the [a]greement . . . should be measured under the law of Illinois.").  The Court finds the

reasoning of these cases to be persuasive.  As a result, it applies New York law to find that

Alaska law applies to Plaintiffs' cause of action for violation of the implied covenant of good

faith and fair dealing.

### b.  Analysis

As explained in the conflict of law analysis above, there is an actual conflict between

New York and Alaska law on this issue, and Alaska law controls.  "The covenant of good faith

and fair dealing is implied in all contracts in Alaska."  *Casey v. Semco Energy, Inc.*, 92 P.3d 379,

384 (Alaska 2004).  Generally speaking, claims for breach of the duty of good faith and fair

dealing are contract claims, as under New York law.  The Alaska Supreme Court has explained:

> In the case of an ordinary commercial contract between sophisticated business
> entities, a tort for breach arises only when a party's conduct rises to the level of a
> traditionally recognized tort.  Creating a broader tort remedy would disrupt the
> certainty of commercial transactions and allow parties to escape contractual

44

allocation of losses.  Therefore, an action for breach of the implied covenant of
good faith and fair dealing sounds in contract alone.

*State, Dep't of Natural Res. v. Transamerica Premier Ins. Co.*, 856 P.2d 766, 774 (Alaska 1993)

(citation, alteration, and internal quotation marks omitted).  Therefore, under normal

circumstances, Plaintiffs would not be able to bring a claim for the breach of the implied

covenant of good faith and fair dealing separate from a breach of contract action.  *See id.*

(holding that generally an "action for breach of the implied covenant of good faith and fair

dealing sounds in contract alone").

However, Alaska has recognized a limited cause of action in tort for the breach of the

covenant of good faith and fair dealing in certain insurance contracts.  *See Municipality of*

*Anchorage v. Gentile*, 922 P.2d 248, 261 (Alaska 1996) ("Insurance companies have been

subjected to tort liability for breaching the covenant of good faith in resolving claims covered by

their insurance policies."); *see also State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152,

1157 (Alaska 1989) (holding that tort liability exists for an "insurer's bad faith failure to settle a

first-party claim"); *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Alaska 1981) (holding

that tort liability applies when "dealing with its insured on a claim").  The decision to extend a

tort cause of action to these circumstances is based on public policy considerations unique to the

insured-insurer relationship.  In particular, in allowing an insured to bring a tort cause of action

for the breach of the implied covenant of good faith and fair dealing, the Alaska Supreme Court

has "recognized the special relationship between insurer and insured: the use of standardized

contract terms, the insurer's superior bargaining position over the insured, and the fact that the

insured seeks protection against calamity, rather than commercial advantage."  *Transamerica*

*Premier Ins.*, 856 P.2d at 774; *see also Nicholson*, 777 P.2d at 1157 ("The adhesionary aspects of

the insurance contract, including the lack of bargaining strength of the insured, the contract's

standardized terms, the motivation of the insured for entering into the transaction and the nature

of the service for which the contract is executed, distinguish this contract from most other non-

insurance commercial contracts.  These features characteristic of the insurance contract make it

particularly susceptible to public policy considerations."); *Alaska Pac. Assurance Co. v. Collins*,

794 P.2d 936, 947 (Alaska 1990) ("Due to the unequal bargaining positions which generally

exist between insurers and insureds, enforcement of this covenant is particularly important in the

insurance context. . . . Characterizing such actions [between the insured and insurer] as sounding

in tort, and thereby permitting tort damages, will provide needed incentive to insurers to honor

their implied covenant to their insureds." (citations and internal quotation marks omitted)), *as

amended on denial of reh'g* (Aug. 30, 1990).  The Alaska Supreme Court has reasoned that

"[t]hese exceptional features of the insurance contract justified the creation of a tort action for an

insurer's bad faith breach." *Transamerica Premier Ins.*, 856 P.2d at 774.

  In deciding against extending the tort cause of action to situations other than the ones

described above, the Alaska Supreme Court has emphasized that the public policy considerations

that formed the basis for extension of the tort cause of action were not present in other

circumstances.  For example, in *Municipality of Anchorage v. Gentile*, the Alaska Supreme Court

considered whether there should be a cause of action in tort for the breach of the implied

covenant of good faith and fair dealing where the Municipality of Anchorage "reduced the post-

retirement medical benefits of its retired police officers and firefighters."  922 P.2d at 252.  In

deciding against allowing a tort cause of action, the Alaska Supreme Court determined that

"[p]ublic policy concerns do not require the imposition of tort liability in this case."  *Id.* at 261.

In particular, the Alaska Supreme Court reasoned that the underlying concern that warranted a

tort cause of action is that "without the threat of tort liability, insurance companies may be

encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than due under the policy." *Id.* (internal quotation marks omitted).  The Alaska Supreme Court therefore held that the case law that allowed for a tort cause of action related to insurance contracts simply did not apply in that case:

> It is unnecessary to decide here whether [the municipality] would be subject to tort liability for failing to deal fairly and in good faith in the settlement of a covered insurance claim.  That is not the nature of the [plaintiffs'] claim.  They instead claim that [the municipality] breached the covenant of good faith and fair dealing by unilaterally decreasing the insurance coverage required by the [collective bargaining agreements].  Although insurance is the topic in dispute, [the municipality] breached the [collective bargaining agreements], not policies of insurance.

*Id.*  Thus, the Alaska Supreme Court recognized that it was not just the subject matter of insurance that yields this tort cause of action, but that special factors must be also be present, and it also indicated an aversion to extending the cases providing for a cause of action in tort past the circumstances of those cases.

The Parties have not cited any case where an Alaska court either applied or declined to apply a tort cause of action for a breach of the implied covenant of good faith and fair dealing in circumstances similar to the case at hand, nor has the Court found any such case in its own research.  In the absence of such authority, and in light of the public policy considerations explicitly relied on by the Alaska courts and persuasive authority from outside the district, the Court holds that Plaintiffs cannot bring a separate claim for the breach of the implied covenant in this case.  The public policy considerations that Alaska courts have relied on in other insurance cases are decidedly not present in this case.  Simply put, this is not a case where there are standardized contract terms, where the insurer has superior bargaining power, and where the insured seeks protection against calamity instead of commercial advantage.  *See Transamerica Premier Ins.*, 856 P.2d at 774.  (*See also* PPM 3 ("PURCHASE OF THE POLICY IS

SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL ECONOMIC MEANS AND

FINANCIAL SOPHISTICATION.  EACH POLICY OWNER WILL BE REQUIRED TO

REPRESENT THAT HE OR SHE MEETS CERTAIN MINIMUM FINANCIAL AND OTHER

SUITABILITY STANDARDS.").)  While the contract is technically an insurance contract, it is

much more similar to an average commercial contract than to a typical insurance contract.  Nor

is this a case about an insurer resolving claims covered by its insurance policy.  *See Gentile*, 822

P.2d at 261.  The Court also finds the reasoning in *Michael S. Rulle Family Dynasty Trust v.*

*AGL Life Assurance Co.*, No. 10-CV-231, 2010 WL 2721029 (E.D. Pa. July 7, 2010), instructive.

In that case, which is very similar to this case, the Eastern District of Pennsylvania reasoned that

> Although insurance might play a tangential role here, it is not the center of the
> dispute.  This claim revolves around the investment made as part of a life insurance
> policy and has nothing to do with the insurance aspect of the [p]olicy.  There is no
> allegation that AGL failed to investigate a claim or that [the] [p]laintiff was in an
> unequal bargaining position and hence found itself signing a contract of adhesion.
> Additionally, the [p]laintiff in this case is the Rulle Trust, which is not a person,
> nor is it the insured.  Finally, the AGL PPM includes minimum suitability
> requirements for potential [p]olicy [o]wners. . . . Given the circumstances
> surrounding this [p]olicy, it is not clear that Alaska would recognize a tort for
> breach of the implied covenant of good faith and fair dealing here.

*Id.* at *13 (citation and internal quotation marks omitted).  Based on this reasoning, and the

reasoning in the Alaska cases, *see Gentile*, 922 P.2d at 260 ("[The] covenant [of good faith and

fair dealing] primarily sounds in contract . . . ."); *Transamerica Premier Ins.*, 856 P.2d at 774

(holding that "an action for breach of the implied covenant of good faith and fair dealing" for a

normal commercial contract "sounds in contract alone"), the Court declines to allow a cause of

action in tort for the breach of the implied duty of good faith and fair dealing in this context, and

the Court grants Defendant's Motion To Dismiss this claim.

5.  Duty-Based Tort Claims

a.  Choice of Law

As stated above, Plaintiffs' tort claims are not governed by the Policy's choice-of-law provision.  Under New York law, negligence sounds in tort, *see Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) ("Under New York law . . . [,] [b]ecause a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." (citation and internal quotation marks omitted)), as does negligent misrepresentation, *see J & R Elecs. Inc. v. Business & Decision N. Am., Inc.*, No. 12-CV-7497, 2013 WL 5203134, at *6 (S.D.N.Y. Sept. 16, 2013) (discussing the "tort of negligent representation"), breach of fiduciary duty, *see In re Pfeifer*, No. 12-CV-13852, 2013 WL 5746125, at *7 (Bankr. S.D.N.Y. Oct. 23, 2013) (categorizing the breach of fiduciary duty as a tort claim under New York Law), and professional malpractice, *see Indus. Quick Search, Inc. v. Miller, Rosado & Algois, LLP*, No. 09-CV-1340, 2013 WL 4048324, at *3 (E.D.N.Y. Aug. 9, 2013) ("In this case, [the] [p]laintiffs' primary claim is for legal malpractice, which, in New York is a species of negligence—i.e., a tort." (internal quotation marks omitted)).  Therefore, the Court must undertake an independent analysis under New York choice-of-law rules to identify which state's law should apply to the question of whether Plaintiffs have stated a claim under these causes of action.

"The New York Court of Appeals has held that the relevant analytical approach to choice of law in tort actions in New York is the interest analysis."  *GlobalNet Fin. Com., Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006) (brackets and internal quotation marks omitted); *see also Empire City Capital Corp.*, 2011 WL 4484453, at *3 (same).  "New York's interest analysis requires that the law of the jurisdiction having the greatest interest in the

litigation will be applied and the only facts or contacts which obtain significance in defining

State interests are those which relate to the purpose of the particular law in conflict." *In re*

*Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) (brackets, alteration, and internal quotation marks

omitted), *certified question accepted sub nom. Thelen LLP v. Seyfarth Shaw LLP*, 2013 WL

6500428 (N.Y. Dec. 12, 2013).  "[T]he significant contacts are, almost exclusively, the parties'

domiciles and the locus of the tort." *Id.* at 219–20 (internal quotation marks omitted).  "Under

the interest-analysis test, torts are divided into two types, conduct-regulating rules, such as rules

of the road, and loss-allocation rules, such as those limiting damages in wrongful death actions,

vicarious liability rules, or immunities from suit." *Id.* at 220 (internal quotation marks omitted).

"If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort

occurred will generally apply because that jurisdiction has the greatest interest in regulating

behavior within its borders." *Id.* (internal quotation marks omitted).  "A tort occurs in the place

where the injury was inflicted, which is generally where the plaintiffs are located." *Lyman*

*Commerce Solutions, Inc. v. Lung*, No. 12-CV-4398, 2013 WL 4734898, at *4 (S.D.N.Y. Aug.

30, 2013); *see also In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 261 (S.D.N.Y. 2011) (same);

*Feldman Law Grp. P.C. v. Liberty Mut. Ins. Co.*, 819 F. Supp. 2d 247, 256 (S.D.N.Y. 2011)

(same), *aff'd*, 476 F. App'x 913 (2d Cir. 2012).  Here, Plaintiffs' tort claims are conduct-

regulating, not loss-allocating.  (*See* Def.'s Mem. 11 ("The torts Plaintiffs alleged in this case are

conduct-relating."); Pls.' Mem. 3, 10–13 (not disputing Defendant's position and choosing not to

conduct a choice of law analysis except with regard to the statute of limitations issue, and merely

arguing that they state valid claims under either New York or Alaska law).)  *See also Mark*

*Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, 265 F. Supp. 2d 366,

378 (S.D.N.Y. 2003) (noting that negligence and negligent-misrepresentation claims are based

on "conduct regulating rules rather than loss allocating rules"), *aff'd*, 96 F. App'x 750 (2d Cir. 2004); *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 355 (S.D.N.Y. 2011) (applying conduct-regulating analysis to legal malpractice claim and collecting cases); *Burns v. Delaware Charter Guarantee & Trust Co.*, 805 F. Supp. 2d 12, 23 (S.D.N.Y. 2011) ("Here, [the] [p]laintiffs allege that [the] [d]efendants breached their duties of care . . . and were otherwise negligent . . . in fulfilling their obligations to [the] [p]laintiffs.  These alleged legal duties are conduct-regulating."), *on reconsideration*, No. 09-CV-8025, 2011 WL 3837146 (S.D.N.Y. Aug. 30, 2011).

Applying that analysis to the instant Action, the Court finds that the alleged torts "occurred" in Alaska, for the same reasons that the Alaska statute of limitations applies, as explained above.  Thus, for the purposes of New York's interest analysis, any torts that Defendant committed against Plaintiffs "occurred" in Alaska.  However, the law of the state that New York's interest analysis yields will only be applied if it conflicts with the law of New York; if there is no conflict between the law of the two jurisdictions, then New York law will apply. *See Lyman*, 2013 WL 4734898, at *3 ("[S]ince there is no conflict of law with respect to these sections, New York law applies to the actual fraud claims alleged in the complaint."); *Hayden Capital USA, LLC v. Northstar Agric. Indus., LLC*, No. 11-CV-594, 2012 WL 2953055, at *4 (S.D.N.Y. July 16, 2012) ("[T]here is no actual conflict between New York and North Dakota law, and New York law applies." (internal quotation marks omitted)); *Admiral Ins. Co. v. Adges*, No. 11-CV-8289, 2012 WL 2426541, at *2 (S.D.N.Y. June 27, 2012) ("No defendant has . . . shown a conflict between New York's law and that of any other state . . . .  Accordingly, the [c]ourt applies New York law."); *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) ("New York law applies to the fraudulent transfer claim in

the present action because there is no material conflict between the laws of New York and Massachusetts governing this claim.")  Therefore, if New York and Alaska law conflict in any material way as to any of Plaintiffs' asserted causes of action, the Court will apply Alaska law; otherwise the Court will apply New York law.

### b.  Negligence

Under Alaska and New York law, the elements of a negligence claim are: (1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff was injured, and (4) that the breach of the duty was the proximate cause of the plaintiff's injury.  *See, e.g.*, *Mitchell v. Icolari*, 969 N.Y.S.2d 503, 505 (App. Div. 2013); *Edenshaw v. Safeway, Inc.*, 186 P.3d 568, 571 (Alaska 2008).

Defendant argues that "since Plaintiffs' claims arise out of an arm's length transaction and nothing more, there are no duties except those in the Policy and therefore Plaintiffs' negligence claim should be dismissed."  (Def.'s Mem. 20.)  Moreover, Defendant argues that "Alaska law does not permit a claim for negligent performance of a contract seeking to recover purely economic losses."  (*Id.* at 21 (citing *St. Denis v. Dep't of Hous. & Urban Dev.*, 900 F. Supp. 1194, 1200–04 (D. Alaska 1995); *Alaska Pac. Assurance Co.*, 794 P.2d at 946).)  Plaintiffs respond that Defendant is not necessarily insulated from tort liability by the existence of a contract, as there is a legal duty independent of the contract.  (Pls.' Mem. 14–20.)  In particular, Plaintiffs argue that there is a duty of care arising out of independent characteristics of the relationship between Plaintiffs and Defendant.  (*Id.* at 16–17.)

First, Defendant is incorrect in its argument that Alaska law will not permit a claim for negligence under these circumstances.  (Def.'s Mem. 21–22.)  Defendant cites two cases in support of this position, neither of which requires the result it seeks.  First, in *Alaska Pacific*

*Assurance Company v. Collins*, the Alaska Supreme Court rejected a claim for negligent breach of an insurance contract.  However, language in that case actually supports Plaintiffs' claim.  *See Alaska Pac. Assurance*, 794 P.2d at 946 (agreeing with the argument that "an insurer may be held liable for torts independent from its contractual duties, such as fraud," but that "an action for negligence in breaching a specific contractual duty sounds in contract").  As Defendant correctly argued in the context of Plaintiffs' breach of contract claim, Plaintiffs do not successfully allege the breach of a specific contractual duty.  Rather, they allege a negligence tort apart from the enumerated contractual duty to provide an annual statement.  Second, Defendant is correct that reasoning in dicta by the District Court for the District of Alaska in *St. Denis v. Department of Housing and Urban Development* did indicate that Alaska might not allow tort claims based on purely economic loss.  *See St. Denis*, 900 F. Supp. at 1200–04 ("It . . . appears that Alaska cases foreshadow a general rule precluding negligence actions by those in privity where only economic losses are alleged.").  However, this "appearance" has been firmly rebutted in subsequent Alaska Supreme Court decisions.  Eleven years after the *St. Denis* decision, the Alaska Supreme Court held:

> We have recognized that promises set forth in a contract must be enforced by an action on that contract.  Only where the duty breached is one imposed by law, such as a traditional tort law duty furthering social policy, may an action between contracting parties sound in tort.  . . . [W]hen a party's actions violate a general duty of care, its actions may give rise to an action in tort, even if the violation also breaches a contract.

*Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006) (brackets and internal quotation marks omitted); *see also Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F. Supp. 2d 356, 368–69 (E.D.N.Y. 2012) (holding the same under New York law).  In reaching this conclusion, the Alaska Supreme Court, in fact, quoted the New York Court of Appeals:

> A tort obligation is a duty imposed by law to avoid causing injury to others.  It is apart from and independent of promises made and therefore apart from the manifested intention of the parties.  Thus, a defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations.

*Jarvis*, 134 P.3d at 363 (brackets and internal quotation marks omitted) (quoting *N.Y. Univ.*, 662 N.E.2d at 767).  Thus, under Alaska law, as under New York law, a plaintiff may bring a tort claim when the duty breached is imposed by law, rather than specifically provided by contract.  *See Transamerica Premier Ins.*, 856 P.2d at 772 ("In the case of an ordinary commercial contract between sophisticated business entities, a tort for breach arises only when 'a party's conduct . . . rises to the level of a traditionally recognized tort.'" (quoting *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1154 (Alaska 1988))).  Thus, Plaintiffs' negligence claim would be cognizable if there was a duty of care distinct from what is required under the contract.

Under Alaska law, if no statute, regulation, contract, case law, or preexisting relationship establishes the existence of a duty of care, the question of whether a duty exists is essentially a public policy question.  *McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 106 P.3d 319, 322 (Alaska 2005).  The public policy question involves the following considerations:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981).  Similarly, under New York law, when determining the existence and scope of a duty, courts consider the relationship of the parties, whether the plaintiff was within the zone of foreseeable harm, whether

54

the injury was foreseeable, and other public policy considerations. *Di Ponzio v. Riordan*, 679 N.E.2d 616, 618 (N.Y. 1997). Thus, while these tests are stated slightly differently, they involve the same general considerations. As the Parties have not alerted the Court to an actual conflict between New York and Alaska law, and the Court has not found a conflict, it will apply New York law. *See Interstate Foods, Inc. v. Lehmann*, No. 06-CV-13469, 2008 WL 4443850, at *3 (S.D.N.Y. Sept. 30, 2008) ("The parties have not submitted any evidence that there is actually a conflict of law between the law of New York and the law of New Jersey with respect to breach of fiduciary duty. . . . Therefore, the Court will apply New York law to the plaintiff's . . . claim.").

Plaintiffs assert that there were several duties owed to them by Defendant that Defendant breached: to properly vet funds, to monitor developments at the funds and provide the Trust with any material information regarding the funds, and to process the redemption requests accurately and in a timely fashion. (SAC ¶ 147.) As explained above, any claims based on the failure to effect the redemption request are time-barred. Thus, the remaining claims relate to the vetting and the provision of information to the Trust.

Plaintiffs fail to state a negligence claim regarding the failure to provide information regarding SSR. Here, Plaintiffs have not alleged the breach of a legal duty independent from Defendant's contractual obligations. Rather, the contract defines the scope of Defendant's duty. "[O]nce a contractual relationship was entered into between the parties, that contract defined the scope of the duties owed to the plaintiff." *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881–82 (App. Div. 1987). In particular, where the contract, having been negotiated by sophisticated and counseled parties, provides that Defendant must "provide annual statements," (*see* Policy 22; PPM 30), Plaintiffs cannot assert that there was an independent duty

in tort to provide additional information.  In particular, here, Plaintiffs knew at the time of the

contract that they would have limited information regarding the underlying investments.  In fact,

they specifically contracted that they would not have contact with the underlying fund managers

for their own benefit: to preserve the tax benefits associated with the Policy.  (SAC ¶ 2; *see also*

*id.* ¶¶ 19, 41–42, 45, 101, 148, 161, 172; Second Dec. 20, 2002 Letter Agreement 2

("Policyowner will not directly or indirectly influence or attempt to influence the Manager's

selection, purchase, retention or sale of any investment within the fund."); PPM 32 (explaining

that one factor considered in determining whether a variable life insurance contract owner is an

owner of the assets invested through the policy for tax purposes is "whether there is any contact

between a variable contract owner and the investment advisor relating to the investment

decisions made"); *id.* at 33 ("[N]o Policy Owner should ever attempt to contact an investment

advisor.  Rather, any and all questions, comments, or instructions regarding the Policy should be

addressed only to the Company." (emphasis omitted)).)  And Plaintiffs knew that the information

provided by the underlying funds, including SSR, would be limited.  (*See* August 2005 SSR Tear

Sheet 2 (listing as one of SSR's risk factors that "[t]he Fund is not subject to the same regulatory

requirements as mutual funds"); *id.* at 4 (warning that SSR will have only limited access to

information about the funds SSR invests in).)  Plaintiffs, who were required to be persons of

financial sophistication, including being accredited investors, qualified purchasers, and having

sufficient knowledge and experience in investments of this type, *knew* that Defendant would

have access to more information than Plaintiffs regarding the underlying investments—and

indeed, specifically contracted for that imbalance.  (PPM 3, 10, 32.)  Knowing this, Plaintiffs

specifically contracted for the provision of annual statements regarding their investments, and

nothing else.  (PPM 30; Policy 22.)  Given these facts, the Court does not find that there was a

duty imposed by law to provide additional information.  If Plaintiffs wanted Defendant to

provide all relevant information about the underlying investment funds, they could have, and

should have, contracted for such.  *See Document Sec. Sys.*, 2013 WL 1945954, at *5 (holding

that where two parties dealt at arm's length and had an express written agreement covering the

subject matter of the dispute, that express agreement set forth the duty owed and there was not an

additional duty imposed in tort); *In re Nat'l Century Fin. Enterprises, Inc.*, 846 F. Supp. 2d 828,

858 (S.D. Ohio 2012) (applying New York law and noting that "[the plaintiff] is unable to

explain how an independent duty could exist when sections 10 and 12 of the [a]greement defined

the scope of [the defendant's] alleged duty of care with respect to the information it supplied to

[the plaintiff]"), *adhered to on denial of reconsideration sub nom. Crown Cork & Seal Co.

Master Ret. Trust v. Credit Suisse First Boston Corp.*, Nos. 12-CV-5803, et al., 2013 WL 490717

(S.D.N.Y. Feb. 6, 2013); *Int'l Ore & Fertilizer Corp. v. SGS Control Servs. Inc.*, 743 F. Supp.

250, 258 (S.D.N.Y. 1990) ("Since the duty to inspect arose only by virtue of the contract, which

was freely negotiated by the parties, there can be no independent tort liability for failing to take

certain steps as part of that inspection"), *aff'd*, 38 F.3d 1279 (2d Cir. 1994).

     Plaintiffs provide no support for their theory that Defendant could be required to provide

information in tort when the contract specifically addresses what information Defendant must

provide.  Plaintiffs primarily rely on two cases: *Bayerische Landesbank, New York Branch v.

Aladdin Capital Management LLC*, 692 F.3d 42 (2d Cir. 2012), and *Banco Multiple Santa Cruz,

S.A. v. Moreno*, 888 F. Supp. 2d 356 (E.D.N.Y. 2012).  However, neither case helps Plaintiffs.

In *Bayerische Landesbank*, the Second Circuit held that "[w]here an independent tort duty is

present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly

wrongful conduct," but if "the basis of a party's claim is a breach of solely contractual

obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual

bargain through an action in tort, the claim is precluded as duplicative."  692 F.3d at 58.  In that

case, the Second Circuit concluded that the plaintiff had alleged a "legal duty, though *assessed*

largely on the standard of care and the other obligations set forth in the contract, [that] would

*arise* out of the independent characteristics of the relationship," where the plaintiff alleged that it

relied on marketing representations from the defendants regarding how they would manage

financial portfolios.  *Id.* at 58–59.  However, the factual issue in that case is markedly different

from this case.  In *Bayerische Landesbank*, the plaintiff alleged that the defendants represented

that their "interests were aligned with investors[']," that the portfolio "would consist of

investment grade, high quality [r]eference [e]ntities," that the defendants would "manage the

[r]eference [p]ortfolio . . . in a conservative and defensive manner," and that they would "act in

good faith using a degree of skill, care, diligence[,] and attention consistent with the practice and

procedures followed by reasonable and prudent institutional managers of national standing for

similar investment portfolios."  *Id.* (internal quotation marks omitted).  Plaintiffs have alleged no

such representations here.  Moreover, *Bayerische Landesbank* does not address the issue here,

which is Plaintiffs' attempt to require Defendant to do something in tort beyond what was

specifically provided for in contract.

*Banco Multiple* is similarly inapposite.  In *Banco Multiple*, the court held that though

New York generally treats relationships between insurance companies and policyholders as

contractual only, because variable annuities "are more like investment vehicles than traditional

insurance" it would allow a negligence action against a company that issued a variable annuity.

888 F. Supp. 2d at 369–70, 374.  The court also held that an issuer of a variable annuity could be

liable in tort for negligence arising out of independent legal duties in connection with the

performance of its contractual duties, in that case, negligence in processing withdrawal requests, where the court found a legal duty independent of the contract. *Id.* at 374. However, the issue in that case is simply not analogous to the one at hand. Additionally, there are cases that hold that plaintiffs might be able to allege legal duties in addition to those explicitly provided for in financial services documents. *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 236, 242–43 (S.D.N.Y. 2010). However, those cases also do not address the issue at hand, which is whether there can be a negligence duty to provide more information than what is specifically provided for in a contract. For the above reasons, the Court holds that Plaintiffs have not plausibly pleaded a claim for negligence in connection with the failure to provide information not required under the contract.

Finally, under the Policy, Defendant was to establish investment options. (*See* Policy 17; PPM 16.) Plaintiffs allege that Defendant was negligent in putting SSR on its platform. The issue here is whether Plaintiffs have alleged a duty of care in vetting investment options independent of the contract that was breached by a failure to use reasonable care in vetting. In this case, Plaintiffs have adequately pleaded the existence of a duty that arises from "circumstances extraneous to, and not constituting elements of, the contract." *Bayerische Landesbank*, 692 F.3d at 58. Plaintiffs allege that they were unable to access information regarding SSR as they were prohibited by contract from communicating with SSR in order to protect the tax benefits that the structure of the investment provided and because the fund did not release information publicly. (SAC ¶¶ 2, 15, 43, 45.) Moreover, the injury to Plaintiffs— financial loss from investing in a fund that allegedly was managed by two unqualified people and where Gunlicks served in an allegedly self-interested role—was foreseeable. *See Lauer v. City of New York*, 733 N.E.2d 184, 193 (N.Y. 2000) ("[W]henever one person is by circumstances

placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger." (internal quotation marks omitted)); *see also Banco Multiple*, 888 F. Supp. 2d at 368 n.14 ("New York courts frequently hold that a person undertaking to perform work is charged with the common law duty to exercise reasonable care and skill in the performance of the work." (alteration and internal quotation marks omitted)). Plaintiffs have adequately alleged that the circumstances—known to all Parties—put Defendant in a position to know that not acting with ordinary skill and care with regard to vetting SSR before putting it on the platform would create a danger of financial injury to Plaintiffs, especially because, according to Plaintiffs' allegations, Defendant had access to material, non-public information about SSR that would impact whether an investor would invest in the fund. Public policy considerations also support the finding of a duty to exercise reasonable care in vetting, as the duty the Court is recognizing is highly limited, would be easy to comply with, and protects investors.[9]

Next, Plaintiffs must allege that Defendant breached the duty. Plaintiffs have done so. They allege that Defendant either failed to vet SSR at all, or "more likely, . . . haphazardly

---

[9] Here, Defendant's reliance on *Michael S. Rulle Family Dynasty Trust v. AGL Life Assurance Co.*, No.10-CV-231, 2010 WL 3522135 (E.D. Pa. Sept. 8, 2010), *aff'd,* 459 F. App'x 79 (3d Cir. 2011), is misplaced. In particular, Defendant cites *Michael S. Rulle Family Dynasty Trust* for the proposition that Defendant owed no duty beyond that provided in the contract. (*See* Def.'s Mem. 7–8.) However, in that case, the court held that the plaintiff's fiduciary duty and negligence claims failed because the claims "rest[ed] on the exclusive control [the defendant] purportedly exercised over the investment account," but the court found that the defendant in fact "did *not* maintain exclusive control over the investment decisions." *Michael S. Rulle Family Dynasty Trust*, 2010 WL 3522135, at *3 (emphasis added). As such, this holding is limited to its facts, which differ from those Plaintiffs allege here.

ignored critical information in its rush to become a leading carrier of variable universal life policies, which involved signing up as many funds as possible, as quickly as possible, to [Defendant's] platform[.]" (SAC ¶ 10; *see also id.* ¶ 114.) In particular, Plaintiffs allege that Defendant "likely ignored . . . SSR's managers' stunning lack of relevant experience," claiming that "one manager had no material experience in the complex world of structured finance, corporate receivables financing and asset-based lending, while the other had no credit or lending experience and just four years of reported business experience." (*Id.* ¶ 11; *see also id.* ¶ 111 (alleging that neither Helland nor Law "had the requisite material experience in the arcane and complex world of structured finance, corporate receivables financing and asset-based lending").) Second, Plaintiffs allege that Defendant "also likely ignored SSR's lucrative, overtly conflicted partnership" with Gunlicks. (*Id.* ¶ 12.) These pleadings plausibly allege that Defendant breached its duty of due care in placing SSR on its platform.

Third, Plaintiffs must allege that they were injured. They have done so, as they allege that the Trust's capital has been frozen, its "SSR investment account [has] steadily declined in stated value, and it is now highly likely that it will end with a zero or *de minimus* balance." (*Id.* ¶ 8.)

Finally, Plaintiffs must allege that the breach of the duty was the proximate cause of Plaintiffs' injury. Plaintiffs have also satisfied this requirement. Specifically, Plaintiffs allege that, had they known that Defendant had not properly vetted SSR, "the Trust would have made a redemption request immediately," and that after "SSR suspended redemptions in October 2008, the Trust could do nothing as all of its investment in SSR was lost." (*Id.* ¶ 19.) For the above reasons, the Court holds that Plaintiffs adequately pleaded a claim for negligence in connection with the vetting of SSR.

<u>c.  Negligent Misrepresentation</u>

To state a claim for negligent misrepresentation under New York law, a plaintiff must

allege: "(1) carelessness in imparting words; (2) upon which others were expected to rely;

(3) and upon which they did act or failed to act; (4) to their damage. . . . [T]he action [also]

requires that (5) the declarant . . . express the words directly, with knowledge or notice that they

will be acted upon, to one to whom the declarant is bound by some relation or duty of care."

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) (citing *White v.

Guarente,* 372 N.E.2d 315, 319 (N.Y. 1977)).  *See Woori Bank v. Citigroup Global Markets,

Inc.*, No. 12-CV-3868, 2014 WL 3844778, at *5 (S.D.N.Y. Aug. 5, 2014) (same); *see also Beach

v. Citigroup Alternative Investments LLC*, No. 12-CV-7717, 2014 WL 904650, at *21 (S.D.N.Y.

Mar. 7, 2014) ("'[L]iability for negligent misrepresentation has been imposed only on those

persons who possess unique or specialized expertise, or who are in a special position of

confidence and trust with the injured party such that reliance on the negligent misrepresentation

is justified.'" (alteration in original) (quoting *Kimmell v. Schaefer,* 675 N.E.2d 450, 454 (N.Y.

1996))).

Under Alaska law, the tort of negligent misrepresentation consists of the following

elements: "First, the tortfeasor must have made a statement in the course of business,

employment, or some other enterprise in which he had a pecuniary interest.  Second, the

statement must have been false when the tortfeasor made it.  Third, the victim must have

justifiably relied upon the statement to his detriment.  Fourth, the tortfeasor must have failed to

exercise reasonable care when making the statement."  *S. Alaska Carpenters Health & Sec. Trust

Fund v. Jones*, 177 P.3d 844, 857 (Alaska 2008) (footnotes omitted).  Defendant cites *Howarth

v. Pfeifer*, 443 P.2d 39 (Alaska 1968), which held that "there must be a relationship between the

parties, whether growing out of contract or otherwise, such that in morals and good conscience the plaintiff has the right to rely upon the defendant for information, and the latter owes a duty to give the information with care," as evidence that Alaska law also requires a special relationship to establish a negligent misrepresentation claim.  *Id.* at 43.  This proposition is not supported either by *Howarth* or by more recent case law.  In *Howarth*, the quotation relied upon by Defendant was made in the context of whether—and what type of—privity is required to establish a negligent misrepresentation claim.  *Id.*  However, this language has not been embraced by Alaska courts; instead they have followed the guidance of the Restatement of Torts, which does not require a special relationship.  *See, e.g. Willard v. Khotol Servs. Corp.*, 171 P.3d 108, 118–19 (Alaska 2007) (providing the four-factor test discussed above and citing to the Restatement (Second) of Torts § 552(1)); *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 670–71 (Alaska 2002) (same); *Valdez Fisheries Dev. Ass'n, Inc. v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 671 (Alaska 2002) (same).  That said, there is one relevant situation under Alaska law where the existence of a duty is required for a negligent misrepresentation claim: To make a negligent misrepresentation claim based on an omission there must be a duty to disclose.  Specifically, under Alaska law, "[a]n omission can constitute a false statement where there is a duty to disclose.  A duty to disclose may . . . arise when facts are concealed or unlikely to be discovered because of the special relationship between the parties, the course of their dealings, or the nature of the fact itself."  *U.S. ex rel. N. Star Terminal & Stevedore Co. v. Nugget Constr., Inc.*, 445 F. Supp. 2d 1063, 1074 (D. Alaska 2006) (citations and internal quotation marks omitted).  Because of this conflict between New York and Alaska law, the Court will apply Alaska law.

First, Plaintiffs allege that Defendant "recklessly (or worse, deliberately) overstated SSR's assets under management by approximately 100% in a report provided to . . . Buchalter (in his role as Advisor) in 2007." (SAC ¶ 18.)  Specifically, Plaintiffs allege that "[Buchalter], on behalf of the Trust, requested more information about SSR, [and Defendant] reported that SSR had $169 million in assets under management, [but] in fact [SSR] had only approximately half that amount based on the August 2007 AIMA disclosure questionnaire containing information supplied by SSR." (*Id.* ¶ 141.)  Plaintiffs allege that the "higher number . . . would misleadingly indicate increased investor acceptance of SSR, a misstatement of SSR's presence in the markets in which it invested, and, most importantly, a misstatement of SSR's implied ability to meet potential redemption requests from investors." (*Id.* ¶ 18.)  Defendant argues that Plaintiffs are "simply misreading the documents by comparing a disclosure of gross assets in one document to net assets in the other." (Def.'s Mem. 22.)  Defendant explains:

> The May 2007 update shows that as of March 31, 2007, SSR had $169 million in assets and the fund's General Partner had $195.5 million in assets, which included SSR's assets and the assets of the separate SSR II fund not at issue in this case.  The AIMA questionnaire shows that as of July 2007, SSR had $170.7 [million] in assets and the fund's General Partner had $198.5 million in assets, which included $27.8 million in assets in the SSR II fund.  The AIMA questionnaire explains these asset totals are *gross*, as they include the funds' leveraged or borrowed assets.  The AIMA questionnaire further disclosed that *net* of leverage, SSR had $86.7 million in assets and SSR II had $15.7 million in assets, for a total of $102.4 million in unleveraged assets under the General Partner's management.  Plaintiffs have mistakenly compared SSR's *gross* assets in March 2007 ($169 million) to SSR's *net* assets in July 2007 ($86.7 million).

(*Id.* (citations and footnotes omitted).)  Plaintiffs respond that Defendant "*never disclosed that it was reporting leveraged assets*, instead simply reporting 'Fund Assets' as $169 million." (Pls.' Mem. 21.)  Plaintiffs argue this is a misrepresentation because "actual assets under management is the true measure utilized by the hedge fund industry" and Defendant previously "represented

SSR's *actual* (not leveraged) assets under management of $47.3 million when presenting the investment option to Buchalter/the Trust in 2005." (*Id.* at 21.)

There are two reasons why this claim fails. First, the alleged misrepresentation was made by SSR, not by Defendant, as the May 2007 disclosure was an SSR document, a fact evident from the document itself and not contested by Plaintiffs' counsel at oral argument. (*See* May 2007 SSR Tear Sheet.) To the extent Defendant passed on this document, there are no allegations that Defendant knew that the document allegedly contained false statements, or that Defendant was negligent or reckless as to this fact. *See Diblik v. Marcy*, 166 P.3d 23, 26 (Alaska 2007) ("One element of negligent misrepresentation is the failure to exercise reasonable care or competence in obtaining or communicating the misinformation.").

Second, there was no misrepresentation.[10] In May 2007, SSR reported its fund assets for the SSR (ID) Fund as $169 million. (*See* May 2007 SSR Tear Sheet.) This roughly matches the 2007 AIMA questionnaire from a few months later, which reported that the size of the fund was $170.7 million, gross, $86.7 million, net. (SAC Ex. E (AIMA's Illustrative Questionnaire for Due Diligence of Fund of Hedge Fund Managers) ("SSR AIMA Questionnaire"), at 16.) Plaintiffs argue that Defendant previously "represented SSR's *actual* (not leveraged) assets under management of $47.3 million when presenting the investment option to Buchalter/the Trust in 2005." (Pls.' Mem. 21; *see also* August 2006 SSR Tear Sheet 1.) Plaintiffs apparently infer that the $47.3 million reported in 2005 is net, not gross, (*see* August 2005 SSR Tear Sheet 1), from the fact that the AIMA questionnaire states that the assets under management in 2005

---

[10] Plaintiffs' allegation that "SSR reported its assets to [Defendant] accurately," but that Defendant "reported a grossly higher number to the Trust," is contradicted by the documents on which Plaintiffs rely and thus is not presumed to be true. (SAC ¶ 141.)

were $70.4 million, thus conceivably indicating that $70.4 million was the leveraged number and $47.3 million was the unleveraged number, (*see* SSR AIMA Questionnaire 6).  However, a close reading of the document shows this is not the case.  Rather, the discrepancy between the AIMA questionnaire's $70.4 million number and the SSR document's $47.3 million number for 2005 is due to the fact that the $47.3 million represents assets that correspond only to SSR's Insurance Dedicated (ID) fund, while the $70.4 million represents the assets that correspond both to the SSR (ID) Fund and the SSR (II) Fund.[11]  Furthermore, the May 2007 Tear Sheet states: "Beginning in May 2006, the Fund began employing modest leverage, which the managers intend to limit to no more than one dollar of leverage per dollar of fund equity."  (May 2007 SSR Tear Sheet 1.)  Thus, the fact that SSR reported unleveraged assets in 2005, when it was not employing leverage, says nothing about whether SSR would report leveraged or unleveraged assets in 2007.  Furthermore, the inclusion of that sentence on the May 2007 statement should have raised the possibility to Plaintiffs that SSR was now reporting leveraged assets.  While the 2007 SSR document was ambiguous as to whether it was disclosing leveraged or unleveraged fund assets, it did not misrepresent leveraged fund assets as unleveraged fund assets.

Next, Plaintiffs allege that "SSR's administrator had been replaced in January 2007[,] tellingly when SSR was in the process of closing their books for the 2006 year."  (SAC ¶ 16.) Plaintiffs further allege that Defendant "sent Buchalter a report in June 2007 erroneously

---

[11] This is evident from examining the 2007 numbers presented alongside the $70.4 million 2005 number in the AIMA questionnaire.  The 2007 numbers are $102.4 million unleveraged and $198.5 million leveraged.  (SSR AIMA Questionnaire 6.)  The $102.4 million unleveraged is $86.7 million unleveraged in the SSR (ID) Fund, (*id.* at 16), plus $15.7 million unleveraged in the SSR II Fund, (*id.* at 17).  Similarly, the $198.5 million leveraged in 2007 is $170.7 million leveraged in the SSR (ID) Fund, (*id.* at 16), plus $27.8 million leveraged in the SSR II Fund, (*id.* at 17).  This demonstrates that, where the AIMA Questionnaire lists $70.4 million for 2005, that number includes the funds in the SSR (ID) Fund and the SSR (II) Fund.

indicating that the replaced SSR administrator still was in place." (*Id.*)  Defendant does not

dispute that Plaintiffs plausibly pleaded that Defendant made a misrepresentation, however, the

negligent misrepresentation claim must still be dismissed.[12]  This alleged misrepresentation was

made in the same document that contained the alleged misrepresentation regarding SSR's assets

under management.  (*See* SAC ¶ 138; May 2007 SSR Tear Sheet.)  Again, this alleged

misrepresentation was made by SSR, not by Defendant, and Plaintiffs do not allege that

Defendant knew, or was reckless or negligent to the fact that the SSR document it passed on to

Plaintiffs allegedly contained misrepresentations.  Therefore, this claim is dismissed.  *See Diblik*,

166 P.3d at 26 ("One element of negligent misrepresentation is the failure to exercise reasonable

care or competence in obtaining or communicating the misinformation.").

Finally, Plaintiffs allege that Defendant misrepresented that it vetted SSR, when in fact

Defendant "appears not to have vetted SSR at all." (SAC ¶ 10.)  Plaintiffs allege generally that

Defendant made "representations as to researching and vetting of 'platform' funds, and

monitoring and oversight of the investments[.]" (*Id.* ¶ 56.)  Plaintiffs also allege that Defendant

did not "inform the Trustee or the Advisors of . . . its failure to properly vet SSR." (*Id.* ¶ 143.)

Defendant argues that "the email Plaintiffs rely upon shows that [Defendant] made no such

representation [regarding vetting]." (Def.'s Mem. 23.)  Rather, Defendant argues, "[t]he email

merely identifies SSR as one 'of the insurance dedicated funds available' through [Defendant],

which it indisputably was," and "[t]hat Plaintiffs claim to have subjectively understood the email

to imply a vetting of SSR is irrelevant." (*Id.*)  However, Defendant's General Counsel emailed

---

[12] Defendant moved to dismiss this claim on the ground that Defendant did not owe
Plaintiffs a duty, but did not argue in its briefing that Defendant did not make this particular
misrepresentation.  (*See* Def.'s Mem. 21–24.)  However, the issue of whether Defendant actually
made the alleged administrator misrepresentation was raised at oral argument, and Plaintiffs had
an opportunity to respond.

Buchalter's counsel in October 2003 to state that he was "in the process of adding [SSR] to [Defendant's] platform" "in the very near future."  (SAC ¶ 113 (internal quotation marks omitted); *see also id.* Ex. L (Email from Joseph A. Fillip, Jr. to William Lipkind (Oct. 17, 2003).)  Later, Defendant's Director of Research sent Buchalter an email identifying SSR as one of the "insurance dedicated funds available through [Defendant's] platform."  (SAC ¶ 57; AGL Life Assurance Company – Insurance Dedicated Funds.)  And Plaintiffs allege that SSR was "one of only 27 [funds] chosen from the available pool of an estimated 75 to 100 insurance-dedicated hedge funds in existence" to be put on Defendant's platform.  (SAC ¶ 4; *see also id.* ¶ 60 ("At the time [Defendant] presented SSR as an approved investment choice, there were an estimated 75 to 100 insurance-dedicated hedge funds in existence.  [Defendant] presented just 27 insurance-dedicated funds, clearly indicating that it had utilized specific criteria to select said funds, and . . . [had] found that the majority of available funds were not appropriate for its policyholders.  As such, [Defendant] affirmatively preselected SSR from a much larger universe as especially suitable for policyholders such as the Trust, based on [Defendant's] purported vetting and determination utilizing specific criteria.").)  Considering the allegations and the emails at issue, the Court concludes that Plaintiffs have adequately pleaded an implicit misrepresentation by Defendant.

What is left of Defendant's arguments against the negligent misrepresentation claim is its contention that Plaintiffs cannot state a claim for negligent misrepresentation based on assertions made to Buchalter.  However, this argument is unavailing for several reasons.  First, that the Trust Instrument did not identify Buchalter as an advisor "does not mean that he was not an Advisor to the Trust as a matter of fact, which is exactly what the [SAC] alleges and must be assumed as true on this motion."  (Pls.' Mem. 22.)  Moreover, "[t]here would have been no

reason for [Defendant] to send its platform funds to Buchalter (and Buchalter alone) if [Defendant] did not recognize that he was acting in an advisory capacity." (*Id.*)  Furthermore, the Restatement (Second) of Torts, which is followed by Alaska courts with regard to the requirements for a negligent misrepresentation tort provides that "liability . . . is limited to a loss suffered . . . by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information *or knows that the recipient intends to supply it*." Restatement (Second) of Torts § 552(2) (1977) (emphasis added).

Therefore, Defendant's Motion To Dismiss the negligent misrepresentation claim is denied as to the alleged vetting misrepresentation and granted as to the alleged fund asset and fund administrator misrepresentations.

### d.  Professional Malpractice

"Professional malpractice is a species of negligence under New York law. . . . [M]alpractice means the negligence of a member of a profession in his relations with his client." *Panteleone v. Envtl. Eng'g & Contracting*, No. 12-CV-5415, 2013 WL 3340483, at *6 (E.D.N.Y. July 2, 2013) (citation and internal quotation marks omitted).  "To prevail on a professional malpractice claim, a plaintiff must demonstrate the elements of negligence, and that the breach of duty was by a professional in a departure from accepted standards of practice."  *Id.* (internal quotation marks omitted).  Under Alaska law, the "elements of a cause of action for professional negligence . . . are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."  *Bukoskey v. Walter W. Shuham, CPA, P.C.*, 666 F. Supp. 181, 184 (D. Alaska 1987) (internal quotation

marks omitted); *see also Johnson & Higgins of Alaska Inc. v. Blomfield*, 907 P.2d 1371, 1374

(Alaska 1995) ("Like other negligence actions, a claim of professional negligence requires proof

of duty, breach, causation, and damages.").  Though stated slightly differently, the baseline

requirements are functionally the same under New York and Alaska law.

      While acknowledging that there are distinctions between Alaska and New York law on

professional malpractice claims, Defendant asserts that there is no conflict because "a life insurer

is not a professional under either state['s] laws[.]"  (Supplemental Br. in Supp. of Def. Phila. Fin.

Life Assurance Co.'s Mot. To Dismiss Pls.' Second Am. Compl. Under Rule 12(b)(6) ("Def.'s

Supplemental Br.") 2 (Dkt. No. 50).)  However, even assuming the ultimate outcomes would be

the same under the laws of New York and Alaska, that fact would not indicate that no conflict of

laws exists.  "To be an 'actual conflict,' the difference between the laws of the two jurisdictions

need not be outcome-determinative, but must provide differing substantive rules that are relevant

to the matter at hand, and the difference must have a significant possible effect on the outcome of

the trial."  *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 313

(S.D.N.Y. 2010); *see also Lehman Bros.*, 414 F.3d at 331 (same).

      Here, there is a conflict.  Under New York law, the term professional encompasses those

whose "qualities include extensive formal learning and training, licensure and regulation

indicating a qualification to practice, a code of conduct imposing standards beyond those

accepted in the marketplace and a system of discipline for violation of those standards."  *Chase*

*Scientific Research, Inc. v. NIA Grp., Inc.*, 749 N.E.2d 161, 166 (N.Y. 2001).  Applying these

characteristics, the New York Court of Appeals has held that insurance agents and brokers are

not professionals.  *Id.* at 167.  Therefore, in New York, courts have held that insurance

companies or agents cannot generally be sued for professional malpractice, beyond a claim for

failing to follow the insured's instructions of obtaining the desired insurance. *Highlands Ins. Co. v. PRG Brokerage Inc.*, No. 01-CV-2272, 2004 WL 35439, at *6 (S.D.N.Y. Jan. 6, 2004) ("[T]he New York Court of Appeals [has] found that [an] insured [can] not state a cause of action for professional negligence against his agent as . . . no 'special relationship' exist[s] between the parties that could impose a duty of care on the agent beyond that of following the insured's instructions of placing the requested insurance . . . . [T]he Court of Appeals [has also] found that an insured may not state a claim against an insurance agent for professional malpractice[,] . . . since neither a broker nor agent are required to engage in extensive specialized education or training, nor bound by a standard of conduct for which they might be disciplined, *[and are therefore] not considered 'professionals,'* in that they generally cannot be sued for professional malpractice." (emphasis added) (citing *Murphy v. Kuhn*, 682 N.E.2d 972 (N.Y. 1997))); *Chase Scientific Research Inc. v. NIA Group, Inc.*, 749 N.E.2d 161 (N.Y. 2001).

However, under Alaska law, the definition of professional is much more inclusive. In Alaska, "professional malpractice . . . involves a professional's . . . breach of a duty of due care which was implied by law as a result of a contractual undertaking." *Breck v. Moore*, 910 P.2d 599, 603 (Alaska 1996) (internal quotation marks omitted). A professional is a "provider of skilled services." *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1037 (Alaska 2002). In particular, the rule adopted by the Alaska Supreme Court is that

> when a person holds himself out to the public in any particular employment, work, or trade, there is an implied engagement with those who may employ him that he and his employees in that trade or business possess that reasonable degree of knowledge and skill which is ordinarily possessed by others engaged in the same business or trade; and that he and they will perform the services which he may be engaged to do, diligently and faithfully, and with that skill and prudence ordinarily possessed and observed by others engaged in the same or like employment.

*Id.* (internal quotation marks omitted).  As such, Alaska courts have "applied the professional negligence standard to trades persons including machinists, electricians, and plumbers," *id.*, as well as to insurance agents, *see State Farm Life Ins. Co. v. Davis*, No. 07-CV-164, 2008 WL 5245332, at *4 (D. Alaska Dec. 17, 2008) ("Generally, an agent employed to effect insurance must exercise such reasonable skill and ordinary diligence as may fairly be expected from a person in his or her profession or situation, in doing what is necessary to effect a policy, in seeing that it effectually covers the property to be insured, in selecting the insurer, and so on. Alaska law is fundamentally the same: an insurance agent owes a duty to exercise reasonable care, skill, and diligence in procuring insurance." (brackets, footnote, and internal quotation marks omitted)); *see generally Christianson v. Conrad-Houston Ins.*, 318 P.3d 390 (Alaska 2014) (discussing a professional negligence claim against an insurance agent), as well as other classes of professionals.  Thus, Defendant qualifies as a professional under Alaska law.

As a professional under Alaska law, Defendant had a duty to perform the "services which [it] [was] engaged to do[] diligently and faithfully, and with that skill and prudence ordinarily possessed and observed by others engaged in the same or like employment. *John's Heating Serv.*, 46 P.3d at 1037.  Because the duty existed only with respect to what Defendant was engaged to do, Defendant cannot be liable for professional negligence for failing to provide information when the contract explicitly addressed the information Defendant was required to provide, for the same reasons addressed above with regard to the claim for negligence. However, Plaintiffs do state a claim for professional negligence with regard to the allegedly inadequate vetting and misrepresentations related thereto.[13]

---

[13] As explained above, Plaintiffs' claim for professional negligence based on the failure to effect the redemption request in 2008 is barred by the statute of limitations.

e.  Breach of Fiduciary Duty

The Parties have not identified an actual conflict between Alaska and New York law as to the elements of a cause of action for breach of fiduciary duty; therefore, the Court will apply the law of New York, the forum state.  *See In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 500 (S.D.N.Y. 2011) ("While the [p]laintiffs claim that New Jersey law should apply, it is notable that they cite primarily to New York law in their breach of fiduciary duty analysis.  And at any rate, the parties do not indicate that there is any actual conflict between New York and New Jersey law with respect to breach of fiduciary duty. . . . Therefore, New York law should apply . . . ." (footnote omitted)); *Goodman v. Goldman, Sachs & Co.*, No. 10-CV-1247, 2010 WL 5186180, at *11 (D.N.J. Dec. 14, 2010) ("As [the] [d]efendant has not pointed to any material differences between the law of New Jersey and New York, the [c]ourt concludes that no actual conflict exists with respect to [the] [p]laintiff's breach of fiduciary duty claim and, consequently, applies the law of the forum state of New Jersey."); *Interstate Foods*, 2008 WL 4443850, at *3 ("The parties have not submitted any evidence that there is actually a conflict of law between the law of New York and the law of New Jersey with respect to breach of fiduciary duty. . . . Therefore, the [c]ourt will apply New York law to the plaintiff's . . . claim.").[14]

_____

[14] Defendant, though not Plaintiffs, addresses the fact that Alaska explicitly recognizes a fiduciary duty between an insurer and an insured, while New York does not.  *Compare Batas v. Prudential Ins. Co. of Am.*, 724 N.Y.S.2d 3, 7 (App. Div. 2001) ("No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer."), *with O.K. Lumber Co. v. Providence Washington Ins. Co.*, 759 P.2d 523, 525 (Alaska 1988) ("The fiduciary relationship inherent in every insurance contract gives rise to an implied covenant of good faith and fair dealing.").  However, as *O.K. Lumber* makes clear, this case law does not apply to the instant case for the same reasons that the law providing for a separate tort cause of action for the breach of the implied covenant of good faith and fair dealing does not apply to this case: this is not a case about an insurer resolving claims covered by its insurance policy, nor is it a case where there are standardized contract terms, where the insurer has superior bargaining power, and where the insured seeks protection against calamity instead of commercial advantage. *See O.K. Lumber*, 759 P.2d at 525 (explaining that this doctrine creates in an insurance agent the

Under New York law, "[t]he elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). "Under New York law, a fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 101 (S.D.N.Y. 2013) (brackets and internal quotation marks omitted); *see also Munn v. Thornton*, 956 P.2d 1213, 1220 (Alaska 1998) ("[A] fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." (internal quotation marks omitted)).  "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *N. Shipping Funds*, 921 F. Supp. 2d at 101 (internal quotation marks omitted).  "[I]t is not mandatory that a fiduciary relationship be formalized in writing and the ongoing conduct between the parties may give rise to a fiduciary relationship that will be recognized by the courts." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00-CV-8688, 2002 WL 362794, at *9 (S.D.N.Y. Mar. 6, 2002) (internal quotation marks omitted).  "[T]he existence of a fiduciary duty cannot be determined by recourse to rigid formulas and often is a factual question.  It arises . . . when a party reposes trust or

---

"obligation to investigate claims and to inform the insured of all settlement offers and the possibility of excess recovery by the injured claimant"); *Seybert v. Cominco Alaska Exploration*, 182 P.3d 1079, 1090 (Alaska 2008) (noting that the fiduciary duty between insured and insurance agent "gives rise to an implied covenant of good faith and fair dealing in execution of the contract").  Therefore, the Alaska law recognizing a breach of fiduciary duty between an insured and insurance agent in certain contexts does not extend to this situation.  *See Michael S. Rulle Family Dynasty Trust*, 2010 WL 3522135, at *3 ("This case does not involve an insurance dispute and the policy reasons Alaska courts have outlined for finding a fiduciary duty in insurance policies is inapplicable in this context.").

confidence in another who thereby gains a resulting superiority or influence over the first," or

"when a party exercises *de facto* control or assumes responsibility for the affairs of another."  *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 475 (S.D.N.Y. 2010) (footnotes, brackets, and internal quotation marks omitted), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73 (2d Cir. 2011); *see also Munn*, 956 P.2d at 1220 ("We have also noted that loyalty and the disavowal of self interest are hallmarks of the fiduciary's role.  Fiduciary relationships are generally defined by a level of trust beyond that in ordinary business relationships." (brackets, citation, and internal quotation marks omitted)).

Plaintiffs base their fiduciary duty claim on the information imbalance created by the contract and the fact that the Policy invested in funds that did not release information publicly. Plaintiffs argue that this dynamic "imposed on the Trust a special confidence in [Defendant] to act in good faith and with due regard for the best interests of the Trust."  (SAC ¶ 162.)  The Court disagrees.  As a primary matter, the Court notes that Plaintiffs do not cite a single case supporting the proposition that the Court may find a fiduciary relationship based on the facts alleged here.  (*See* Pls.' Mem.)  Nor did the Court find any such case in its own research.  "When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances."  *Atlantis Info. Tech., GmbH v. CA, Inc.*, 485 F. Supp. 2d 224, 231 (E.D.N.Y. 2007) (brackets and internal quotation marks omitted).  There is no basis here for finding such extraordinary circumstances.  While the information imbalance alleged by Plaintiffs might otherwise be sufficient to create a question of fact as to whether a fiduciary relationship existed, *see id.* at 231–32 (suggesting that a fiduciary relationship may be alleged between parties in arms' length relationships where there is an allegation of obvious disparity between the parties),

it is not sufficient here when the Plaintiffs—who were sophisticated investors and were represented by counsel—knew that such an information disparity existed, and by contract provided only that Defendant was required to pass on annual statements for the funds to Plaintiffs. *See Document Sec. Sys.*, 2013 WL 1945954, at *5 (holding that where a fiduciary duty of confidentiality would otherwise by implied by law, but where there was a specific written contract addressing the duty of confidentiality, no such fiduciary duty would be applied by law).

Additionally, Plaintiffs do not allege any special relationship with Defendant such that they could expect Defendant to disavow its own self-interest and act on behalf of Plaintiffs.  For example, Plaintiffs have not alleged that they were entitled to rely on Defendant for investment advice.  In one New York state case, the Supreme Court of New York County held that where an insurance company "did not serve as an investment advisor in any meaningful way" in connection with a variable life insurance policy, but "merely passed on prospectuses (such as the PPM) to its insureds from the funds in which the insureds could choose investments," such a relationship did "not amount to an advisory role that [would] give[] rise to a fiduciary relationship." *SSR II, LLC v. John Hancock Life Ins. Co. (U.S.A.)*, No. 652793/2011, 2012 WL 4513354, at *11 (Sup. Ct. Sept. 28 2012), *judgment entered sub nom. SSR II, LLC v. John Hancock Life Ins. Co. (u.s.a)*, 2012 WL 7784415 (N.Y. Sup. Ct. Oct. 17, 2012); *cf. Muller-Paisner v. TIAA*, 289 F. App'x 461, 466 (2d Cir. 2008) (holding that while "[b]y their nature, arms-length commercial transactions ordinarily do not involve" fiduciary relationships, where the complaint alleges that the defendants "advertise that they have a considerable infrastructure to help people" and where they have made public statements that they "will help their customers choose among [their] products," a fiduciary duty claim would withstand a motion to dismiss).  Similarly, here, Plaintiffs do not allege that Defendant acted as an investment advisor.  Indeed,

they distinguish *Michael S. Rulle Family Dynasty Trust* on the ground that here "Plaintiffs are

<u>not</u> alleging that [Defendant] exercised exclusive, or any, control over investment decisions, or

that it was responsible for recognizing that SSR was a flawed investment," and "[i]ndeed, [that]

Plaintiffs fully admit that the Trustee and Advisors were exclusively responsible for making

investment decisions."  (Pls.' Mem. 20.)  As in *SSR II*, the role of Defendant as alleged by

Plaintiffs "does not amount to an advisory role that gives rise to a fiduciary relationship."  *SSR

II*, 2012 WL 4513354 at *11.

      Moreover, and more generally, several courts applying New York law have found that

"[i]n the case of arm's length negotiations or transactions between sophisticated financial

institutions, no extra-contractual duty of disclosure exists."  *Banque Arabe et Internationale

D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995); *see also In re Enron

Corp.*, 292 B.R. 752, 787–88 (Bankr. S.D.N.Y. 2003) (holding that where the parties "engaged in

arm's length negotiations" and the contract disclaims reliance on information provided by the

other party, no claim can be stated for breach of fiduciary duty); *Banco Espanol de Credito v.

Sec. Pac. Nat'l Bank,* 763 F. Supp. 36, 45 ("In the case of arm's length transactions between

large financial institutions, no fiduciary relationship exists unless one was created in the

agreement.").  While the facts of these cases are distinguishable from the facts at hand, as here

Plaintiffs are not a "large financial institution," the Court finds persuasive the reasoning that

when sophisticated, counseled parties contract, and specifically contract about what information

needs to be disclosed, there is no basis for holding that there is an extra-contractual legal duty to

disclose.  Therefore, the Court dismisses Plaintiffs' claim for breach of fiduciary duty.

### 6.  Unjust Enrichment

#### a.  Choice of Law

Some controversy appears to exist as to whether a claim for unjust enrichment is governed by a contract's enforceable choice-of-law provision, or whether it is instead governed by the law of the state that New York's interest analysis yields, being a fundamentally non-contractual cause of action.  *Compare Fieger*, 251 F.3d at 394 ("With respect to a quantum meruit claim, we are not aware of any published New York decision that has stated the appropriate conflict-of-law test to apply to such a claim.  Under New York law, a quantum meruit claim is a claim in quasi-contract.  [The plaintiff's] claimed entitlement to a commission payment sounds more in contract than in tort, arising as it does from the benefit allegedly conferred upon [the] defendants by [the] plaintiff's business advice.  Accordingly, the court will apply New York's choice-of-law analysis for contract claims to [the plaintiff's] quantum meruit claim." (citations omitted)); *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 304 n.8 (E.D.N.Y. 2010) ("The parties agree that New York law applies to the unjust enrichment claim, and a choice of law clause in their agreement mandates the application of New York law."); *Merrill Iron & Steel, Inc. v. Yonkers Contracting Co., Ins.*, No. 05-CV-5042, 2006 WL 2679940, at *3 (S.D.N.Y. Sept. 19, 2006) ("Th[e] [c]ourt questions whether [the plaintiff] may avoid the [j]oint [p]ayment [a]greement's choice of law clause when the [a]greement underlies many of [the plaintiff's] arguments." (citing *Valley Juice Ltd. v. Evian Waters of Fr., Inc.*, 87 F.3d 604, 610 (2d Cir. 1996))); *In re Lois*, 264 B.R. at 106 ("[T]he claim for unjust enrichment similarly should be governed by the law of Illinois . . . . [A]t least the great bulk of the consideration paid by [the debtor] to [the creditors]—the essence of this claim for unjust enrichment—was paid under the [a]greement, and the rights, if any, to the return of that consideration cannot be

considered without at least some consideration of the [a]greement and its terms." (footnotes

omitted)), *with Innovative BioDefense, Inc. v. VSP Techs.*, No. 12-CV-3710, 2013 WL 3389008,

at *5 (S.D.N.Y. July 3, 2013) ("[The] [p]laintiff argues that [the] [d]efendants' unjust enrichment

counterclaim raises extra-contractual allegations and thus, should not be governed by the choice-

of-law provision.  The [c]ourt agrees.  Claims for unjust enrichment or quantum meruit are non-

contractual, equitable remedies and are therefore outside the scope of the parties' choice-of law

provision." (italics, footnote, and internal quotation marks omitted)); *Gross Found., Inc. v.

Goldner*, No. 12-CV-1496, 2012 WL 6021441, at *11 (E.D.N.Y. Dec. 4, 2012) ("Although the

[g]uaranty provides for Kansas law, unjust enrichment is an equitable claim that is outside the

scope of the contract's choice-of-law provision and may be governed by the law of a different

state."); *Hettinger v. Kleinman*, 733 F. Supp. 2d 421, 444 (S.D.N.Y. 2010) ("[The] [p]laintiffs

cite New York law and [the defendants] cite both New Jersey and Florida law with respect to

plaintiffs' unjust enrichment claim.  Although the choice of law clause in the [i]ndependent

[c]ontractor [a]greement specifies Florida law, extra-contractual claims are outside the scope of

contractual choice-of-law provisions." (citations and internal quotation marks omitted)); *Cargill,

Inc. v. Sears Petroleum & Transp. Corp.*, No. 03-CV-530, 2004 WL 3507329, at *16 (N.D.N.Y.

Aug. 27, 2004) ("With the exception of the breach of contract claim which . . . is subject to

Minnesota law because of the choice of law provision contained within the relevant agreement,

the . . . parties' common law counterclaims, including for . . . unjust enrichment, . . . are all

governed by New York law.").  If anything can be gleaned from the conflicting case law

described above, it is that the more an unjust enrichment claim relates to an enforceable contract,

the more likely it is to be considered contractual in nature for the purposes of New York's

choice-of-law analysis.  Given the allegations surrounding Plaintiffs' unjust enrichment claim,

this line of best fit argues in favor of applying Alaska law, pursuant to the Policy's choice-of-law provision.  Nevertheless, because the law is not entirely clear on this point, the Court will apply both Alaska and New York law, and will only be forced to choose between the two at this stage if a conflict presents itself.

### b.  Analysis

"To state a claim of unjust enrichment under New York law, the plaintiff must allege '(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or [benefit] to the plaintiff.'"  *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 3–4 (S.D.N.Y. 2004) (alteration in original) (footnote omitted) (quoting *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.,* 273 F.3d 509, 519 (2d Cir. 2001)).  "The essence of a claim for unjust enrichment is that one party has parted with money or a benefit that has been received by another at the expense of the first party."  *Id.* at 4.  It is well settled that, under New York law, "'the existence of a valid and enforceable written contract . . . ordinarily precludes recovery in quasi contract [such as unjust enrichment] for events arising out of the same subject matter.'"  *Id.* (alteration in original) (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.,* 157 F.3d 956, 964 (2d Cir. 1998)).

Plaintiffs did not allege in the SAC that the unjust enrichment claim was pleaded in the alternative to their breach of contract claim, nor did they make this argument in their opposition papers: they raised it for the first time at oral argument.  However, under New York law, Plaintiffs cannot raise the unjust enrichment claim in the alternative to the breach of contract claim because there is a "'valid and enforceable written contract governing [the] . . . subject matter.'"  *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573,

586–87 (2d Cir. 2006) (quoting *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 516 N.E.2d 190, 193

(N.Y. 1987)); *see also Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC,* 637 F. Supp. 2d

185, 196 (S.D.N.Y. 2009) (dismissing unjust enrichment claim, pleaded in the alternative, noting

that "[the plaintiff's] failure to allege that the contracts at issue [were] invalid or unenforceable

preclude[d] it . . . from seeking quasi-contractual recovery for events arising out of the same

subject matter."); *Courtien Commc'ns, Ltd. v. Aetna Life Ins. Co.*, 193 F. Supp. 2d 563, 571

(E.D.N.Y. 2002) ("The law in New York is that a party 'may assert causes of action in both

breach of contract and quasi-contract where there is a bona fide dispute concerning existence of a

contract or whether the contract covers the dispute in issue . . . or where one party wrongfully

has prevented the other from performing the contract.'" (first alteration in original) (quoting

*Randall v. Guido,* 655 N.Y.S.2d 527, 528 (App. Div. 1997))).  Thus, under New York law, this

cause of action for unjust enrichment fails and should be dismissed.

  Under Alaska law, "[a] party seeking to recover for unjust enrichment must show (1) a

benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such

benefit; and (3) acceptance and retention by the defendant of such benefit under such

circumstances that it would be inequitable for him to retain it without paying the value thereof.").

*Ware v. Ware*, 161 P.3d 1188, 1197 (Alaska 2007); *see also Alaska Sales & Serv., Inc. v. Millet*,

735 P.2d 743, 746 (Alaska 1987) (same).  "The courts are in accord in stressing that the most

significant requirement for recovery in quasi-contract is that the enrichment of the defendant

must be unjust; that is, the defendant must receive a true windfall or something for nothing." *In

re Avery*, 461 B.R. 798, 822 (Bankr. D. Alaska 2011) (internal quotation marks omitted) (citing

*Millet*, 735 P.2d at 746).

Though the issue is slightly less clear cut than under New York law, the Court concludes that, as under New York law, the existence of a valid contract bars recovery under a theory of unjust enrichment.  The Alaska Supreme Court has stated that "[c]ourts generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and quantum meruit as essentially the same.  In fact, this terminology is generally employed interchangeably, often within the same opinion."  *Bennett v. Artus*, 20 P.3d 560, 563 n.3 (Alaska 2001) (italics and internal quotation marks omitted); *see also Brady v. State*, 965 P.2d 1, 13, n.38 (Alaska 1998) (same).  And the Alaska courts have stated that "a plaintiff is entitled to the reasonable value of the services rendered to the defendant" "[u]nder the doctrine of quantum meruit" only "when a valid contract does not exist . . . ."  *Romero v. Cox*, 166 P.3d 4, 9 (Alaska 2007) (internal quotation marks omitted); *see also Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 419 (Alaska 2001) (noting that "plaintiffs may generally recover in quantum meruit for services rendered" only "[w]hen parties to a contract dispute do not have a valid contract"); *Mitford v. de Lasala*, 666 P.2d 1000, 1006 n.1 (Alaska 1983) ("It is well settled that proof of an express contract covering the services in question precludes relief in quantum meruit."); *cf. Nicdao*, 839 F. Supp. 2d at 1071 (discussing the requirements for showing unjust enrichment under Alaska law, and stating that "[g]enerally, a [p]laintiff may not rely on a theory of implied contract where a valid, express contract governs" (second alteration in original) (internal quotation marks omitted)); *Soules v. Ramstack*, 95 P.3d 933, 940 (Alaska 2004) ("Enforcement of a valid contract does not constitute unjust enrichment.").  Additionally, in *Nicdao v. Chase Home Finance*, an Alaska district court dismissed an unjust enrichment claim under Alaska law in part because "the [p]arties' relationship was governed by valid contracts and [the] [p]laintiff [could not] plausibly allege a breach of the contracts at issue."  839 F. Supp. 2d at 1071.  Thus, a

plaintiff cannot recover for unjust enrichment under Alaska law when a valid, enforceable contract covers the services in question.

The Court has not found an Alaska case addressing whether a claim for unjust enrichment can be pleaded in the alternative to a breach of contract case.  However, based on Alaska's case law, for a complaint to state an unjust enrichment claim that could plausibly warrant relief where a contract is also alleged to exist, the plaintiff must allege in the alternative either that the contract is not valid, that the contract does not apply, or that the money goods, or services, the grant of which constituted the unjust enrichment, was outside the scope of the contract. Otherwise, under the facts alleged by the complaint, the plaintiff would not be entitled to relief. *See U.S. ex rel. Poong Lim/Pert v. Dick Pac./Ghemm Joint Venture*, No. 03-CV-290, 2005 WL 846204, at *2 (D. Alaska Apr. 4, 2005) (noting that "[i]n Alaska, quantum meruit relief is not available to recover the value of services performed if the services are within the scope of the original contract[,] [b]ut if the services are beyond the scope of the contract, quantum meruit relief is available" and holding that the plaintiff's complaint survived a motion to dismiss because it "contain[ed] two allegations that [the plaintiff] provided labor, materials, and services beyond what [was] required by [the contract], and that [the defendant] has not paid [the plaintiff] for those items" (footnotes omitted)).  Here, Plaintiffs have pleaded the existence of a contract and that the payment they made pursuant to the contract unjustly enriched Defendant, but have not alleged that the contract was invalid or that the payments were outside the scope of the contract.  Even if Plaintiffs are able to conclusively prove the truth of these factual allegations, they still would not be entitled to relief.

For the above reasons, Plaintiffs fail to set forth an unjust enrichment claim under either Alaska or New York law, and Defendant's Motion To Dismiss this claim is granted.

### III.  Conclusion

For the above reasons, Defendant's Motion To Dismiss is denied in part and granted in part.  In particular, the following claims are dismissed: the first cause of action for negligence relating to the failure to provide information and the failure to effect the redemption request, the second cause of action for negligent misrepresentation related to the alleged misrepresentations about the fund assets and fund administrators, as well as any other claims based on those alleged misrepresentations, the third cause of action for breach of fiduciary duty, the fourth cause of action for professional malpractice related to the failure to provide information and the failure to effect the redemption request, the fifth cause of action for breach of contract, the sixth cause of action for breach of the covenant of good faith and fair dealing, and the seventh cause of action for unjust enrichment.  The Motion is denied as to all other claims.

SO ORDERED.

Dated:      March 31, 2015
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE