Thomas F. A. Hetherington*
Hutson B. Smelley*
Kendall J. Burr
EDISON, MCDOWELL & HETHERINGTON, LLP
Phoenix Tower
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Telephone:  (713) 337-5580
Facsimile:  (713) 337-8850
*admitted pro hac vice
Attorneys for Defendant

UNITED   STATES   DISTRICT   COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x
THE  2002  LAWRENCE  R.  BUCHALTER   :   Civil Action No. 12-cv-6808 (KMK)
ALASKA  TRUST  and  ALASKA  TRUST   :   ECF Case
COMPANY  and  STEPHEN  C.  HARRIS,   :
TRUSTEES                                              :
   Plaintiffs,                                        :
   vs.                                                    :
                                  :
PHILADELPHIA         FINANCIAL        LIFE   :
ASSURANCE  COMPANY  f/k/a  AGL  LIFE   :
ASSURANCE COMPANY                          :
                                  :
   Defendant.                                        :
_____ x


## DEFENDANT PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  PLAINTIFFS' CLAIMS ARE TIME-BARRED.................................................................... 1

II.  FACTUAL BACKGROUND............................................................................................ 6

  A. PFLAC IS A PRIVATE PLACEMENT LIFE INSURANCE COMPANY. ................... 6

  B. LAWRENCE BUCHALTER ESTABLISHED AN IRREVOCABLE TRUST IN
  ALASKA AND THE TRUST, THROUGH COUNSEL, NEGOTIATED THE
  PURCHASE OF A LIFE INSURANCE POLICY................................................................ 7

  C. THE TRUST NEGOTIATED TWO SIDE LETTERS TO THE POLICY. ..................... 8

  D. THE CHANGES IN TAX LAW WERE REFLECTED IN THE APPLICABLE
  MARCH 2005 PPM.............................................................................................................. 9

  E. THE TRUST DECIDED IN LATE 2005 TO ALLOCATE PREMIUMS TO SSR AND
  WAS TOLD BY PFLAC THAT IT DID NOT VERIFY THE ACCURACY OF SSR'S
  OFFERING DOCUMENTS. ............................................................................................... 10

  F. SSR'S OFFERING DOCUMENTS SAID IT WAS NEWLY FORMED, RISKY,
  UNDIVERSIFIED FUND. ................................................................................................. 11

  G. THE NEW PFLAC PPM WAS SUPPLEMENTED ON JANUARY 5, 2006 AND ON
  MAY 1, 2006. ..................................................................................................................... 12

  H. BUCHALTER AND PLAINTIFFS FILED THIS LAWSUIT IN SEPTEMBER 2012. 13

III.  LEGAL STANDARD...................................................................................................... 13

IV.  ARGUMENT ................................................................................................................. 14

  A. PLAINTIFFS' CLAIMS FAIL FOR LACK OF A LEGAL DUTY TO VET AND
  ADVISE THE TRUST. ....................................................................................................... 14

  B. PLAINTIFFS' CLAIMS FAIL BECAUSE THERE NO BREACH THAT HARMED
  THE TRUST. ....................................................................................................................... 20

  C. PLAINTIFFS' CLAIMS FAIL FOR LACK OF JUSTIFIABLE RELIANCE. ............. 21

V.  CONCLUSION................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cameron v. State*, 822 P.2d 1362 (Alaska 1991) ............................................................ 2

*Christianson v. Conrad-Houston Ins.*, 318 P.3d 390 (Alaska 2014) ............................. 6

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP,* 735 F.3d 114 (2d Cir.2013) .................. 15

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554 (Alaska 1981) ......... 16, 17, 19, 20

*Di Ponzio v. Riordan*, 679 N.E.2d 616 (N.Y. 1997) ...................................................... 20

*Egner v. Talbot's, Inc.*, 214 P.3d 272 (Alaska 2009) ...................................................... 3

*Fishman v. Philadelphia Fin. Life Assurance Co.*, 11-cv-1283, 2016 WL 2347921 (S.D.N.Y. May 3, 2016) ................................................................................................................. 17

*Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264 (Alaska 2013) ........................... 2

*Geotek Alaska, Inc. v. Jacobs Eng'g Grp., Inc.*, 354 P.3d 368 (Alaska 2015) ........... 17, 20, 21, 22

*Lauer v. City of New York*, 95 N.Y.2d 95 (2000) ........................................................ 20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ...................................................................................................... 15

*McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 106 P.3d 319 (Alaska 2005) ............................................................................................................. 16

*Mesiar v. Heckman*, 964 P.2d 445 (Alaska 1998) ...................................................... 21

*Palmer v. Borg-Warner Corp.*, 818 P.2d 632, (Alaska 1990) ...................................... 2

*Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120 (2d Cir. 2014) ............................. 14

*Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838 (Alaska 2001) ................................ 16

*Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265 (Alaska 2001) ............................... 2

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979) ............... 19

*United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984) ................................................ 3

*Wrobel v. Cnty. of Erie,* 692 F.3d 22 (2d Cir.2012) .................................................... 15

**Other Authorities**

28 U.S.C. § 7702 ..................................................................................................... 8

Alaska Stat. § 09.10.053 ......................................................................................... 2

Alaska Stat. § 09.10.070 ......................................................................................... 2

Alaska Stat. § 13.36.375) ...................................................................................... 16

Alaska Stat. §§ 13.36.225 ..................................................................................... 16

Alaska Stat. §§ 13.36.230 ..................................................................................... 16

Alaska Stat. §§ 13.36.236 ..................................................................................... 16

Alaska Stat. §§ 13.36.273 ..................................................................................... 16

Company Act of 1940 .............................................................................................. 6

Fed.R.Civ.P. 56(a) ................................................................................................. 13

Revenue Ruling 2003-91 ......................................................................................... 9

Revenue Rulings 2003-92 ....................................................................................... 9

Securities Act of 1933 ............................................................................................. 6

Defendant Philadelphia Financial Life Assurance Company ("PFLAC") files this brief in support of its motion for summary judgment, and would show the Court as follows:

## I.   Plaintiffs' Claims are Time-Barred.

PFLAC is a private placement life insurance company that issues customizable variable insurance products to high net worth individuals who typically want exposure within their contracts to unregistered alternative investment strategies, i.e., hedge funds. In December 2002, The 2002 Lawrence R. Buchalter Alaska Trust (the "Trust") purchased a life insurance policy providing $55 million of coverage on the lives of Lawrence and Robin Buchalter.  (SUF 18) In 2008, after years of strong performance by fund manager Strategic Stable Return Fund (ID), LP ("SSR") and no complaints by the Trust, SSR incurred substantial losses due to exposure within its underlying holdings to the Thomas Petters Ponzi scheme.  (SUF 64) Despite losing over $1 million of Policy value in 2008, Plaintiffs waited until September 2012 before filing suit.  *Id.*

The Court previously dismissed as untimely Plaintiffs' claims based on PFLAC's alleged failure to properly process a redemption request out of SSR.  *See* Order (Dkt. 52).  The Court noted that SSR's suspension of redemptions in 2008, steady decline in value since that time, and a November 20, 2008 letter discussing SSR bringing legal action against underlying funds "raises the question of whether Plaintiffs were on inquiry notice as early as 2008 of Defendant's alleged failure to vet SSR."  Order (Dkt. 52) at 26-27.  However, the Court concluded that on the facts alleged it could not say the other claims were untimely as a matter of law.  *Id.* at 27.  Now that discovery is complete, the Court can consider the limitations issue on the developed record, which overwhelmingly shows Plaintiffs' negligence and malpractice claims are time-barred.[1] Plaintiffs' central allegation of wrongdoing is that PFLAC did not adequately vet SSR, but the

---

[1] Plaintiffs' negligence and negligent misrepresentation claims are subject to 2-year limitations periods, and the professional malpractice is subject to a 3-year limitations period.  Alaska Stat. § 09.10.053 and 09.10.070.

1

Trust was on notice from the December 2005 PPM that PFLAC had not "**confirmed the completeness, genuineness, or accuracy of such information or data**" in the SSR offering documents.   (SUF 45). As demonstrated below, based on this undisputed fact and numerous others, Plaintiffs' remaining claims are time-barred as a matter of law.

The general rule is that a claim accrues at the time of the injury.  *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1273 (Alaska 2013).  The accrual can be delayed by the discovery rule.  *Id. at 1274*.  Alaska courts adopted the discovery rule "to protect plaintiffs from losing their cause of action when they have an injury that remained undiscovered or reasonably undiscoverable for longer than the limitations period."  *Sopko v. Dowell Schlumberger, Inc.*, 21 P.3d 1265, 1270 (Alaska 2001).  However, "when an obvious injury occurs, a reasonable person is generally on notice of all the elements of the claim." *Cameron v. State*, 822 P.2d 1362, fn. 5 (Alaska 1991); *Palmer v. Borg-Warner Corp.*, 818 P.2d 632, fn 4 (Alaska 1990) ("[W]e do not insist that a claimant actually know the precise cause at the time of the injury, rather we conclude that a claimant must begin an inquiry as to the cause of injury promptly and diligently once it is apparent that an injury has occurred due to the possible negligence of another.").  Moreover, "under the discovery rule it is irrelevant if the full scope of injury is not known immediately." *Sopko*, 21 P.3d at 1272.  Limitations runs from the date when a reasonable person has enough information to alert that person that he or she has a potential claim or should begin an inquiry to protect his or her rights.  *Gefre*, 306 P.3d at 1274-75.  Importantly, whether the undisputed facts establish that a plaintiff is on inquiry notice and the claim is time-barred are legal questions. *Egner v. Talbot's, Inc.*, 214 P.3d 272, 277 (Alaska 2009).

The undisputed facts demonstrate that:

(1) Plaintiffs were on notice from December 2005 that PFLAC was not confirming the accuracy or completeness of the SSR offering documents. (SUF 45)

(2) Plaintiffs knew in January 2006 that SSR changed auditors, which Plaintiffs allege would have caused them to redeem, had they known. (SUF 55)

(3) Plaintiffs knew in May 2006 that SSR was beginning to leverage its investments, which Plaintiffs allege would have caused them to redeem, had they known. (SUF 57, 58)

(4) By 2007, SSR was on Buchalter's redemption watch list because he "wasn't getting the information [he] should have as an investor."  (SUF 59).

(5) Buchalter (purported to be a trust advisor) in 2008 felt the "performance was so aberrational and unreasonably good that it materially informed his suspicions of wrongdoing at SSR and he elected to redeem before even a single month of investment loss was ever reported."[2] Orig. Compl., ¶ 77 (Dkt. 1).  He later wrote PFLAC that SSR's performance "clearly point[s] to SSR itself as a fraud." (SUF 60).

(6) The Trust's redemption request in 2008 was not honored and allegedly botched. Sec. Am. Compl., ¶ 6 (Dkt. 42)

(7) Plaintiffs' Policy lost over $1 million in value in 2008 due to SSR losses that included Petters fraud losses. (SUF 64)

(8) Plaintiffs knew in 2008 that SSR filed litigation to recover Petters-related losses. (SUF 66)

(9) October 2008 correspondence from PFLAC and SSR reflected a 25% write down of SSR's equity for the losses in Petters investments. (SUF 65)

---

[2] Allegations in the Original and Amended Complaints are deemed admissions. *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) (where allegations in an amended pleading are inconsistent with or contradictory to prior allegations, the prior allegations are deemed to be binding admissions).

(10) November 2008 correspondence from SSR stated "we are unable to estimate what, if any, recovery there may be and there is no assurance of any recovery" from "the Petters-related investments."  (SUF 66).

(11) Plaintiffs knew in April 2009 that there were no 2007 and 2008 audits for SSR, which Plaintiffs allege would have caused them to redeem earlier had they known. (SUF 67)

(12) Plaintiffs knew by May 2009 both that the limited partner (Founding Partners Equity Fund) of the SSR general partner that managed SSR's investments, as well as a core SSR holding (Founding Partners Stable Value Fund) and William Gunlicks, were sued by the SEC for securities fraud. (SUF 68, 69)

(13) Plaintiffs knew they incurred Policy losses of almost $1.5 million by September 2009 (three years before filing suit) and over $2 million by September 2010 (two years before filing suit).  (SUF 64)

Despite these undisputed facts, Plaintiffs' response to their limitations problem has been to deny awareness of any injury.  But back in 2008, there was no question the Policy incurred real losses.  Indeed, in November 2008, on the heels of the discovery of the Petters fraud, the Trust's counsel inquired whether PFLAC had initiated legal action against any underlying fund managers and was informed by PFLAC that SSR was evaluating legal options and that an investor steering committee was interviewing counsel to bring suit.  (SUF 66).  Then a few weeks later in December 2008, Buchalter e-mailed the Trust's counsel an article describing how Madoff victims may be able to take a tax deduction for theft losses and asking, "I am wondering aloud whether this is applicable to Petters, and if so, does it even matter since the policy holder is not a taxpayer.  Not asking for you to do anything, just maybe send along to AGL for their consideration."  (SUF 71)  Plaintiffs' counsel then emailed PFLAC:  "Any comment for Larry

[Buchalter]?  I already wrote him stating that I would be shocked at any result other than **the losses are not deductible** by him…But I did promise I would send it on to you for comment."  (*Id*.) (emphasis added).  When asked about an October 2008 letter from SSR describing the Petters fraud, Buchalter testified:

> Q.      …So my question was, at that point in time, did you expect losses, you know, the trust to have losses associated with the Petters' losses here?
>
> A.      Did I – were they telling me that there was a possibility of criminal loss of capital?  They were…There's potentially a permanent loss of capital here.  That's how I interpreted this.
>
> Q.      And you understood that that would cause a permanent loss to the value of the policy?
>
> A.      Absolutely.

(SUF 63).  Plaintiffs were on notice of their injury.

Plaintiffs also argue that correspondence from SSR somehow assured them they were not harmed because there might be a future recovery.  What Plaintiffs call their "paper losses" argument is fallacious for several reasons.  First and foremost, the Alaska Supreme Court rejected the argument that limitations are tolled because of the possibility of a subsequent recovery.  *Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 400 (Alaska 2014) (where an insurer failed to defend, "the theoretical possibility that defense expenses might be reimbursed in the future [does not] obviate the fact Christianson was then suffering an actual injury that triggered the duty of inquiry as a matter of law").  In addition, Plaintiffs' privity was solely with PFLAC, who consistently provided statements showing hundreds of thousands of dollars of SSR-related losses.  (SUF 64).  And as shown above, the SSR letters plainly warned there might be no Petters recovery and stated that SSR had side pocketed the 25% of its equity exposed to Petters and written it down to zero.  (SUF 65)  Buchalter acknowledged he understood at the time the loss might be permanent.  (SUF 63)  Moreover, SSR's stated desire (no letter promised

anything) to honor the December 31, 2008 redemptions at a future point was not a promise to return the dollars lost to Petters because those losses reduced by 25% the 2008 year-end balances that theoretically might have been redeemed. There would have been substantial losses even if the redemptions were fulfilled, including time-value of money losses.

The facts showing Plaintiffs had inquiry notice before September 2009 are overwhelming. Their claims are time-barred and should be summarily dismissed. But even if a claim survives limitations, it fails on the merits. When the Court addressed the duty to vet on the merits, the Court explained that since "the Parties have not alerted the Court to an actual conflict between New York and Alaska law, and the Court has not found a conflict, it will apply New York law." PFLAC believes there is a nuanced but important difference in how certain public policy considerations are analyzed when a party seeks to recover only economic harm. Moreover, the Court relied on allegations that were false and based on Plaintiffs attaching the wrong offering documents to their Second Amended Complaint. PFLAC will set forth below the undisputed facts pertinent to the duty question and demonstrate that PFLAC had no duty to vet, but even if there was, there was no breach of that duty that caused Plaintiffs' alleged harm.

## II.  Factual Background

### A.  PFLAC is a private placement life insurance company.

PFLAC is a private placement life insurance company that issues private placement variable universal life insurance policies and variable annuities to high net worth individuals. (SUF 13).  In order to purchase a PFLAC product, the prospective policyholder must be an accredited investor under the Securities Act of 1933 or a qualified purchaser under the Investment Company Act of 1940.  PFLAC's products allow the contract holders to obtain economic exposure within their contracts to various investment strategies and vehicles, including both registered mutual funds and non-registered partnerships (i.e., hedge funds).  The products

are variable because their value can increase or decrease based on, among other factors, the value of investments to which contract holders allocate premium in their discretion.   Policyholders both select tax-compliant investments to be featured within their contracts and instruct PFLAC how premiums are to be allocated among those investments.   PFLAC is not a registered investment advisor and does not recommend or select investment vehicles for policy owners or prospective policy owners, nor does it recommend allocations to those investment vehicles.

**B.      Lawrence Buchalter established an irrevocable trust in Alaska and the Trust, through counsel, negotiated the purchase of a life insurance policy.**

In the Fall of 2002, Buchalter approached PFLAC through his trust and estate counsel William Lipkind ("Lipkind") about purchasing a life insurance policy.   (SUF 10).   Buchalter reviewed available subaccounts while his attorney created the Trust and negotiated side letters discussed below. (SUF 11).   The Trust is an irrevocable trust created by Buchalter on November 1, 2002. (SUF 1).   The Trust and two Trustees are the only parties to this action.   The Trust Agreement grants broad authority to the Trustee, including the right to make investments and purchase life insurance.   (SUF 5).   The Trust Agreement also provided for an Investment Advisor, Jeffrey Brown, who alone was responsible for directing the Alaska Trust Company regarding investment actions.   (SUF 8, 9).

On December 5, 2002, Lipkind provided Buchalter a copy of the PFLAC Private Placement Memorandum ("PPM") and he reviewed it.   (SUF 12).   This is the PPM that Plaintiffs attached to their Second Amended Complaint, but is not the applicable PPM as it was replaced in March 2005.   (SUF 33).   In any event, the Trust submitted an application in Alaska for a variable universal life policy insuring the lives of Lawrence and Robin Buchalter.   (SUF 15). The Trustee also executed an Accredited Investor/Qualified Purchaser Questionnaire affirming ownership of over $5 million in investments, that "I AM ABLE TO BEAR THE ECONOMIC RISK OF AN

INVESTMENT IN A POLICY FOR AN INDEFINITE PERIOD OF TIME," that "I UNDERSTAND AND ACCEPT THE FULL NATURE AND RISK OF AN INVESTMENT IN A POLICY," that it "received, carefully reviewed, understand and am familiar with the Private Placement Memorandum…the Policy and the Investment Account(s) available to me," and that "I have had the opportunity to ask [PFLAC] questions and to receive answers concerning the purchase of the Policy…that is necessary to verify the information provided regarding the Policy." (SUF 17). The policy was issued to the Trust on December 20, 2002 (the "Policy") insuring the Buchalters for $55 million. (SUF 18).

**C.      The Trust negotiated two side letters to the Policy.**

A central benefit of variable life insurance is that taxation on any increase in value of the policy is deferred so long as the policy qualifies as life insurance under federal tax law. *See* 28 U.S.C. § 7702. The PPM explained the risk of adverse tax treatment under the "investor control doctrine" if the policyholder were "considered the owner of the assets of the Variable Account for federal income tax purposes." (SUF 19). As of December 2002, there was a measure of uncertainty insofar as the IRS had not issued any rulings concerning "the tax treatment of a variable life insurance contract issued in a private placement transaction." (SUF 20). In the context of this uncertainty, the PPM cautioned policy owners against contacting the investment advisors but they were free to address questions to PFLAC. *Id.* Plaintiffs have relied upon this to argue for the creation of new tort duties suggesting they could not conduct their own diligence. That allegation is indisputably false because the next year the IRS issued new Revenue Rulings bringing significantly more clarity to these issues, which will be addressed below.

At the time the Trust purchased the Policy, its counsel understood these risks and, reflective of the arms-length nature of the transaction, negotiated two letter agreements, both

dated December 20, 2002, as "an inducement for and as a precondition to the execution and delivery of the Application…" (SUF 23).  In particular, the Trust "requested Insurer's assurance that the proposed structure for investing the Assets will not cause the Policyowner to be deemed to control the investment of the Assets and result in the Policy's failure to qualify as life insurance for federal tax purposes."  *Id.*  Knowing that PFLAC did not vet underlying investments to determine their suitability for particular policyholders, the other letter obtained suitability assurances as to the asset allocator available at the time the Policy issued.  (SUF 26). The Trust did not obtain similar assurances as to any other adviser.  *Id.*

**D.      The changes in tax law were reflected in the applicable March 2005 PPM.**

On March 17, 2005, PFLAC replaced the December 2002 PPM with a new PPM (the "March 2005 PPM").  (SUF 33)  The March 2005 PPM stated in bold in a box on its second page that "THE POLICY OWNER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL.  THERE IS NO GUARANTEED MINIMUM ACCOUNT VALUE."  (*Id.*) While the March 2005 PPM attached offering documents provided by funds called Arden and Silver Creek, PFLAC informed the Trust: "**The Company has not confirmed the completeness, genuineness, or accuracy of such information or data.**"  (SUF 36) (emphasis in original).

The March 2005 PPM outlined the changes brought about by Revenue Rulings 2003-91 and 2003-92.  Among other things, Revenue Ruling 2003-91 implicitly clarified that the policyholder could communicate directly with the investment manager of an insurance dedicated fund except about "the selection, quality, or rate of return of any specific investment or group of investments held" within that fund.  In Revenue Ruling 2003-92, the IRS held that policyholders are permitted to select identified investments within the variable contract, provided that those investments are insurance-dedicated funds (like the SSR fund).  Accordingly, in contrast to the

earlier PPM that discouraged contact with fund managers, the March 2005 PPM only advised against requesting information about current or proposed investments, and otherwise permitted contact.  (SUF 37).  The Trust was otherwise free to pose questions to PFLAC or underlying fund managers.  There is no language within the Policy or the March 2005 PPM prohibiting the policy owner from conducting diligence of the fund managers, and the Trust had tax counsel that could advise it as to the investor control doctrine and any limitations on the information it could request from PFLAC or the fund managers.

**E.  The Trust decided in late 2005 to allocate premiums to SSR and was told by PFLAC that it did not verify the accuracy of SSR's offering documents.**

PFLAC conducted diligence of a hedge fund called SSR in late 2004.  (SUF 27) The purpose of the diligence was to verify the business bonafides of SSR and ensure the fund was an insurance dedicated fund with an infrastructure in place to ensure operation in conformity with the tax laws.  (*Id*.)  PFLAC's Director of Research Sandy Geyelin worked with outside diligence consultant Jeff Dierks of InTrust Advisors.  The diligence included information gathering, interviews, and an on-site visit, and the results of the diligence were outlined in a December 2004 report provided by InTrust Advisors to PFLAC.  (SUF 28)  The report expressed a staffing concern but also that SSR planned on hiring more personnel as the assets under management grew and concluded that "We feel confident that their assets under management will rise to the necessary level to ensure the sustainability of the business…."  (SUF 29, 30).  The report also noted a 44% concentration risk in an underlying fund affiliated with SSR's limited partner and recommended a disclosure.  (SUF 31).  As shown below, SSR's offering documents disclosed that there were only two professionals, that SSR would not be diversified, would invest as much as 55% of its assets in one fund, and would invest in an affiliate of its limited partner.  SSR was added to PFLAC's list of available funds in early 2005.  (SUF 32).

Between August and September 2005, Buchalter requested information about available funds and PFLAC provided him "tear sheets" for several funds including SSR.  (SUF 39).  The SSR tear sheet encouraged investors to consult their advisors, advised that the fund was not suitable for all investors, that SSR "is speculative and involves a high degree of risk," that "an investor could lose all or a substantial amount of his or her investment," that SSR "may engage in leveraging and other speculative investment practices" and that its "performance may be volatile."  *Id.*  Other than requesting performance data, however, neither Buchalter nor the Trust asked for any further information about SSR.  (SUF 40).  Indeed, Buchalter was not looking to PFLAC for investment advice, and none was given.  (SUF 41).  Once the Trust requested (at Jeff Brown's direction) that SSR be added as an available investment account within its Policy, PFLAC issued a December 15, 2005 supplement to the March 2005 PPM reflecting the addition of the SSR investment account.  (SUF 43,44).  The supplement attached SSR's private placement memorandum (the "SSR PPM") and limited partnership agreement, stating in bold on the second page of the supplement:  "**The Company has not confirmed the completeness, genuineness, or accuracy of such information or data.**"  (SUF 45).

## F.      SSR's offering documents said it was newly formed, risky, undiversified fund.

SSR described itself as an insurance dedicated fund of funds and "a newly-formed entity which does not have an operating history for prospective investors to evaluate prior to making an investment in the Partnership."  (SUF 72).  SSR would be managed by its general partner, SSR Capital Partners, L.P.  (SUF 46).  The SSR PPM listed only Steve Helland and Tim Law as the professionals making the investment decisions for SSR.  (*Id.*)  The SSR PPM also disclosed a potential conflict of interest in that a limited partner of SSR Capital Partners, L.P. was Founding Partners Equity Fund, L.P., and that "the general partner of [Founding Partners Equity Fund] is also the general partner of one or more of the Investment Vehicles in which [SSR] may invest."

(SUF 47).  The SSR PPM stated that the limited partner has no control over the management of SSR, and in deposition Steve Helland confirmed that neither the limited partner nor its ultimate owner William Gunlicks ever controlled the investment decisions of SSR.  (SUF 48).

The SSR PPM disclosed that "the Partnership's portfolio will not necessarily be widely diversified" and therefore, "the investment portfolio…may be subject to more rapid changes in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities."  (SUF 49).  In fact, "[t]he Partnership may invest a substantial portion of its assets in one or a small number of Investments Vehicles, e.g., up to 55% of the Partnership's assets may be invested in one Investment Vehicle."  (SUF 50).  Moreover, the "General Partner anticipates that Partnership assets will be allocated among a relatively small group of Investment Vehicles (6-15), some of which may be affiliated with the General Partner."  (SUF 52).  Thus, with as little as six underlying investments, SSR could invest 50% of its assets in one fund and 10% of its assets in each of five other funds.

The Trust directed premium allocations to SSR over several months with its first allocation on December 30, 2005:  $88,000 on 12/30/05; $2,781,000 on 1/31/2006; $317,000 on 3/1/06; and $29,000 on 4/28/2006. (SUF 53)

**G.    The new PFLAC PPM was supplemented on January 5, 2006 and on May 1, 2006.**

One of the Trust's complaints in this suit is that the SSR offering documents were outdated, but just seven days after the Trust's first allocation of premium ($88,000) to SSR, PFLAC provided the Trust with a PPM supplement dated December 29, 2005 attaching an updated SSR private placement memorandum and limited partnership agreement, both effective as of January 1, 2006.  (SUF 54).  The updated SSR PPM disclosed the new auditor, Rothstein, Kass & Company, that Plaintiffs allege they were never told about.  (SUF 55).  The Trust never requested information about the reason for the change of auditor.  In addition, the updated SSR

PPM disclosed that SSR "currently invests" in a fund managed by the general partner of Founding Partners Equity Fund (SSR Capital's limited partner).  (SUF 56).  The Trust never requested further information about this issue.  The SSR offering documents were again updated in mid-2006 to reflect a new leverage strategy.  (SUF 58).

**H.     Buchalter and Plaintiffs filed this lawsuit in September 2012.**

Plaintiffs attempted to redeem the Policy investment out of SSR in the summer of 2008 but were unable to do so.  (SUF 73).  Then in October 2008 the Petters Fraud, and SSR's exposure to it, became public and the Trust was notified.  (SUF 61).  The Policy continued to lose money and Plaintiffs filed this lawsuit on September 7, 2012.  *See* Compl. (Dkt. 1). Plaintiffs amended their Complaint twice, dropping Buchalter as a party, and by their Second Amended Complaint asserted seven causes of action.  Sec. Am. Compl. at ¶¶146-186 (Dkt. 39). PFLAC filed a motion to dismiss, which the Court granted in part.  *See* Opinion (Dkt. 52).  The only claims remaining are Plaintiffs' negligence (Cause of Action No. 1), negligent misrepresentation (Cause of Action No. 2) and professional negligence (Cause of Action No. 4) claims arising out of PFLAC's alleged failure to adequately vet SSR before putting it on its platform. *See* Dkt. 52 at 84.

PFLAC will demonstrate below that these claims fail on the merits.

### III. Legal Standard

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.,* 748 F.3d 120, 123–24 (2d Cir. 2014) (same). Moreover, "…when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party

must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP,* 735 F.3d 114, 123 (2d Cir.2013) (alterations and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir.2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## IV. Argument

Plaintiffs never clearly pleaded what the scope of the alleged duty to vet is, nor the scope of disclosure of the vetting results, but their expert testified that PFLAC should not have allowed anyone to allocate premiums to SSR.  PFLAC will demonstrate below that Alaska law does not support the imposition of a vetting duty, but even if it did, there is simply no evidence that SSR was a sham or otherwise unsuitable for every investor.

### A.    Plaintiffs' claims fail for lack of a legal duty to vet and advise the Trust.

Plaintiffs never cited for the Court a single statute or case—there is none—holding that a life insurer has a duty to vet and pass along information about available subaccounts beyond providing the offering documents created by those funds.  Both the securities industry (variable insurance products are securities) and the insurance industry are heavily regulated, and in the absence of a regulatory or statutory duty, Plaintiffs ask this Court to impose a vetting duty on insurers that by contract and law applies to others.  Whether a duty exists and the scope of any duty of care are legal questions for the Court to determine.  *Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 846-47 (Alaska 2001).

To determine whether a defendant owes a plaintiff a duty of reasonable care, "we first determine whether a duty is imposed by statute, regulation, contract, undertaking, the parties' preexisting relationship, or existing case law." *McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 106 P.3d 319, 322 (Alaska 2005) (footnote omitted).  "If these sources do not resolve the issue, we apply the multi-factor approach discussed in *D.S.W.* ... to determine whether an actionable duty exists." *Id*. (citing *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981)). The *D.S.W.* factors are seven public policy considerations to determine whether to recognize a negligence duty not otherwise defined by law. *Geotek Alaska, Inc. v. Jacobs Eng'g Grp., Inc.*, 354 P.3d 368, 376 (Alaska 2015).  PFLAC will first address the contract documents and existing law, then turn to the *D.S.W.* factors.

The Policy nowhere obligates PFLAC to independently vet the funds the policy owner elects to add to the policy and allocate premiums to, nor to ensure a particular fund is suitable for a policy owner.  (SUF 13, 33).  Plaintiffs knew this, which is why the Trust negotiated a side letter in December 2002 to obtain assurances of suitability from PFLAC concerning the allocator FMC.  (SUF 26). And as shown above, the new March 2005 PPM expressly stated with regard to the two funds available within the Policy at the time that PFLAC had not confirmed the accuracy or completion of the funds' offering documents that were attached to the PFLAC PPM and provided for the policy owner's consideration.  (SUF 36).  PFLAC provided the same notice to the Trust when it passed along the SSR offering documents as attachments to the December 2005 PPM.  (SUF 45).  And the March 2005 PPM explained that "THE POLICY OWNER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL," language Judge Griesa recently held was inconsistent with any promise of diligence. *Fishman v. Philadelphia Fin. Life Assurance Co.*,

11-cv-1283, 2016 WL 2347921, *14  (S.D.N.Y. May 3, 2016) (dismissing a promissory estoppel claim that PFLAC allegedly promised to conduct diligence).  (SUF 35).  Moreover, Plaintiffs' allegation that it was prohibited from conducting its own diligence is unsupported.  No provision of the Policy says that, and the applicable March 2005 PPM places only one limit on communications to PFLAC and fund managers regarding current and prospective holdings.

In contrast to the Policy and applicable PFLAC PPM, the SSR limited partnership agreement established SSR Capital Partner's obligations to manage the investments of SSR, which would include diligence of underlying holdings.  (SUF 74).  Again, Plaintiffs' expert takes the position that PFLAC was required to conduct diligence of both SSR and its underlying holdings, but SSR's manager was contractually obligated and paid to handle the selection of SSR's investments.

Moreover, no Alaska statute or regulation in force in 2005 obligated PFLAC to determine the suitability of the Policy for the Trust, or to second guess the appropriateness of the Trust's decision to add SSR as an investment subaccount within the Policy and allocate premiums to that subaccount.  Instead, the duties of a prudent investor in managing the Trust's investments fall upon the Trustee unless the trust agreement directs the trustee to follow the directions of an advisor.[3]  The trust agreement obligated Jeff Brown to serve the role of Investment Advisor, making him a fiduciary in carrying out the investment duties that otherwise would have fallen on the Trustee.  (SUF 8, 9); Alaska Stat. § 13.36.375(c).  Since the Policy is a security, the sale of the Policy in late 2002 would have implicated suitability requirements only if a broker dealer recommended the purchase, but in 2005 when the Trust decided to allocate premiums to SSR, there was neither a purchase by the Trust of a security nor a recommendation by PFLAC.  (SUF

---

[3] *See generally* Alaska Stat. §§ 13.36.225 (prudent investor rule), 13.36.230 (delineating the standard of care for trustee), 13.36.236 (trustee must diversify assets), 13.36.273 (determine whether a life insurance policy is a proper investment and whether to exercise a policy option), 13.36.375 (delegation to an advisor).

75)  At that point, the diligence obligation was solely on Jeff Brown as the Trust's Investment Advisor.  *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) ("As we have previously recognized, § 206 establishes 'federal fiduciary standards' to govern conduct of investment advisers…").

Since the vetting duty Plaintiffs propose is not contained in the Policy and expressly contradicted by the applicable PFLAC PPMs, and since the SSR partnership agreement, trust agreement and statutes place the fiduciary roles and diligence obligations exclusively on the Trust's Investment Advisor Jeff Brown (as to the Trust's investments) and SSR Capital Partners (as to SSR's investments), the Court should not impose a vetting duty on PFLAC.  But to the extent the Court is inclined to consider the *D.S.W* public policy considerations, those are analyzed below.  The factors include the following: (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered an injury; (3) the closeness of the connection between the defendant's conduct and the plaintiff's injury; (4) moral blame attached to the defendant's conduct; (5) the policy of preventing further harm; (6) the extent of the burden to the defendant and consequences to the community of imposing a duty of care; and (7) the availability, cost, and prevalent of insurance for the risk involved.  *D.S.W. v. Fairbanks North Star Borough School Dist.*, 628 P.2d 554, 555 (Alaska 1981).

As a preliminary matter, Alaska courts have shown a strong reluctance to creating tort duties to protect against purely economic harm.[4]  For example, in *Geotek Alaska, Inc. v. Jacobs*

---

[4]  In light of *Geotek*, a conflict in Alaska and New York law is apparent.  Under both New York and Alaska law, public policy considerations are weighed in determining whether a duty exists.  Compare *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981) to *Di Ponzio v. Riordan*, 679 N.E.2d 616, 618 (N.Y. 1997).  However, foreseeability carries the greatest weight under New York law (*see Lauer v. City of New York*, 95 N.Y.2d 95, 109 (2000) (finding that "whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense…would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and sill to avoid such danger."), whereas under *Geotek*, Alaska law is very

*Engineering Group, Inc.*, 354 P.3d 368 (Alaska 2015), the Alaska Supreme Court recognized that it would not "provide a negligence cause of action for any foreseeable economic harm caused by another's lack of due care." *Id.* at 377.  In holding there was no duty of care, the Court explained that "we have ascribed little blameworthiness to ordinary negligence that merely causes economic…harm." *Id.* at 379.  The Court further noted that this "is particularly true when parties are in a position to have contracted around the risk."  The Court also found that "[t]he policy of preventing future harm also does not require recognition of a novel duty in tort, as other contracting parties have the ability to protect themselves by refusing to enter into relationships they consider financially fraught or by negotiating for more protective provisions in their contracts before signing them." *Id.*

The harm caused to Plaintiffs was not foreseeable.  While market losses are foreseeable, the SSR offering documents disclosed numerous market risks.  What happened here is that SSR fell victim to a Ponzi scheme, which was not foreseeable, and Plaintiffs have adduced no evidence that anything could have been uncovered by PFLAC in diligence in 2004 or 2005 that would have shown SSR was exposed to a Ponzi scheme or securities fraud.  Plaintiffs have adduced no evidence that SSR was itself a sham or engaged in any fraud, and in fact SSR enjoyed over 5 years of positive returns before it encountered problems in 2008. And while Plaintiffs' expert says SSR should not have been offered to anyone, he did no economic analysis to demonstrate that SSR had a zero or negative expected value from its strategy.  Further, there is no close connection between PFLAC's alleged misconduct and the Trust's injury because the market risks Plaintiffs complain of about SSR were in fact disclosed (i.e., limited staffing and

clear that foreseeability of harm, while a factor, cannot alone establish a duty of care, particularly in cases of purely economic harm.  *See Geotek*, 354 P.3d at 377-379.

lack of diversification), and there is no evidence that either of these risks materialized into Plaintiffs' harm, which was the result of frauds in the underlying SSR holdings.

There is also no basis on these facts for attributing moral blame to PFLAC's conduct for causing purely economic harm. *Mesiar v. Heckman*, 964 P.2d 445, 451 (Alaska 1998) ("We conclude that, when ordinary negligence creates a risk of economic harm only, moral blameworthiness is not a prominent factor for purposes of determining the existence of an actionable duty."). PFLAC candidly disclosed in the offering document that it had not vetted SSR to determine the accuracy or completeness of SSR's offering documents and that the risk of the investment was solely on the Trust. The Trust had its own professional advisors and every opportunity to conduct diligence of SSR to its satisfaction subject to the narrow limits under the investor control doctrine that it could not inquire as to SSR's current or prospective investment holdings.[5]  And like the plaintiff in *Geotek*, the Trust was well capable of contracting around the risk as it did with the December 2002 side letter, or simply refusing to purchase the Policy, or later, refusing to allocate to SSR if its advisors felt they had insufficient information about SSR.

Imposing a tort duty on these facts will not prevent further harm because, again, there is no evidence that the harm was preventable—i.e., that the fraudulent nature of SSR's underlying holdings was discoverable in 2004 / 2005. However, the burden of imposing the duty Plaintiffs propose presents an industry game changer for insurance companies who do not hold themselves out as investment advisors and since existing laws, as shown above, already impose diligence obligations on trustees, broker dealers, fund advisors (i.e., SSR was the advisor obligated to conduct diligence of its own holdings) and investment advisors. The end result of imposing such an entirely new obligation would materially affect life insurance pricing by adding another layer

---

[5] The Court's prior postulation of a duty by PFLAC to vet SSR was largely based upon Plaintiffs' allegations that applicable law and PFLAC's policy documentation prohibited them from conducting *any* due diligence with respect to SSR. At the time of Plaintiffs' decision to allocate to SSR, this was simply not true.

of fees, particularly since the scope and duration of the vetting duty advocated by Plaintiffs is completely undefined and unlimited.

For all of the foregoing reasons, the Court should not impose a vetting duty on PFLAC and should dismiss Plaintiffs' claims, all of which hinge on this Court being the first to recognize such a duty. But even if the Court imposes a vetting and disclosure duty, Plaintiffs cannot establish a breach that harmed the Trust.

**B.      Plaintiffs' claims fail because there no breach that harmed the Trust.**

Even if the Court creates a vetting duty, the undisputed evidence is that PFLAC did vet SSR before adding it to its platform. The only way a breach of a vetting duty could harm Plaintiffs is if there is also a duty to not allow any policyholder to allocate premiums to SSR or to convey information from the vetting to Plaintiffs. In either event, Plaintiffs' claims fail. There is no evidence that information was available in 2004 or 2005 that PFLAC could have uncovered showing that SSR is unsuitable for all investors. There is also no evidence that PFLAC made material omissions or misrepresentations that harmed Plaintiffs.

The Trustee was asked if there was any information the Trustee "sought from [PFLAC] about SSR and was not provided," and answered, "No." (SUF 76). The Trustee was asked, "And are you aware of any misrepresentations made by [PFLAC] about the services [PFLAC] would provide to the trust in connection with the policy?," and again answered, "No." (*Id.*) Nevertheless, Plaintiffs allege PFLAC misrepresented "that SSR was thoroughly vetted." Sec. Am. Compl., ¶ 155. Plaintiffs have no evidence of that[6], and PFLAC expressly told Plaintiffs the opposite: "**The Company has not confirmed the completeness, genuineness, or accuracy of**

---

[6] Plaintiffs have only pointed to the fact of their being provided a list of available funds. Buchalter testified that PFLAC's general counsel Joseph Fillip "implied" diligence was done by providing the list but never represented that diligence was done or that a specific investment was suitable. (SUF 78).

**such information or data.**"  (SUF 45).  Also, Buchalter requested the list of available funds, which contained express disclaimers.

Plaintiffs also allege that parts of the December 2004 InTrust report should have been disclosed.  In the first place, any alleged misrepresentations in the SSR offering documents are those of SSR and not PFLAC.  Moreover, there is no evidence that SSR's staffing materialized into any losses by SSR, but regardless, the December 2005 SSR PPM disclosed only two SSR employees.  (SUF 46).  And SSR's potential for concentration in a single investment was disclosed in the December 2005 and January 2006 SSR PPMs, which explained that SSR was designed to **not** be diversified, that SSR invested in a fund affiliated with its limited partner Founding Partners Equity Fund, and that it might make a single investment of as much as 55% of its assets.  (SUF 47, 49, 50, and 56)  To the extent Plaintiffs argue that the SSR PPM should have identified the underlying investment in advance, such a disclosure was (and is) prohibited by the investor control doctrine.  Plaintiffs were free to ask PFLAC the percentages of SSR's largest holdings, just as Jeff Dierks did.

Since Plaintiffs have no evidence establishing a breach of a vetting duty or that a material omission or misrepresentation that they relied upon to their detriment, their claims should be dismissed.

**C.     Plaintiffs' claims fail for lack of justifiable reliance.**

Finally, Plaintiffs cannot establish they reasonably relied upon a material misrepresentation or that they were proximately harmed by a material omission.  The Trustee testified it looked solely to Jeff Brown to direct its investments and premium allocations, and never looked to Buchalter to do so or "for guidance of any sort."  (SUF 9) Jeff Brown described his role as "an administrative processor of instructions" who never communicated with PFLAC and had no role in deciding how to allocate premiums within the Policy.  (SUF 79)  Since the

Trustee and its Investment Advisor did not make investment decisions for the Trust, and the Trustee was not relying on anyone else to do so, the Trustee cannot establish reliance and its claims should be dismissed.

## V.  Conclusion

For all of the foregoing reasons, PFLAC respectfully requests that the Court grant summary judgment on all claims and such other relief to which PFLAC may be entitled.

Dated: July 1, 2016

Respectfully submitted,
Edison, McDowell & Hetherington LLP


By:____/s/ Hutson Smelley_____
     Thomas F. A. Hetherington*
     Hutson B. Smelley*
     Kendall J. Burr, Bar No. KB5562
Phoenix Tower
1001 Fannin Street, Suite 2700
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile:  (713) 337-8850
* admitted pro hac vice

Attorneys    for    Defendant,    Philadelphia Financial Life Assurance Company

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing has been served on the 1st

day of July, 2016, on the following parties and counsel of record by ECF notification:

> Jonathan T. Shepard
> Eric D. Dowell
> 7 Times Square, 3rd Floor
> New York, New York  10036-6569

_____/s/ Hutson B. Smelley_____
Hutson B. Smelley
