Jonathan T. Shepard, Esq., jshepard@pryorcashman.com
Eric D. Dowell, Esq., edowell@pryorcashman.com
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel: (212) 421-4100
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE 2002 LAWRENCE R. BUCHALTER ALASKA TRUST, ALASKA TRUST COMPANY and STEPHEN C. HARRIS, TRUSTEES,<br><br>                        Plaintiffs,<br><br>      - against –<br><br>PHILADELPHIA FINANCIAL LIFE ASSURANCE COMPANY f/k/a AGL LIFE ASSURANCE COMPANY,<br><br>                     Defendant. | Civil Action No. 12 cv 6808 (KMK)<br><br>ECF Case |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 3

    The Trust's Investment In SSR And Dependence On PFLAC To Vet Its Platform Funds ..... 3

    PFLAC Suspends Redemptions ................................................................................... 4

    SSR's Comfort Letters ................................................................................................. 4

    Buchalter's Investigation ............................................................................................. 5

    PFLAC's Due Diligence On SSR ................................................................................ 6

    PFLAC Ignored Its Own Diligence Team And Added PFLAC To Its Platform ..................... 9

    The Result Of PFLAC's Negligence .......................................................................... 11

ARGUMENT ..................................................................................................................... 12

I.    Plaintiffs' Claims Are Not Time-Barred ................................................................... 12

    A.    The Undisputed Facts Demonstrate That Plaintiffs Were Not
        On Notice Of PFLAC's Negligence Before 2012 .................................................. 13

        1.    SSR's Insufficient Staffing And Funding ....................................................... 13

        2.    SSR's Hidden Conflict of Interest With William Gunlicks ............................. 14

        3.    SSR's Diversification Risk .............................................................................. 15

        4.    Geyelin's and Diercks's Conclusions ............................................................. 15

        5.    PFLAC's Intentional Disregard Of
            The Due Diligence Recommendations ........................................................... 16

    B.    The Undisputed Facts Demonstrate That Plaintiffs Were Not
        On Notice Of Any Injury Attributable To PFLAC Before 2012 ............................. 18

## TABLE OF CONTENTS, *continued*

II.  PFLAC Had A Duty To Vet Its Platform Funds............................................................20

    A.  This Court Already Held That PFLAC Had A Duty to Vet....................................20

        1.  The Evidence Demonstrates That Buchalter Reasonably Believed He Was Precluded From Having Any Contact With SSR ................................20

        2.  The Evidence Demonstrates That The Injury Was Foreseeable ......................22

        3.  The Other *D.S.W.* Factors Support Imposing A Duty On PFLAC....................22

III.  The Evidence Demonstrates That PFLAC Breached Its Duty To Vet..........................25

CONCLUSION.....................................................................................................................26

# TABLE OF AUTHORITIES

**CASES**                                          **PAGE(s)**

*Buchalter v. Philadelphia Fin. Life Assurance Co.,*
   96 F. Supp. 3d 182, 222–223 (S.D.N.Y. 2015) .................................................................. 20–21

*Christianson v. Conrad–Houston Ins.,*
   318 P.3d 390 (Ala. 2014) .................................................................................................... 20

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.,*
   628 P.2d 554 (Ala. 1981) .................................................................................................... 23

*Di Ponzio v. Riordan,*
   89 N.Y.2d 578 (1997) ........................................................................................................ 23

*Egner v. Talbot's, Inc.,*
   214 P.3d 272 (Ala. 2009) .................................................................................................... 12

*Fishman v. Philadelphia Fin. Life Assurance Co.,*
   No. 11-cv-1283, 2015 U.S. Dist. LEXIS 63751 (S.D.N.Y. May 3, 2016) ............................ 25

*Gefre v. Davis Wright Tremaine, LLP,*
   306 P.3d 1264 (Ala. 2013) .................................................................................................. 12

*GeoTek Ala., Inc. v. Jacobs Eng'g Group, Inc.,*
   354 P.3d 368 (Ala. 2015) .................................................................................................... 23

*Havas v. Victory Paper Stock Co.,*
   49 N.Y.2d 381 (1980) ........................................................................................................ 23

*Jarvill v. Porky's Equip., Inc.,*
   189 P.3d 335 (Ala. 2008) ............................................................................................... 19, 20

*John's Heating Serv. v. Lamb,*
   46 P.3d 1024 (Ala. 2002) .................................................................................................... 12

*McGrew v. State,*
   106 P.3d 319 (Ala. 2005) .................................................................................................... 23

*R.E. v. State,*
   878 P.2d 1341 (Ala. 1994) .................................................................................................. 23

Plaintiffs respectfully submit this memorandum of law in opposition to defendant Philadelphia Financial Life Assurance Company's ("PFLAC") motion for summary judgment.

## PRELIMINARY STATEMENT

The evidence of PFLAC's negligence is more shocking than Plaintiffs ever could have imagined. Prior to placing SSR on its Platform in early-2005, PFLAC knew that: (i) SSR's managers lacked any relevant experience in managing a fund-of-hedge fund or selecting hedge fund managers; (ii) SSR recently had changed auditors without any credible explanation; (iii) SSR had a level of assets under management (only $20 million) that did not allow for proper employee staffing; (iv) SSR's managers were the fund's only two employees and were at their "physical and emotional breaking point," such that critical functions likely were not being attended to; (v) nearly half of SSR's capital was invested with William Gunlicks, the "silent partner" who had staked SSR and owned one-third of the firm; and (vi) adding to this severe lack of diversification, Gunlicks's fund was invested in only one strategy and industry.

PFLAC was keenly aware of these material risks because its Director of Research teamed with an outside due diligence consulting firm and specifically flagged them for executive management charged with approving SSR for the Platform. The diligence team investigated SSR, and wrote an extensive report detailing its findings and setting forth its conclusion. And they identified SSR's highly-conflicted relationship with Gunlicks as the most significant risk factor and concluded that PFLAC should not add SSR to its Platform (unless the conflicted over-allocation to Gunlicks was specifically disclosed).

Despite having this report in hand, PFLAC's senior management blatantly ignored the recommendation of its own diligence team and *unanimously* approved SSR for the Platform in early-2005. PFLAC's Director of Research sent Buchalter information on SSR later that year, and

completely unaware of the due diligence report and the most critical risk factors identified therein, Buchalter directed the investment in SSR. Buchalter ultimately requested a full redemption of the Trust's SSR investment (just under $4 million) in July 2008, but SSR subsequently suspended all redemptions in October 2008. The Trust never had a penny of its capital returned.

PFLAC's primary argument on this motion is that Plaintiffs' claims are time-barred. But the evidence demonstrates that Buchalter remained unaware of the risk factors that PFLAC had identified internally until well after he commenced his investigation in 2012 of what went wrong with the SSR investment. Buchalter commenced his investigation then because it was only at that point that SSR's reported performance began materially diverging from the overall market (his reported SSR account balances were dropping sharply in 2011, while financial markets stabilized from the collapse of 2008/2009). In the years prior, SSR had sent multiple letters to policyholders indicating confidence that their capital would be returned in full. In short, no events prior to Buchalter commencing his investigation placed him on notice that he might have claims such that he should have commenced a reasonable investigation any time prior. Accordingly, Plaintiffs' claims are timely because they did not accrue under Alaska law until 2012.

PFLAC's other primary argument is that it did not have a duty to vet SSR, which succeeds in ignoring this Court's prior holding, the law, and the facts. First, the Court already held that Plaintiffs allegations, if true, established that SSR had a duty. And those facts were confirmed during discovery. Buchalter was specifically precluded from having contact with SSR's managers, such that he was wholly reliant on PFLAC to conduct investment diligence. His injury also was foreseeable in that PFLAC's ignoring its own diligence team's advice concerning SSR substantially increased the likelihood that policyholders would invest in the fund while being unaware of the numerous risks that the diligence team had identified. Second, Alaska law

2

recognizes a duty of care where the harm at issue is foreseeable and other public policy considerations are in plaintiff's favor, as is the case here. And third, the evidence demonstrates why this is the *exact* sort of relationship where a duty of care should be implied.

## STATEMENT OF FACTS

### The Trust's Investment In SSR And Dependence On PFLAC To Vet Its Platform Funds

Buchalter, acting on the Trust's behalf, selected PFLAC from a field of several insurance carriers to: (1) underwrite, syndicate and maintain the "tax integrity" of the underlying insurance coverage, and; (2) comprehensively maintain and administer the Policy's optional investment accounts. (¶ 1.)[1] For these services, the Trust paid PFLAC upfront and annual fees for the life of the Policy, totaling over $300,000. (¶ 2.)

While Buchalter had the ability to choose the managers of the Policy's investment accounts, neither he nor the Trust had any ownership interest in the investments in the accounts. (¶ 3.) PFLAC instead was the owner of the Trust's interest in the investment accounts, and served as limited partner investing on behalf of and as agent for the Trust. (¶ 4.) Moreover, pursuant to both the Policy and the Policy PPM, Buchalter was prohibited from contacting the investment managers who managed the funds in the Policy's investment accounts. (¶ 5.) The PPM stated in bold-faced type that this prohibition was necessary to preserve the Policy's tax advantaged status (a prohibition dictated by the "Investor Control Doctrine"). (¶ 6.)[2]

In order to allow Buchalter to select investment alternatives under the Policy, PFLAC's CEO (John Hillman), General Counsel (Joe Fillip), and Director of Research, (Sandy Geyelin), each discussed PFLAC's approved list of "Platform" funds with him. (¶ 8.) In September 2005,

---

[1] Citations in the form of "¶ __" refer to paragraphs in Plaintiffs' Statement of Additional Material Undisputed Facts, and citations in the form of "Resp. ¶ __" refer to Plaintiff's Responses to PFLAC's Statement.

[2] In addition to written warnings, John Hillman, PFLAC's CEO, indicated during a phone call with Buchalter that occurred near inception of the Policy that Buchalter could not perform investment due diligence of his own. (¶ 7.)

Geyelin sent Buchalter an email containing information on SSR, a fund-of-hedge funds that PFLAC had added to its Platform earlier that year.  (¶ 9.)  In or about December 2005, after reviewing information on the Platform funds, Buchalter elected to move nearly $3.2 million of the Trust's investment account capital to SSR's fund.  (¶ 10.)

### PFLAC Suspends Redemptions

As of mid-2008, the reported value of the Trust's SSR investment account approximated $3.9 million.  (¶ 11.)  But the Trust's capital was indefinitely frozen when SSR suspended redemption requests in October 2008.  (¶ 12.)  Redemption requests skyrocketed during that timeframe, leading some of the world's largest fund managers such as Fortress, Tudor, and DE Shaw to similarly suspend redemptions. (¶ 13.) SSR's decision to suspend redemptions therefore would not have alerted a reasonable person to investigate whether SSR was a flawed investment, much less whether PFLAC had been negligent in adding the fund to its Platform.

### SSR's Comfort Letters

In the months and years that followed, SSR offered considerable optimism  to its limited partners that the return of investor capital was forthcoming (and PFLAC forwarded these letters to Buchalter).  Specifically, on November 19, 2008, SSR wrote: "However, given the current market environment and liquidity constrains with our underlying managers, it could take 12–18 months or more to *fully* pay out the December 31 [2008] withdrawals." (¶ 14 (emphasis added).)  On July 27, 2009, SSR wrote: "Assuming the accuracy of these projections, and most importantly, assuming a successful refinancing this year or next of the Promise facility, which would provide liquidity to Stable-Value investors, distributions to ID Fund investors could begin in the first part of 2011." (¶ 15.)  On June 2, 2010, SSR wrote: "While you may already appreciate our position, we want to reiterate that we placed 100% redemption requests with ALL underlying manager

4

positions and as such, as liquidity returns, we first pay down leverage and once leverage is paid in full, we expect to begin making *full* distributions to all investors." (¶ 16 (emphasis added).) And on March 18, 2011, SSR wrote: "While 2010 has been an extremely difficult year, we remain committed to seeking liquidity to pay down the leverage line and return capital to investors as quickly as possible." (¶ 17.)

These letters, sent to investors roughly every nine to ten months from late-2008 through 2011, offered Buchalter considerable reassurance that the Trust's redemption request would be fulfilled and its capital returned. (¶ 18.) Between these letters and the market's continued volatility and choppy performance into 2011, no reasonable investor would have been on notice that he should have commenced an investigation of SSR, let alone PFLAC.

Buchalter's Investigation

The financial markets stabilized over the course of 2011. (¶ 19.) But SSR had yet to return any capital, and SSR account balances were in sharp decline while broader market indices were flat. (¶ 20.)[3] Concerned with this unexplainable divergence, and after relying on three years of SSR's representations about the near-term return of investor capital, Buchalter began investigating in December 2011 what went wrong with the SSR investment. (¶ 21.)

PFLAC steadfastly refused throughout 2012 to speak with Buchalter about SSR or allow him to speak directly to SSR (and SSR stated in writing that it was not permitted to have any discussions without PFLAC's approval). (¶ 22.) Despite these refusals, Buchalter ultimately discovered that PFLAC had committed negligence by approving SSR for its Platform and maintaining it there for years to the detriment of unsuspecting policyholders.[4] (¶ 23.) The

---

[3] Specifically, the value of the Trust's investment in SSR was marked down over 50% in the 11 months ending on November 30, 2011, despite the fact that all major equity and credit indices had positive returns for the year at that point. (*Id.*)

[4] Soon thereafter, the Trust's SSR investment effectively zeroed out. (¶ 24.)

evidence of negligence in this regard is overwhelming. And once Buchalter was on notice of his claims, he promptly filed this action in September 2012. (¶ 25.)

### PFLAC's Due Diligence On SSR

On or about October 18, 2004, Geyelin, and Jeff Diercks (head of InTrust Advisors and an outside consultant retained by PFLAC[5]) commenced their due diligence on SSR by travelling to Dallas to meet with SSR's managers, Steve Helland and Tim Law. (¶¶ 26, 28.) Later that same day, Geyelin asked Helland and Law to provide a number of items (audit reports, Form ADVs, marketing materials, references, etc.), and complete a 13-page due diligence questionnaire ("DDQ"). (¶ 29.) The DDQ was incredibly detailed, directing SSR to provide information ranging from ownership structure, manager experience, assets under management, manager capital at risk, staffing, historical performance, service providers, strategy, and risk management. (¶ 30.)

Geyelin and Diercks next had several follow-up phone conferences with Helland and Law in furtherance of PFLAC's due diligence effort. (¶ 31.) Diercks's contemporaneous handwritten notes are telling, as he expressed considerable concern about investing in a fund with a limited track record and de minimus asset base. Among the notes he made were: "Review for while? See monthly reporting?" and "Wade in over time?" (¶¶ 32–33.) And Diercks confirmed that had he been making the investment for his own investors, he would have continued to monitor SSR's returns for some time before making any decision. (¶ 34.) The evidence also shows that Geyelin and Diercks had follow-up calls with SSR specifically about Gunlicks. (¶ 36.)

Geyelin's and Diercks's final written product detailing their diligence of SSR was a nine-page, single-spaced "Manager Due Diligence Package," dated December 2004. (¶ 37–38.) The final Due Diligence Package highlighted *numerous* risk factors, including the following:

---

[5] Diercks previously had run his own fund-of-funds, and had conducted due diligence on numerous fund managers, and PFLAC paid him a flat rate per project. (¶ 27.)

- Helland and Law had founded SSR only approximately one year prior, in July 2003, and commenced in September 2003 managing only $2 million. (¶ 39.)[6]

- The fund in question (the "ID Fund") had only $20 million in assets under management. (¶ 40.)

- SSR was running at "break-even" profitability. (¶ 41.)

- Helland and Law were SSR's only employees, and performed roles ranging all the way from manager sourcing to office upkeep. Geyelin and Diercks identified this arrangement as a serious risk: **"This is an overwhelming task for four people let alone two who are married with children. One of the areas is most likely not being attended to as much as necessary."** (¶¶ 42–43 (emphasis original).)

- SSR did not plan to hire another employee to relieve this "overwhelming" burden, not even an administrative assistant, until it reached $40 to $50 million in assets under management (*double* its then-current level). (¶ 44.)

Finally, the most alarming risk factor that Geyelin and Diercks identified was SSR's overtly conflicted relationship with William Gunlicks. They learned that SSR was equally owned (1/3 each) by Helland, Law and Founding Partners Equity Fund, LP, which in turn was owned by Gunlicks. (¶ 46.) Gunlicks had financially staked Helland and Law (¶ 47)[7], and Helland and Law reciprocated by allocating nearly half of SSR's capital back to one of Gunlicks's other funds. As Geyelin and Diercks explained in the Due Diligence Package: **"The largest risk/concern with this fund/firm deals with the silent partner, Gunlicks, and a fund that he runs, the Stable**

---

[6] Helland and Law lacked any experience relevant to their new role as hedge fund managers. Helland came from an equity sales background, and Law was a tax attorney. Notes reflecting Geyelin's and Diercks's reference checks show that they spoke with Helland's and Law's prior manager at Scottish Re in or around November 2004. The manager confirmed that Helland "worked for 2 ½ years as EVP in the Wealth Management department, where he focused more on the administration and marketing of the unit," and that Law had been a Senior Vice President for about 4 years in the same area, but was more involved with working on tax issues associated with the private placement. (¶ 35.) Moreover, the manager confirmed that neither Helland nor Law "was too involved in the selection of managers, as that was typically left up to the investment advisors." (*Id.*)

[7] Gunlicks was a "Control Person" of SSR as reported in its Form ADV and owned one-third of SSR—facts never reported to Buchalter. (¶¶ 48–49.)

Value Fund. SSR currently invests 44% of its fund with Gunlicks and the Stable Value Fund." (¶ 54 (emphasis original).)[8]

Beyond the conflicted nature of the relationship between SSR and Gunlicks, Geyelin and Diercks were concerned with diversification risk. As they explained, "[s]ince 44% of SSR's fund is with one manager, it is a stretch to claim that diversification mitigates a lot of risk." (¶ 55.) And while they noted that the Stable Value Fund had performed well in prior years, they recognized that prior performance did "not address the impact it has on [SSR], especially in the case of an adverse event." (¶ 56.) This risk was even more magnified because the Stable Value Fund itself was not diversified. All of its investments were "within the same strategy/industry" (medical receivables lending), and thus "could be affected by some externality, such as a change in government regulation." (¶ 57.) Geyelin and Diercks also were concerned that the relationship illuminated Helland's and Law's lack of manager selection skill, "since SSR's returns [were] consistently less than the Stable Value Fund." (¶ 58.) They found that:

> **The concentration risk makes adding this fund to the [PFLAC] platform a risk without appropriate disclosure of the concentrated nature of the fund's investments. Without such disclosure, we would be unable to recommend this fund for inclusion on [PFLAC's] platform.**

(¶ 59 (emphasis original).)

The Conclusion section in the Due Diligence Package is damning. Geyelin and Diercks concluded that SSR "need[ed] to increase its assets under management." (¶ 60.) They concluded that Helland and Law would "soon be at a breaking point emotionally and physically, if additional staff [was] not added." (¶ 61.) And they concluded that SSR's investments were "heavily concentrated in one fund in one strategy," and "hardly qualifie[d] as diversified from an investment

---

[8] To be clear, this arrangement allowed Gunlicks to earn fees both as a one-third owner of SSR, and also on the other end, for managing the fund in which SSR invested 44% of its assets under management. (¶ 53.)

position." (¶ 62.) Accordingly, Geyelin's and Diercks's final conclusion was that PFLAC not add SSR to the Platform "without appropriate disclosure of the concentrated nature of the fund's investments" with Gunlicks. (¶¶ 63–64 ("**Without such disclosure, we would be <u>unable to recommend</u> this fund for inclusion on [PFLAC's] platform.**") (emphasis original).)[9]

### PFLAC Ignored Its Own Diligence Team And Added PFLAC To Its Platform

PFLAC's senior executives (including Hillman, Fillip and John Fischer, to whom Geyelin reported) sat on the committee that considered funds for inclusion on the Platform. (¶ 68.) Geyelin and Diercks would submit their due diligence reports to the committee, and then the committee would meet with Geyelin to consider the fund in question. (¶ 69.) For a fund to be added to the Platform, the committee had to be unanimous in its approval. (¶ 71.)

On January 17, 2005, Diercks sent an email to Fillip, asking whether SSR had been added to the Platform, writing: "I wanted to follow up on SSR. Are they going to be added to your platform and monthly performance reporting or not? I know we advised you not to add them without a disclosure about their single fund concentration, but I never heard what you decided." (¶¶ 72–73.) Fillip never responded. (¶ 74.) But the evidence does show that Fillip received an email from PFLAC's Chief Operating Officer on February 3, 2005, advising that he had reviewed the Due Diligence Package, and specifically noting the recommendation that PFLAC not add SSR to its Platform without disclosure of "SSR's concentrated investment (44%) in the Stable Value Fund, a fund run by William Lee Gunlicks, a silent 1/3 owner of SSR." (¶ 75.)

Notwithstanding the numerous risk factors identified by the diligence team and the specific recommendation not to add SSR to the Platform absent specific disclosures, PFLAC's senior

---

[9] SSR changed auditors from Ernst & Young during the middle of the team's due diligence process, and even though this should have raised a significant concern, the team negligently failed to investigate. Indeed, Geyelin testified that the change in auditor caused him no concern, and admitted that he did not even call E&Y to seek detail. (¶ 50.)

management committee voted *unanimously* to add SSR to the Platform in or around March 2005. (¶ 76.) They ignored material findings of its diligence team:  (i) that Helland and Law had no prior investment management experience; (iii) that SSR had only $20 million in assets under management and was not yet profitable; (iv) that Helland and Law were completely overwhelmed running SSR and likely not attending to critical functions; and (v) the overtly conflicted relationship between SSR and its "silent partner," William Gunlicks and that nearly half of SSR's assets under management being invested in one single Gunlicks-controlled fund.   Indeed, PFLAC's management even disregarded Geyelin's and Diercks's ultimate conclusion—that SSR not be added to the Platform absent full disclosure of the over-allocation with Gunlicks.  (¶ 77.)[10]

Fillip specifically recalled ignoring the advice of PFLAC's diligence team, claiming that any disclosure "would have caused the fund to blow up from an investor control perspective." (¶ 79.)   He also testified, incredibly, that the *only* criteria that PFLAC's senior management committee considered when deciding whether to add a fund to the Platform were:  (i) whether the fund existed; (ii) whether the manager(s) existed; and (iii) whether the fund complied with technical regulatory requirements such as that contained in Rule 817.  (¶ 80.)

These minor criterion aside, Fillip offered the remarkable testimony that PFLAC was not concerned whatsoever with "investment risk" (i.e., whether the funds being added to the Platform for policyholder selection presented a high risk of failure).  (¶ 81.)  Hillman echoed this testimony. (¶ 82.)  And shockingly, so did Director of Research Sandy Geyelin (¶ 83), even though his role would have been pointless if all PFLAC needed to do before adding a fund to the Platform was verify that the fund actually "existed," and complied with a handful of regulations governing

---

[10] The evidence demonstrates that PFLAC negligently failed to even conduct a background check on Gunlicks even though he was a one-third owner of SSR, managed 44% of SSR's capital, and was a "control person" identified in SSR's Form ADV.  (¶ 50.)  Had PFLAC done so, it would have discovered that Gunlicks received a Wells notice in 2003.  (¶ 51.)

insurance-dedicated funds.[11] But tellingly, none of these witnesses could reconcile their testimony with the detailed Due Diligence Package drafted by Geyelin and Diercks, and all of the underlying work. When asked what the point of the due diligence and the final report was, given that almost nothing in the report's eight, single-spaced pages concerns verification of existence or Rule 817 requirements, Fillip offered the following nonsensical answer: "We did not tell [Diercks] how to conduct due diligence .... As to what was concluded or not included in the document, that was dictated by [Diercks], not by us." (¶ 81.)

<u>The Result Of PFLAC's Negligence</u>

The SEC sued Gunlicks for fraud in April 2009. (¶ 87.) SSR continued for several years thereafter to put a positive spin on the restructuring of Founding Partners (¶¶ 14–18), and given the turbulent times, there was nothing notable about a fund being under investigation and subject to restructuring. But ultimately, after Buchalter began his investigation in 2012, SSR's optimism reached a dead end. There would be no return of investor capital; SSR instead closed its doors and sold the interests in the fund to an independent party. (¶ 88.) No capital has been returned to date. (¶ 89.) Ironically, Geyelin and Diercks had done their job. The largest risk they clearly had identified in 2004—SSR's conflicted over-allocation with its "silent partner"—ultimately resulted in SSR's demise and the Trust lost millions of dollars as a result. (¶¶ 88–89.)[12]

---

[11] Fischer notably contradicted his colleagues, testifying that PFLAC "wouldn't have put [a] fund on the platform" if PFLAC's due diligence revealed that there was a "significant investment risk." (¶ 84.)

[12] Tellingly, PFLAC also revamped its diligence team after 2008, and the new team indisputably conducts "investment" due diligence. Anthony Moretti, the Senior Managing Director for Investment Research, has significant prior experience with investment banks and hedge funds. (¶¶ 90–93.) He is the self-acknowledged head "of investment research and due diligence for firm's platform of 3rd-party managers," and is responsible "for a team tasked with manager strategy and evaluation, in-depth initial due diligence, and ongoing monitoring and assessment of investment managers." (*Id.*) Additionally, PFLAC's current client marketing materials, available on its website, speaks glowingly about "rigorous due diligence being the key to everything we do." (¶ 94.)

## ARGUMENT

### I.   Plaintiffs' Claims Are Not Time-Barred

PFLAC's primary argument in support of its motion is that Plaintiffs' claims are time-barred.[13]  The argument fails for the reasons set forth below.

Under Alaska law, accrual of a cause of action generally is established "at the time of injury." *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1273 (Ala. 2013).  But the common law discovery rule tolls the running of the statutory period "[w]here an element of a cause of action is not immediately apparent." *Id.* at 1274.  The discovery rule thus "mitigate[s] the harshness that result from the [accrual] rule's preclusion of claims where the injury provided insufficient notice of a cause of action to plaintiff." *Id.*  Accordingly, Plaintiffs' surviving claims did not accrue until they:  (i) reasonably should have discovered the existence of their claims against PFLAC; or (ii) had information that was sufficient to alert a reasonable person to begin an inquiry to protect his or her rights. *See John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1031 (Ala. 2002).  The inquiry notice date generally controls when a cause of action accrues. *See Gefre*, 306 P.3d at 1275.  And if an inquiry has not been made, Alaska courts "ask in the abstract whether a reasonable inquiry would have produced knowledge of the cause of action." *Id.*[14]

Here, PFLAC argues that Plaintiffs were on inquiry notice prior to September 2010 (two years before they sued), but the argument fails at both ends of the relevant chronology.

---

[13] Plaintiffs' negligence and negligent misrepresentation claims are subject to two-year limitations periods, and their professional malpractice claim is subject to a three-year limitations period. Alaska 09.10.053; 09.10.070.

[14] PFLAC maintains that "whether the undisputed facts establish that a plaintiff is on inquiry notice and the claim is time-barred are legal questions."  But in fact, Alaska courts hold that when a cause of action accrues "ordinarily presents a question of fact," such that summary judgment "is appropriate *only if* the superior court has before it uncontroverted facts regarding when the statute of limitations began running." *Egner v. Talbot's, Inc.*, 214 P.3d 272, 278 (Ala. 2009) (emphasis added).

A.    **The Undisputed Facts Demonstrate That Plaintiffs Were Not**
      **On Notice Of PFLAC's Negligence Before 2012**

There is nothing in the factual record demonstrating that Plaintiffs were aware of any negligence by PFLAC until 2012, when Buchalter, on behalf of the Trust, began his investigation. PFLAC devotes nearly six pages on its statute of limitations argument, but the numerous "facts" Plaintiffs supposedly were on notice of all go toward concerns with SSR as an investment rather than its own negligence in placing SSR on its Platform.  For instance, even if Buchalter had been aware that SSR changed auditors in 2006, or instituted leverage later that same year, or delivered too-consistent returns, such knowledge did not put him on notice that *PFLAC* negligently placed SSR on its Platform in the first place.

The evidence demonstrates that PLFAC was shockingly negligent in this regard.  Prior to placing SSR on the Platform, PFLAC commissioned Geyelin and Diercks to conduct due diligence and prepare a report on SSR to disseminate to PFLAC's committee of executives responsible for approving funds for its Platform.  As set forth herein, the final "Due Diligence Package" they prepared was nothing short of damning, as was PFLAC's acknowledged failure to abide by its own experts' recommendation that SSR not be added to the Platform.

1.    **SSR's Insufficient Staffing And Funding**

Helland and Law launched SSR in September 2003, and nothing in either man's prior experience included managing a fund-of-funds, much less conducting due diligence on hedge funds in which to invest. (¶¶ 35, 39.)   When Geyelin and Diercks conducted their diligence in late-2004, SSR still had only $20 million in assets under management and was not profitable. (¶¶ 40–41.) SSR also had had no staff, as Helland and Law were SSR's *only* employees and performed "the manager sourcing and due diligence, marketing, portfolio construction, risk management and office upkeep themselves." (¶ 42.) Geyelin and Diercks concluded that the situation presented

13

"an overwhelming task for four people let alone two who [were] married with children," and accordingly, that "[o]ne of the areas [was] most likely not being attended to as much as necessary." (¶ 43.) And even worse, Helland and Law did not anticipate adding staff (not even an administrative assistant) until SSR reached $40 to $50 million in assets under management (in other words, *doubling* their then-current NAV). (¶ 44.)

Diercks's contemporaneous notes show that he openly questioned "how long" SSR could "stay afloat," and was inclined to "review for a while." (¶ 33.) And he confirmed that he would have "wade[d] in over time" if he were investing in SSR, due to his concerns with the fund's small asset base and insufficient staffing. (¶ 34 ("This is how I would approach it.").) But PFLAC took the exact opposite approach and immediately added SSR to its Platform, despite that it had a very limited track record, lacked experienced managers, had de minimus assets under management, and was critically understaffed. PFLAC's negligence in doing so put its policyholders in jeopardy.

There is no evidence showing that Plaintiffs were on notice of any of these operational concerns, nor Diercks's inclination to wait and see, prior to this action. Indeed, PFLAC's witnesses conceded that the due diligence report was not provided to policyholders. (¶ 67.)

### 2. SSR's Hidden Conflict of Interest With William Gunlicks

Geyelin and Diercks also identified a serious conflict of interest. SSR was equally owned by Helland, Law and Founding Partners Equity Fund, LP, which in turn was owned by SSR's "silent partner," Gunlicks. Gunlicks had staked Helland and Law, and coincidently, Helland and Law in turn invested nearly half of SSR's assets in one of Gunlicks's funds. Geyelin and Diercks explained the risk as follows:

> **The largest risk/concern with this fund/firm deals with the silent partner, Gunlicks, and a fund that he runs, the Stable Value Fund. SSR currently invests 44% of its fund with Gunlicks and the Stable Value Fund.**

14

(¶ 54 (emphasis original).)    There is no evidence showing that Plaintiffs were on notice of this
material conflict of interest prior to 2012.

### 3.    SSR's Diversification Risk

Part and parcel with SSR's conflict of interest with investing nearly half of its assets in its
own silent partner's fund, Geyelin and Diercks also identified SSR's lack of diversification as a
serious risk. Given that SSR invested 44% of its assets with just one manager, Geyelin and Diercks
concluded that it was "a stretch to claim that diversification mitigates a lot of risk." (¶ 55.)  Indeed,
Diercks admitted that he never conducted due diligence on a fund-of-funds with a higher
concentration in a single investment. (¶ 65.) And to make matters worse, the Stable Value Fund
itself invested only in medical receivables lending, meaning that it could be substantially "affected
by ... a change in government regulation." (¶ 57.)[15] As Geyelin and Diercks recognized:

> **The concentration risk makes adding this fund to the [PFLAC]
> platform a risk without appropriate disclosure of the
> concentrated nature of the fund's investments. Without such
> disclosure, we would be unable to recommend this fund for
> inclusion on [PFLAC's] platform.**

(¶ 59 (emphasis original).)  There is no evidence showing that Plaintiffs were on notice of SSR's
alarming lack of diversification prior to 2012.

### 4.    Geyelin's and Diercks's Conclusions

Geyelin and Diercks pulled no punches in rendering their final conclusions in the Due
Diligence Package.  They found that: (i) SSR "need[ed] to increase its assets under management";
(ii) Helland and Law "[would] soon be at a breaking point emotionally and physically, if additional

---

[15] Geyelin and Diercks also noted that SSR's returns were consistently less than those of the Stable Value Fund, which
brought "into question the manager selection skill of" Helland and Law.  (¶ 58.)  And given the overconcentration
with Gunlicks, Geyelin and Diercks recognized that SSR's performance would suffer if the Stable Value Fund were
to shut down, which is precisely what occurred here.  (*Id.*)

support staff [was] not added"; and (iii) SSR's investments were "heavily concentrated in one fund in one strategy," meaning that it "hardly qualifie[d] as diversified from an investment position." (¶¶ 60–62.) Accordingly, they concluded:

> **The concentration risk in one single fund and strategy (Stable Value Fund – 44%) makes adding this fund to the [PFLAC] platform a risk without appropriate disclosure of the concentrated nature of the fund's investments. Without such disclosure, we would be <u>unable to recommend</u> this fund for inclusion on [PFLAC's] platform.**

(¶¶ 63–64 (emphasis original).) The gravity of this recommendation was highlighted by Diercks's admission that this was the *only* time he recommended that a fund on which he conducted due diligence *not* be added to PFLAC's Platform. (¶ 66.)

There is no evidence showing Plaintiffs were on notice of the PFLAC diligence team's recommendation <u>not</u> to add SSR to the Platform. Indeed, Geyelin admitted that PFLAC never sent its due diligence reports to policyholders. (¶ 67.) There simply was no way for Plaintiffs to learn of this material information when PFLAC stuffed it in the proverbial desk drawer.

### 5. PFLAC's Intentional Disregard Of <u>The Due Diligence Recommendations</u>

PFLAC's witnesses tied themselves in knots when confronted with evidence that its own diligence team issued a report in December 2004 recommending that SSR <u>not</u> be added to the Platform, and then forced to reconcile this evidence with the fact that PFLAC nevertheless added SSR to the Platform in early-2005.

First, Geyelin sought to disclaim knowledge to the point of absurdity. He testified that he did not even know who had authority to add a fund to the Platform. (¶ 70 ("I do not know … People above me ….)), and could not recall receiving feedback from management on his due diligence reports. (*Id.*) This was hard to fathom even before Fillip and Senior Managing Director

John Fischer, both of whom sat on the committee that considered funds for the Platform, recalled Geyelin presenting funds for that committee's consideration, and participating in follow-up question and answer sessions. (¶ 69.)

Next, PFLAC's witnesses could not even agree on what criteria they considered when making Platform decisions. The Due Diligence Package addresses issues like manager experience, assets under management, staffing, conflicts of interest, and diversification, and the lengthy 13-page DDQ that PFLAC sent to SSR addresses these same topics, and others, including organization of the fund, operations, strategy, sourcing and evaluation of managers, and risk management. (¶¶ 37–64.) Fischer, who oversaw Geyelin, agreed that these criteria were part of the Platform consideration. (¶ 84.) Fillip, who sat on the senior management committee with Fischer, said otherwise. He claimed that PFLAC's due diligence was limited merely to a "verification function"—concerned only with whether the fund and its managers "existed," whether they cleared background checks, and whether the fund satisfied Rule 817, which mandates that insurance-dedicated funds limit any single investment to no more than 55%. (¶¶ 80–81.) Geyelin remarkably agreed with Fillip, even though the vast majority of the report he co-authored had nothing to do with the supposed "verification function," and the DDQ he submitted to SSR similarly ranged wide in scope. (¶ 83.)

The picture this testimony painted was nothing short of absurd. PFLAC would have this Court believe that: (i) it employed its Director of Research and Diercks on a consultancy basis even though the only criteria that mattered were whether a fund and its managers existed, and whether a handful of rules for insurance dedicated funds were satisfied; and (ii) had Geyelin and Diercks fly to Dallas for on-site interviews, transmit a detailed DDQ, review voluminous written materials, and prepare an eight-page, single-spaced due diligence report on SSR, addressing

criteria ranging from manager experience to diversification risk, even though **none** of that supposedly mattered to the ultimate Platform decision. In short, PFLAC claims that it did not concern itself with the "investment risk," even though it employed professionals to evaluate criteria going toward that very consideration.

Finally, the evidence shows that PFLAC blatantly ignored the advice of its due diligence professionals (which explains why its witnesses nonsensically claimed that the criteria its due diligence professionals considered did not matter). Geyelin and Diercks unequivocally recommended against adding SSR to the Platform based on a litany of investment risks, but senior management shockingly voted unanimously to add SSR to the Platform. PFLAC's utter disregard of such material risks resulted in over $3 million in damages.

In short, the evidence shows that PFLAC was shockingly negligent in placing SSR on its Platform, and there is nothing in the record demonstrating that Plaintiffs were on inquiry notice of this negligence prior to Buchalter beginning his investigation in 2012.

## B. The Undisputed Facts Demonstrate That Plaintiffs Were Not On Notice Of Any Injury Attributable To PFLAC Before 2012

PFLAC also argues that Plaintiffs were on notice that the Trust suffered harm merely because SSR account statements showed a reduction in SSR's NAV beginning in 2008. But this argument ignores both context and the nature of investment losses.

First, PFLAC ignores that the world financial markets collapsed in 2008, and that SSR joined many other leading funds in suspending redemptions to preserve liquidity. The account statements that SSR issued in 2008 and beyond showed paper losses, but as Buchalter explained, *every* investment was getting pummeled during this time period. (¶ 20.) Statements showing even a 50% reduction in NAV against prior highs would not have stood out during the financial crisis.

And this especially was true where SSR sent numerous letters to its policyholders expressing confidence that their capital ultimately would be returned.[16]

As Buchalter explained, his suspicions were not raised until late-2011/early-2012, when the markets stabilized but the stated value of his SSR investment kept declining sharply. (¶ 20.) It was at this point that he immediately commenced an investigation, and in the process discovered PFLAC's negligence. (¶¶ 20–21.) Buchalter's testimony in this regard is undisputed.

Second, PFLAC's argument that the Trust suffered harm in 2008 runs afoul of Alaska law. In short, temporary "paper" losses do not constitute "injury" for Alaska statute of limitations purposes. *See, e.g., Jarvill v. Porky's Equip., Inc.*, 189 P.3d 335, 338–341 (Ala. 2008).

*Jarvill* is highly instructive. There, Jarvill bought a fishing boat from Porky's. When the boat was delivered, Jarvill's inspector expressed concern that the aluminum sheeting used for the hull was too thin to be safe. Years later, the hull cracked and the boat sank. Jarvill sued Porky's, and Porky's argued that the two-year statute of limitations for negligence claims barred suit because Jarvill had notice of the defect at the time of delivery. The Alaska Supreme Court rejected Porky's argument. Despite the fact that Jarvill was put on notice that the boat might have been defective when it was delivered, the court held that "any tortious injury to Jarvill remained a matter of speculation" until the boat actually sank. *Id.*

Here, the SSR "boat" did not sink when SSR issued statements showing a reduction in NAV. Investments rise and fall in value all the time. But each fall in value does not equate to

---

[16] PFLAC contends that SSR's exposure to Petters-related investments (which was not unique to SSR as many funds had such exposure) should have put Buchalter on inquiry notice, but the evidence demonstrates otherwise. SSR notified investors that it was placing such exposure in a "side pocket" until the assets could be accurately valued, and even though it conceded that the Petters fraud might result in a loss of approximately 25%, touted that the fund still outperformed broader market indices in 2008, and continued to express confidence that investors would see *all* of their capital returned. (Resp. ¶¶ 66–67.) While Petters losses were material, Petters defrauded investors of some $3 billion and SSR's share of those losses did not suggest negligence on the part of SSR, much less on the part of PFLAC.

actionable harm.  Harm "remained a matter of speculation" until the loss became irreversible, which only first appeared to be the case at the end of 2011.[17]

## II.    PFLAC Had A Duty To Vet Its Platform Funds

PFLAC's first (and only substantive) merits-based argument is that Plaintiffs' claims fail because PFLAC supposedly had no legally enforceable duty to vet its Platform funds.  (Mem. at 14–20.)  This argument fails on several levels.

### A.    This Court Already Held That PFLAC Had A Duty To Vet

This Court *already held* that Plaintiffs pleaded facts sufficient to establish that PFLAC had a duty to vet the funds it offered on its Platform.  The Court based its holding on two central allegations: (1) that Plaintiffs were at a severe informational disadvantage due to their being precluded from contacting the managers of the PFLAC's Platform funds; and (2) that the injury— "financial loss from investing in a fund that allegedly was managed by two unqualified people and where Gunlicks served in an allegedly self-interested role"—was foreseeable.[18]  PFLAC tellingly ignores this holding in its papers, and the reason why is obvious.

#### 1.    The Evidence Demonstrates That Buchalter Reasonably Believed He Was Precluded From Having Any Contact With SSR

First, the Policy PPM that PFLAC provided to Buchalter prior to his electing to invest in SSR (the December 2002 PPM) explicitly precluded policyholders from contacting fund managers.

---

[17] *Christianson v. Conrad–Houston Ins.*, cited by PFLAC, does not alter the analysis.  The question there was whether an insurer's letter to an insured advising that it was investigating the underlying incident and might deny coverage placed the insured on inquiry notice of his malpractice claim against his broker.  The Alaska Supreme Court affirmed the trial court's affirmative answer, noting that, at the time of the letter, plaintiff knew he was being sued, knew that his general liability insurer initially was refusing to provide a defense, knew that his policy had two provisions that potentially foreclosed coverage, and knew that he was incurring significant defense costs. 318 P.3d 390, 398 (Alaska 2014).  Those circumstances were enough to put plaintiff "on notice that he needed to make an inquiry to determine why Great Divide was not providing him a defense—including asking whether CHI had failed to secure adequate insurance for his businesses." *Id.*  With that said, the court took pains to distinguish *Jarvill* and explain that it still controlled.  In the case before it, the court explained, "incurring expenses of a defense was equivalent to the sinking of the boat; both satisfied the damages element of a tort claim." *Id.* at 399.  Here, the Trust had did not suffer damages in 2008.  As in *Jarvill*, the harm remained "speculative" until SSR zeroed out as an investment.

[18] *Buchalter v. Philadelphia Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 222–223 (S.D.N.Y. 2015).

(¶ 5.) PFLAC now rests its argument in this regard on the March 2005 PPM, which modified this admonition to address two IRS Revenue Rulings issued in 2003.

PFLAC's reliance is misplaced. First, the March 2005 PPM did not "permit contact" with fund managers and only advise "a limited restriction on such contact," as PFLAC claims. Instead, PFLAC explicitly cautioned that the Revenue Rulings did not purport to address all forms of contact and that it therefore was "possible that a finding of investor control could be based upon facts and circumstances that are not described in either of these Revenue Rulings or in any of the other guidance published by the IRS to date on this subject." (Resp. ¶ 37.) PFLAC also warned policyholders to avoid contact of the types described in the Revenue Rulings, and in particular, "avoid contact with the manager of or investment adviser to any of the Investment Accounts regarding actual or proposed investments in such Investment Accounts." (Id.) Given the prior "no contact" warning in the 2002 PPM, no reasonable policyholder reviewing this new language would have concluded that it now was safe to contact fund managers.

Moreover, even if PFLAC was correct that the upshot of the March 2005 PPM changes was to warn only against communications concerning "the selection, quality, or rate of return of any specific investment or group of investments held" within a fund, Buchalter still would have been precluded from conducting diligence on SSR's selection of underlying funds, which thereby prevented him from analyzing Helland's and Law's manager selection skills, and most importantly, their justification for investing nearly half of SSR's assets with Gunlicks (in other words, the key topics any investor would be interested in investigating). Additionally, there is no evidence that PFLAC ever discussed this change in policy with Buchalter. [19]   And finally, the evidence

---

[19] Indeed, the evidence demonstrates that PFLAC still was advising Buchalter in 2012 that he could not have any direct contact with SSR. There is every reason to believe that PFLAC's principals believed that the "no contact" policy remained in place until they adopted an argument to the contrary for purposes of this litigation.

demonstrates that Buchalter reasonably believed that PFLAC already had conducted due diligence on SSR as reflected by its inclusion on the approved Platform. (Resp. ¶ 41.)

### 2.    The Evidence Demonstrates That The Injury Was Foreseeable

Second, the financial loss was foreseeable. Based on *PFLAC's own due diligence*, it was foreseeable that SSR would inadequately vet the funds it invested in. As Diercks recognized, the prudent course of action would have been to wait and see regarding concentration, staffing, assets under management, diversification and the manager gaining experience in manager selection.

PFLAC also knew that SSR's conflicted relationship with Gunlicks presented a serious investment risk. Geyelin and Diercks recommended that PFLAC not add SSR to its Platform unless it specifically disclosed the over allocation in Gunlicks's Stable Value fund. They regarded the relationship with Gunlicks as a serious risk factor, and recognized that policyholders would be unaware of that risk when deciding whether to invest in SSR, unless PFLAC made a specific disclosure. The decision by PFLAC's upper management to blatantly ignore its own diligence team's conclusion resulted in foreseeable consequences. Policyholders invested in SSR when they otherwise would not have had they been aware of the significant investment risks posed by the fund. The unfortunate irony is that the biggest risk factor that PFLAC's own diligence team identified—a conflicted investment of nearly half of SSR's assets in a single fund employing a single strategy—ultimately led to SSR's undoing.[20]

---

[20] PFLAC posits that foreseeability is not present because the securities frauds that SSR fell victim to were not foreseeable. But this is a total red herring. Given Helland's and Law's lack of experience and being overwhelmed with work, it was foreseeable that SSR would fail to adequately vet the funds it invested in, which increased the possibility of missing significant risk factors that appropriate diligence would have revealed. Moreover, it was foreseeable that SSR's conflicted over-allocation in Gunlicks's Stable Value Fund, which itself was invested in a single strategy and industry, created a disproportionate investment risk. These are the same reasons that previously led the Court to conclude that the injury here was foreseeable.

### 3.    The Other *D.S.W.* Factors Support Imposing A Duty On PFLAC

Under Alaska law, if no statute, regulation, contract, case law, or relationship establishes the existence of a duty of care, the question of whether a duty exists essentially is a public policy question.  *See McGrew v. State*, 106 P.3d 319, 322 (Ala. 2005).  The public policy question involves the following considerations:

> The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Ala. 1981).[21]

Application of these factors favors imposing a duty on PFLAC.  First and foremost, the harm was foreseeable, as set forth above.  And both Alaska and New York courts recognize that foreseeability in particular is "the single most important criterion for imposing a duty of care." *R.E. v. State*, 878 P.2d 1341, 1346 (Ala. 1994) (citation omitted); *see also Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 385 (1980).[22]

Several other *D.S.W.* factors also support imposing a duty on PFLAC.  There is no dispute that Plaintiffs suffered injury as well as the connection between PFLAC's conduct (or more precisely, its failure to act) and the injury suffered.  If PFLAC had followed its diligence team's

---

[21] Similarly, under New York law, when determining the existence and scope of a duty, courts consider the relationship of the parties, whether the plaintiff was within the zone of foreseeable harm, whether the injury was foreseeable, and other public policy considerations. *Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997).

[22] PFLAC remarkably argues, for the first time, that there is a conflict between Alaska and New York law. But the Court already held that no conflict exists, because, while the two tests "are stated slightly differently, they involve the same general considerations." (Op. & Order, dated Mar. 31, 2015).  And the Alaska Supreme Court's recent decision in *GeoTek Alaska, Inc. v. Jacobs Eng'g Group, Inc.* does not alter that holding.  That court specifically reaffirmed the so-called "*D.S.W.* factors," and, contrary to PFLAC's suggestion, reaffirmed that foreseeability is the "single most important criterion for imposing a duty of care." 354 P.3d 368, 378 (Ala. 2015) (internal quotation omitted).

recommendation, SSR would not have been offered on the Platform. And had SSR not been offered on the Platform, the Trust would not have suffered injury.

Public policy considerations also support imposing a duty. This Court already held as much: "Public policy considerations also support the finding of a duty to exercise reasonable care in vetting, as the duty the Court is recognizing is highly limited, would be easy to comply with, and protects investors." *Buchalter*, 96 F Supp. 3d at 223. And the Court should not reconsider its holding. PFLAC's argument that it did not need to do "investment" due diligence prior to adding funds to its Platform is socially irresponsible vis-à-vis all policyholders. Simply put, requiring providers of variable insurance policies to conduct appropriate due diligence on hedge funds before offering them on an approved platform to investors is prudent and will prevent future harm.

Moreover, there will be little extra burden imposed on PFLAC and its peers (and no "consequences to the community") if a duty is imposed.[23] PFLAC emptily argues that imposing a duty will be "an industry game changer." But the "industry," as PFLAC concedes, is very new, and there is no evidence that PFLAC's peers do not conduct investment due diligence. Indeed, one of PFLAC's main competitors employs a set of *detailed* due diligence criteria. (¶ 85.) Had PFLAC employed similar criteria (for instance, requiring that funds had $100 million in assets under management and that managers have five years of relevant experience), SSR would not even have been considered for the Platform.

Finally, it bears repeating that PFLAC: (i) concededly *did* conduct investment due diligence in this case, and the evidence demonstrates that the cost of doing so was very modest

---

[23] PFLAC also concedes that variable life insurance policies really just investment products in an insurance wrapper. It argues that variable insurance providers "do not hold themselves out as investment advisors," but that is *exactly* what happened here. PFLAC representatives had several conversations with Buchalter about the funds that it had chosen for its Platform. And when PFLAC's "Director of Research" forwarded information concerning SSR, which just recently had been added, anyone sitting in Buchalter's position reasonably would have believed that PFLAC had conducted underlying due diligence on the fund (especially when the insurance provider was collecting extremely generous fees for its services).

(and certainly outweighed by the potential harm to policyholders); and (ii) PFLAC currently employs a due diligence team led by an experienced due diligence manager who concededly conducts investment due diligence. Injury occurred only because PFLAC's senior management inexplicably ignored its own diligence team's findings and recommendation.[24]

### III.  The Evidence Demonstrates That PFLAC Breached Its Duty To Vet

PFLAC also argues that there was "no breach" that caused harm. First, it argues that it *did* vet SSR before adding it to the Platform. But what PFLAC conveniently ignores is that the evidence demonstrates that its executive management ignored the diligence team's findings and recommendations in unanimously approving SSR for the Platform.

PFLAC further contends that Plaintiffs were on notice that SSR had only two employees, but it is undisputed that they were unaware that PFLAC had concluded that Helland and Law were out of their depth and overwhelmed. And finally, PFLAC argues that Plaintiffs were aware (after Buchalter directed the investment in SSR) that: (i) SSR invested in a fund affiliated with its limited partner the Founding Partners Equity Fund; and (ii) SSR "might make a single investment of as much as 55% of its assets" under Rule 817. But what PFLAC did not disclose and conveniently ignores now is: (i) the extreme nature of the actual conflict, in that Gunlicks had staked Helland and Law; and (ii) that SSR in fact had invested almost half of its assets with Gunlicks (who himself was non-diversified). And of course PFLAC did not disclose that its own diligence team had concluded that SSR's investment with Gunlicks presented an unacceptable investment risk.[25]

---

[24] PFLAC falsely suggests that the recent decision in *Fishman v. Philadelphia Fin. Life Assurance Co.* somehow dictates a holding that PFLAC had no duty to vet Platform funds. But Judge Griesa in fact explicitly declined to decide "whether PFLAC owed plaintiff a duty." No. 11-cv-1283, 2015 U.S. Dist. LEXIS 63751 (S.D.N.Y. 2016).
[25] PFLAC's final argument is that there is no evidence of justifiable reliance. PFLAC spends all of four sentences on this argument, and for good reason: it fails the straight face test. PFLAC represented that SSR was one of its Platform funds. Buchalter directed the investment in SSR. Period.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny PFLAC's motion in its entirety, and award Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
        August 19, 2016

PRYOR CASHMAN LLP

By: _____
       Jonathan T. Shepard
       Eric D. Dowell
7 Times Square
New York, New York 10036-6569
(212) 421-4100
*Attorneys for Plaintiffs*