UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE 2002 LAWRENCE R. BUCHALTER
ALASKA TRUST, ALASKA TRUST
COMPANY, and STEPHEN C. HARRIS,
Trustees,

                                   Plaintiffs,                    No. 12-CV-6808 (KMK)

            v.                                                   OPINION & ORDER

PHILADELPHIA FINANCIAL LIFE
ASSURANCE COMPANY, f/k/a AGL Life
Assurance Company,

                                   Defendant.

---

Appearances:

Jonathan Thomas Shepard, Esq.
Eric Donovan Dowell, Esq.
Pryor Cashman LLP
New York, NY
*Counsel for Plaintiffs*

Kendall Johan Burr, Esq.
Thomas F.A. Hetherington, Esq.
Hutson Brit Smelley, Esq.
Edison, McDowell & Hetherington LLP
Houston, TX
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiffs The 2002 Lawrence R. Buchalter Alaska Trust (the "Trust"), Alaska Trust

Company, and Stephen C. Harris ("Harris") filed the instant Complaint, Amended Complaint,

and Second Amended Complaint against Defendant Philadelphia Financial Life Assurance

Company alleging several claims related to the Trust's purchase from Defendant of a variable

life insurance policy and subsequent investment decisions.  At this stage in the proceeding, the

remaining claims relate to Defendant's alleged failure to properly vet a fund that Defendant

offered as an investment in connection with the policy.  Defendant moves for summary judgment

on these claims.  Plaintiffs and Defendant have both also moved to disqualify the expert offered

by the opposing Party.  For the reasons to follow, Defendant's Motion for Summary Judgment is

granted.  The Motions To Exclude Expert Testimony are denied as moot.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements of undisputed material facts

and the documents submitted by the Parties in connection with the pending Motions.

#### 1.  The Trust

The Trust is an irrevocable trust created by Lawrence Buchalter ("Buchalter") on

November 1, 2002.  (*See* Decl. of Hutson B. Smelley ("Smelley Decl.") Ex. 1 ("Trust

Agreement") (Dkt. No. 104); *see also* Def. Philadelphia Financial Life Assurance Company's

Consolidated Reply to Pls.' Resp. to Def.'s Local Rule 56.1 Statement of Uncontroverted Facts

& Statement of Additional Material Disputed Facts ¶ 1 (Dkt. No. 119).)[1]  The agreement creating

the Trust (the "Trust Agreement") provides for an independent Trustee, a role which Buchalter

may not fill.  (*See* Trust Agreement II-11; *see also* Def.'s Consolidated 56.1 ¶ 3.)  Plaintiff

Alaska Trust Company was the sole Trustee until June 2012, when Harris was added as a

Trustee.  (*See* Second Am. Compl. ¶¶ 23, 24, 31 (Dkt. No. 42); *see also* Def.'s Consolidated 56.1

¶ 4.)  The Trust Agreement grants the Trustee the authority to make investments, including the

---

[1] For ease of reference, the Court cites to the consolidated statement of undisputed facts offered by Defendant.  Citations to the consolidated reply to Plaintiffs' response to Defendant's 56.1 statement will be cited as "Def.'s Consolidated 56.1 ¶ __," and citations to Defendant's response to Plaintiffs' statement of additional material undisputed facts will be cited as "Def.'s Resp. 56.1 ¶ __."

purchase of life insurance.  (*See* Trust Agreement II-1, II-14; *see also* Def.'s Consolidated 56.1 ¶ 5.)  Notwithstanding the Trustee's authority regarding investment decisions, the Trust Agreement also provides for an Investment Advisor, whose stated duties are to "direct the investments and reinvestments of the property of such trust."  (Trust Agreement II-26–II-27; *see also* Def.'s Consolidated 56.1 ¶ 8.)  At all relevant times, Jeffrey Brown was the appointed Investment Advisor.  (*See* Def.'s Consolidated 56.1 ¶ 9.)  Although the representative for Alaska Trust Company, one of the Trustees, testified that he received investment instructions from only Brown, (*see* Smelley Decl. Ex. 2, at 13–14), Brown indicated that he received instructions from Buchalter regarding investment decisions for the Trust, (*see* Smelley Decl. Ex. 25, at 9; *see also* Def.'s Consolidated 56.1 ¶ 9).

### 2.  The Policy

In 2002, Buchalter and his legal counsel, William Lipkind, approached Defendant about purchasing a life insurance policy through the Trust.  (*See* Smelley Decl. Ex. 3; *see also* Def.'s Consolidated 56.1 ¶ 10.)  As a result of those conversations, Lipkind obtained and sent to Buchalter a Private Placement Memorandum (the "2002 PPM") from Defendant outlining the terms of a flexible premium variable life insurance policy (the "Policy") offered by Defendant.  (*See* Smelley Decl. Ex. 5, at BUCH00000214–15; *see also* Def.'s Consolidated 56.1 ¶ 12.)  The 2002 PPM provided that "THE POLICY OWNER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL.  THERE IS NO GUARANTEED MINIMUM ACCOUNT VALUE."  (*See* Smelley Decl. Ex. 5, at BUCH00000216; *see also* Def.'s Consolidated 56.1 ¶ 13.)  The 2002 PPM also provided that "PURCHASE OF THE POLICY IS SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL ECONOMIC MEANS AND FINANCIAL

SOPHISTICATION," and "EACH POLICY OWNER WILL BE REQUIRED TO REPRESENT THAT HE OR SHE MEETS CERTAIN MINIMUM FINANCIAL AND OTHER SUITABILITY STANDARDS." (*See* Smelley Decl. Ex. 5, at BUCH00000217; *see also* Def.'s Consolidated 56.1 ¶ 14.)

On December 18, 2002, the Trust executed an application for the Policy insuring the lives of Lawrence and Robin Buchalter with a $55,000,000 death benefit. (*See* Smelley Decl. Ex. 6, at PFLAC 001091, PFLAC 001124; *see also* Def.'s Consolidated 56.1 ¶ 15.) The Trust also executed an accredited investor form affirming ownership of over $5 million in investments, attesting that "I AM ABLE TO BEAR THE ECONOMIC RISK OF AN INVESTMENT IN A POLICY FOR AN INDEFINITE PERIOD OF TIME," that "I UNDERSTAND AND ACCEPT THE FULL NATURE AND RISK OF AN INVESTMENT IN A POLICY," that "I received, carefully reviewed, understand and am familiar with the [2002 PPM], . . . the Policy and the Investment Account(s) available to me," and that "I have had the opportunity to ask [Defendant] questions and to receive answers concerning the purchase of the Policy and to obtain any additional information . . . that is necessary to verify the information provided regarding the Policy." (Smelley Decl. Ex. 8, at PFLAC 001012–15; *see also* Def.'s Consolidated 56.1 ¶ 17.) The Policy was issued to the Trust on December 20, 2002. (*See* Smelley Decl. Ex. 6; *see also* Def.'s Consolidated 56.1 ¶ 18.)

The feature of the Policy at issue here is the allocation of premium payments to a variable account. (*See* Smelley Decl. Ex. 5, at BUCH00000229–30.) The variable account allows the policyholder to allocate premium payments to various investment funds offered by Defendant. (*See id.* at BUCH00000251.) For example, the 2002 PPM offered the Trust the opportunity to allocate premium payments to Millennium Global Estate, L.P. (*See id.* at BUCH00000252.)

4

Family Management Corporation was initially designated to "provide asset allocation services for the [i]nvestment [a]ccounts."  (*Id.* at BUCH00000216.)

A policyholder can select its preferred investment funds from a platform of insurance-dedicated funds provided by Defendant.  (*See* Smelley Decl. Ex. 20; *see also* Def.'s Resp. 56.1 ¶ 3.)  Before adding a fund to the platform, Defendant conducts due diligence.  (*See* Decl. of Jonathan T. Shepard in Opp'n to Def.'s Mot. for Summ. J. ("Shepard Decl.") Ex. U, at 27–28 (Dkt. No. 105); *see also* Def.'s Resp. 56.1 ¶ 69.)  A committee of senior managers, including, from 2002 through approximately 2010, John Hillman (Defendant's CEO), Joe Fillip (Defendant's General Counsel), and John Fischer (a research supervisor), would review the due diligence report for a fund, (*see* Shepard Decl. Ex. U, at 28; *see also* Def.'s Resp. 56.1 ¶ 68), and the members of the committee would then come to an agreement to either unanimously place the fund on the platform or to not move forward with the fund, (*see* Shepard Decl. Ex. X, at 17–18; *see also* Def.'s Resp. 56.1 ¶ 71).

The 2002 PPM provided additional detail regarding the tax implications of the Policy. Specifically, the 2002 PPM indicated that favorable "tax treatment will only apply, however, if the investments of each Investment Account of the Variable Account are (1) 'adequately diversified' in accordance with Treasury Department regulations, and (2) the Company, rather than the Policy Owner, is considered the owner of the assets of the Variable Account for federal income tax purposes."  (Smelley Decl. Ex. 5, at BUCH00000246; *see also* Def.'s Consolidated 56.1 ¶ 19.)  The 2002 PPM also provided that "no published ruling of the IRS or any other precedential authority has addressed the tax treatment of a variable life insurance contract issued in a private placement transaction," and went on to state that "**[f]or this reason, no Policy Owner should ever attempt to contact an investment advisor.  Rather, any and all**

**questions, comments, or instructions regarding the Policy should be addressed only to the Company.**" (Smelley Decl. Ex. 5, at BUCH00000247; *see also* Def.'s Consolidated 56.1 ¶¶ 20–21.)

On December 20, 2002, Defendant sent two letters to the Trust. The first letter indicated that "[a]s an inducement for and as a precondition to the execution and delivery of the Application," Defendant offered its assurance "that the proposed structure for investing the Assets will not cause the Policyowner to be deemed to control the investment of the Assets and result in the Policy's failure to qualify as life insurance for federal income tax purposes." (Smelley Decl. Ex. 10, at PFLAC 000996; *see also* Def.'s Consolidated 56.1 ¶¶ 23–24.) The letter also included a provision indemnifying the Trust should a court or agency determine that the assets are held by the Trust. (*See* Smelley Decl. Ex. 10, at PFLAC 000998; *see also* Def.'s Consolidated 56.1 ¶ 25.)

The second letter provided:

> You have requested various assurances from Insurer with respect to Family Management Corporation ("FMC"). On behalf of the Insurer, this is to certify that . . . [t]he Insurer has conducted due diligence with respect to FMC, and as a result of such due diligence, Insurer has satisfied itself that FMC is a suitable party to allocate, on behalf of the Insurer, Assets that are invested in the Asset Allocation Account and/or the Discretionary Account. However, the Insurer in no way guarantees or otherwise warrants to the Policyowner or to any other person the future performance of FMC . . . .

(Smelley Decl. Ex. 11, at PFLAC 001002; *see also* Def.'s Consolidated 56.1 ¶ 26.)

### 3. Strategic Stable Return Fund (ID), LP

On or about October 18, 2004, Sandy Geyelin, Defendant's Director of Research, and Jeff Diercks, the head of the consulting firm InTrust Advisors, traveled to Dallas to meet the managers of Strategic Stable Return ("SSR") Fund (ID) to conduct due diligence on SSR and determine whether it was suitable for inclusion on Defendant's platform. (*See* Smelley Decl. Ex.

16 ("Diligence Report"), at InTrust 000010; *see also* Def.'s Consolidated 56.1 ¶ 27; Def.'s Resp.

56.1 ¶ 26.)  The managers of SSR were Steve Helland and Tim Law.  (*See* Diligence Report, at

InTrust 000010; *see also* Def.'s Resp. 56.1 ¶ 26.)  The same day as the meeting, Geyelin sent an

email to Helland and Law asking them to provide some additional information and to complete a

due diligence questionnaire.  (*See* Shepard Decl. Ex. N; *see also* Def.'s Resp. 56.1 ¶ 29.)  The

questionnaire asked SSR to provide information relating to ownership structure, manager

experience, assets under management, manager capital at risk, staffing, historical performance,

service providers, investment strategy, and risk management.  (*See* Shepard Decl. Ex. N; *see also*

Def.'s Resp. 56.1 ¶ 30.)  Geyelin and Diercks thereafter spoke with individuals at SSR at least

three more times.  (*See* Shepard Decl. Ex. O; *see also* Def.'s Resp. 56.1 ¶ 31.)  In the notes

Diercks made during those meetings, one page included the notations: "Review for while?  See

monthly reporting?  See for a while," and "Wade in over time?"  (Shepard Decl. Ex. P, at

PFLAC 000390; *see also* Def.'s Resp. 56.1 ¶ 33.)  Geyelin and Diercks also spoke with various

references for Helland and Law and memorialized those conversations in their notes.  (*See*

Shepard Decl. Ex. R.)

     In December 2004, Geyelin and Diercks put together a due diligence report entitled

"Manager Due Diligence Package."  (*See* Diligence Report; *see also* Def.'s Consolidated 56.1

¶ 29.)  The report relayed a number of foundational facts about SSR, including: (1) SSR had

launched in July 2003 and did not launch its first fund until September 2003; (2) the SSR ID

Fund (the "ID Fund"), in which the Trust was considering investing, was launched in July 2004

and had approximately $20 million in assets under management; (3) SSR was then running at a

break-even profitability; and (4) Helland and Law were the only employees of SSR.  (*See*

Diligence Report, at InTrust 000010; *see also* Def.'s Resp. 56.1 ¶¶ 39–42.)  The report indicated

that SSR was owned in equal parts by Helland, Law, and Founding Partners Equity Fund, LP, an entity owned by "silent partner" William Lee Gunlicks.  (*See* Diligence Report, at InTrust 000011; *see also* Def.'s Resp. 56.1 ¶ 46.)

The report stated that the "largest" risk posed by SSR and the ID Fund was the fact that 44% of the assets of the ID Fund were invested in the Stable Value Fund, a fund run by Gunlicks.  (*See* Diligence Report, at InTrust 000011.)  The report noted that the Stable Value Fund invested in a single industry, and thus the Stable Value Fund, and the ID Fund in turn, could be negatively affected by changes in that industry.  (*See id.*)  The report also questioned the managerial skills of Helland and Law given that the ID Fund's returns were consistently lower than that of the Stable Value Fund.  (*See id.*)  The report concluded this section by noting that "**[t]he concentration risk makes adding this fund to the . . . platform a risk without appropriate disclosure of the concentrated nature of the fund's investments.  Without such disclosure, we would be unable to recommend this fund for inclusion on [the] platform.**" (*Id.*)

The report went on to note that the ID Fund had "delivered on its stated goals," and that it was "currently the top performing Fund of Fund" for the year on Defendant's investment platform.  (*Id.* at InTrust 000012–13.)  With respect to operations, the report warned that managing the firm was "**an overwhelming task for four people let alone two who are married with children.  One of the areas is most likely not being attended to as much as necessary.**" (*Id.*)  The report added, however, that SSR was planning on hiring an analyst and possibly a marketing employee once it reached $40 or $50 million in assets under management.  (*See id.*)

In discussing the risk associated with the ID Fund's portfolio, the report again pointed to the allocation of 44% of the ID Fund's assets with the Stable Value Fund, and noted that given

this concentration, it was a "stretch to claim that diversification mitigate[d] a lot of risk." (*Id.*)

The report noted that SSR claimed to have commitments for at least $20 million more in assets

under management, and that if it obtained such assets, it would be able to hire the support staff it

needed. (*See id.* at InTrust 000015.) The report also indicated that background checks were run

on the firm, Helland, and Law. (*See id.*) There is no indication that a background check was run

on Gunlicks.

> The report concluded with the following observations:

> > SSR needs to increase its assets under management. Although they are
> > currently at break-even point financially, [Helland] and [Law] will soon be at a
> > breaking point emotionally and physically, if additional support staff is not added.
> > We feel confident that their assets under management will rise to the necessary
> > level to ensure the sustainability of the business, given their performance track
> > record and alleged commitments for new assets.

> > SSR investments are heavily concentrated in one fund in one strategy.
> > Although this meets the diversification requirements of Rule 817, it hardly qualifies
> > as diversified from an[] investment position. This information should be more
> > prominently displayed in materials related to them, so policyholders are aware of
> > this attribute.

> > **The concentration risk in one single fund and strategy (Stable Value
> > Fund—44%) makes adding this fund to the . . . platform a risk without
> > appropriate disclosure of the concentrated nature of the fund's investments.
> > Without such disclosure, we would be <u>unable to recommend</u> this fund for
> > inclusion on [the] platform.**

(*Id.* at InTrust 000016.) The due diligence report was never provided to Buchalter. (*See* Shepard

Decl. Ex. T, at 150–51; *see also* Def.'s Resp. 56.1 ¶ 67.)

On January 17, 2005, Diercks sent an email to Fillip asking whether SSR had been added

to Defendant's platform, noting that he had "advised [Defendant] not to add them without a

disclosure about their single fund concentration." (Shepard Decl. Ex. Y; *see also* Def.'s Resp.

56.1 ¶¶ 72–73.) There is no evidence of a response. (*See* Def.'s Resp. 56.1 ¶ 74.) On February 3,

2005, Defendant's Chief Operating Officer David Peters emailed Fillip advising him that the due

diligence report had recommended that Defendant disclose "SSR's concentrated investment (44%) in the Stable Value Fund." (Shepard Decl. Ex. Z; *see also* Def.'s Resp. 56.1 ¶ 75.) Around March 2005, SSR's ID Fund was added to Defendant's investment platform. (*See* Shepard Decl. Ex. U, at 162; *see also* Def.'s Consolidated 56.1 ¶ 32; Def.'s Resp. 56.1 ¶ 76.)

### 4. The Trust's Addition of SSR

On March 17, 2005, the 2002 PPM was replaced with a new PPM (the "March 2005 PPM"). (*See* Smelley Decl. Ex. 19; *see also* Def.'s Consolidated 56.1 ¶ 33.) Like the 2002 PPM, the March 2005 PPM provided that "THE POLICY OWNER BEARS THE ENTIRE INVESTMENT RISK FOR ALL AMOUNTS INVESTED IN THE POLICY, INCLUDING THE RISK OF LOSS OF PRINCIPAL." (Smelley Decl. Ex. 19, at PFLAC 002706; *see also* Def.'s Consolidated 56.1 ¶ 35.)

The change most pertinent to this case in the March 2005 PPM was the modification of language relating to how the IRS would analyze ownership of the assets in the variable account. Specifically, the March 2005 PPM noted that "[t]he IRS ha[d] stated in published rulings that a variable contract owner will be considered the owner of the assets of a segregated asset account if the owner possesses incidents of ownership in those assets, such as the ability to exercise investment control over the assets," and added that the IRS had issued "two Revenue Rulings that provide guidance on certain circumstances in which investor control of investments of a segregated asset account within a variable annuity or insurance policy . . . cause the investor . . . to be treated as the owner . . . ." (Smelley Decl. Ex. 19, at PFLAC 002736.) After summarizing the pertinent revenue rulings, the March 2005 PPM instructed that a "Policy Owner should avoid contact with the manager of or investment adviser to any of the Investment Accounts regarding actual or proposed investments in such Investment Accounts," and advised that "[i]n view of the

10

uncertainties involved in the ownership treatment of the Policy, it is important for a prospective purchaser to consult a qualified tax adviser."  (*Id.* at PFLAC 002738.)

In August 2005, Buchalter requested information from Defendant about the funds available on the platform.  (*See* Smelley Decl. Ex. 20; *see also* Def.'s Consolidated 56.1 ¶ 38.) Defendant provided "tear sheets" for several available funds, including SSR's ID Fund.  The tear sheet for SSR indicated that

> INVESTORS ARE ENCOURAGED TO CAREFULLY AND THOROUGHLY REVIEW THE FUND'S PRIVATE PLACEMENT MEMORANDUM AND RELATED GOVERNING DOCUMENTS WITH THEIR FINANCIAL, LEGAL AND TAX ADVISORS TO DETERMINE WHETHER THE INVESTMENT IS APPROPRIATE AND SUITABLE FOR THEM.  INVESTMENT IN THE FUND AND ALLOCATION OF ASSETS TO AN INSURANCE COMPANY SUB-ACCOUNT THAT INVESTS IN THE FUND IS NOT APPROPRIATE OR SUITABLE FOR ALL INVESTORS.

(Smelley Decl. Ex. 21, at PFLAC 002660; *see also* Def.'s Consolidated 56.1 ¶ 39.)  The tear sheet further indicated that the ID Fund was "speculative and involve[d] a high degree of risk" and that "[a]n investor could lose all or a substantial amount of his or her investment."  (Smelley Decl. Ex. 21, at PFLAC 002660; *see also* Def.'s Consolidated 56.1 ¶ 39.)  Shortly thereafter, on November 9, 2005, Buchalter emailed Defendant asking for updated return numbers on a number of funds, including SSR.  (*See* Supplemental Decl. of Hutson B. Smelley in Supp. of Summ. J. ("Supplemental Smelley Decl.") Ex. 56 (Dkt. No. 114); *see also* Def.'s Consolidated 56.1 ¶ 40.) Defendant responded with the updated numbers.  (*See* Supplemental Smelley Decl. Ex. 56.)

After Buchalter, purporting to act on behalf of the Trust, requested that the ID Fund be added as an available investment account, Defendant issued a December 15, 2005 supplement (the "December Supplement") to the March 2005 PPM reflecting the addition of SSR's ID Fund. (*See* Smelley Decl. Ex. 26, at PFLAC 002090; *see also* Def.'s Consolidated 56.1 ¶ 44.)  The December Supplement provided that with respect to the SSR offering documents, Defendant

"**ha[d] not confirmed the completeness, genuineness, or accuracy of such information or data.**" (Smelley Decl. Ex. 26, at PFLAC 002091; *see also* Def.'s Consolidated 56.1 ¶ 45.)

Attached to the December Supplement was a Confidential Private Placement Memorandum regarding the ID Fund (the "SSR PPM"), dated November 2003. (*See* Smelley Decl. Ex. 26, at PFLAC 002094.) The SSR PPM disclosed that Founding Partners Equity Fund, LP was a limited partner in SSR, and that "[t]he general partner of [Founding Partners Equity Fund, LP] is also the general partner of one or more of the Investment Vehicles in which [the ID Fund] may invest. Although [Founding Partners Equity Fund, LP] has no control over the management of [SSR], such affiliation may give [SSR] additional incentive to invest in such Investment Vehicle(s)." (Smelley Decl. Ex. 26, at PFLAC 002113; *see also* Def.'s Consolidated 56.1 ¶ 47.) Helland similarly testified that neither Founding Partners Equity Fund, LP nor Gunlicks had any management role at SSR. (*See* Smelley Decl. Ex. 27, at 27; *see also* Def.'s Consolidated 56.1 ¶ 48.) The SSR PPM went on to state that "the [ID Fund's] portfolio will not necessarily be widely diversified," and that "the investment portfolio of the [ID Fund] may be subject to more rapid changes in value than would be the case if the [ID Fund] were required to maintain a wide diversification among companies, securities and types of securities." (Smelley Decl. Ex. 26, at PFLAC 002110; *see also* Def.'s Consolidated 56.1 ¶ 49.) The SSR PPM specifically disclosed that the ID Fund "may invest a substantial portion of its assets in one or a small number of Investment Vehicles, e.g., up to 55% of the [ID Fund's] assets may be invested in one Investment Vehicle." (Smelley Decl. Ex. 26, at PFLAC 002110 (italics omitted); *see also* Def.'s Consolidated 56.1 ¶ 50.) Buchalter testified that he understood from the SSR PPM that the ID Fund could invest up to 55% of its assets in an affiliate of Founding Partners Equity Fund, LP. (*See* Supplemental Smelley Decl. Ex. 55, at 109–10; *see also* Def.'s Consolidated 56.1 ¶

51.)  The SSR PPM additionally stated that SSR "anticipate[d] that [the ID Fund] assets [would] be allocated among a relatively small group of Investment Vehicles (6–15), some of which may be affiliated with [SSR]."  (Smelley Decl. Ex. 26, at PFLAC 002104; *see also* Def.'s Consolidated 56.1 ¶ 52.)  The SSR PPM listed Ernst & Young as the auditors for the ID Fund. (*See* Smelley Decl. Ex. 26, at PFLAC 002123.)

The Trust thereafter directed premium allocations to the ID Fund over several months: $88,000 on December 30, 2005; $2,781,000 on January 31, 2006; $317,000 on March 1, 2006; and $29,000 on April 28, 2006.  (*See* Smelley Decl. Ex. 28; *see also* Def.'s Consolidated 56.1 ¶ 53.)  Buchalter testified that although the allocations were made in four separate payments, he made a legal subscription and commitment of the funds to the ID Fund all at once in December 2005.  (*See* Decl. of Lawrence R. Buchalter in Opp'n to Def.'s Mot. for Summ. J. ("Buchalter Decl.") ¶ 7 (Dkt. No. 106).)

When asked why Defendant did not specifically disclose that the ID Fund had invested 44% of its assets into a fund managed by Gunlicks, Fillip explained that disclosure of that information "would have caused the fund to blow up from an investor control perspective" because IRS revenue rulings indicated that "calling out specific underlying publicly available investments held by an insurance dedicated fund" could cause the insurance assets to be considered owned by the policyholder.  (Shepard Decl. Ex. U, at 147–49; *see also* Def.'s Resp. 56.1 ¶ 79.)  Fillip additionally testified that when considering whether to add a new fund to Defendant's investment platform, the committee considered only (1) whether the fund existed; (2) whether the manager(s) existed; and (3) whether the fund complied with technical regulatory requirements.  (*See* Supplemental Decl. of Jonathan T. Shepard in Opp'n to Def.'s Mot. for Summ. J. ("Supplemental Shepard Decl.") Ex. U, at 124 (Dkt. No. 122); *see also* Def.'s Resp.

56.1 ¶ 80.)  In the same vein, Fillip testified that in evaluating whether to put a fund on its

platform, Defendant was typically not concerned with whether lack of diversification by the fund

increased its risk of loss.  (*See* Supplemental Shepard Decl. Ex. U, at 128.)  Hillman similarly

testified that Defendant did not evaluate whether a fund was more or less likely to succeed (or

fail).  (*See* Shepard Decl. Ex. X, at 18–19.)  Geyelin also testified that he was not concerned

about a fund's risk strategy or risk profile.  (*See* Supplemental Shepard Decl. Ex. T, at 69–70,

74–75; *see also* Def.'s Resp. 56.1 ¶ 83.)  Fischer, by contrast, testified that investment risk and

suspicion of fraud were material considerations for Defendant when selecting funds to place on

its platform.  (*See* Shepard Decl. Ex. W, at 129–31; *see also* Def.'s Resp. 56.1 ¶ 84.)

<u>5.  Developments After the Trust's Investment</u>

On or about January 6, 2006, Defendant provided the Trust with the January 1, 2006

PPM Supplement (the "January Supplement").  (*See* Smelley Decl. Ex. 32; *see also* Def.'s

Consolidated 56.1 ¶ 54.)  The January Supplement listed Rothstein, Kass & Company as the ID

Fund's auditors, a change from the original SSR PPM, which listed Ernst & Young.  (*See*

Smelley Decl. Ex. 32, at PFLAC 001630; *see also* Def.'s Consolidated 56.1 ¶ 55.)  The January

Supplement additionally provided that the ID Fund "currently invests" in a fund managed by the

general partner of Founding Partners Equity Fund, LP.  (Smelley Decl. Ex. 32, at PFLAC

001619; *see also* Def.'s Consolidated 56.1 ¶ 56.)  In a May 1, 2006 PPM Supplement, Defendant

forwarded to the Trust information about the ID Fund's new leverage strategy and program,

which included the statement: "if you do not wish to remain invested in the [ID Fund] under the

Second Amended Agreement you may withdraw your Interest as of June 30, 2006."  (Smelley

Decl. Ex. 34, at PFLAC 001938; *see also* Def.'s Consolidated 56.1 ¶ 58.)

By 2007, Buchalter was concerned about SSR because he "wasn't getting the information [he] should have as an investor." (Smelley Decl. Ex. 24, at 122–23; *see also* Def.'s Consolidated 56.1 ¶ 59.) In the summer of 2008, the Trust put in a request to redeem the Policy investment in the ID Fund, (*see* Def.'s Consolidated 56.1 ¶ 73), but before that request was processed, SSR exercised its right to suspend all pending investor redemption requests, (*see* Shepard Decl. Ex. G; Buchalter Decl. ¶ 9; *see also* Def.'s Resp. 56.1 ¶ 12). At the time the redemption request was made, the value of the Trust's SSR investment account was approximately $3.9 million. (*See* Buchalter Decl. ¶ 8; *see also* Def.'s Resp. 56.1 ¶ 11.)

SSR's decision to suspend redemption requests was presumably related to an October 10, 2008 letter SSR sent to its investors alerting them that the ID Fund had exposure to fraudulent financing transactions with inventory broker Tom Petters. (*See* Smelley Decl. Ex. 37; *see also* Def.'s Consolidated 56.1 ¶ 62.) Buchalter, who received the correspondence, testified that it was his understanding from this letter that there could "potentially [be] a permanent loss of capital here." (Smelley Decl. Ex. 24, at 211–12; *see also* Def.'s Consolidated 56.1 ¶ 63.) On October 29, 2008, Defendant sent the Trust a letter regarding SSR's proposal to create a "side pocket" account to hold assets related to the Petters fraud and attached a letter from SSR indicating that the "side pocket" would represent approximately 25% of SSR's equity. (*See* Smelley Decl. Ex. 47, at BUCH00002250–52; *see also* Def.'s Consolidated 56.1 ¶ 65.) On November 21, 2008, Defendant sent the Trust a letter from SSR dated November 19, 2008, detailing the ID Fund's exposure to the Petters fraud and the recovery efforts and warning that there was no assurance of "any recovery" from investments related to the Petters fraud. (*See* Smelley Decl. Ex. 48; *see also* Def.'s Consolidated 56.1 ¶ 66.) The same letter indicated that "given the current market environment and liquidity constraints with [the ID Fund's] other underlying managers, it could

15

take 12–18 months or more to fully pay out the December 31 withdrawals." (Smelley Decl. Ex. 48, at BUCH00002309; *see also* Def.'s Resp. 56.1 ¶ 14.)  Sometime in November 2008, the Trust's counsel inquired into whether Defendant had initiated legal action against any of the underlying fund managers, and Defendant responded that it was evaluating legal options. (*See* Second Am. Compl. Ex. J.)[2]  In December 2008, Buchalter emailed the Trust's counsel asking about the possibility that the Trust's losses attributable to the Petters fraud could be tax deductible. (*See* Smelley Decl. Ex. 52; *see also* Def.'s Consolidated 56.1 ¶ 71.)  The Trust's counsel forwarded the email to Defendant, who responded that it was unlikely the losses would be deductible for the Trust. (*See* Smelley Decl. Ex. 52.)  By the end of 2008, the Trust's investment in SSR had decreased in value by approximately $950,000. (*See* Smelley Decl. Ex. 54; *see also* Def.'s Consolidated 56.1 ¶ 63.)

On April 24, 2009, Defendant forwarded to the Trust a letter from SSR dated April 21, 2009, reflecting a 27.66% loss of equity in 2008 for the ID Fund and noting that SSR assumed "a full write-down" of any Petters-related investments. (Smelley Decl. Ex. 49, at BUCH00000533; *see also* Def.'s Consolidated 56.1 ¶ 67.)  The letter also acknowledged that the 2007 audit had not yet been issued, and that the 2008 K-1 statements would not be issued until the fall. (*See* Smelley Decl. Ex. 49, at BUCH00000535–36; *see also* Def.'s Consolidated 56.1 ¶ 67.)  On July

---

[2] Defendant references this correspondence in its brief in support of its Motion for Summary Judgment and cites to ¶ 66 of its 56.1 Statement in support. (*See* Def. Philadelphia Financial Life Assurance Company's Brief in Supp. of Mot. for Summ. J. 4 (Dkt. No. 103).) Paragraph 66, however, makes no reference to the correspondence in question; the only indication of the correspondence is in Exhibit J of the Second Amended Complaint. Nevertheless, because the exhibit was attached to Plaintiff's Second Amended Complaint, neither Party has objected to its consideration in these proceedings, and when asked about the correspondence at oral argument, Plaintiff's counsel made no suggestion that the Court could not consider the correspondence at summary judgment, the Court finds it appropriate to consider the correspondence in deciding the pending Motions.

27, 2009, SSR wrote a letter to investors, saying: "Assuming the accuracy of [its] projections, and, most importantly, assuming a successful refinancing this year or next . . . , distribution to ID Fund investors could begin in the first part of 2011."  (Shepard Decl. Ex. J, at INT 00529; *see also* Def.'s Resp. 56.1 ¶ 15.)  On June 2, 2010, SSR wrote another letter to investors, saying: "While you may already appreciate our position, we want to reiterate that we placed 100% redemption requests with ALL underlying manager positions and as such, as liquidity returns, we first pay down leverage and once leverage is paid in full, we expect to begin making full distributions to all investors."  (Shepard Decl. Ex. K, at BUCH00000562; *see also* Def.'s Resp. 56.1 ¶ 16.)  Finally, on March 18, 2011, SSR wrote another letter: "While 2010 has been an extremely difficult year, we remain committed to seeking liquidity to pay down the leverage line and return capital to investors as quickly as possible."  (Shepard Decl. Ex. L, at BUCH00000015; *see also* Def.'s Resp. 56.1 ¶ 17.)  Buchalter alleges that these letters offered him reassurance that the Trust would have its redemption requests fulfilled and its capital returned.  (*See* Buchalter Decl. ¶ 10; *see also* Def.'s Resp. 56.1 ¶ 18.)

On May 6, 2009, Defendant sent to the Trust a letter from SSR disclosing that the SEC had filed a civil complaint against Gunlicks and several of the funds he controlled, including the Stable Value Fund in which the ID Fund had invested and the fund which was a limited partner in SSR, on April 20, 2009, and that a federal district judge had frozen Gunlicks's and the funds' assets and appointed a receiver.  (*See* Smelley Decl. Ex. 51; *see also* Def.'s Consolidated 56.1 ¶ 70.)  The letter included the complaint filed against Gunlicks and the funds.  (*See* Smelley Decl. Ex. 51, at WDL 00087; *see also* Def.'s Consolidated 56.1 ¶ 70.)  On May 7, 2009, SSR sent Defendant another notice referencing the pending SEC action against Gunlicks and his funds.  (*See* Smelley Decl. Ex. 50; *see also* Def.'s Consolidated 56.1 ¶ 68.)  The notice also

disclosed that because of the size of the ID Fund's investment in the Stable Value Fund, SSR's audit could not be completed without an underlying audited financial statement for the Stable Value Fund, and such a statement was unlikely to be produced.  (*See* Smelley Decl. Ex. 50.) Buchalter suggested that he received the same notice on or about May 7, 2009.  (*See* Smelley Decl. Ex. 24, at 220.)  The receiver who took control of Gunlicks's funds, including the Stable Value Fund, rolled them up into a new holding company for all of the receivership assets.  (*See* Shepard Decl. Ex. V, at 117–18; *see also* Def.'s Resp. 56.1 ¶ 88.)  SSR thereafter sold all of its assets to an independent party.  (*See* Shepard Decl. Ex. V, at 117–18; *see also* Def.'s Resp. 56.1 ¶ 88.)  By June 2009, the value of the Trust's SSR investment had dropped from approximately $3.9 million at the time of the redemption request to approximately $2.5 million.  (*See* Smelley Decl. Ex. 54, at PFLAC 001443; Buchalter Decl. ¶ 8.)

In the 11 months ending November 30, 2011, the Trust's investment in SSR was marked down over 50%, down to $746,971 of the $3,215,000 originally invested.  (*See* Shepard Decl. Ex. NN, at 4; *see also* Def.'s Resp. 56.1 ¶ 20.)  Buchalter alleges that in 2012, after he commenced his "investigation" during which Defendant refused to speak with Buchalter about SSR or allow Buchalter to speak directly to SSR, (*see* Def.'s Resp. 56.1 ¶ 22), "the Trust's SSR investment effectively zeroed out," (Buchalter Decl. ¶ 13; *see also* Def.'s Resp. 56.1 ¶ 24). Plaintiffs allege in their Second Amended Complaint that as of November 30, 2012, the balance of the Trust's SSR account was $356,900.  (*See* Second Am. Compl. ¶ 97.)  As of the filing of the Motions, none of the Trust's SSR capital has been returned.  (*See* Buchalter Decl. ¶ 13; *see also* Def.'s Resp. 56.1 ¶ 89.)

B.  Procedural History

Plaintiffs filed their Complaint on September 7, 2012, alleging claims for negligence/negligent misrepresentation, breach of contract, breach of duty of good faith and fair dealing, professional malpractice, and unjust enrichment.  (*See* Dkt. No. 1.)  After Defendant received leave to file a Motion To Dismiss, (*see* Order (Dkt. No. 14)), Plaintiffs sought and were granted leave to amend, (*see* Endorsed Letter (Dkt. No. 19)).  Plaintiffs filed the Amended Complaint on February 15, 2013.  (*See* Dkt. No. 20.)  After a new briefing schedule was entered, (*see* Order (Dkt. No. 25)), Defendant filed a Motion To Dismiss, (*see* Dkt. No. 26).  After oral argument, the Parties agreed that the Court should deny Defendant's Motion without prejudice and allow Plaintiffs to file a Second Amended Complaint.  (*See* Order (Dkt. No. 35).)  On March 31, 2014, Plaintiffs filed their Second Amended Complaint.  (*See* Dkt. No. 42.)  The Second Amended Complaint, which is the operative pleading, alleges claims for (1) negligence, (2) negligent misrepresentation, (3) breach of fiduciary duty, (4) professional malpractice, (5) breach of contract, (6) breach of the covenant of good faith and fair dealing, and (7) unjust enrichment. (*See id.*)  Defendant filed a Motion To Dismiss on June 2, 2014.  (*See* Dkt. No. 44.)

On March 31, 2015, the Court granted Defendant's Motion in part.  Specifically, the Court dismissed all claims except the portions of the claims for negligence, negligent misrepresentation, and professional malpractice relating to Defendant's alleged failure to properly vet SSR and the ID Fund before placing the ID Fund on its investment platform and making it available to policyholders.  (*See* Op. & Order 84 (Dkt. No. 52).)  Defendant thereafter filed an Answer to the Second Amended Complaint.  (*See* Dkt. No. 55.)  On April 29, 2015, the Court entered a case management and scheduling order.  (*See* Dkt. No. 60.)

On May 26, 2016, after the close of discovery, the Court granted Defendant leave to file a Motion for Summary Judgment and a Motion To Exclude Testimony of Plaintiffs' expert, and granted Plaintiffs leave to file a Motion To Exclude Testimony of Defendant's expert.  (*See* Mot. Scheduling Order (Dkt. No. 97).)  Defendant filed its Motions and accompanying papers on July 1, 2016.  (*See* Dkt. Nos. 99–104.)  Plaintiffs filed their opposition papers and their Motion on August 19, 2016.  (*See* Dkt. Nos. 105–112.)  Defendant filed its reply papers and its response to Plaintiffs' Motion on September 16, 2016.  (*See* Dkt. Nos. 113–119.)  On September 30, 2016, Plaintiffs filed their reply in support of their Motion.  (*See* Dkt. No. 120.)  The Court held oral argument on January 19, 2017.  (*See* Dkt. (minute entry for Jan. 19, 2017).)

## II.  Discussion

Because Defendant's Motion for Summary Judgment may moot the remaining Motions, the Court will first address summary judgment.

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy*

*Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v.
Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

     "However, when the burden of proof at trial would fall on the nonmoving party, it
ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an
essential element of the nonmovant's claim," in which case "the nonmoving party must come
forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to
avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,
123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a
[summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical'
possibility that his allegations were correct; he need[s] to 'come forward with specific facts
showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d
Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the
pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)
(internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009)
("When a motion for summary judgment is properly supported by documents or other
evidentiary materials, the party opposing summary judgment may not merely rest on the
allegations or denials of his pleading . . . .").

     "On a motion for summary judgment, a fact is material if it might affect the outcome of
the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental
Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage,
"[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any
factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a

court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted)).

B.  Analysis

Defendant argues that Plaintiffs' claims are all time barred because Plaintiffs were on notice prior to 2011 or 2012 that Defendant had not vetted SSR and that the Trust had incurred substantial financial injury.

The Court has already determined that Alaska law controls the question of whether Plaintiffs' claims are timely.  (*See* Op. & Order 23.)  Under Alaska law, Plaintiffs' negligence and negligent misrepresentation claims are subject to a two-year statute of limitations.  *See*

Alaska Stat. § 09.10.070(a).  Professional malpractice claims arising out of an economic injury are subject to a three-year statute of limitations.  *See* Alaska Stat. § 09.10.053; *see also Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 396 (Alaska 2014).  Because the Complaint was filed on September 7, 2012, the negligence and negligent misrepresentations claims are untimely if the statute of limitations began to run before September 7, 2010, and the professional malpractice claim is untimely if the statute of limitations began to run on September 7, 2009.

In Alaska, "[t]he general rule is that 'accrual of a cause of action is established at the time of the injury.'"  *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1273 (Alaska 2013) (quoting *Cameron v. State*, 822 P.2d 1362, 1365 (Alaska 1991)).  Alaska, however, has adopted the discovery rule, which stipulates that "a cause of action accrues when the plaintiff has 'information sufficient to alert a reasonable person to the fact that he has a potential cause of action.'"  *Christianson*, 318 P.3d at 396–97 (quoting *Preblich v. Zorea*, 996 P.2d 730, 734 (Alaska 2000)).  Under this rule, the Court should look to "the date when 'a reasonable person in like circumstances would have enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights.'"  *Id.* at 397 (quoting *Lee Houston & Assocs., Ltd. v. Racine*, 806 P.2d 848, 851 (Alaska 1991)).  The Supreme Court of Alaska has articulated the discovery rule as follows:

> (1) a cause of action accrues when a person discovers, or reasonably should have discovered, the existence of all elements essential to the cause of action;
>
> (2) a person reasonably should know of his cause of action when he has sufficient information to prompt an inquiry into the cause of action, if all of the essential elements of the cause of action may reasonably be discovered within the statutory period at a point when a reasonable time remains within which to file suit.

*Cameron*, 822 P.2d at 1366.  The "third part" of the discovery rule provides that "where a person makes a reasonable inquiry which does not reveal the elements of the cause of action within the

statutory period at a point where there remains a reasonable time within which to file suit," then

"the limitations period is tolled until a reasonable person discovers actual knowledge of, or

would again be prompted to inquire into, the cause of action." *John's Heating Serv. v. Lamb*,

129 P.3d 919, 924 (Alaska 2006) (italics and internal quotation marks omitted).

It is not necessary that the plaintiff "know the precise cause at the time of the injury,"

rather, the plaintiff must simply "begin an inquiry as to the cause of injury promptly and

diligently once it is apparent that an injury has occurred due to the possible negligence of

another." *Palmer v. Borg-Warner Corp.*, 818 P.2d 632, 634 n.4 (Alaska 1990).  In other words,

"it is irrelevant if the full scope of injury is not known immediately." *Sopko v. Dowell*

*Schlumberger, Inc.*, 21 P.3d 1265, 1272 (Alaska 2001).

Under this rule, "[w]hen a cause of action accrues ordinarily presents a question of fact."

*Egner v. Talbot's, Inc.*, 214 P.3d 272, 278 (Alaska 2009).  Accordingly, "[r]esolution of the issue

on summary judgment is appropriate only if the . . . court has before it uncontroverted facts

regarding when the statute of limitations began running."  *Id.*

In its prior Opinion, the Court noted:

> Plaintiffs' allegations that SSR suspended investor redemption requests in 2008 and
> that the Trust's SSR investment account "steadily declined in stated value" since
> that point, as well as Plaintiff's [sic] attachment of an email dated November 20,
> 2008 discussing the possibility of Defendant bringing legal action against SSR,
> raises the question of whether Plaintiffs were on inquiry notice as early as 2008 of
> Defendant's alleged failure to vet SSR.

(Op. & Order 26–27.)  Nonetheless, the Court concluded that "[t]aking as true the facts alleged

in the [Second Amended Complaint], the Court cannot conclude as a matter of law that Plaintiffs

had inquiry notice and that a reasonable inquiry would have produced knowledge of the cause of

action in 2008."  (*Id.* at 27.)  Now, however, with the benefit of discovery, the Court is fully

apprised of the pertinent undisputed facts, and the record indicates that Plaintiffs were on notice

of more than merely a precipitous decline in the value of the SSR investment.  Accordingly, the Court will consider the arguments raised by Defendant to determine whether the record at this stage requires the conclusion that a reasonably diligent person would have been on inquiry notice of Defendant's alleged negligence and professional malpractice prior to September 7, 2009, three years before the Complaint was filed.

Defendant argues that Plaintiffs were aware as far back as 2005 that Defendant was not vetting the funds placed on the platform.  Defendant points to the disclosure in the December Supplement (issued in 2005) that Defendant "**ha[d] not confirmed the completeness, genuiness, or accuracy of such information or data** [contained in the SSR PPM]."  (Smelley Decl. Ex. 26, at PFLAC 002091.)  This argument falls short of showing that Plaintiffs were on inquiry notice in 2005 of Defendant's alleged negligence.  The disclosure establishes only that Defendant had relied on the representations made by SSR without independent verification, not that Defendant had never considered whether those representations justified the ID Fund's inclusion on the platform.  Indeed, Defendant's counsel admitted as much at oral argument.  There is nothing in the December Supplement that put Plaintiffs on notice of Defendant's alleged negligence.

Defendant next points to the January Supplement, issued in 2006, that revealed that the ID Fund had changed auditors from Ernst & Young to Rothstein, Kass & Company.  (*See* Smelley Decl. Ex. 32, at PFLAC 001630.)  But Plaintiffs have not suggested that a mere change in auditors was a telltale sign that the ID Fund was inappropriate for placement on the platform, only that a change in auditors is a material event that should have been (and, in fact, was) reported to them.  (*See* Second Am. Compl. ¶ 16.)  That Plaintiffs were aware in 2006 that SSR had changed auditors does not inform whether Plaintiffs were aware that in 2005, Defendant had

not properly vetted the ID Fund.  The same is also true of Defendant's argument that Plaintiffs knew by May of 2006 that SSR was beginning to leverage its investments.  (*See* Smelley Decl. Ex. 34, at PFLAC 001938.)  While these facts may have been yellow flags, they did not put Plaintiffs on notice that Defendant had performed its duties negligently or that SSR was doomed.

Defendant additionally points out that Buchalter admitted that by 2007, the ID Fund was on his redemption watch list because he "wasn't getting the information [he] should have as an investor."  (Smelley Decl. Ex. 24, at 122–23.)  Defendant also highlights Buchalter's statement in a letter he wrote to Defendant in 2012 that SSR's reported investment performance "clearly pointed to SSR itself as a fraud" as evidence that Plaintiffs were on notice that Defendant had not adequately vetted SSR or the ID Fund.  (*See* Smelley Decl. Ex. 35, at 6.)  But Defendant does not explain how these facts, which gave rise to general concerns about the quality of SSR, would have put Plaintiffs on notice that Defendant had not adequately vetted SSR.  And even assuming these statements show that Buchalter was on inquiry notice that Defendant had not properly vetted SSR or the ID Fund, Plaintiffs had not yet suffered any injury, and thus could not have been on notice that Defendant's alleged negligence had injured them.  *See Palmer*, 818 P.2d at 634 n.4 ("[W]e conclude that a claimant must begin an inquiry as to the cause of injury promptly and diligently once it is apparent that an injury has occurred due to the possible negligence of another.").

More difficult is whether Plaintiffs were on inquiry notice of Defendant's alleged negligence in 2008 and 2009, when Plaintiffs learned that SSR placed a hold on redemptions, the Trust's investment dropped over $1 million in value, the ID Fund had significant exposure to the Petters fraud, and the SEC had filed civil actions against Gunlicks and his funds for securities fraud, resulting in a freeze of Gunlicks's and the funds' assets.

Plaintiffs first point out a host of other facts they were unaware of in 2008 and 2009, including the lack of sufficient staffing or funding at SSR, the magnitude and nature of Gunlicks's interest in SSR and the ID Fund, the lack of diversification of the ID Fund, the conclusions of the due diligence report, and the decision of Defendant to not disclose the specific nature of Gunlicks' interest in SSR and the ID Fund.  (*See* Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Summ. J. Mem.") 13–16 (Dkt. No. 107).)  But this argument proves too much.  As Plaintiffs concede, these are all facts they learned through discovery in this litigation, not facts that gave them cause to file this suit in the first place.  (*See* Buchalter Decl. ¶¶ 11–12.) Plaintiffs' argument thus begs the question of what facts they learned between 2009 and the commencement of this suit that led them to believe Defendant acted negligently.  Moreover, the fact that Plaintiffs were unaware of the scope of Defendant's alleged negligence does not delay the accrual of the claim, *see Brannon v. Continental Cas. Co.*, 137 P.3d 280, 285 (Alaska 2006) ("[I]n Alaska it is irrelevant if the full scope of the injury is known . . . ."), because the pertinent question is whether "it is apparent that an injury has occurred due to the *possible* negligence of another," *Palmer*, 818 P.2d at 634 n.4 (emphasis added).  The information gleaned in discovery, gathered in order to *prove* the allegations, not merely to form a reasonable belief as to their truth, cannot be invoked as evidence that Plaintiffs were not on notice of the *possibility* of Defendant's alleged negligence.  To suggest otherwise would imply that prior to obtaining discovery in this matter, Plaintiffs lacked a good-faith basis for filing their Complaint.  As the sufficiency of the Second Amended Complaint has already been tested, the Court is satisfied that Plaintiffs had sufficient information prior to obtaining discovery in this matter to at least put them on inquiry notice of Defendant's alleged negligence.

Moreover, Plaintiffs' reference to Buchalter's 2012 "investigation," of which no details are provided, is of no help. Because Alaska recognizes that the statute of limitations begins to run once a plaintiff has inquiry notice, not when a plaintiff has actual notice of all of the elements of a cause of action, *see Christianson*, 318 P.3d at 396–97, citing to the facts that Plaintiffs learned once they commenced that investigation is insufficient. The Court must inquire at what point Plaintiffs were put on notice that they should investigate potential claims against Defendant—not at what point they actually did commence the investigation and discover the factual basis for the claims set forth in the Complaint. The Court must therefore probe what facts arose prior to 2012 that caused Plaintiffs to commence their investigation, or whether facts that arose earlier would have put a reasonably diligent plaintiff on inquiry notice.

Plaintiffs next argue that "paper" losses do not constitute an injury for purposes of determining claim accrual, and that the claims did not accrue until the losses "appeared" to be "irreversible" at the end of 2011. (Pls.' Summ. J. Mem. 19.) In support, Plaintiffs cite *Jarvill v. Porky's Equipment, Inc.*, 189 P.3d 335 (Alaska 2008). In that case, the purchaser of a boat was aware at the time he purchased it that the maker had not adequately reinforced the hull. *See id.* at 336–37. When the boat sank a few years later, the defendants claimed that the plaintiff's product defect and negligence claims were time-barred because his cause of action accrued at the time he purchased the boat and was aware that the hull was not adequately reinforced, and not at the time the boat sank. *See id.* at 337. The Supreme Court of Alaska disagreed, saying that at the time the plaintiff purchased the defective boat, "any tortious injury to [the plaintiff] remained a matter of speculation." *Id.* at 339. The court noted that to hold otherwise would "lead [the court] to 'the anomalous and grossly unfair result of the statute being held to have run and the bar becoming completed even before the hapless plaintiff suffered injury or damage.'" *Id.* at 340–41

28

(quoting 1A Stuart M. Speiser et al., The American Law of Torts § 5:35 (1983)).  The court thus concluded that the statute of limitations on the tort claims did not begin to run until the boat sank.  *See id.* at 341.

*Jarvill* does not stand for the proposition that "paper" losses are not actionable.  On its face, *Jarvill* does not even discuss the issue here—whether the precipitous and suspicious loss in value of an investment instrument is actionable only when the plaintiff becomes aware that the loss is "irreversible."  In *Jarvill*, the issue was merely whether a cause of action for negligence accrued when the defect was discovered or when the injury from the defect was actually realized. Importantly, the court acknowledged that any breach of contract claim likely accrued at the time the defect was discovered, not when the boat ultimately sank.  *See id.* at 339.  The court held only that the specific injury upon which the negligence claim was based—the sinking of the boat—formed the basis of the accrual date.

Plaintiffs' argument here is unpersuasive.  First, notwithstanding Plaintiffs' conclusory assertion that the investment in the ID Fund has "effectively zeroed out," (Buchalter Decl. ¶ 13)—whatever that cryptic term may mean—it is unclear what changed with respect to Plaintiffs' claim between 2008 and 2012, when the suit was brought.  It is no answer to say that the value of the investment "effectively zeroed out" in late 2011 and 2012; Plaintiffs offer no explanation for why the claim did not accrue until the account value reached zero.  If Plaintiffs' position were taken seriously, that would mean no aggrieved investor could sue for negligence or negligent misrepresentation so long as the investment retained some nominal value.  There is no law cited by any Party, and none uncovered by the Court, suggesting that an aggrieved investor must wait until the value of his or her investment reaches $0 before suing, and the Court is not persuaded that it should infer such a rule from *Jarvill*, particularly in light of the Supreme Court

of Alaska's admonition against "anomalous and grossly unfair result[s]." *Jarvill*, 189 P.3d at

340 (internal quotation marks omitted).  And such a proposition is, in any event, at odds with the

Supreme Court of Alaska's holding that "it is irrelevant if the full scope of injury is not known

immediately." *Sopko*, 21 P.3d at 1272.  Notably, no such "paper losses" rule applies in the

securities fraud context.  *See GVA Market Neutral Master Ltd. v. Veras Capital Partners

Offshore Fund, Ltd.*, 580 F. Supp. 2d 321, 332 (S.D.N.Y. 2008) ("[I]n a securities fraud action,

the injury occurs 'at the time an investor enters a transaction as a result of material

misrepresentations.'" (alteration omitted) (quoting *Lenz v. Associated Inns & Rests. Co. of Am.*,

833 F. Supp. 362, 370 (S.D.N.Y. 1993)); *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F.

Supp. 2d 444, 458 (S.D.N.Y. 2001) ("[The] [p]laintiffs are incorrect in asserting that they

received no injury until [the defendant] failed to make the first Contingent Payment.").

Second, despite insisting that the account "effectively zeroed out" in 2012, (Buchalter

Decl. ¶ 13), Plaintiffs allege in their Second Amended Complaint that the value of the Trust's

investment in SSR was approximately $356,900 as of November 30, 2012, (*see* Second Am.

Compl. ¶ 97).  Under Plaintiffs' theory of "paper losses," there is still some theoretical, if not

practical, possibility of recovery, and Plaintiffs' claims would therefore not yet be ripe.  In light

of this information, Plaintiffs have not explained why it is their belief that their losses became

"irreversible" in 2011 or 2012, but not in 2008 or 2009.  But as there is no dispute that Plaintiffs'

claims are ripe, the more likely explanation is that Plaintiffs' losses were as concrete and

irreversible in 2009 as they were in 2012, or still are today.  At a minimum, in May 2009,

Plaintiffs were on notice of the possibility of substantial losses, and of the possibility that

Defendant's negligence and/or malpractice was the cause of Plaintiffs' injuries.

Plaintiffs offer, however, another argument as to why it was not until 2011 or 2012 that they were on inquiry notice that Defendant may have acted negligently.  Plaintiffs argue that in 2008, the entire financial industry was facing a systematic collapse, and SSR was one of many hedge funds that suffered severe financial losses and suspended account redemptions.  (*See* Pls.' Summ. J. Mem. 18–19.)  Plaintiffs point to the assurances by SSR from 2008 to the beginning of 2011 that investors' capital would be returned, (*see id.* at 19; *see also* Smelley Decl. Exs. 48, 49; Shepard Decl. Exs. J, K, L), and Buchalter's testimony that these letters gave him confidence that the Trust's redemption request would be honored, (*see* Buchalter Decl. ¶ 10).  According to Buchalter, it was not until 2011, when SSR's monthly account balances continued to decline while "broader market indices were stabilizing," that he became suspicious and commenced his investigation into SSR and the ID Fund.  (*See* Shepard Decl. Ex. II, at 131–35; Buchalter Decl. ¶ 11.)

Plaintiffs' argument, while viable in some respects, ultimately fails.  The optimism expressed by SSR that the suspended redemption requests would eventually be honored does not speak to whether Plaintiffs were on notice that Defendant had not adequately vetted SSR or the ID Fund.  By May 2009, Plaintiffs were on notice that SSR had switched auditors at the beginning of 2007; the 2007 and 2008 audits and the 2008 K-1 statement had not yet been issued; SSR had suspended redemptions; the ID Fund had significant exposure to the Petters fraud; and Gunlicks and the funds he controlled, including one that was a limited partner in SSR and one in which the ID Fund had made a significant investment, had been sued by the SEC and had had their assets frozen by a federal district court.  While Plaintiffs could not be *certain* that these failures were attributable to deficiencies that could have been identified through adequate due diligence, they were at least on notice of that *possibility*, which is sufficient to begin running

the statute of limitations.  *See Jones v. Westbrook*, 379 P.3d 963, 967 (Alaska 2016) (noting that

the discovery rule "tolls the statute of limitations until 'the plaintiff has information sufficient to

alert a reasonable person to the fact that he has a potential cause of action' or should begin to

inquire about that *possibility*" (emphasis added) (quoting *Preblich*, 996 P.2d at 734).  Tellingly,

despite Buchalter's testimony that SSR's representations gave him confidence that his

redemption request would be honored, he wrote an email to his attorney in December 2008

asking whether the Trust's losses attributable to the Petters fraud could be tax deductible, (*see*

Smelley Decl. Ex. 52), suggesting that Buchalter was preparing for the very real possibility that

his redemption request would never be honored and that the Trust could incur substantial losses.

Moreover, the Trust's counsel asked Defendant in November 2008 whether it had any intention

of pursuing legal action against the underlying managers of the funds in which SSR had invested,

further indicating an awareness that there was at least the possibility of unrecoverable losses.

Although Plaintiffs point out that other firms also suspended redemptions and were

facing financial distress as a result of the Petters fraud, (*see* Def.'s Resp. 56.1 ¶¶ 13, 20), the fact

that other funds suffered mismanagement or risk oversight issues does not inform whether

Plaintiffs were aware of the possibility that this particular fund was ill-equipped to manage

Plaintiffs' assets or that Defendant had not conducted adequate due diligence.  Moreover,

Plaintiffs were also aware of a civil action facing one of SSR's founding partners and one of the

ID Fund's biggest investments, a circumstance unique to SSR.  Although at oral argument,

Plaintiffs' counsel pointed to SSR's language in its notice to investors that the civil action

consisted of only "allegations" at that point, (*see* Smelley Decl. Ex. 51, at WDL00086), the

SEC's allegations were at least substantiated enough to warrant an asset freeze, which surely put

Plaintiffs on notice that the allegations were not baseless.  And the fact that other funds

recovered in 2011 and 2012 while SSR and the ID Fund continued to struggle is also unavailing; Plaintiffs do not suggest that they believed at any point in time that the ID Fund's decline was attributable solely to the financial crisis and not to the various issues of which they became aware in 2008 and 2009.  Moreover, it would work a perverse justice on defendants offering financial products to hold that the statute of limitations for all causes of actions alleging negligence was tolled for three years while the markets recovered.  That SSR expressed optimism about eventually being able to honor the Trust's redemption request says nothing about the quality of the fund or Defendant's diligence in vetting the fund in the first place.  Plaintiffs were on notice in 2008, when the Petters fraud was first disclosed, that there could be a "permanent loss of capital."  (Smelley Decl. Ex. 24, at 211–12; *see also* Smelley Decl. Ex. 48.)  And while Plaintiffs were perhaps entitled to hold out hope that their losses would be mitigated or compensated, they were not entitled to sit on their claims in reliance on such hope.  *See Christianson*, 318 P.3d at 400 ("Nor does the theoretical possibility his out-of-pocket defense expenses might be reimbursed in the future obviate the fact [the plaintiff] was then suffering an actual injury that triggered the duty of inquiry as a matter of law.").

Fatal to Plaintiffs' case is the fact that no new information about the quality of the management of the ID Fund or the level of diligence exercised by Defendant was revealed between May 2009 and the time at which Buchalter commenced his investigation (i.e., was undoubtedly on inquiry notice) in late 2011 and 2012.  Plaintiffs' argument is that the mere passage of time and the compounding of their losses, which by 2009 were already substantial, jolted Buchalter and Plaintiffs into action.  Tellingly, Plaintiffs are unable to identify any moment or date upon which they were put on inquiry notice, alluding only to a general range late

in 2011 and 2012.  The amorphous timeframe of this argument is itself evidence that Plaintiffs'

claim stands on thin ice.

 Plaintiffs also assert, in a footnote, that other investors were also exposed to the Petters

fraud, and that accordingly, the fact that a significant portion of the ID Fund's equity was

exposed to the fraud was not a red flag that put them on notice of wrongdoing by SSR or

Defendant.  (*See* Pls.' Summ. J. Mem. 19 n.16.)  But the fact that other investors also fell prey to

the Petters fraud does not inform whether SSR's misguided investment was a consequence of

mismanagement that should have been detected by Defendant.  And while the Court agrees that

this fact, on its own, would not have put a reasonably diligent plaintiff on inquiry notice of

Defendant's alleged negligence, it was far from the only red flag that should have alerted

Plaintiffs to a potential cause of action.

 Finally, Plaintiffs argue that even if they were on notice of some injury stemming from a

party's negligence by 2009 (or earlier), they were not on notice until 2011 or 2012 that

*Defendant* had acted negligently.  (*See* Pls.' Summ. J. Mem. 13.)  Notwithstanding that, for the

reasons noted above, the accuracy of this assertion is belied by the record, Plaintiffs' argument

misapprehends the law.  The Supreme Court of Alaska has held that the statute of limitations

begins running "once it is apparent that an injury has occurred due to the possible negligence of

another."  *Palmer*, 818 P.2d at 634 n.4.  The plaintiff need not "actually know the precise cause

at the time of the injury."  *Id.*  Thus, it is insufficient for Plaintiffs to argue that they did not

know *which* entity—Defendant, SSR, or the underlying funds—had acted negligently.  In

*Palmer*, the court held that the estate of a victim of a plane crash was on inquiry notice of its

negligence claim against the manufacturer at the time of the plane crash, even though the estate

did not know which entity's negligence caused the crash.  *Id.* at 634 ("[T]he [decedent's] estate

reasonably should have known from the date of being informed of the crash that potential claims existed against the pilot, the carrier, or the manufacturers.").  The court so held notwithstanding that the National Transportation Safety Board had made a determination that it was the pilot, not the manufacturer, who was responsible for the crash.  *See id.* at 633.  Here, by May 2009, Plaintiffs were on notice—by way of, among other things, the exposure to the Petters fraud, the SEC action against Gunlicks and his funds, and the drastic and consistent decline in the Trust's value—that they had suffered injury that could be attributable to the negligence of another, and that an inquiry into the actions of all involved parties was warranted.  That they did not know the precise cause of the injury, or even the identity of the responsible party, does not serve to toll the statute of limitations.

Admittedly, courts in Alaska "look[] upon the defense of statute of limitations with disfavor and will strain neither the law nor the facts in its aid."  *Solomon v. Interior Reg'l Hous. Auth.*, 140 P.3d 882, 883 (Alaska 2006) (internal quotation marks omitted); *see also Lee Houston & Assocs., Ltd.*, 806 P.2d at 854 ("[A]lthough the defense of the statute of limitations is a legitimate one, it is generally disfavored by the courts.").  Moreover, because "the question [of the date on which the statute of limitations begins to run] is fact dependent, summary judgment ordinarily should not be used to resolve when a statute of limitations commences."  *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1031 (Alaska 2002).  The Court is satisfied, however, that the undisputed evidence establishes that by May 2009, there was "information [that] would be sufficient to alert a reasonably diligent plaintiff to the existence and scope" of the cause of action, and that "[o]n this point[,] reasonable minds could not differ."  *Gudenau & Co. v. Sweeney Ins., Inc.*, 736 P.2d 763, 767 (Alaska 1987).  Plaintiffs knew that Gunlicks was the owner of Founding Partners Equity Fund, LP, a limited partner in SSR, (*see* Smelley Decl. Ex.

26, at PFLAC 002113; Smelley Decl. Ex. 51, at WDL00086); knew that Gunlicks, Founding

Partners Equity Fund, LP, and Stable Value Fund had been sued by the SEC, (*see* Smelley Decl.

Ex. 51, at WDL00086); knew that as a result of that lawsuit, the assets of Gunlicks and the funds

he controlled were frozen and a receiver appointed, (*see id.*); knew that the ID Fund's investment

in the Stable Value Fund was significant enough to postpone, perhaps indefinitely, audits of the

ID Fund, (*see* Smelley Decl. Ex. 50, at BUCH00000538–39); knew that approximately 25% of

the ID Fund's limited partner equity had been exposed to the Petters fraud, (*see* Smelley Decl.

Ex. 37, at BUCH00002323); and knew that the value of the Trust's SSR investment had dropped

from approximately $3.9 million at the time of the redemption request to $2.5 million by June

2009, and was continuing to drop, (*see* Smelley Decl. Ex. 54, at PFLAC 001443; Buchalter Decl.

¶ 8).  From these facts, Plaintiffs had sufficient notice that the systematic failure of SSR and the

ID Fund could have been attributable to deficiencies identifiable through adequate due diligence.

The only thing that changed between May 2009 and late 2011 was that the value of the

investment continued to drop.

Before concluding, however, the Court must assure itself that Plaintiffs could have

actually discovered the elements of the cause of action within two (or three) years had they

conducted a reasonably diligent investigation in May of 2009.  *See Cameron*, 822 P.2d at 1366.

When Buchalter attempted his "investigation" in 2011 and 2012, he was stonewalled by both

Defendant and SSR.  (*See* Shepard Decl. Exs. JJ, KK.)  There is no reason to believe, on the

record before the Court, that the response of Defendant and SSR would have been any different

had Buchalter asked these same questions in 2009.  However, notwithstanding the fact that

neither Defendant nor SSR was willing to answer the questions of Buchalter, Plaintiffs were able

to gather enough information to file their Complaint in September 2012.  Plaintiffs have not

offered any details about the investigation or what sources Buchalter tapped, but there is no basis upon which to infer that the information Buchalter obtained in 2012 that led him to advise Plaintiffs to file this lawsuit was unobtainable in 2009.

The Court therefore concludes that Plaintiffs were on inquiry notice as of May 2009 of their potential cause of action against Defendant. Because the Complaint was not filed until more than three years later, on September 7, 2012, (*see* Dkt. No. 1), Plaintiffs' claims are time-barred.

### III. Conclusion

Because Plaintiffs' claims are time-barred, the Court declines to consider the merits of the claims or address the Motions seeking to exclude expert testimony.

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. The Parties' respective Motions seeking to exclude expert testimony are denied as moot. The Clerk of Court is respectfully requested to terminate the pending Motions, (Dkt. Nos. 99, 102, 110), enter judgment for Defendants, and close the case.

SO ORDERED.

DATED:     February **5** , 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

37